53 *new*

# PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name ___SHEPPARD___ ___IRVING___ _____
     (Last)       (First)       (Initial)

Prisoner Number ___C-34952___

Institutional Address ___CSP-Solano, 23-A-6U,___

            P.O. Box 4000, Vacaville, CA. 95696-4000

**FILED**

AUG 20 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

====================================================================

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

E-filing

IRVING SHEPPARD
_____
(Enter the full name of plaintiff in this action.)

          vs.

D. K. SISTO, Warden
_____
_____
_____
_____
(Enter the full name of respondent(s) or jailor in this action)

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CV 08 3983

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT OF HABEAS CORPUS**

WHA

(PR)

====================================================================

### Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

1  Who to Name as Respondent

2        You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now and the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1. What sentence are you challenging in this petition?

12              (a)    Name and location of court that imposed sentence (for example; Alameda

13                     County Superior Court, Oakland):

14        County of Santa Clara Superior Ct.   Santa Clara, CA.

15              Court                                Location

16              (b)    Case number, if known ___79029_____

17              (c)    Date and terms of sentence _July, 1981, 25-Life_____

18              (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19                     parole or probation, etc.)              Yes _x___    No _____

20                     Where?  CSP-Solano, Vacaville.

21                     Name of Institution: _CA. State Prison- Solano_____

22                     Address: ____P.O. Box 4000, 95696-4000_____

23        2. For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26        First Degree Murder-

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS         - 2 -

1    3. Did you have any of the following?

2        Arraignment:                          Yes _X_    No _____

3        Preliminary Hearing:                  Yes _X_    No _____

4        Motion to Suppress:                   Yes _X_    No _____

5    4. How did you plead?

6        Guilty _____    Not Guilty _X_    Nolo Contendere _____

7        Any other plea (specify) _____N/A_____

8    5. If you went to trial, what kind of trial did you have?

9        Jury _X_    Judge alone_____    Judge alone on a transcript _____

10   6. Did you testify at your trial?                Yes _____    No _X_

11   7. Did you have an attorney at the following proceedings:

12       (a)    Arraignment                    Yes _X_    No _____

13       (b)    Preliminary hearing            Yes _x_    No _____

14       (c)    Time of plea                   Yes _____    No _X_

15       (d)    Trial                          Yes _X_    No _____

16       (e)    Sentencing                     Yes _X_    No _____

17       (f)    Appeal                         Yes _X_    No _____

18       (g)    Other post-conviction proceeding    Yes _∴_    No _X_

19   8. Did you appeal your conviction?              Yes _X_    No _____

20       (a)    If you did, to what court(s) did you appeal?

21              Court of Appeal                 Yes _X_    No _____

22              Year: 1981         Result: Denied _____

23              Supreme Court of California     Yes _X_    No _____

24              Year: 1985         Result: Denied _____

25              Any other court                 Yes _X_    No _____

26              Year: 1988         Result: Denied _____

27

28       (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

1                    petition?                                 Yes _____    No_ X_

2         (c)   Was there an opinion?              Yes _____    No_ X_

3         (d)   Did you seek permission to file a late appeal under Rule 31(a)?

4                                                      Yes _____    No_ X_

5               If you did, give the name of the court and the result:

6                                    N/A

7

8 9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9 this conviction in any court, state or federal?            Yes _X_    No_____

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition. You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15 U.S.C. §§ 2244(b).]

16        (a)   If you sought relief in any proceeding other than an appeal, answer the following

17              questions for each proceeding. Attach extra paper if you need more space.

18           I.    Name of Court: _____ N/A _____

19                Type of Proceeding: _____

20                Grounds raised (Be brief but specific):

21                   a._____ N/A _____

22                   b._____

23                   c._____

24                   d._____

25                Result: _____ Date of Result:_____

26           II.   Name of Court: _____ N/A _____

27                Type of Proceeding: _____

28                 Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS     - 4 -

1                    a._____

2                    b._____

3                    c._____

4                    d._____

5                    Result: _____Date of Result:_____

6       III.    Name of Court: _____N/A_____

7               Type of Proceeding: _____

8               Grounds raised (Be brief but specific):

9                    a._____

10                   b._____

11                   c._____

12                   d._____

13              Result: _____Date of Result:_____

14      IV.     Name of Court: _____N/A_____

15              Type of Proceeding: _____

16              Grounds raised (Be brief but specific):

17                   a._____

18                   b._____

19                   c._____

20                   d._____

21              Result: _____Date of Result:_____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                              Yes _____    No NO

24          Name and location of court: _____

25   B. GROUNDS FOR RELIEF

26          State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3   of these cases:

4   _____

5   _____

6   _____

7   Do you have an attorney for this petition?                              Yes____    No  X

8   If you do, give the name and address of your attorney:

9   _____N/A_____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on _____          _____

14              Date                              Irving Sheppard
                                                 Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

1    need more space. Answer the same questions for each claim.

2    [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One:___Violation of Protected Liberty Interest_____

6    _____

7    Supporting Facts:_____

8    _____

9    _____

10   _____

11   Claim Two:___Failure to provide Constitutional Right to Present Facts.

12   _____

13   Supporting Facts:_____

14   _____

15   _____

16   _____

17   Claim Three:_Failure to Provide Equal Protection under the Law._____

18   _____

19   Supporting Facts:_____

20   _____

21   _____

22   CLAIM Four: Unconstitutional Basis for Denial._____

23   If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____N/A_____

26   _____

27   _____

28   _____

1

2

3

4

5

6

7

8
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
9

10    IRVING SHEPPARD

11                                                    CASE NO. _____

12        vs.                                         **PRISONER'S**
                                                      **APPLICATION TO PROCEED**
13    D.K. SISTO, Warden                              **IN FORMA PAUPERIS**

14                            Defendant.

15

16        I, _Irving Sheppard_____, declare, under penalty of perjury that I am the plaintiff in

17    the above entitled case and that the information I offer throughout this application is true and correct.

18    I offer this application in support of my request to proceed without being required to prepay the full

19    amount of fees, costs or give security. I state that because of my poverty I am unable to pay the

20    costs of this action or give security, and that I believe that I am entitled to relief.

21        In support of this application, I provide the following information:

22    1.    Are you presently employed?    Yes ____ No _X_

23    If your answer is "yes," state both your gross and net salary or wages per month, and give the name

24    and address of your employer:

25    Gross: _____N/A_____ Net: _____N/A_____

26    Employer: _____N/A_____

27    _____

28    If the answer is "no," state the date of last employment and the amount of the gross and net salary

PRIS. APPLIC. TO PROC. IN FORMA

PAUPERIS Case No.                              - 1 -

1 | and wages per month which you received. ( If you are imprisoned, specify the last place of

2 | employment prior to imprisonment.)

3 |      1979 - I cannot remember

4

5

6 | 2.    Have you received, within the past twelve (12) months, any money from any of the following

7 | sources:

8 |      a.    Business, Profession or                Yes ___ No $\underline{X}$

9 |           self employment

10 |      b.    Income from stocks, bonds,           Yes ___ No $\underline{X}$

11 |           or royalties?

12 |      c.    Rent payments?                      Yes ___ No $\underline{X}$

13 |      d.    Pensions, annuities, or              Yes ___ No $\underline{X}$

14 |           life insurance payments?

15 |      e.    Federal or State welfare payments,      Yes ___ No $\underline{X}$

16 |           Social Security or other govern-

17 |           ment source?

18 | If the answer is "yes" to any of the above, describe each source of money and state the amount

19 | received from each.

20

21

22 | 3.    Are you married?                            Yes ___ No $\underline{X}$

23 | Spouse's Full Name: _____ N/A _____

24 | Spouse's Place of Employment: _____

25 | Spouse's Monthly Salary, Wages or Income:

26 | Gross $_____ Net $_____

27 | 4.    a.    List amount you contribute to your spouse's support : $ _____

28 |      b.    List the persons other than your spouse who are dependent upon you for support
PRIS. APPLIC. TO PROC. IN FORMA

PAUPERIS, Case No._____         - 2 -

1        and indicate how much you contribute toward their support. (NOTE: For minor

2        children, list only their initials and ages. DO NOT INCLUDE THEIR NAMES.).

3    _____

4    _____

5    5.    Do you own or are you buying a home?        Yes \_\_\_ No $\times$

6    Estimated Market Value: $_____ Amount of Mortgage: $_____

7    6.    Do you own an automobile?        Yes \_\_\_ No $\times$

8    Make _____ Year _____ Model _____

9    Is it financed? Yes \_\_\_\_\_ No _____ If so, Total due: $ _____

10   Monthly Payment: $ _____

11   7.    Do you have a bank account? Yes \_\_\_\_ No $\times$ (Do not include account numbers.)

12   Name(s) and address(es) of bank: _____

13   _____

14   Present balance(s): $ _____

15   Do you own any cash? Yes \_\_\_ No $\times$ Amount: $ _____

16   Do you have any other assets? (If "yes," provide a description of each asset and its estimated

17   market value.) Yes \_\_\_ No $\times$

18   _____

19   8.    What are your monthly expenses?

20   Rent: $ _____ N/A _____ Utilities: _____ N/A _____

21   Food: $ _____ N/A _____ Clothing: _____ N/A _____

22   Charge Accounts:

23   Name of Account        Monthly Payment        Total Owed on This Acct.

24   _____ $ _____ $ _____

25   _____ $ _____ $ _____

26   _____ $ _____ $ _____

27   9.    Do you have any other debts? (List current obligations, indicating amounts and to whom

28   they are payable. Do not include account numbers.)
       PRIS. APPLIC. TO PROC. IN FORMA

PAUPERIS, Case No._____        - 3 -

1 _____

2 _____

3 10.    Does the complaint which you are seeking to file raise claims that have been presented in

4 other lawsuits?                                          Yes ____ No _X_

5 Please list the case name(s) and number(s) of the prior lawsuit(s), and the name of the court in which

6 they were filed.

7 _____ N/A _____

8 _____

9         I consent to prison officials withdrawing from my trust account and paying to the court the

10 initial partial filing fee and all installment payments required by the court.

11        I declare under the penalty of perjury that the foregoing is true and correct and understand

12 that a false statement herein may result in the dismissal of my claims.

13

14 ___8-17-08___                    _____Irving Sheppard_____

15     DATE                         SIGNATURE OF APPLICANT
                                     Irving Sheppard, In pro per
16

17

18

19

20

21

22

23

24

25

26

27

28

**IRVING SHEPPARD**
C-34952
P.O. Box 4000/23-A-6U
Vacaville, CA 95696-4000

**In Pro Se**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **IRVING SHEPPARD,** | § | |
| | § | |
| Petitioner, | § | Case No. |
| | § | |
| vs. | § | **PETITION FOR WRIT OF HABEAS** |
| | § | **CORPUS AND MEMORANDUM OF POINTS** |
| | § | **AND AUTHORITIES** |
| **D.K. SISTO,** et al. | § | |
| | § | |
| Respondents. | § | |

**I.**

### INTRODUCTION

1. Petitioner challenges the illegal denial of parole in violation of the California Code of Regulation, (CCR) Title 15, Division 2; violation of CCR, Title 15, Division 2 in which Petitioner is suitable for parole, and meets all criteria for parole; violation of the Fourteenth Amendment in unequal treatment; violation of the California and United States Constitution prohibiting cruel and unusual punishment.

2. Petitioner is a 49 year old prisoner who was sentence to 29 years to life with the possibility of parole for First degree murder committed over 27 years ago. Petitioner has appeared before the Board of Prison Terms (BPT) twice for parole hearings.[1] The BPT abused its discretion and denied Petitioner parole after every appearance based on vague, arbitrary and capricious reasons. This

---

[1] Since the filing of this writ of habeas corpus in the state courts, Petitioner has been before the BPT several times.

1

is causing Petitioner to be "unlawfully imprisoned or restrained of his liberty." California Penal Code §1473(a).

3. Routine denials of parole have been under increasingly judicial scrutiny lately. McQuillion v. Duncan, 306 F.3d 895, (9th Cir. 2002); Sass v. Cal. Bd. or' Prison Terms, 461 F.3d 1123, 1125 (9th Cir.2006); Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003); Irons v. Carey, 505 F.3d 846 (9th Cir. 2007).

4. Petitioner is now 10 years past his Minimum Eligibility Parole Date (MEPD) of 1995. Ten years past Petitioner's MEPD is directly contradicting the state's parole statute's rule that "you shall normally have a parole date set one year prior to your MEPD." Penal Code §3041(a).

5. The facts of Petitioner's crime and his personal culpability in the offense are not particularly egregious to justify this contradiction of the state's parole statute.

6. One question that Petitioner is asking this Court:  "Is the BPT applying the controlling legal principles to Petitioner's case in a manner that is consistent with the constitution, the ISL, the states parole statue, uniformity in sentencing and the BPT's matrix for first degree murderers?

7. It is a matter of statewide importance to determine whether federal and state due process require the BPT to set a parole date that is consistent with the Legislative intent and the mandatory language in the state's parole statue, Penal Code §3041.

8. In this petition, it will be shown that there were insufficient reasons for denying parole, that Petitioner has done everything and more than that has been asked of him to become suitable for parole.  This Court is now being asked to act as a check and balance to the executive agency that is denying the constitutional rights of due process of law and that prohibition against cruel and unusual punishments.

## II.

### PARTIES

9. Petitioner, IRVING SHEPPARD is a state prisoner within the California Department of Corrections, (CDC), housed at CSP-Solano State Prison, within the general population, serving a sentence of twenty-nine (29) years to life with the possibility of parole, and must appear before the Board of Prison Terms (BPT) for parole consideration.

10. Respondents are D.K. SISTO, Warden CSP-Solano State Prison, the BOARD OF PRISON TERMS, and as such are the legal custodian of Petitioner. Each are responsible to ensure that Petitioner is provided with all his due process rights; provided with a fair and impartial Board of Prison Terms hearing, further to ensure that all laws, rules, regulations, California Constitution, and the United States Constitution are not violated.

### III.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

11. Petitioner has exhausted all his state judicial remedies, Exhibit "A".

### IV.

### STATEMENT OF FACTS

12. After a conviction in 1981 for a violation of Penal Code section 187, Petitioner was sentenced to twenty-nine (29) years to life with the possibility of parole.

13. Petitioner was received by the California Department of Corrections (CDC) on September 2, 1981 and his MEPD was fixed at 4-17-98, but it should have been set at 1995 since Petitioner was receiving half-time credits.

14. The BPT "shall normally set a parole release date" one year prior to the prisoner's MEPD. Penal Code §3041, In re Rosenkrantz, 29 Cal 4th 616, 128 Cal.Rptr. 2d 104 (2002).

15. On 3-12-98 Petitioner appeared before the BPT for his Initial Parole Hearing. §2268. Petitioner was denied parole for three years primarily for the crime. Exhibit "B".

16. On October 1, 2001 Petitioner appeared before the BPT for his First Subsequent Parole hearing, §2270. Petitioner was denied parole for 2 years primarily for the crime. Exhibit "C".

17. The 2001 Panel recited the following unsuitability reasons:

(1) "The offense was carried out in an especially callous. (2) The offense was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering. (3) The motive for the crime was very trivial in relation to the offense." Exhibit "D" pg. 47:10-15.

18. During the October 1, 2001 hearing, the Panel abused its discretion and failed to duly consider Petitioner's classification score of zero.

19. The testimony given by Petitioner at the October 1, 2001, hearing was under oath. Exhibit "D", p.10:23-27.

20. Petitioner now turns to this Court for relief.

21. During Petitioner's incarceration since 1981 to the present, he has been involved in numerous self-help and rehabilitation programs, Exhibit "E". Further, he has obtained marketable skills that are highly employable in society, which would provide for a stable livelihood. Exhibit "F". Petitioner has also volunteered in programs. Exhibit "G".

22. Petitioner does and has met all the criteria contained within CCR, Title 15, division 2 to be granted parole.

I.

PETITIONER HAS A PROTECTED LIBERTY
INTEREST RIGHT IN THE RECEIPT
OF A PAROLE RELEASE DATE

4

II.

PETITIONER HAS A CONSTITUTIONAL RIGHT TO
HAVE THE BOARD OF PRISON TERMS CONSIDER
ALL FACTS DURING PETITIONER'S HEARING

III.

PETITIONER HAS A PROTECTED LIBERTY INTEREST
RIGHT IN PAROLE AS PETITIONER MEETS ALL
CRITERIA IN CCR, TITLE 15, DIVISION 2
IN PAROLE BEING GRANTED

IV.

PETITIONER HAS A CONSTITUTIONAL
RIGHT TO BE TREATED EQUALLY

V.

UNCONSTITUTIONAL BASIS FOR DENIAL
OF PETITONER'S PAROLE

**V.**

**PRAYER FOR RELIEF**

Petitioner is without remedy save for habeas corpus. Accordingly,
the Court should:

1. Issue a writ of habeas corpus;

2. Issue an order to show cause;

3. Order Respondents to give Petitioner a parole release date;

4. That this Court retains jurisdiction over this case;

5. That the Court will issue a briefing schedule;

6. That the Court will grant an evidentiary hearing, if necessary,
on any unresolved factual issues after briefing is completed;

7. That the Court finds, after careful and thorough consideration of
all the evidence presented in this case that Petitioner is not an unreasonable
risk of danger to society;

8. That the Court will declare that Petitioner's constitutional
rights have been violated and is being unlawfully imprisoned or restrained of
his liberty;

5

9. That the Court will discharge Petitioner from custody under Penal Code §1487 or any other provision of law applicable.

10. In the alternative, that the Court rule that there is no evidence to support the 2001 Hearing Decision and compel the Board of Prison Terms to set a parole date, within 30 days, that is commensurate with first degree murder and the circumstances of Petitioner's crime within the letter and the spirit of the law;

11. Order the immediate discharge of Petitioner from the California Department of Corrections;

12. Appoint counsel or award reasonable attorney fees;

13. Grant any and all other relief deemed appropriate.

DATED: this 4th day of August, 2008.


IRVING SHEPPARD
In Pro Se

//

//

//

//

//

//

//

//

6

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THE PETITION FOR WRIT OF HABEAS CORPUS**

23. Habeas corpus is available to challenge duration as well as fact of custody. Ellott v. United States, 572 F.2d 238, 239 (9th Cir. 2978); Watetzki v. Keonane, 13 F.3d 1079 (7th Cir. 1994). Furthermore, Petitioner's habeas claims must be construed liberally when he appears pro se. Osbron v. Shilinger, 997 F.2d 1342 (10th Cir. 1993); Cuadra v. Suadra Sullivan, 837 F.2d 56 (2nd Cir. 1988).

24. Habeas corpus procedure is the proper mechanism for Petitioner to challenge legality or duration of confinement. Badea v. Cox, 931 F.2d 573 (9th Cir. 1991).

**I.**

**PETITIONER HAS A PROTECTED LIBERTY
INTEREST RIGHT IN THE RECEIPT
OF A PAROLE RELEASE DATE**

25. The Ninth Circuit in Irons v. Carey, 505 F.3d 846 (9th Cir. 2007) has recently held that the California Penal Code section 3041 vested Petitioner and all other California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause. Sass, 461 F.3d at 1128; Biggs, 334 F.3d at 914; McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002); see also Bd. of Pardons v. Allen, 482 U.S. 369, 377-78 (1987) (quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 12 (1979)). The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," Sass, 461 F.3d at 1128-29 (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)); see also Biggs, 334 F.3d at 915 (citing McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457.2. When the Court assesses whether a state parole board's

7

suitability determination was supported by "some evidence" in a habeas case, its analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. See Biggs, 334 F.3d at 915. Accordingly, the Court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence." Petitioner's case constituted an unreasonable application of the "some evidence" principle articulated in Hill, 472 U.S. at 454.

26. Under California law, prisoners serving an indeterminate sentence for first degree murder "may serve up to life in prison, but [ ] become eligible for parole consideration after serving minimum terms of confinement." Although the Board must "normally set a parole release date" before the minimum term has been served, a prisoner "shall be found unsuitable for parole and denied parole if, in the judgment of the (Board,] the prisoner will pose an unreasonable risk of danger to society if released from prison. Cal. Code Regs., tit. 15 §2402(a).

27. Respondent would urge the Court to deny Petitioner's petition on the ground that he does not have a federally protected liberty interest in parole. This argument is foreclosed by controlling Ninth Circuit authority. See, e.g., Irons, 505 F.3d at 850 ("California Penal Code section 3041 vests ... all ... California inmates whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause."); Sass v. Cal. Bd. or' Prison Terms, 461 F.3d 1123, 1125 (9th Cir.2006) ("We hold that California inmates continue to have a liberty interest in parole after In re Dannenberg, 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005)"); Trunzo v. Ornoski, WL 703770 (N.D. Cal 2008).

28. Petitioner contends the Board unconstitutionally came to the conclusion that he would pose an unreasonable risk of danger to society if released is both arbitrary and not supported by "some evidence." Any argument that Respondent argue indicating that the "some evidence" standard is not clearly established federal law, is again, an argument that is foreclosed by Ninth Circuit authority. See Sass, 461 F.3d at 1129.

**1. Analysis**

29. At the 2001 Hearing, the Board found Petitioner unsuitable for parole based on the following three findings:

> (1) "The offense was carried out in an especially callous. (2) The offense was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering. (3) The motive for the crime was very trivial in relation to the offense." Exhibit "D" pg. 47:10-15.

30. A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate Petitioner will, at the time of the suitability hearing, present a danger to society if released." Irons, 505 F.3d at 852 (quoting Dannenberg, 34 Cal.4th at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783). In Petitioner's case there was, nor is there any showing that Petitioner is now a danger to society. Therefore, to demonstrate 'an exceptionally callous disregard for human suffering'...the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of first degree murder." In re Scott, 119 Cal.App.4th 871, 891, 15 Cai.Rptr.3d 32 (2004).

31. In Irons, supra, the petitioner killed the victim following an argument over a suspected drug theft. Irons fired twelve rounds into the victim and, after the victim complained that he was in pain, Irons stabbed him twice in the back. Irons then wrapped the victim's body in a sleeping bag, and attempted

9

to procure a car.  During the ten days it took Irons to obtain a car, he left
the victim's body in a room in the sleeping bag.  Thereafter, Irons took the
victim's body to the coast, weighted it, and disposed of it in the ocean. Irons,
505 F.3d at 849.

32. The Board must determine whether a prisoner is presently too
dangerous to be deemed suitable for parole based on the "circumstances tending
to show unsuitability" and the "circumstances tending to show suitability" set
forth in Cal. Code. Regs., tit. 15 §2402(c)(a).  In the instant case Respondents
have failed to show any evidence of Petitioner's unsuitability for parole.
Respondents have relied solely on the crime to deny parole.

33. Here, the Board based its 2001 determination that Petitioner was
unsuitable for parole "first and foremost" on the fact that "[t]he offense was
carried out in an especially cruel and callous manner which demonstrates a
callous disregard for human life."  Yet, failed to point to one factor to
support this, especially since this is a first degree murder case, as such is
always going to be considered such.

II.

### PETITIONER HAS A CONSTITUTIONAL RIGHT
### TO HAVE THE BOARD OF PRISON TERMS CONSIDER
### ALL THE FACTS DURING PETITIONER'S HEARING

34. The sole reason why Petitioner was denied a parole release date
was based on the board members indication that Petitioner poses an unreasonable
risk of danger to society. (Exhibit "D", p.43).  This allegation was not based
on any facts before the board that Petitioner presently poses a danger to
society.  In contrary, the [facts] state that Petitioner DOES NOT pose a risk of
danger to society. Exhibits "H", "I", "J" "K" and "L".

//

//

//

//

10

35. Petitioner has been determined not to pose a risk of danger to

society members if released from prison by a Licensed Psychologist. Exhibit "H"

a Licensed Psychologist, Louis L. Beermann, Ph.D., stated in his report dated

February 26, 2001 that Petitioner's dangerousness assessment was:

> `No risk factors are apparent. This inmate was very articulate
> and cooperative, and in my opinion, would be a reasonable
> candidate for parole." Id., p.3.

36. Which was also supported by Melvin Macomber, Psychologist in

which he stated that:

> "The previous evaluation does not do Mr. Sheppard justice. His
> achievement while in the institution, level of performance,
> and effort at self-improvement are outstanding. His progress
> is superior in comparison to other prisoners who are serving
> life sentences...) agree with the previous evaluation that Mr.
> Sheppard is free from any mental or emotional problems and
> does not have a metal disorder that can be diagnosed. There
> are no psychological factors that would interfere with his
> being granted parole at this point in time." Exhibit "I", p.2.

37. Even in past psychological reports dated December 3, 1997 by

F.M. Criswell, M.D. it has been stated:

> "On the positive side, however, is his record. I note that his
> disciplinary record is essentially void of any violence
> behavior. The record he has maintained is also evidence of his
> good impulse control. With his record of non-violence and good
> impulse control since 1981, combined with his current age, he
> is unlikely, in the future, to commit any violent crimes. I
> would rate his current potential for violence as below
> average." Exhibit "J" p.2-3.

38. Petitioner would also note that his counselor, A. Cain, in his

January 21, 1998 report stated that:

> "After talking with I/M Sheppard on multiple occasions over
> the past years, a review of his file, I believe his potential
> to recidivist is very low. I believe the Parole Board should
> consider the possibility of parole. Exhibit "K", p.5.

39. Finally in Petitioner's last counselor's report by D.H. Tobin,

dated March 2001, he stated:

> "Considering the commitment offense, prior record and prison
> adjustment, this writer believes the prisoner would pose a
> very low degree of threat to the public at this time, if
> released from prison to parole." Exhibit "L", p.3.

11

40. Taking this into the context at hand, using Respondents own rules and regulations, Petitioner's maximum amount of time to be served has expired. As the [max]imum matrix is 28 years, minus good time. Exhibit "M". Therefore, Petitioner would have been paroled on or before 1995, taking into account good time credits that Petitioner has earned during his incarceration. Petitioner was sentenced based on a violation of §187 of the Penal Code, in which the controlling sentence in Petitioner's case was Penal Code §3046, which provides in part:

> "Person sentenced to life term: Statement and recommendations to be considered by board in considering parole. No prisoner imprisoned under a life sentenced may be paroled until he or she has served at least seven calendar years or has served a term as established a minimum period of confinement under a life sentence before eligibility for parole, whichever is greater."

41. The law does not prohibit the Board from denying parole on the basis of the nature of the underlining offenses, but prohibits a blind, automatic, categorical exclusion from parole without consideration of other factors. The law requires the Board to exercise discretion after looking at [a]ll of the factors relevant to a particular prisoner on an individual basis. In re Seabock, 140 Cal.App. 3d 29, 36 [189 Cal.Rptr. 310].

42. The facts that must be considered: "what has Petitioner done during this 27 year period; has Petitioner changed, or is he still that 27 year old who committed the crimes 27 years ago." The answer can only be determined from the attached exhibits, and Petitioner's prison files. Such facts point and prove that Petitioner has changed, and does not pose a risk of danger to society now, and should be granted parole.

43. There was and is absolutely no support for Respondent's BPT contentions that Petitioner pose a danger to society. Nor is there evidence of Respondents' contentions that there was "some evidence" to deny Petitioner a parole release date.

12

44. The Irons Court restated its holding that they have made it clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the' rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, supra at 916-17. Specifically, the Ninth Circuit has held that:

> "a parole board's sole reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916.

45. The Irons Court further noted that in all the cases in which they have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his committed offense comports with due process, the decision was made before the prisoner had served the minimum number of years required by his sentence. Specifically, in Biggs, Sass, those petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. Biggs, 334 F.3d at 912; Sass, 461 F.3d. This is not the case in Petitioner's parole hearing. Petitioner is challenging his 2001 suitability hearing, and his expiration if his minimum suitability release date was 1995. Making the granting of the instant petition appropriate.

46. Respondents have totally disregarded all the material facts in Petitioner's case, and its allegations are totally opposite to what a licensed psychologists have indicated. Exhibit "H-J". Petitioner does not, nor does he presently pose a risk of danger to society if released from prison.

13

47. Even Petitioner's prior convictions does not suggest that he has a history of violent crime, again a factor that weighs against a finding of unsuitability and in favor of suitability. See id. §§2402(c)(2), 2402(d)(6).

48. Further, while the record may support a conclusion that Petitioner previously failed to profit from society's attempts at rehabilitation, the Board's findings are based on facts that will never change. This Court must determine whether the Board's findings would support a finding of present unsuitability. Petitioner's early record in prison certainly was not unblemished. However, since 1990 Petitioner has shown that he is willing and able to take the steps necessary to profit from the rehabilitative programs available to him while incarcerated and to take those skills into society if released. Thus, the Court should find, as the Trunzo Court did, that the Board's reliance on Petitioner's prior criminal history to determine that he posed an unreasonable risk of danger to society is not supported by some evidence.

49. All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. Penal Code §3000(b)(1). The legislature has clearly expressed its intent that when murders - who are the great majority of prisoners serving indeterminate sentences -approach their minimum eligible parole date, Respondents BPT shall normally set a parole release date. Penal Code §3041(x). Respondents BPT authority to make an exception based on the gravity of a life term prisoner's current or past offenses should not operate so as to swallow the rule that parole is normally to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code §3041(x), and also by the murder statutes, which provide distinct terms of life with a possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. Ramirez, supra.

14

50. Therefore, a life term offense or any other offenses underlying
an indeterminate sentence must be particularly egregious to justify the denial
of a parole date. In order to comply with the parole policy established by the
Legislature in Penal Code §3041. Respondents BPT must weigh Petitioner's
criminal conduct, not against ordinary social norms, but against other instances
of the same crime or crimes. Respondents BPT must also consider the length of
time Petitioner has served in relation to the terms prescribed by the
Legislature for the offenses under consideration, in order to arrive at a
"uniform" term as contemplated by Penal Code §3041(X). Ramirez, supra. Exhibit
"M" provides such uniform term.

**III.**

**PETITIONER HAS A PROTECTED LIBERTY INTEREST
RIGHT IN PAROLE AS PETITIONER MEETS ALL
CRITERIA IN CCR, TITLE 15, DIVISION 2
IN PAROLE BEING GRANTED**

**A. Legal Standards Applicable to Parole Suitability Determinations**

51. California's parole scheme is set forth in California Penal Code

§3041, et seq. Section 3041(a) provides, in pertinent part:

> "The panel or board shall set a release date unless it
> determines that the gravity of the current convicted offense
> or offenses, or the timing and gravity of current or past
> convicted offense or offenses, is such that consideration of
> the public safety requires a more lengthy period of
> incarceration for this individual, and that a parole date,
> therefore, cannot be fixed at this meeting." Cal. Pen.Code
> §3041(b).

52. Title 15 of the California Code of Regulations section 2402

(hereinafter "Section 2402") sets forth the criteria used to determine whether

an inmate is suitable for release on parole. The opening paragraph of Section

2402(a) states:

> "Regardless of the length of time served, a life prisoner
> shall be found unsuitable for and denied parole if in the
> judgment of the panel the prisoner will pose an unreasonable
> risk of danger to society if released from prison." 15 Cal.
> Code Regs. §2402(a).

15

53. Section 2402(b) provides:

In the case of any inmate sentenced pursuant to any provision
of law ... [o]ne year prior to the inmate's minimum eligible
parole release date a panel of two or more commissioners or
deputy commissioners shall again meet with the inmate and
shall normally set a parole release date as provided in
Section 3041.5.... The release date shall be set in a manner
that will provide uniform terms or offenses of similar gravity
and magnitude in respect to their threat to the public, and
that will comply with the sentencing rules that the Judicial
Council may issue and any sentencing information relevant to
the setting of parole release dates.

54. Penal Code section 3041(b) provides, in pertinent

All relevant, reliable information available to the panel
shall be considered in determining suitability for parole.
Such information shall include the circumstances of the
prisoner's social history; past and present mental state; past
criminal history, including involvement in other criminal
misconduct which is reliably documented; the base and other
commitment offenses, including behavior before, during and
after the crime; past and present attitude toward the crime;
any considerations of treatment or control, including the use
of special conditions under which the prisoner may safely be
released to the community; and any other information which
bears on the prisoners suitability for release. Circumstances
which taken alone may not firmly establish unsuitability for
parole may contribute to a pattern which results in a finding
of unsuitability.

55. Circumstances tending to show unsuitability for parole are:

Id. § 2402(c).

56. Circumstances supporting a finding of suitability for parole

are:

(1) Commitment Offense.   The prisoner committed the offense in an
especially heinous, atrocious or cruel manner.   The factors to be considered
include:

(A) Multiple victims were attacked, injured or killed in the same or
separate incidents.

(B) The offense was carried out in a dispassionate and calculated
manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the
offense.

16

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the Victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

17

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was a result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the possibility of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

57. Petitioner is challenging the legality of his continued confinement for the last 27 years on a 29 years to life sentence for first degree murder. Despite having programmed in a nearly perfect manner throughout his term of confinement, and having received extensive support from family, and CDC for being released, Petitioner has been denied a parole date for the 2nd time and over 7 years after his MEPD.

58. Petitioner seeks from this Court an Order compelling the BPT to find him suitable for parole. To demonstrate how Petitioner is justified in this request, the Court must closely examine the BPT's own written rules on the topic of parole suitability and unsuitability.

59. Petitioner will demonstrate that all of the evidence supports a proposition that he is suitable for parole, that no evidence whatsoever indicates he is unsuitable for parole and that he cannot do any more to become suitable for parole.

//

//

18

## A. THE FACTS OF THE CRIME

60. The facts of Petitioner's crime, as found by the 2001 BPT panel, were set forth from the "Statement of Facts from Petitioner 1998 hearing. Exhibit "O". Petitioner's version of the crime as stated in the 2001 hearing is the same version as the prior hearing and is essentially undisputed in this petition.

## B. THE FACTS OF THE CRIME WERE NOT INTENDED BY THE LEGISLATURE OR THE PEOPLE TO CREATE A DE FACTO REASON FOR PAROLE DENIAL

61. Unless the words in a statute are ambiguous, there is no need for statutory construction. Rojo v. Kliger, (1990) 52 Cal. 3d 65, 73; Hak Fu Hung v. Wang, (1992) 8 Cal.App. 4th 908, 929. If a statute does need to be analyzed, rules of statutory construction mandate that a statute is to be construed to promote its purpose, to render it reasonable, and to avoid absurd results or consequences. In re Atiles, (1991) 33 Cal. 3d 805, 810 n.4; Landrum v. Superior Court, (1981) 30 Cal. 3d 1, 9. Statutes must be given a common sense construction rather than one which leads to absurdity. Landrum, supra at 9; Woolley v. Embassy Suites, Inc., (1991) 227 Cal.App. 3d 1520, 1528-29. Each word of a statue must be given meaning and effect if at all possible. People v. Gilbert, (1969) 1 Cal. 3d 475, 480; People v. Cardenas, (1987) 192 Cal.App. 3d 51, 57. A statutory construction making some words surplusage of to be avoided. Norton (J.R.) Co. v. A.L.R.B., (1979) 26 Cal. 3d 36-37; Gilbert, supra, at 480. When a statute is subjected to two reasonable interpretations, that which favors a criminal defendant must be adopted. People v. Piper, (1992) 42 Cal. 3d 477.

62. If parole was to be routinely denied based solely on the crime facts, then the "shall normally" language of the stature is meaningless surplusage. Such an interpretation would make all the "public safety" exception of Penal Code §3041(b) to consume the "shall normally" parole rule found in Penal Code §3041(a). Such a convoluted interplay would result in a strained construction which would defeat the intent of the Legislature and what the

19

People expressed in the minimum terms and mandatory language they chose to enact. Ramirez, supra at 570. Biggs, supra.

## C. **STANDARD OF REVIEW**

63. BPT Decision which lack evidence to support them are made in violation of the Due Process Clauses of both the California and Federal Constitution. California Constitution Article 1, §7; U.S. Constitution, Fourteenth Amendment; also see Superintendent v. Hill, (1985) 472 U.S. 445, 456-457; In re Powell, (1988) 45 Cal. 3d 894, 904. "The touchstone of due process is the protection of the individual against arbitrary government action." Wolff v. McDonnell, (1974) 418 U.S. 539, 558, citing Dent v. West Virginia, (1899) 129 U.S. 114, 123.

64. The BPT is authorized by statute to determine parole suitability, and to exercise its discretion in deciding whether to grant or deny parole. Penal Code §3040, 5075 et seq.; In re Fain, (1983) 145 Cal.App. 3d 540, 548.

65. The evidence underlying a BPT decision must be reliable. §2402(b); also see Jancsek v. Oregon Board of Parole, (1987) 9th Cir. 833 F.2d 1398, 1390. This is not to say that the Court may review the credibility of witnesses or reweigh the evidence, but it may deny that a piece of evidence stands for a claim made by the BPT about it. The Court may also rule that the BPT's decision was contrary to the evidence presented at the hearing. Thus, the Court need not simply take the BPT's word for the force and meaning of a piece of evidence, but may ask if it truly constitutes evidence within the meaning of the circumstances tending to show unsuitability in §2402(c)(1-6).

66. Even if some evidence exists, if it is being used in a way which fails to apply controlling legal principles to the facts, the decision cannot stand. Ramirez, supra at 571; citing In re Cortez, (1971) 6 Cal. 3d 78, 85-86 and People v. Cluff, (2001) 87 Cal.App. 4th 991, 998.

67. In In re Caswell, (2001) 92 Cal.App. 4th 1017, the court observed that simply because "reasonable minds could differ" about the evidence, that this did not constitute "some evidence" to support a decision. It noted that "some evidence" showing unsuitability for parole:

> "...would exist in virtually every parole hearing, exposing every grant of parole to a Board's subsequent change of heart or political whim" if that were the standard. Caswell, supra at 1029.

68. At the October 1, 2001 parole hearing there was no reliable evidence supporting the stated reasons for parole denial with the circumstances tending to show unsuitability in §2402(c)(1-6) and the conclusion reached: That Petitioner would pose "an unreasonable risk of danger to society of released from prison" after 22 years of incarceration.

69. In Petitioner's denial for parole, the Board stated:

> "The offense was carried out in an especially callous manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."

70. The Board used the exact wording right out of CCR, Title 15 §2281 (c)(1), yet there is no records, nor facts to support the Board's statements. Further, their statement as, "It was carried out in an especially callous manner," has already been determined to be unconstitutional. Therefore, cannot be used to deny parole.

71. This is the exact wording used at Petitioner's hearing to deny parole, and just as the court found in Rosenkrantz's case, there is absolutely no evidence to support this nor did Respondents make reference to any evidence that support such a statement and findings.

72. A prefect statement to Respondent's responsibilities is in Minnis, supra, where the California Supreme Court stated: "The goals of the parole system can best be achieved by the liberation of a prisoner on parole at the earliest period when permitted by law and when on a consideration of the

21

merits of each individual case, parole ought, in the judgment of the Board to be granted." Id. at 664, quoting Robert v. Duffy, (1914) 167 Cal. 629, 634 [140 P.260].

## D. The Board's Continued Reliance on Unchanging Factors Raises the Due Process Concerns Articulated in Biggs

73. Even if there was some evidence to support the Board's reliance on the nature of the commitment offense and Petitioner's criminal history to conclude that he poses an unreasonable risk of danger if released, the Court also must consider whether the Ninth Circuit's cautionary statements in Biggs are implicated by this case. The Court should find that they are.

74. As set forth in Biggs [o]ver time, ..., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

75. A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation. Id. at 916-17 cf. Dannenberg, 334 Cal. 4th at 1094, 23 Cal.Rptr.3d 417, 104 P.3d 783; ("sole reliance on the commitment offense might, in particular cases, violate" section 3041(a)'s "provision that a parole date 'shall normally be set' under 'uniform term principles, and might thus also contravene the inmate's constitutionally protected expectation of parole''); Rosenkrantz, 29 Cal.4th at 682-83. 128 Cal.Rptr.2d 104, 59 P.3d 174 ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

76. In issuing the note of caution in Biggs regarding continued reliance on unchanging factors, the Ninth Circuit gave little guidance to

district courts as to how they should evaluate such a claim. In Irons, however, the court noted that when it had determined that "a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comported] with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Id. The court concluded that "[a]ll we held in [Biggs and Sass,] and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Id. at 853-54.   The Irons court further expressed its hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." Id. at 854.

77. Petitioner had served more than his minimum sentence. See Irons, 505 F.3d at 853-54. At each of these hearings, the Board relied, in whole or in part, on the unchanging facts of the commitment offense and Petitioner's prior criminal record to find him unsuitable for parole. The Board's decision at the 2001 hearing also was based on these factors. Petitioner has done everything possible to comply with the Board's recommendations. Moreover, as the Irons court reasoned, there is nothing Petitioner can do to change either the commitment offense or his criminal history.

78. It is undisputed that Petitioner has an undeniable "vested right" in ensuring that his term be fixed proportionately to his offense. Thus, a sentence may be unconstitutionally excessive either because Respondents has fixed his term disproportionate to the offense and because no term what-so-ever has been set. Failure to fix Petitioner's term may be just as violent of his rights as an actual excessive term since, "it is fundamental to the indeterminate sentence law that every such sentence is for the maximum unless

23

and until the Authority acts to fix a shorter term.  The Authority may act just as validly by considering the case and then declining to reduce the term as by entering an order reducing it...This principle of law is, of course, the same whether we are dealing with a maximum term of life or a maximum of years." In re Mills, (1961) 55 Cal. 2d 646, 653 [12 Cal.Rptr. 483, 361 P.2d 15]; Wingo, supra at 182-183.  The present statutes provide for mandatory and discretionary parole.  Parole is automatic since Petitioner has served his maximum time less good-time. Greenholtz, supra.  Petitioner is entitled to be discharged from his term. Rodriguez, supra; McQuillion, supra.

**IV.**

### PETITIONER HAS A CONSTITUTIONAL
### RIGHT TO BE TREATED EQUALLY

79. Petitioner would ask the Court to take judicial notice of Exhibit "N" this documents source is identified on page 1, in which it is stated: "Data Compiled From: 1) ABC (American Broadcasting Company) News Documentary Life After Death Row, aired on 9/9/88, transcripts from Journal Graphics. 2) Parole Data published by the California Department of Corrections, Administrative Services Division, Offender Information Services Branch, Estimates and Statistical Analysis Section, Data Analysis Unit. This covered Life Inmate Statistics from 1945-1981. Data from the years 1982-1986 complied independently via review of state and federal judicial case files. Refer to the `California Department of Corrections - Murder, Time Served in prison and Term Set' chart (covering 1945-1996) following." Exhibit "N", p.1.

//

//

//

//

//

24

80. Furthermore, these individual prisoners are actual cases, in which the individual was sentenced to the California Department of Corrections. The below citations are from case law of some of these prisoners whose cases were authorized for publication.

> People v. Kemp, 11 Cal. Rptr. 361, [p8, case no. 1]; People v. Hines, cal. 2d 164, 37 Cal.Rptr. 622, reversed in part, 57 Cal.Rptr. 757, [p.9, case no. 2]; People v. Nye, 45 Cal.Rptr. 328, [p.1 1, case no. 4]; People v. Goodridge, 76 Cal.Rptr. 421, [p.14 case no. 7]; In re Stanworth, 33 Cal. 3d 176, [p.15 case, no. 8]; In re Lokey, 51 Cal.Rptr. 266,[p21 case no. 12]; I n re Fain, 139 Cal.App. 3d 295, [p.22, case no.13]; People v. Subia, 48 Cal.Rptr. 584, [p.23, case no.16]; People v. Massie, 59 Cal.Rptr. 733, [p.26, case no, 17]; People v. McGautha, 76 Cal.Rptr. 434, [p.31, case no. 20L People v. Sating, 103 Cal.Rptr. 698, [p.38, case no. 27]; People v. Earl, 105 Cal.Rptr. 831, [p.44, case no. 37]; In re Seabock, 189 Cal.Rptr. 310, [p.64. case no. 52].

## A. THE RELEASED DATE SHALL BE SET IN A MANNER THAT WILL PROVIDE UNIFORM TERMS FOR OFFENSES OF SIMILAR GRAVITY AND MAGNITUDE IN RESPECT TO THEIR THREAT TO THE PUBLIC

81. Petitioner contends that the BPT is not setting release dates in a manner that provides uniform terms for offenses of similar gravity and magnitude in respects to their threat to the public.

82. Archie Fain (Fain) received a parole dated from the BPT on June 18, 1976, after 15 years of incarceration, In re Fain, (1983) 139 Cal.App. 3d 295, 298. Fain was released on parole after 15 years of incarceration. At point blank range, with a shot gun, Fain blew away a 17 year old high school student who Fain did not know and Fain was not under the influence of any substances. Fain kidnapped two 17 year old girls who were with the murdered victim. Fain drove the two girls to a remote area in the woods and raped them. Fain performed other sexually perverted acts with the girls. Fain was convicted of first degree murder, 2 kidnaps, 3 forcible rapes, 1 attempted kidnap and other sexually perverted acts. Fain was sentenced to death. See Exhibit "N". While incarcerated Fain escaped using force and violence. While on the lamb, Fain committed robberies to survive. The inescapable point, is since the parole suitability/unsuitability guidelines have not changed,' how can Fain receive a

25

parole date in a shorter period of time for a much more cruel, heinous and
atrocious crime, after escaping while incarcerated and committing other felonies
while on the lamb is beyond reason and contradicts Penal Code §3041(x). which
states:

> "The release date shall be set in a manner that will provide
> uniform terms for offenses of similar gravity and magnitude in
> respect to their threat to the public..."

83. Even more compelling evidence in support of this argument is the
case of Dennis Stanworth. (Stanworth), see Exhibit "N" case number "2" for the
horrendous details of this case.

84. In 1966 Stanworth was sentenced to death following his plea of
guilty to two counts of first degree murder. Stanworth also pleaded guilty in
the same proceeding to counts charging aggravated and simple kidnapping,
forcible rape, oral copulation, and robbery. The convictions followed a series
of five crimes involving the brutal murders and abuse of multiple victims.
Stanworth's M/O was to stalk his female victims and tie their hands with piano
wire before raping them and then on two occasions he murdered them. In 1979,
after 13 years of incarceration, the BPT fixed his term of imprisonment and
chose a 17 years term for the base offense of first degree murder. In re
Stanworth, (1982) 33 Cal. 3d 176, 178.

85. Petitioner's crime and his personal culpability is in no way
shape or form as cruel, heinous or atrocious as the ones cited above and
reflects a determination that the BPT's is failing to set terms in a uniform
manner. Even more questionable is the fact that the principle in Petitioner's
offenses paroled after 27 years.

86. Petitioner is similarly situated to these prisoners. As most of
these prisoners were released after 1977 when the ISL was changed to the DSL,
therefore, these prisoners would have went before the Board of Prison Terms
under the DSL for their parole release date, Seabock, supra at 315, just as
Petitioner has and must do. Making them similarly situated as life term

26

prisoners now under the DSL. Especially since the Courts have held that under the ISL it was completely discretionary, with no procedures to grant parole. In re Rogers, supra at 28 Cal. 3d 435. Now with the DSL, which most of these prisoners were released under, that desertion is taken away: "...the Board of Prison Terms is given no discretion as to the setting of parole." Id. That the statute under the DSL continued to damned what the case law requires under the ISL: a weighting process, an exercise of discretion based upon [all] of the relevant factors. Seabock, supra at 315. The Seabock Court has also held that prisoners sentenced under the ISL are not disadvantaged by appearing before the Board of Prison Terms under the DSL, making these prisoners similarly situated to Petitioner. Petitioner has raised a prima facie claim.

87. The Legislature has made parole mandatory for a wide range of violent felons, and "normal" for murderers and other sentenced to indeterminate terms. When considering whether a prisoner serving an indeterminate term is suitable for parole, the Board may not ignore the requirement that it strives to achieve uniform terms for offense of similar gravity, and instead consider each prisoner's offense in a cocoon of "individualized consideration." Dannenberg, supra. Furthermore, there is no reason to believe the Legislature used the term "gravity" in subdivision (b) in any different sense than in subdivision (a), which prescribes "uniform terms for offenses of similar gravity." Logically, and offense must be especially grave compared to other offenses for the exception provided in subdivision (b) to apply. The Board must use only the gravest offenses as grounds for refusing to set a parole release date, if it is to fulfill its obligation to normally set release dates so as to provide uniform terms for similar offenses.

88. For prisoners sentenced to indeterminate terms, the Legislature has commanded the Board to "normally set a parole release date...in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public..." §3041, subd.(a). By demanding uniform

27

terms for similar offenses, the Legislature has unmistakably incorporated the concept of proportionality into the parole evaluation process. Dannenberg, supra.

89. Respondents BPT must make its determination "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to Petitioner's threat to the public. Penal Code §3041 (a). However, Respondents BPT should strive to achieve at least a rough balance between the gravity of the offenses, the time Petitioner has served, and the sentences prescribed by law for the commitment offense. Which they have failed to do so in the instant case.

90. The Court will note that most of these prisoners in Exhibit "N" were convicted of First Degree Murder, and received serious disciplinary reports (CDC-115) while in prison. Further, the Court will note that most of these prisoners started their sentence on "Death Row," with a "death sentence," then were released when the death sentence was ruled as unconstitutional.

91. Petitioner would ask the Court to exercise its authority and rule that Petitioner's present incarceration is excessive.

92. Respondents cannot make-up their own standards and rules as they go alone; increasing Petitioner's incarceration through unequal treatment in violation of the Fourteenth Amendment to the United States Constitution. It is undisputed in Ruley v. Nevada Bd. of Prison Com'rs, 628 F.Supp. 108, 11 that:

> "An administrative agency that administers a statute does not have the power to make law; rather, its authority is to adopt regulations to carry into effect the [will] of the legislature as expressed by the state. Ernst & Frnst v. Hochfelder, 425 U.S. 185, 213-14, 96 S.Ct. 1375, 1390-91, 47 L.Ed. 2d 668 (1979). It follows that the agency may [not] make a rule or regulation that is not in harmony] with or goes beyond the scope of its statutory grant of authority. Cashmen Photo Con. & Labs, Inc. v Nevada Gam. Com'n, 91 Nev. 424, 528 P.2d 138, 160 (1975); Ruiz v. Mortion, 462 F.2d 818, 822 (9th Cir. 1972)." (emphasis added).

93. The Dannenberg Court has also reasoned that the Board must make its suitability determination in a manner consistent with its obligation under

section 3041, subd.(a) to provide uniform terms for similar offenses.  Thus, while the gravity of the commitment offense may be a sufficient basis for refusing to set a parole date under the exception provided in section 3041(x), the exception properly applies only to particularly "egregious offenses." Otherwise, the exception would tend to swallow the rule that a parole release date is "normally" set under section 3041(x), even for murderers.  Accordingly, the Board must weigh the gravity of the inmate's criminal conduct against other instances of the same crime, performing an evaluation similar to that prescribed by the sentencing rules governing probation determinations.

94.  The Board cannot claim, that Petitioner has no constitutionally protected liberty interest in a parole date, Biggs, Trunzo, McQuillion, supra, and therefore could claim no due process protection in connection with his parole hearing.  This position is inconsistent with a long line of California Supreme Court authority. In re Powel, 45 Cal. 3d at 903-904; Ramirez, supra, 94 Cal.App. 4th at 560-564; Dannenberg, supra.

**V.**

## UNCONSTITUTIONAL BASIS FOR DENIAL
## OF PETITIONER'S PAROLE

### A. UNCONSTITUTIONAL VAGUE WORDING

95.  Respondents in their denial of Petitioner's parole indicated: "It was carried out in an especially callous manner." Exhibit D"

96.  The United States Supreme Court in Maynard v. Cartwright, 486 U.S. 356, 100 L.Ed. 2d 375, 108 S.Ct. 1853, noted that the statutory words, "heinous," "atrocious," and "cruel," do not on their fact offer sufficient guidance to the jury escape the structures of Furman v. Georgia, 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726.  Therefore, the uses of "callous and cruel" are unconstitutionally vague.

97.  It is difficult to assign any specific content to the pejorative contained in §2281(c)(1).  Webster's New International Dictionary 2d, defines

29

"callous" as being "[hard]ened and thick[ened]; feeling no motion; feeling no sympathy." The term address the emotions and subjective idiosyncratic values While it stimulates feeling or repugnance, it has no directive content. The adverb especial" is defined by Webster as "[not] general; distinguished among others of the same class as exceptional in degree." People v. Superior Court of Santa Clara City, 31 Cal. 3d 797, 801, 183 Cal. Rptr. 800.

98. The use of cruel simply declared that the facts of the case were so plainly "especially callous" that continual incarceration warranted was by itself unconstitutionally vague under the Eighth Amendment to the United States Constitution. Maynard, supra. Vague statutory language is not rendered more precise by defining it's terms or synonyms or equal or greater uncertainty, in the use of especially. Pryor v. Municipal Court, (1979) 25 Cal. 3d 238, 249, 158 Cal.Rptr. 30.

99. Respondent's use of callous violates the Due Process Clause approach to vagueness recognize the rationale of the United States Supreme Court's Eighth Amendment cases. 108 S.Ct. 1855.

100. Just as the language of the Oklahoma provision gave no more guidance to the jury there than did the "outrageously or wantonly vile, horrible or inhuman" language that was held unconstitutional in Godfrey v. Georgia, 446 U.S. 420, 64 L.Ed. 2d 398, 100 S.Ct. 1759. Neither does the words callous and cruel. Moreover, Oklahoma's addition of the word "especially" no more limited the over breadth of the aggressing factor then did the addition of "outrageously or wantonly" to the word "vile" the language considered in Id.; Maynard, supra.

101. Petitioner would ask the Court to take judicial notice of Exhibit "R", in which, the standard of "heinous, atrocious and cruel" which is stated in CCR, Title 15 §2281 (c)(1) is unconstitutionally vague." (see p.4). That Court in "People v. Superior Court (Emgert), (1982) 31 Cal. 3d 797 stated that the court found that this language was void for vagueness when applied to sentencing. This language was also found to be unconstitutionally vague in

30

Maynard, supra, which determined that "additional facts to be considered do not cure this infirmity."

102. The United States Supreme Court's ruling in Maynard, ante by citing Walton v. Arizonia, 497 U.S. 639, 111 L.Ed. 2d 511, 110 S.Ct. 3047, and Lewis v. Jeffers, 497 U.S. 764. The Walton Court makes it clear that, Walton and Lewis has not changed the interpretation of Maynard. The Court in Walton stated: "The court's definition of "especially cruel" is virtually identical to the constitution approved in Maynard; Id. 486 U.S. 356, 364-365; Walton, supra at 111 L.Ed. 2d 519; Godfrey, supra. The logic of Maynard, and Godfrey has no place in the context of sentencing by a trial judge. Trial judges are presumed to know the law and to apply it in making their decisions. 111 L.Ed. 2d at 528. But Respondents BPT do not have such knowledge.

103. In Maynard the Court expressed approval of a definition that would limit Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance to murders involving "some kind of torture or physical abuse." U.S. at 364-365; Walton, supra 111 L.Ed. 2d 529. Furthermore, in Walton the Arizona courts defined especially cruel: "a crime is committed in an especially cruel manner when the perpetrator inflicts [mental anguish or physical abuse before the victim's death]," and that "mental anguish includes a victim's uncertainty as to his unlimited fate." 159 Ariz. At 586, 769 P.2d at 1032. Respondent's rules and regulations §2281(c)(1)does not contain such language to define what construes "cruel" or "callous." The Walton Court rejected the state's argument that the six days the victim suffered after being shot constituted cruelty within the meaning of the statute. The court pointed out that it had limited the cruelty circumstance in prior cased to situations where the suffering of the victim was intended by or foreseeable to the killer. Id. at 587, 769 P.2d at 1033.

104. There is absolutely no limitation placed in Respondent's BPT use of such unconstitutionally wording in Petitioner's denial of parole. When

31

the court is asked to review a state court's application of an individual

statutory, aggravating or mitigating circumstance in a particular case, it must

first determine whether the statutory language defining the circumstance is in

itself too vague to provide any guidance to the sentence.  If so, then the

courts must attempt to determine whether the state courts have further defined

the vague terms and, if they have done so, whether those definitions are

constitutionally sufficient, i.e. whether they provide some guidance to the

sentence. Walton, supra.

## CONCLUSION

105. For the aforementioned reasons Petitioner would request that

his motion for writ of habeas corpus be granted.

DATED: this 4th day of August, 2008.

IRVING SHEPPARD
In Pro Se

32



Court of Appeal, Sixth Appellate District - No. H030550
**S156997**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re IRVING SHEPPARD on Habeas Corpus

---

The petition for review is denied.

SUPREME COURT
# FILED

NOV **2 8** 2007

Frederick K. Ohlrich Clerk

---
Deputy

---

GEORGE
---
Chief Justice

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SIXTH APPELLATE DISTRICT

**COPY**

Barbara B. Fargo
P.O. Box 3872
Santa Cruz, CA 95063

RE:    In re IRVING SHEPPARD
       on Habeas Corpus.

       H030550
       Santa Clara County No. 79029

### * * REMITTITUR * *

I, MICHAEL J. YERLY, Clerk of the Court of Appeal of the State of California, for the Sixth Appellate District, do hereby certify that the opinion or decision entered in the above-entitled cause on August 29, 2007, has now become final.

Costs are not awarded in this proceeding

Witness my hand and the seal of the Court affixed at my office on **NOV 3 0 2007**

MICHAEL J. YERLY, Clerk

**{SEAL}**

By:

BETH MILLER
Deputy

CV 08     3983

(ENDORSED)
**F I L E D**

AUG 0 2 2006

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ JANE LINN _____ DEPUTY

1

2

3

4

5

6

7        SUPERIOR COURT OF CALIFORNIA

8          COUNTY OF SANTA CLARA

9

10

11   In re      C 34952              No.: 79029

12      IRVING SHEPPARD,             ORDER

13   On Habeas Corpus

14

15       Respondent argues that the Board's use of the "especially

16   heinous, atrocious or cruel" unsuitability criteria is not

17   unconstitutionally vague because the term is "further defined" so as

18   to "provide more detailed guidance." (Supp. at p. 9.)  As to the

19   Board's finding in this case that Petitioner's motive was "trivial,"

20   "Respondent denies that by using the term 'trivial' [] it is using a

21   term of comparison that must have meaningful and definable criteria."

22   (Supp. at p. 3.)  This position is untenable.   Vague terms cannot be

23   defined by reference to equally vague terms[1], nor by reference to

24   terms that, as Respondent insists, need have no meaning or definition

25   whatsoever.

26   ─────────────
[1] "[V]ague statutory language is not rendered more precise by defining it in terms
27   or synonyms of equal or greater uncertainty." (*People v. Superior Court (Engert)*
     (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 249.)

28

1

1       The only remaining Board finding - that the crime was ". . . as
2 an execution style murder," (Decision at p. 1.) is unexplained and
3 unsupported by any evidence articulated by the Board or present in
4 the record before it. That mere fact that four shots were fired
5 certainly cannot support that conclusion. Were the shots all fired
6 from the same direction? At close range? From what caliber gun?
7 Was death caused by the combined injuries from all the shots such
8 that they were all necessary for a murder to have occurred? Did the
9 scene show there had been a struggle, a spontaneous eruption of
10 violence, or staging? These and other concerns regarding this
11 'finding' were noted by the Sixth District yet, just as with the
12 Sixth District's directive regarding the 'triviality' finding,
13 Respondent has ignored the Judiciary and insists it can continue to
14 do so.

15

16       Citing *In re Smith* (2003) 114 Cal.App.4th 343, 367, and Justice
17 Moreno's concurrence in *In re Rosenkrantz* (2002) 29 Cal.4th 616, the
18 Sixth District told the Board in this case: "[T]he simple assertion
19 that the life crime was exceptionally callous, without factual
20 analysis in support of that conclusion does not satisfy due process."
21 (Opinion at pp 16-17.) The Board provided no factual analysis, but
22 instead made the same findings without any demonstration of their
23 applicability to the facts of the case before it.

24

25     In every case of first degree murder, the question must be
26 addressed: what facts establish *more* than the premeditation and

27

28

1  deliberation essential to every such conviction?  Ignoring this
2  question allows Board determinations devoid of any frame of reference
3  or perspective, and perpetuates the use of unsuitability criteria
4  that are without standards and cannot be applied or reviewed in
5  accordance with due process.  Thus, Respondent must explain, and
6  distinguish, when a premeditated and deliberated (first degree)
7  murder is, *and is not*, 'execution style', or be deemed to have waived
8  and conceded this point.  (*People v. Thorbourn* (2004) 121 Cal.App.4th
9  1083, 1089.)

10

11      In *In re Dannenberg* (2005) 34 Cal.4th 1061 the court referred to
12  the Board's criteria as "detailed standards" (*Dannenberg* at p. 1096,
13  fn. 16,) and required that the Board's terms and findings represent
14  meaningful comparisons.  Both in *Dannenberg* and in *Rosenkrantz* the
15  California Supreme Court compared the facts of the particular second
16  degree conviction at issue to what might have lead to a first degree
17  conviction.  (*Dannenberg, supra*, 34 Cal.4th at p. 1095, text and
18  footnote 16, *Rosenkrantz, supra*, 29 Cal.4th at pp. 678-679.  See also
19  *In re Van Houten* (2004) 116 Cal.App.4th 339, 352 [first degree vs.
20  special circumstances.  And see *Smith, supra*, 114 Cal.App.4th 343
21  [nothing distinguishing the crime from other [same] degree murders as
22  exceptionally callous].)  Since every crime will have unique facts
23  (there are countless ways to commit first or second degree murder,) a
24  comparison to the more severe crime is the best yardstick for
25  measuring when a murder is "more aggravated or violent than the
26  minimum necessary to sustain a conviction for that offense."
27  (*Dannenberg, supra*, 34 Cal.4th 1061, 1094-1095, quoting *Rosenkrantz*,
28

3

1  *supra*, 29 Cal.4th 616, 683.)

2

3      In addition to the fact that no evidence supports any findings

4  regarding the crime itself, this Court will note the Board

5  inappropriately double (or triple) counted the 25+ year old static

6  factors against Petitioner. If a person has a prior record and is

7  serving a term for murder then they necessarily both had an

8  "escalating" pattern and did not fully "profit" from prior

9  correctional attempts. Furthermore, these static factors can be

10  among the least significant when, as in this case, substantial prison

11  time has been served and the inmate's programming and subsequent

12  behavior indicate rehabilitation.

13

14      The history of this case demonstrates that it is futile to

15  direct this Board to 'proceed in accordance with due process' because

16  the Board has disregarded the specific guidance of this court and the

17  Court of Appeals in that regard. Accordingly, it is hereby ordered

18  that the Board may not find Petitioner unsuitable for parole based on

19  the same evidence and findings discussed above, however if new

20  evidence is presented different from the evidence presented at the

21  previous hearing, the Board may consider Petitioner's suitability

22  considering that new evidence, if any.

23

24      The contempt issue will be addressed within the separate

25  proceedings under docket 104CV029413 as it was originally filed by

26  Petitioner.

27

28

4

1    The petition for a writ of habeas corpus is granted as outlined

2  above and Respondent is ordered to, within 5 days, set a date for a

3  new hearing to be held within 30 days and at which the Board shall

4  obey every order and directive contained in this order, the opinion

5  and order of the Sixth District (H026322) and the original Superior

6  Court order insofar as it was affirmed by the Sixth District.

7

8

9  DATED: _____ / , 2006          _____

10                                     LINDA R. CONDRON
                                       JUDGE OF THE SUPERIOR COURT

11

12  cc:  Petitioner's Attorney (Allen Schwartz)
         Attorney General (Denise Yates)
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

FILED

JUL 01 2004

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of California County of Santa Clara
BY _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re                                    )        No.: 79029
                                         )
        IRVING SHEPPARD,                 )
                                         )        ORDER
On Habeas Corpus                         )
_____)

        Pursuant to the order of the Sixth District of the Court of
Appeal, it is hereby ordered that the Parole Board's decision to deny
parole to Petitioner is reversed.  The Board is directed to "conduct
a new hearing [and] reconsider Sheppard's suitability for parole
using only the factors deemed appropriate by the relevant statutes
and regulations and in accordance with the requirements of due
process."  (H026322)  The Board shall, within fifteen days, set a
date for a new hearing to be conducted within 30 days.

DATED: July 1   , 2004            James C. Emerson
                                  JAMES C. EMERSON
                                  JUDGE OF THE SUPERIOR COURT

cc:  Petitioner's Attorney (Barbara Fargo)
     Attorney General (Anya Binsacca or Pamela Hooley)
     CJIC

1

Filed 4/29/04  In re Sheppard CA6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

|  |  |
|---|---|
| In re IRVING SHEPPARD,<br><br>on Habeas Corpus. | H026322<br>(Santa Clara County<br>Super.Ct.No. 79029) |

The Board of Prison Terms (Board) found that Irving Sheppard would pose an unreasonable risk of danger to society if released from prison, and therefore denied him parole. (See Cal. Code Regs., tit. 15, § 2281, subd. (a).)[1]  In response to Sheppard's petition for writ of habeas corpus, the trial court found that the record did not contain " 'some evidence' " to support the denial of parole and ordered his release. (See *In re Rosenkrantz* (2002) 29 Cal.4th 616, 652 (*Rosenkrantz*).)  The warden of Folsom State Prison and the Chair of the Board, through the Office of the Attorney General (People), appeal the trial court's release order.  Ultimately, we consider whether the Board's finding that Sheppard was unsuitable for parole was supported by "some evidence."

We conclude that the record does contain " 'some evidence' " (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 652) to support the Board's finding that Sheppard would "pose an unreasonable risk of danger to society if released from prison" (Regs., § 2281, subd. (a)).

---

[1] We refer to the California Code of Regulations as the "Regulations" or "Regs." All further references to the Regulations are to title 15 unless otherwise specified.

One of the stated bases for finding unsuitability, however, was improper. Further, it was unclear whether some of the other grounds for unsuitability arising from the commitment offense were properly evaluated by the Board. Because it is unclear whether the Board would have come to the same decision had it properly weighed the factors discussed below, we cannot find the error to be harmless. Therefore, we will reverse the superior court's order directing Sheppard's release and remand the matter to the Board for reconsideration of whether Sheppard is suitable for parole. The Board should consider only appropriate factors that are supported by the record.

## STATEMENT OF THE CASE AND OF THE FACTS

Sheppard was convicted in 1981 of the first degree murder of a fellow drug dealer who owed him money. The victim was shot four times in the head. Jamal Sampson, a neighbor of the victim, told police that the victim had cheated Sheppard in a drug deal, that Sheppard had threatened to get the money out of the victim "one way or another," and that Sheppard was at the apartment building on the night of the victim's death. Sheppard was carrying a handgun and told Sampson that he intended to harm the victim. The gun used to shoot the victim was found in a hidden compartment of a car registered to Jamal Sampson, which was actually owned by Sheppard. Sheppard's fingerprints were found on the murder weapon and the newspaper in which the gun was wrapped. He flew to South Carolina the day after the shooting. Sheppard claimed he was not present during the shooting and expressed the belief that the victim was likely shot while someone, perhaps Jamal Sampson, was stealing the drugs that Sheppard had given to the victim to sell.

Sheppard's initial parole evaluation in January of 1998 showed his history with the criminal justice system: He stole a bicycle at age 10, stole a car at age 13, was sent to a training school, then committed larceny and joyriding at age 17. As an adult, Sheppard was convicted of theft, menacing, possession of paraphernalia, and two counts of possession of a controlled substance before reaching his 28th birthday. A charge of

2

possession of cocaine for the purpose of sale was dismissed. Sheppard's military career was cut short by a robbery conviction and discharge. Prior to the current incarceration, Sheppard ran a children's arcade for seven years. While in prison for the life offense, Sheppard was punished for five "serious" rules violations between 1985 and the end of 1990, including attempting to smuggle Valium into the facility during a visit and testing positive for ingestion of marijuana.

Sheppard's work history, however, showed exemplary performance reports and nine laudatory commendations from his supervisors from 1988 through 1998. On top of his work duties, by the time of his first parole hearing, Sheppard had completed enough courses to earn a high school diploma and had almost completed a Bachelor of Science degree in Business Administration. He paid for the college courses with the money he made at his in-prison jobs. Sheppard received 10 laudatory commendations from his instructors. He also participated in a Toastmaster's group, and completed six courses dealing with anger management, recidivism prevention, emotional control, behavior modification as well as Narcotics Anonymous. He eventually became secretary of the Narcotics Anonymous program. Further, Sheppard spent his free time tutoring other inmates in various academic and vocational subjects, showing pride in his accomplishments and those of his pupils. Upon questioning, defendant explained that his lack of disciplinary problems since 1990 was attributable to his realizations that he was the only one in control of his behavior; and that others, such as his wife, son and daughter, were relying upon him to improve himself. By the time of Sheppard's second parole hearing he had been married for 17 years. While Sheppard was working in prison he sent money home to help support his daughter.

A December 1997 psychiatric report observed that Sheppard's "[i]mpulse control is good as manifested by his disciplinary record and his classification score of zero." Various mental health professionals diagnosed Sheppard with Antisocial Personality Disorder in the early years of his incarceration, but noted that this feature had lessened

3

over time. The preparer speculated that it could be that Sheppard was a "clever psychopath who has used the opportunities afforded by participation in . . . various work and educational programs to further his success in dealing drugs in prison."[2] Alternatively, the report states that his record showed no evidence of violence and no recent disciplinary problems, and asserted that Sheppard could also be "a rehabilitated inmate who has proven himself by being successful in numerous programs to better himself."

Sheppard stated that if he were paroled he planned to complete his Bachelor of Science degree and live with his wife and daughter in Oakland. He had received "numerous" job offers related to his computer skills. In sum, Sheppard was found by corrections officials to have had "minimal" disciplinary problems, in contrast with consistently complimentary review from his work supervisors and scholarly instructors. The preparer of the parole report wrote that Sheppard's studies towards self improvement "all appear to be for his benefit and not just for the Parole Board['s] approval. . . . I believe his potential to recidivit is very low. I believe the Parole Board should consider the possibility of parole."

The Board denied Sheppard parole, and recommended that he remain free from disciplinary action, upgrade his vocational skills, and participate in self-help and therapy.

A February 2001 psychosocial assessment of Sheppard produced prior to his second parole hearing observed that he had a good relationship with his wife and two children, who visited him and with whom he exchanged correspondence. He attended a drug treatment program, as suggested by the Board. He did not appear to have had any current or previous history of mental disease or impairment and his "prognosis for continuing a stable life is excellent." Overall, Sheppard's "prognosis for adjustment to

---

[2] One of the Board members expressed that he did not understand the basis for this hypothesis and ignored it as a factor relating to Sheppard's suitability for parole.

4

community living is good" and he "does not pose more than normal risk [for dangerousness] in a controlled environment. . . . No risk factors are apparent. This inmate was very articulate and cooperat[ive] and . . . would be a reasonable candidate for parole." An addendum to this assessment observed that Sheppard's "progress is superior in comparison to other prisoners who are serving life sentences."

Sheppard's March 2001 parole evaluation remarked that he had "consistently met and exceeded all [Board] stipulated goals. Subject's completion of work assignments, vocational programs, and his participation in self-help and therapy programs is in the well above average to exceptional range." Sheppard completed a program to train others in the Alternatives to Violence program. The preparer observed that Sheppard had not been the subject of any disciplinary action since 1990, had maintained his tutoring schedule and had competed an Office Services and Related Technology Vocational Program with perfect grades. "Sheppard has matured considerably since his reception into CDC." His counselor received eight letters in support of Sheppard's release on parole and believed he would "pose a very low degree of threat to the public . . . ."

The Board denied Sheppard a parole date in 2001, relying upon the following factors: "The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. And the motive for the crime was very trivial in relation to the offense in that this was a drug death. . . ." "The offense was carried out in a dispassionate manner." It described his social history as unstable and criticized his post-release plan because it was not in the county of commitment. The Board also relied upon Sheppard's "escalating pattern of criminal conduct," his failure to benefit from previous attempts to "correct his criminality" through incarceration, opposition from the District Attorney of Santa Clara County, and Sheppard's continuing denial of responsibility for the victim's death as reasons to deny parole. Finally, the Board described Sheppard's achievements in education and comportment as "recent[,] and he must demonstrate an ability to maintain gains over . . . a longer period of time." The

5

Board recommended that Sheppard remain disciplinary free, upgrade his vocational and educational skills, and participate in self-help and therapy.

Sheppard filed an appeal with the Board alleging that the finding of unsuitability for parole was based on an erroneous application of *Rosenkrantz*, Penal Code section 3041,[3] and an improper substitution of the Board's opinion for that of the psychiatric evaluator, and effectively changed his sentence to "life without the possibility of parole." He further argued that his having served the amount of time suggested by the regulatory matrix should satisfy society's penal interests, and the Board violated his constitutional rights by requiring him to admit to the crime.

The Board responded to Sheppard's appeal as follows: Because the Board's decision considered relevant factors, such as the nature of the crime, Sheppard's prior history of criminality, unstable prior social life and lack of plans in the county where he was tried, the decision did not violate *Rosenkrantz* or Penal Code section 3041, subdivision (b). Because the nature of the crime was just one of several factors considered by the Board in denying Sheppard's parole, this decision did not effectively change his sentence to life without parole. There was no evidence that the Board substituted its judgment for that of the psychiatric evaluator. The fact that Sheppard has served the amount of time suggested in the Board's matrix is irrelevant because the matrix is only designed to be applied after the Board has found a prisoner suitable for parole. As to the claim that the Board improperly required an admission of guilt, the Board must accept as true a verdict of guilt unless it is overturned on appeal. Sheppard was not required to discuss or admit the details of the murder (Regs., § 2236). The fact that he chose to discuss his claim of innocence, and whatever effect this assertion may have had on the Board, was his own choice.

---

[3] "[T]he [Board] shall . . . normally set a parole release date . . . ." (Pen. Code, § 3041, subd. (a).)

6

Sheppard filed a petition for writ of habeas corpus with the Superior Court of Santa Clara County alleging that the Board's denial of parole violated his right to due process in that the decision was not supported by the circumstances of his case. The superior court issued an order to show cause, ordering the People to show why Sheppard's petition should not be granted.

After the People filed a return and Sheppard filed a traverse , the superior court found that Sheppard's parole denial was not supported by some evidence, granted his petition and ordered the Board to set an immediate release date for his parole. Regarding the gravity of Sheppard's offense, the trial court observed that there was no evidence of human suffering caused by the four gunshots to the victim's head, and no evidence of particular callousness of this crime beyond that necessarily required to establish first degree murder. It opined that Sheppard's crime falls within the second lowest category in the Board's proportionality matrix, as the victim was a criminal accomplice and death was almost immediate. (See Regs., § 2403.) The Board's failure to compare the gravity and motivational triviality of Sheppard's crime versus those of other first degree murders contradicted the Board's conclusion that his crime was much worse than other murders. (See *In re Ramirez* (2001) 94 Cal.App.4th 549, 570.)

The court concluded that Sheppard's functioning in a stable manner inside prison, his classification score of zero, and support system of family and friends outside of prison show the weakness of the Board's conclusion that he had an unstable social history. Rather, the court found no evidence of social instability in Sheppard's record.

The People filed a timely notice of appeal from the superior court's order granting Sheppard's petition and a petition for a writ of supersedeas. This court issued a writ of supersedeas staying the superior court's order pending the resolution of the People's appeal.

7

## DISCUSSION

The Board "shall normally set a parole release date" consistent with the defendant's minimum eligible parole release date unless it determines that "consideration of the public safety requires a more lengthy period of incarceration . . . ." (Pen. Code, § 3041, subds. (a)-(b).) In determining whether an inmate is suitable for parole the Board should consider factors enumerated in section 2401 of the Regulations. The Board must consider "[a]ll relevant, reliable information available" in determining suitability, such as the inmate's social history, mental state, criminal history, the commitment offense and behavior around the time of the offense. (Regs., § 2402, subd. (b).)

The weight given the specified factors relevant to parole suitability lies within the discretion of the Board. (*In re Smith* (2003) 114 Cal.App.4th 343, 361 (*Smith*), *Rosenkrantz, supra,* 29 Cal.4th at p. 677.) Thus, while a Board decision to deny parole that lacks any basis in fact "would be arbitrary and capricious, thereby depriving the prisoner of due process of law," (*Rosenkrantz, supra,* 29 Cal.4th at p. 657), our determination of whether the preponderance of the evidence supports a finding of suitability for parole is irrelevant. (*Smith, supra,* 114 Cal.App.4th at p. 361.) Therefore, our review of whether a parole denial comports with the requirements of due process of law raises the sole question of "whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.)

"We shall review the trial court's decision and the contentions of the parties in light of the materials that properly were before that court. Because the trial court's findings were based solely upon documentary evidence, we independently review the record. [Citation.]" (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

### I. The Board's Alleged Anti-parole Bias Has Not Been Proven.

Citing statistics that show the Board has a very low rate of granting parole, Sheppard argues that the Board is biased against parole. The trial court specifically

8

found "the Board is not honestly weighing or considering the statutory criteria for parole suitability," basing this conclusion upon the fact that the Board "routinely made most of its findings without any supporting evidence. [Citations.] This pattern cannot be attributed to carelessness or inadvertence, instead it is indicative of conscious and intentional behavior." *Rosenkrantz* requires the contrary conclusion.

A blanket policy mandating denial of parole would be contrary to the law, "which contemplates that persons convicted of murder without special circumstances may eventually become suitable for parole and that, when eligible, they should be considered on an individualized basis. (Pen. Code, §§ 3041, 3041.5.)" (*In re Morrall* (2002) 102 Cal.App.4th 280, 291; see also *In re Minnis* (1972) 7 Cal.3d 639, 645 [policy by predecessor to Board of denying parole to any inmate convicted of selling narcotics violated the individual assessment of suitability for parole contemplated by the indeterminate sentencing law].) A Board that rarely grants parole, however, may be distinguished from one that necessarily denies parole.

Similarly to this case, in *Rosenkrantz*, our supreme court considered the trial court's finding that the Governor, in revoking the Board's grant of parole, had applied a no-parole policy. This finding was based upon quotes of the Governor expressing that all convicted murderers should serve life terms without exception, as well as the Governor's review and reversal of almost all grants of parole. (*Rosenkrantz*, *supra*, 29 Cal.4th at pp. 684-685.) The high court found this to be insufficient evidence of a no-parole policy. It reasoned that even if the quotations truly did reflect the Governor's views when he made the statements, his subsequent actions of either affirming the grant of parole or providing individualized analyses for reversing the Board's findings of suitability belied the claim that he was applying a blanket policy of reversing the grant of parole regardless of the circumstances of the particular case. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 685.)

This analysis is even more persuasive when applied to the Board's actions. As discussed in *Rosenkrantz*, the Board has approved a much larger number of paroles than

9

the former Governor. (*Rosenkrantz, supra,* 29 Cal.4th at p. 638, fn. 5.) The Board has

not expressed the intent to apply an anti-parole policy, but does provide a written

statement of reasons for each decision. The fact that the Board denies parole more often

than would some trial or appellate courts does not " 'establish that [it] follows a blanket

policy of denying parole or that [its] decision in the present case was based upon such a

policy, rather than upon a consideration of the factors and evidence discussed in the

[Board's] written decision denying petitioner parole.' " (*Smith, supra,* 114 Cal.App.4th

at p. 362.)

The statistical likelihood of parole may properly change with the composition of

the Board so long as the outcome of each case is the result of individual consideration.

(*Rosenkrantz, supra,* 29 Cal.4th at pp. 651-652, 655.) Disagreement between the Board,

the Governor or elements of the judiciary over how heavily to weight various factors in

the suitability determination does not necessarily mean that any one formula is biased in

one direction or another. (*Ibid.*) It merely reaffirms the adage that reasonable minds may

differ. Thus, in effect, *Rosenkrantz* is dispositive of Sheppard's argument. (*Id.* at

pp. 637-652, 683-686.) We are bound by that decision. (*Auto Equity Sales, Inc. v.

Superior Court* (1962) 57 Cal.2d 450, 455.)

## II. While some of the board's grounds for denying parole were supported by the evidence, the deficiency of some of the Board's findings requires remand.

Any " 'official or board vested with discretion is under an obligation to consider

*all* relevant factors [citation], and the [Board] cannot, consistently with its obligation,

ignore postconviction factors unless directed to do so by the Legislature.' [Citation.]"

(*Rosenkrantz, supra,* 29 Cal.4th at p. 655, quoting *In re Minnis, supra,* 7 Cal.3d at p. 645,

original italics.) Circumstances that tend to establish suitability for parole are that "the

prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2)

has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the

10

result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. [Citation.]" (*Rosenkrantz* 29 Cal.4th at p. 654, citing Regs., § 2402, subd. (d).)

Circumstances tending to show unsuitability for parole are that the prisoner "(1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. [Citation.]" (*Rosenkrantz*, 29 Cal.4th at pp. 653-654, fn. omitted, citing Regs., § 2402, subd. (c).)

The factors weighing in favor of and against parole are "general guidelines" rather than an exhaustive list. (Regs., § 2402, subds. (c), (d).) "[T]he importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the [Board]" (*ibid.*) so that "[c]ircumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., § 2402, subd. (b).)

### a. An inmate's attitude toward the crime is a permissible factor weighing against suitability; failure to admit the facts of the life offense is not a permissible factor.

At the beginning of Sheppard's parole hearing, the Board explained to him, "You are not required to discuss your offense nor are you required to admit to your offense." Commissioner Daly asked Sheppard if he would be talking with the Board, to which he replied that he would. Commissioner Daly then recounted the facts of the crime and

11

asked Sheppard "was that the circumstances of how this crime occurred?" Sheppard explained, "I take full responsibility for my crime and my incarceration and that I was the cause of everything that's happened. Because I was the one that supplied everybody with the drugs. [¶] . . . [¶] . . . I was introduced to [the victim]. . . . And then I started dealing drugs. And he started introducing me to other people . . . . So I was supplying everybody with narcotics . . . . [¶] . . . [¶] . . . On the evening of the crime I went down to Sunnyvale, I dropped off a package to [the victim]. I seen Jamal Sampson and I picked up some money from him and I gave him . . . another package. I went back to . . . Sacramento. I got a call from [Sampson]. He told me he got what I need then I was on my way to go pick up a large quantity of drugs from South Carolina. I met him at the airport and I got the gun from him. I put [the gun] in the paper, put it in the trunk . . . . I never made it back before I got arrested down in South Carolina."

Commissioner Daly asked Sheppard, "[y]ou were tried by two different juries? [¶] . . . [¶] . . . And they both found you guilty . . . . [¶] . . . [¶] . . . of the crime as stated? [¶] . . . [¶] . . . And so you're saying that you're an innocent man in prison?" Sheppard replied, "[n]o, I'm not saying I'm an innocent man. . . . It's because of me that all this happened. My lifestyle was drug related and all the people that I was involved with it was drug related." Commissioner Daly again asked, "[y]ou said that your drug dealing— you consequentially were probably responsible, or could have been responsible. So is that what I'm hearing you saying?" Sheppard replied, "[y]es, I am responsible for it."

In its oral statement of reasons for denying parole, the Board stated, "Other information bearing upon suitability would be the attitude towards the crime and the continuous denial for the responsibility of the death of the victim with regard to the actual shooting. Although he does acknowledge being involved in the sale of drugs and in the element that could have perhaps created this." It further explained, "specifically we're going to ask the psychologist to review the probation officers' reports, . . . and the

12

minimization. Minimization . . . of your involvement in this homicide and your denial of committing the life crime to try to give us a better understanding of that."

"The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." (Pen. Code, § 5011, subd. (b); see also Regs., § 2236;[4] *In re Caswell* (2001) 92 Cal.App.4th 1017, 1033.) The Board may, however, consider an inmate's attitude toward the life crime and whether he shows remorse. (Regs., § 2402, subds. (b), (d)(3).)

Although the Board recognized that it could not require an admission of guilt for the life crime from Sheppard, it apparently decided it could use this as a factor in finding him unsuitable for parole. That conclusion flies in the face of the word and spirit of Penal Code section 5011 and Regulations section 2236. The fact that Commissioner Daly continued to accuse Sheppard of asserting that he was an "innocent man" after he had in fact taken "full responsibility for my crime and my incarceration and that I was the cause of everything that's happened" shows the high level of interest the Board showed to this improper factor. The Board's reliance upon Sheppard's "continuous denial for the responsibility of the death of the victim with regard to the actual shooting" as a sign of the need for additional psychological analysis, and ultimately a finding of unsuitability for parole, was thus improper. This factor should not be considered as a sign of unsuitability for parole on remand.

Sheppard's attitude of remorse for the victim's death should, however, be considered as a factor in favor of finding suitability for parole. He repeatedly and unequivocally explained that he believed he was responsible for the victim's death because of his drug dealing activities with the victim. The Board's unwillingness to

---

[4] "The board shall not require an admission of guilt to any crime for which the prisoner was committed."

13

accept Sheppard's repeated assertions to this effect demonstrated its improper application of the regulatory factors and Penal Code section 5011.

### b. It is unclear whether the Board properly weighed some factors regarding the commitment offense.

Where "the prisoner committed the offense in an especially heinous, atrocious or cruel manner[,]" such facts may support a finding of unsuitability for parole. (Regs., § 2402, subd. (c)(1).) Factors showing that the crime was particularly atrocious include: "(A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. [Citation.]" (*Rosenkrantz, supra,* 29 Cal.4th at p. 653, fn. 11, citing Regs., § 2402, subd. (c)(1).)

The probation report described the crime scene: "[O]fficers found victim Lawrence Ronald Williams, age 28, lying on the kitchen floor in a large pool of blood. A check of the victim's vital signs revealed that he had expired . . . . The coroner's report . . . indicated the victim died from multiple gunshot wounds (four) to the head. An analysis of his blood revealed it contained 0.15 [percent] blood alcohol content at the time of his death. [¶] . . . [A] neighbor, who lived next-door to the victim . . . heard what he thought to be four rapid-fire gunshots coming from next-door followed by a 'thump.' " This is the total of information we have found in the record regarding the immediate circumstances of the victim's death.

Here, the board based its finding of unsuitability in part upon the fact that the commitment offense was "carried out in an especially callous manner and that the manner . . . demonstrates an exceptionally callous disregard for human suffering" and "in

14

a dispassionate manner." The Board further found the motive for the crime, a drug debt, to be very trivial in relation to the offense.

A finding of factors that show particular cruelty or atrociousness must also show that those factors extend beyond that required for a conviction of the life offense. "A conviction for murder does not automatically render one unsuitable for parole." (*Smith, supra,* 114 Cal.App.4th at p. 366, citing *Rosenkrantz, supra,* 29 Cal.4th at p. 683; *In re Ramirez, supra,* 94 Cal.App.4th at pp. 569-570.) "[P]arole is mandatory for violent felons serving determinate sentences. (Pen. Code, § 3000, subd. (b)(1).) And the Legislature has clearly expressed its intent that when murderers—who are the great majority of inmates serving indeterminate sentences—approach their minimum eligible parole date, the Board 'shall normally set a parole release date.' (Pen. Code, § 3041, subd. (a).)" (*In re Ramirez, supra,* 94 Cal.App.4th at p. 570; *Smith, supra,* 114 Cal.App.4th at p. 366; see also *Rosenkrantz, supra,* 29 Cal.4th at p. 683.) The denial of parole based solely upon the nature of the offense may violate an inmate's rights to due process where "no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

A murder conviction requires that the perpetrator act with "malice aforethought." (Pen. Code, § 187.) Express malice occurs "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (Pen. Code, § 188.) First degree murder includes "any . . . kind of willful, deliberate, and premeditated killing . . . ." (Pen. Code, § 189.) Accordingly, "it can reasonably be said that *all* [first] degree murders by definition involve some callousness—i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. (See Webster's Third New International Dict. (3d ed. 1993) p. 319, col. 1.)" (*Smith, supra,* 114 Cal.App.4th at pp. 366-367.)

15

The Board found that Sheppard killed the victim in a manner that showed exceptionally callous disregard for human suffering. (See Regs., § 2402, subd. (c)(1)(D); *Smith, supra*, 114 Cal.App.4th at pp. 366-367.) The Board did not, however, explain what facts, if any, showed greater callousness than that required for any premeditated murder. The record describes only four quick gunshots to the head. This evidence does not require us to conclude that defendant endured any greater suffering than that inherent to any murder. It is not clear either from facts of the case or from the Board's statement of decision whether it determined that this crime was conducted in an exceptionally callous manner in the scope of first degree murders or with any more disregard for human suffering than is required for a conviction of that crime. Such a determination is required if the callousness of the crime is relied upon as a factor weighing against parole.

The People argue that the victim's death was "execution-style" and thus the Board's finding of dispassion was supported by that evidence. (See Regs., § 2402, subd. (c)(1)(B).) The Board, however, did not make any finding that the death was in fact "execution-style." Nor are the facts of this case so clear that they compel us to reach this conclusion. The record does not show whether the gunshots were fired at close range or whether they even came from the same direction. Nor do we know whether the position of the body indicated that the shooting was purposefully staged or spontaneous. The facts of this case therefore do not clearly demonstrate that this was an execution style murder. We will therefore not infer that the Board came to that conclusion.

Because reasonable minds may differ regarding whether this crime was more aggravated than any other first degree murder, we will not make such a conclusion for the Board. If the Board were able to identify some evidence that this killing was more aggravated, violent or dispassionate than the minimum necessary to sustain a conviction for that offense, then use of such evidence to justify a parole denial would not violate defendant's right to due process. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.) In a close case such as this, absent such a showing the simple assertion that the life crime was

16

exceptionally callous, without factual analysis in support of that conclusion does not satisfy due process. (*Smith, supra*, 114 Cal.App.4th at p. 367; see *Rosenkrantz, supra*, 29 Cal.4th at p. 689 (conc. opn. of Moreno, J.) ["Although I agree that evidence of premeditation and deliberation supports the conclusion that petitioner's crime was particularly egregious for a *second degree* murder, it is another matter whether any evidence would support the same conclusion for a *first degree* murder. Other than felony murders, first degree murders by definition involve premeditation and deliberation"], original italics.)

As to the finding that the motive for the crime was trivial, it is unclear whether the Board determined whether the life crime was motivated by a reason more trivial than necessary to prove a first-degree murder. "Trivial" means "found everywhere, commonplace . . . of little worth or importance . . . ." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 1261.) A defendant may lower the degree of criminality associated with his killing of another if he has a sufficiently compelling excuse or justification for his actions. (Pen. Code, § 189.5.) A first degree murder conviction therefore presumes that the motive for the killing was relatively worthless in comparison to the great value our legal system assigns to human life. Thus, under *Rosenkrantz*, the motive for a killing must be not just trivial in relation to the value of a human life, as such is required for first degree murder conviction, but rather trivial in comparison to that minimally required for a first degree murder conviction.

A drug debt of a few thousand dollars may perhaps be a motive that is trivial in comparison to that inherent to any unjustified killing. The record may therefore support the Board's conclusion that the motive for Sheppard's crime was trivial, but the Board made no such finding. As discussed above, because it is unclear whether the Board determined that the motive in this case was more trivial than that inherent to any first degree murder, we can not affirm that conclusion without additional findings. Because it

17

is debatable whether this crime was in fact more trivial than any first degree murder, we must remand this case to the Board to make that determination.

If this crime were on its face so heinous, callous or dispassionate that the Board's findings were clearly supported by the evidence then remand would not be necessary. Such is not the case here. On remand, if the Board chooses to rely upon the triviality of Sheppard's motive for the life crime as a reason for finding unsuitability for parole, it should make specific findings about the degree of triviality associated with this crime as opposed to that ordinarily required for a first degree murder conviction. Similarly, if the Board relies on the callousness of the crime or the dispassionate manner of its commission, it should provide additional factual analysis to support the conclusion that this crime was exceptionally callous, or carried out in a manner more dispassionate than the minimal requirements for first degree murder.

### c. The board may properly consider an inmate's unstable social history and history of nonviolent criminality.

Sheppard explained that the criminality in his youth arose from a lack of supervision. His mother worked at nights, so she could not supervise him after he got out of school. He was immature and took part in non-violent criminal activities in order to fit in with his older friends. Sheppard used marijuana, cocaine and heroin from an early age. He was not, however, under the influence on the night of the crime.

Sheppard now argues that it is only proper to consider his previous criminal history to the extent that it was violent, pursuant to Regulations, section 2402, subdivision (c)(2). That subsection instructs the Board to consider the inmate's "Previous Record of Violence[; i.e., whether t]he Prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." (Regs., § 2402, subd. (c)(2).) It is true that Sheppard's record does not show more than one instance of violence, i.e., the 1972 robbery. (*People v. Bonner* (2000) 80 Cal.App.4th 759, 763 [Robbery is inherently

18

assaultive against the victim].) The other instances of criminal activity, however, are relevant to his arguably unstable relationship with society as a youth and a young man.

The Board is also instructed to consider an inmate's "Unstable Social History[; i.e., whether t]he prisoner has a history of unstable or tumultuous relationships with others." (Regs., § 2402, subd. (c)(3).) This regulation does not require that the "tumultuous relationships" were with individuals with whom the inmate had an ongoing relationship. Such a relationship could therefore be encompassed within the interactions between a criminal and his victim. To determine whether an inmate is suitable for parole, the Board's goal is to " 'predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts.' " (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 655, citing *In re Sturm* (1974) 11 Cal.3d 258, 267.) Likewise, Penal Code section 3041 states that the Board's suitability determination should focus upon "consideration of the public safety." (Pen. Code, § 3041, subd. (b).) Any criminal conduct, violent or nonviolent, is thus relevant to the nature of an inmate's prior relationships with individuals and society as a whole. The Board's reliance upon Sheppard's prior history of nonviolent crime was thus proper.

### d. The recentness of an inmate's gains and deficiency of parole plans are proper grounds for a finding of unsuitability.

The Board further relied upon two additional factors in support of its finding of unsuitability: the recentness of Sheppard's various pursuits of self-improvement and the fact that his parole plans were not in the county of commitment. Sheppard argued, but has not persuaded this court, that these factors are inappropriate grounds for denial of parole.

The Board is not limited to the statutorily listed factors in determining suitability for parole. (Regs., § 2402, subds. (c), (d).) Rather, it should generally consider any "relevant, reliable information available" to make this decision. (Regs., § 2402, subd. (b).) Surely the fact that a prisoner has only recently improved his behavior could

19

logically impact the Board's evaluation of whether he has shown he is ready to comport with the law if released. Similarly, a prisoner's lack of planning for a successful return to society would decrease the likelihood of his successful acclamation to life outside prison.

The trial court, however, criticized the Board's analysis of these factors. The Board did not provide substantial factual analysis of the deficiency of Sheppard's parole plans. Nor did it provide substantial factual analysis for the conclusion that "the prisoner's gains are recent and he must demonstrate an ability to maintain gains over . . . a longer period of time." Should the Board on remand rely upon the recentness of Sheppard's gains or the inadequacy of his parole plans, it should provide factual support for the relevance of these factors to Sheppard's suitability for parole.

### III. The Board was not required to consider the proportionality of Sheppard's sentence to the sentencing matrix.

The superior court granted relief in part because the Board failed to expressly consider the length of time already served by Sheppard to assure that it was applying uniform sentences for crimes of similar gravity, citing *In re Ramirez, supra,* 94 Cal.App.4th at p. 569. The People argue that this is not a proper basis to overturn the Board's findings. As observed by the People, *In re Ramirez* was not published until after Sheppard's parole hearing.

"A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude in respect to the threat to the public." (Regs., § 2280.) Regulations section 2281 provides in part, "[t]he panel shall first determine whether a prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the

20

judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."[5]

The matrix provided in Regulations section 2282 is to be considered only after a life prisoner is "found suitable for parole." (Regs., § 2282, subd. (a) ["The [Board] panel shall set a base term for each life prisoner who is found suitable for parole"].) Requiring the Board to consider the length of time a prisoner has served in its suitability determination would undermine the Board's responsibility to make the suitability determination based on "consideration of the public safety." (Pen. Code, § 3041, subd. (b).) There is no indication that "public safety" depends on the length of a prisoner's incarceration. Although *Ramirez* predated *Rosenkrantz*, the court in *Rosenkrantz* did not consider the length of the inmate's sentence in determining his suitability for parole. Rather, it focused on the "particularly egregious" nature of the crime. (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.) We thus see no need for the Board to consider the proportionality of the inmate's sentence if it has already determined that he is unsuitable for parole.

**IV.  Our Findings Require Remand Of The Matter To The Parole Board.**

The Board improperly considered Sheppard's lack of admission of guilt as a factor showing unsuitability for parole. Thus, a significant part of the Board's decision was not supported by some evidence. Further, it is unclear whether the Board properly weighed the circumstances of Sheppard's life crime with respect to the minimum

---

[5] The California Supreme Court has granted review to determine whether the Board must "engage in a comparative proportionality analysis with respect to offenses of similar gravity and magnitude and consider base term matrices used by the Board in setting release dates and deny a parole date solely on the basis of the circumstances of the offense only when the offense is particularly egregious, or may the Board first determine whether the inmate is suitable for parole because he or she is no longer a threat to public safety and engage in a proportionality analysis only if it finds the inmate suitable for parole." (*In re Dannenberg,* rev. granted Jan. 15, 2003, S111029.)

requirements of Sheppard's conviction. We therefore cannot sustain the Board's decision
on the basis that some aspects of the decision may have been or were supported by an
adequate evidentiary basis. (Compare *Rosenkrantz, supra*, 29 Cal.4th at p. 677
[Governor's decision based on separate and alternative findings] with *In re Capistran*
(2003) 107 Cal.App.4th 1299, 1306-1307 [Governor's decision based on combination of
findings].)

In *Rosenkrantz*, the California Supreme Court decided that when some of the
Board's findings are not supported by "some evidence" the court should grant the
petitioner's writ of habeas corpus, order the Board to vacate its decision denying parole
and to proceed in accord with due process of law. (*Rosenkrantz, supra*, 29 Cal.4th at
p. 658; see also *In re Capistran, supra*, 107 Cal.App.4th at pp. 1306-1307.) In *In re
Smith* (2003) 109 Cal.App.4th 489, the Second District determined that where the
material considered by the Board contains no evidence to support the Governor's
decision to reverse the Board, a remand to the Governor would be an idle and
unnecessary act because there was no evidentiary basis for the Governor to again reverse
the Board. This case is distinguishable from *Smith* because here parts of the decision to
deny parole were, or may be, supported by some evidence. Under the circumstances,
therefore, we consider it appropriate to direct that the matter be remanded to the Board.

## DISPOSITION

The trial court's order granting the petition for habeas corpus and directing
Sheppard's immediate release is reversed. The matter is remanded to the trial court for
entry of a new and different order directing the Board to conduct a new hearing to

22

reconsider Sheppard's suitability for parole using only the factors deemed appropriate by the relevant statutes and regulations and in accordance with the requirements of due process.

_____

Wunderlich, J.

I CONCUR:

_____

Mihara, J.

I CONCUR IN THE JUDGMENT ONLY:

_____

Bamattre-Manoukian, Acting P.J.

23

FILED

AUG 0 6 2003

KIRI TORRE,
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
BY _____ DEPUTY

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

|  |  |
|---|---|
| In re | No.: 79029 |
|     IRVING SHEPPARD, | |
| On Habeas Corpus | ORDER |

IRVING SHEPPARD, hereinafter Petitioner, is a fifty year old inmate who was convicted by a jury of first degree murder for his part in the killing of a fellow drug dealer who owed him money. The crime occurred in 1980 and the cause of death was four gunshot wounds to the head.

During his time in prison Petitioner has reduced his classification score to zero and his last disciplinary was over 11 years ago. (RT 22.) Petitioner has received "at least a half dozen" vocational certificates in the computer repair field and he has extensive practical experience in this area in his current facility. (RT 24.) Petitioner plans to live with his wife when released. (RT

1  29-30.)  Petitioner has demonstrated, through letters written to the
2  Board, that he would have the financial and emotional support of
3  friends and relatives in addition to that of his wife.  (RT 32-34.)
4  The correctional counselor's report stated that Petitioner "would
5  pose a very low degree of threat to the public at this time if
6  released."  (RT 27.)  And in the psychological evaluation, the doctor
7  concluded Petitioner was "free of any mental or emotional problems"
8  and noted that Petitioner's "achievement while in the institution, []
9  level of performance and [] effort at self improvement are
10 outstanding."  (RT 28.)  The doctor also rated Petitioner as posing a
11 "less than average" risk of dangerousness with the only qualification
12 being that Petitioner should stay away from drugs.  (RT 28.)

13     The Board denied Petitioner a parole date stating: "The offense
14 was carried out in an especially callous manner.  The offense was
15 carried out in a manner which demonstrates an exceptionally callous
16 disregard for human suffering.  And the motive for the crime was very
17 trivial in relation to the offense in that this was a drug death …
18 the victim and the prisoner had been engaged in a narcotics business
19 resulting in the victim owing the prisoner a large sum of money."
20 The Board also relied on Petitioner's previous criminal history,
21 which it characterized as demonstrating an "escalating pattern of
22 criminal conduct," as a reason to deny parole.  The Board further
23 concluded Petitioner "has an unstable social history."  The Board
24 faulted Petitioner because his "parole plans are not in the county of
25 commitment."  And the Board stated: "Other information bearing upon
26 suitability would be the attitude towards the crime and the
27 continuous denial for the responsibility of the death of the victim
28

2

1  with regard to the actual shooting." The Board concluded

2  Petitioner's "gains are recent and he must demonstrate an ability to

3  maintain gains over a period of -- a longer period of time." And

4  lastly, the Board seems to have adopted the position, argued by the

5  Santa Clara County Deputy District Attorney, that the positive staff

6  evaluations did not consider all the relevant material.

7

8

9  **THE BOARD'S CONCLUSIONS AND FINDINGS**
   **ARE NOT SUPPORTED BY THE EVIDENCE**

10

11  (1)  THE GRAVITY OF THE COMMITMENT OFFENSE

12  The Board observed in their decision that the crime was "carried

13  out in an especially callous manner" and that the crime "demonstrates

14  an exceptionally callous disregard for human suffering." A review of

15  the record indicates that there is no evidence of "human suffering."

16  Death was caused by four gunshot wounds to the head. The Board did

17  not point to, and the record does not contain, any evidence of victim

18  suffering. Nor does the record contain any evidence that Petitioner

19  or the crime was especially callous. The "minimum necessary" (*In re*

20  *Rosenkrantz* (2002) 29 Cal.4th 616, 683) facts of any first degree

21  murder are the decision to kill and the act of killing. There was

22  nothing more in this case.

23  The above perspective and understanding of the crime is

24  compelled by the Board's own proportionality matrix. (See Title 15,

25  § 2403.) Petitioner's rating is the second lowest out of the seven

26  possibilities. (There are fourteen positions on the matrix and some

27  overlap of base terms.) Petitioner's crime must be placed on the

28

3

1 | lowest point of the vertical axis because of the "participating

2 | victim."  (This is defined as: "victim was accomplice or otherwise

3 | implicated in a criminal act with the prisoner during which or as a

4 | result of which the death occurred, e.g. crime partner, drug dealer,

5 | etc.)  And Petitioner's crime rates as the second lowest type on the

6 | horizontal axis since "death was almost immediate."

7 | As stated by the Court of Appeal in *In re Ramirez* (2001) 94

8 | Cal.App.4th 549, "the Board must weigh the inmate's criminal conduct

9 | not against ordinary social norms, but against other instances of the

10 | same crime or crimes."  (*Ramirez* at p. 570.)  Criminal acts

11 | constituting any given Penal Code violation come in a broad spectrum

12 | and it is inappropriate for the Board to label a crime cruel,

13 | callous, or grave without providing perspective.  The Board violated

14 | the controlling precedent in this case and made no attempt to justify

15 | its decision with reference to the gravity of Petitioner's crime as

16 | compared with other first degree murders.  The qualifiers of

17 | "exceptionally" or "especially" by definition are only meant to apply

18 | to the most extreme examples.  As can be seen from the matrix,

19 | Petitioner's first degree murder, by comparison, is not an

20 | "exceptionally" or "especially" aggravated example.  Without "some

21 | evidence" the Board's conclusion otherwise is a violation of the

22 | controlling statutory and case law.

23 | Similarly, the Board's statement that "the motive for the crime

24 | was very trivial in relation to the offense in that this was a drug

25 | death," is provided without any meaningful perspective or comparison.

26 | The Board must first provide examples of what motives for murder were

27 | not trivial before it could attach a qualitative label to any

28 |

4

1 particular instance.  This Court believes that any reason, short of a

2 legal defense, offered in excuse of murder would be very trivial in

3 relation to the offense.  Taking into consideration that motivations

4 for murder include revenge, greed, bigotry, rejection, betrayal,

5 jealously, "respect," a desire to cover up other crimes, and rage, it

6 is doubtful that a several thousand dollar debt is any more trivial

7 than the other possible motivations.  The present case involved a

8 drug debt.  That fact places the crime at the lowest possible matrix

9 category of "participating victim."

10

11     (2) PETITIONER'S SOCIAL HISTORY

12     The Board further concluded Petitioner "has an unstable social

13 history."  There appears to be no evidence to support this statement.

14 Over the past 22 years Petitioner has demonstrated his ability to

15 function stably within the social constraints of prison given his

16 classification score of zero and his support base on the outside.

17 His pre-commitment history does not support the Board's

18 characterization.  In addition, Respondent's return merely repeats

19 the Board's conclusions without providing evidentiary support.  Both

20 the original petition and the traverse ably explain why this Board

21 "finding" is unsupported.

22

23     (3) PETITIONER'S CRIMINAL RECORD

24     Since Petitioner has a record of prior crimes and is now

25 incarcerated for murder, it is true that his criminality has

26 "escalated."  However, this would be true of any life term prisoner

27 with a prior conviction.  Title 15, § 2402, only recognizes prior

28

1  "violent" crime as having a bearing on future dangerousness.

2  Petitioner's traverse explains that there was no evidence of prior

3  violence before the Board and why it appears the Board

4  mischaracterized other prior criminal behavior.

5      Given the Board's analysis, a person who has prior criminal

6  history would likely be denied parole given an "escalating pattern of

7  criminality" pursuant to Title 15, § 2402.  For a person who does not

8  have any prior crimes, the fact that they committed murder, having

9  never previously violated the law, could justify parole denial under

10 Title 15 because of their unpredictability and potential for

11 explosive and extreme overreaction to situations.  Both prior

12 criminality, or lack thereof, can be labeled unfavorable factors when

13 considering someone who has committed murder.  However, either one

14 would appear conclusory and calculated to deny parole when analyzing

15 a prisoner who has been incarcerated for 22 years; is now 50 years

16 old; has a zero classification score; a wife and family waiting for

17 him; no disciplinaries in 11 years; outstanding counselor and

18 psychological reports (indicating that he is a low risk); and who, as

19 appears from all evidence, has been reformed.

20     The "some evidence" test is not satisfied when there is "some

21 evidence" supporting the Board's erroneous logic which is based on

22 preconceived conclusions.  There must be "some evidence" supporting

23 the decision on the basic issue before the Board, namely -- whether

24 Petitioner would be an **unreasonable** risk if released **now**.  While it

25 is true that the Title 15 enumerated factors are illustrative

26 examples and not exclusive, the Board seems to ignore what they

27 illustrate and exemplify.  The legislature qualified the criteria of

28

1   "risk" with the word "unreasonable" which indicates their recognition

2   that any parole might be a risk.  Given the legislature's mandate

3   that a parole date shall normally be set, only the unusual, extreme,

4   or extraordinary instances should qualify as exceptions.  In this

5   case the Board did not attempt to explain why crimes from thirty

6   years ago weighed against Petitioner.  The record reflects a moderate

7   criminal history which is hardly "some evidence" supporting a parole

8   denial at the present time.

9

10      (4) PETITIONER'S PAROLE PLANS

11      Petitioner's educational achievements in prison (he completed

12   most of a college degree) and his vocational skills (certificates and

13   experience in computer repair) have prepared him for employment

14   outside prison.  Petitioner's immediate parole plans were to move

15   into his wife's residence and live with her and their daughter.

16   Should that plan fail, Petitioner also has letters of support, which

17   included offers of residence and financial assistance, from his

18   mother and from a friend.  Yet the Board faulted Petitioner because

19   his "parole plans are not in the county of commitment" and used this

20   fact to deny him parole.  It is, however, unreasonable to expect that

21   most, or even many, inmates will still have substantial contacts in

22   the county of commitment after serving a 15 or 25 year minimum term.

23   Petitioner's parole plans are reasonable and factually supported.

24   There appears to be no legal justification for denying parole given

25   the available, and applicable, option of allowing parole to a

26   different county.

27

28

1      (5)   REQUIRING AN ADMISSION FROM PETITIONER

2      The Board is not permitted to require an acknowledgment of guilt

3 from a prisoner.  (*In re Caswell* (2001) 92 Cal.App.4th 1017, 1033, PC

4 § 5011(b), CCR Title 15 § 2236.)   It appears, however, that this is

5 just what occurred in this case.   The Board denied Petitioner parole

6 in part because of his "continuous denial for the responsibility of

7 the death of the victim with regard to the actual shooting."   The

8 Board stated it was not there to re-litigate the life crime, yet it

9 questioned Petitioner when he accepted responsibility for the crime

10 but claimed he was not the one who actually pulled the trigger.

11      The reason for the rule is sound.   It is, in part, recognition

12 that for those rare occasions when the person is telling the truth

13 about their role in the crime, it would be a further perpetuation of

14 the injustice to insist that they adopt the state's theory of their

15 case.   The Board should be more concerned with the inmate's progress

16 and development after the crime, and his prospects for the future,

17 once the inmate has served the statutory time.

18

19      (6) THE "RECENTNESS" OF PETITIONER'S GAINS

20      The Board concluded Petitioner's "gains are recent and he must

21 demonstrate an ability to maintain gains over a period of -- a longer

22 period of time."   There was no factual support found in the record

23 for this conclusion.   The record before the Board, and currently

24 before this Court, shows Petitioner's steady improvement throughout

25 his incarceration.   Petitioner has continuously upgraded

26 educationally, behaviorally, vocationally, psychologically, and

27 socially.   Petitioner's disciplinaries are few and far between and

28

1 | none within the last eleven years.  He has progressed to the point
2 | that both the correctional counselor and the psychologist gave him
3 | glowing recommendations.  Petitioner has demonstrated his ability to
4 | maintain his gains for a period of over one decade.

5 |

6 |        (7)  THE VALIDITY OF THE CDC REPORTS

7 |        The Santa Clara County Deputy District Attorney who spoke at the
8 | end of Petitioner's hearing took issue with one of the doctors'
9 | reports and insisted that it did not adequately or accurately
10 | consider Petitioner's history of involvement with drugs.  The Board
11 | erred to the extent it accepted these arguments as valid.
12 |        Dr. Beermann's report noted Petitioner's "treatment program"/
13 | "narcotics anonymous" and concluded "his current problems are in
14 | remission."  At the hearing a commissioner noted Petitioner's
15 | "ongoing" participation in Narcotics Anonymous and Alcoholics
16 | Anonymous, and the proof that Petitioner had contacted Narcotics
17 | Anonymous on the outside so as to be ready to "continu[e] to
18 | participate in that program."  (RT 25-26.)  Later in the hearing the
19 | other commissioner touched on the subject of Narcotics Anonymous and
20 | summed up Petitioner's explanation that he "didn't have a drug
21 | problem" as follows: "Okay.  So you benefited from it even if you
22 | didn't have a severe drug problem."  (RT 35.)  The report authored
23 | by Dr. Macomber, concluded "it is evident that he does not have a
24 | drug or alcohol problem."  The Deputy District Attorney's position
25 | appears to be erroneous.  Petitioner was a drug dealer not an addict.
26 | Although his crime was drug related, it was not related to his own
27 | substance abuse.  Although there was other evidence that Petitioner
28 |

1 had used drugs in the past, there was no evidence he **ever suffered** an

2 addiction.  Dr. Beermann reported any drug problem was "in

3 remission."  Dr. Macomber reported that Petitioner did not presently

4 "have a drug or alcohol problem."  Petitioner's record of no

5 disciplinaries (drug related or otherwise) for eleven years, and his

6 similarly longstanding commitment to Narcotics Anonymous, is evidence

7 which supports both doctors' conclusions.  There is absolutely no

8 evidence to support the Board's decision denying parole due to drug

9 or alcohol issues.

10

11     (8) CONCLUSIONS REGARDING THE SOME EVIDENCE TEST

12     Although the "some evidence" test is very broad, it is applied

13 to a very narrow question.  The evidence must show Petitioner to be

14 an "unreasonable risk" for release at the present time.  Nothing the

15 Board found supports that conclusion.  Accordingly, Petitioner is

16 entitled to immediate relief and the issuance of a writ of habeas

17 corpus.

18

19

20                    **PROPORTIONALITY**

21     The *Ramirez* decision is over a year old and the Parole Board was

22 bound by that Court's holding that the Board is required to engage in

23 a proportionality analysis during its hearings.  The Court stated:

24 "The Board must also consider the length of time the inmate has

25 served in relation to the terms prescribed by the Legislature for the

26 offenses under consideration, in order to arrive at a 'uniform' term

27 as contemplated by Penal Code section 3041, subdivision (a)."

28

                                    10

1  (*Ramirez* at p. 570.)  The record of the hearing in this case is

2  devoid of any consideration of the time Petitioner has spent

3  incarcerated or its ramifications.

4      The *Ramirez* Court explained:

5      The Board must make its determination "in a manner that
       will provide uniform terms for offenses of similar
6      gravity and magnitude in respect to their threat to the
       public." (Pen. Code, § 3041, subd. (a).) Determining
7      what would be a "uniform" term for an inmate serving an
       indeterminate life term for offenses that include
8      concurrent determinate terms is not an exact science.
       However, the Board should strive to achieve at least a
9      rough balance between the gravity of the offenses, the
       time the inmate has served, and the sentences prescribed
10     by law for the commitment offenses. … When weighing the
       seriousness of his criminal conduct to determine whether
11     Ramirez would pose a threat to public safety if paroled,
       the Board is not free to disregard his 15-year minimum
12     term for murder and the concurrent 7-year terms for
       robbery. These sentences reflect both a legislative
13     determination of proportionality (PC § 1170(a)(1)), and
       the trial court's assessment of the seriousness of the
14     offenses. The Board's broad discretion over parole
       suitability determinations is not a license to
15     recharacterize the commitment offenses as crimes
       carrying a more severe penalty. (*Ramirez* at p. 569, text
16     and footnote 8.)

17

18     *Ramirez* correctly notes that the parole process is not an exact

19  science, however just as the Board in *Ramirez* was "not free to

20  disregard his 15-year minimum," the Board in this case was not free

21  to disregard the fact that Petitioner's life crime has a matrix of

22  26-27-28.  The matrix chart notes that its numbers "do[] not include

23  post conviction credits."  <u>In this case Petitioner's exhibit Q</u>

24  <u>demonstrates his entitlement to halftime credits and it therefore</u>

25  <u>appears that he has the equivalent of over 40 years time in custody</u>.

26  Given Petitioner's current classification score, positive history of

27  programming and development, parole plans and favorable

28

1 | recommendations from CDC staff, it appears his sentence has become
2 | illegally disproportionate to the "uniform" term it should represent.

3 | The *Ramirez* proportionality analysis was recently recognized by
4 | the Ninth Circuit.  In *Biggs v. Terhune* (2003) C.D.O.S. 5702, D.A.R.
5 | 7245, the inmate filed a habeas petition after being denied parole at
6 | what appears to have been his first Board hearing.  The Ninth Circuit
7 | held that although "many of the conclusions reached, and factors
8 | relied on, by the Board were devoid of evidentiary basis," there was
9 | "some evidence" to support it.  The Ninth Circuit noted however that
10 | continuing to "deny[] him a parole date simply because of the nature
11 | of the offense and prior conduct would raise serious questions
12 | involving his liberty interest in parole. … A continued reliance in
13 | the future on an unchanging factor, the circumstance of the offense
14 | and conduct prior to imprisonment, runs contrary to the
15 | rehabilitative goals espoused by the prison system and could result
16 | in a due process violation."  (See also Justice Moreno's concurrence
17 | in *Rosenkrantz*.)

18 | Although it can be argued that a proportionality analysis only
19 | comes after a parole suitability finding, the published authority,
20 | which binds the Board and this Court, holds otherwise.

21 |
22 |

23 | **NEITHER THE SOME EVIDENCE TEST, NOR
A REMAND FOR ANOTHER HEARING, IS APPROPRIATE**
24 |

25 | The California Supreme Court in *Rosenkrantz* stated that if a
26 | reviewing court finds errors committed by the Board, the remedy is to
27 | remand with instructions relating to any due process requirements.
28 |

1 (*Rosenkrantz* at p. 658.)  This approach presupposes however, that the

2 Board's errors were mistakes, that they proceeded in good faith, and

3 that they have an appropriate focus on Constitutional principals.

4 Such would not be the remedy if the Board possessed a bias against

5 granting parole, granting relief in only 2% of all reviewed cases.

6     Petitioner has presented statistics and additional proof that

7 the Board is a biased decision making body.  The proof is persuasive.

8 The Board has adopted a policy of underinclusion for its rare parole

9 grants.  It appears the Board is not honestly weighing or considering

10 the statutory criteria for parole suitability but rather has set much

11 higher (and nearly impossible) standards.  In nearly every one of the

12 petitions this Court has ruled upon, most of the findings by the

13 Board were not supported by any evidence.  The published cases have

14 also found the Board to have routinely made most of its findings

15 without any supporting evidence.  (See *Ramirez, supra*, *Biggs v.*

16 *Terhune, supra, Caswell, supra*, *In re Rosenkrantz* (2000) 80

17 Cal.App.4th 409.)  This pattern cannot be attributed to carelessness

18 or inadvertence, instead, it is indicative of conscious and

19 intentional behavior.

20     There is indisputable evidence that this anti-parole bias was at

21 work in this case as well.  There is the fact that the Board labeled

22 Petitioner's crime as "demonstrat[ing] an exceptionally callous

23 disregard for human suffering" when there was an instant death and no

24 suffering.  Also, to label this example of first degree murder as

25 "especially callous" and "very trivial" when the Board's own matrix

26 places it among the least atrocious when compared to other "routine"

27 and common variations of murder is equally telling.  As outlined

28

13

1 │ above, the remaining reasons and conclusions given by the Board were

2 │ similar abuses of their discretion.  Furthermore, the deliberate

3 │ violation of the *Ramirez* holdings, which require the Board to first

4 │ weigh the crime against other instances of the same crime, and then to

5 │ engage in a proportionality analysis, demonstrates the Board's

6 │ intentional disregard of the law.  The evidence is compelling that

7 │ the policy of the Governor and the Board of underinclusion and

8 │ tokenism, as stated in this Court's orders in the matters of Singer

9 │ [#75927] and Cortinas [#106160] (attached as Petitioner's exhibits)

10 │ accurately outlines the policies and methods of the executive branch

11 │ regarding parole matters.  The Singer and Cortinas orders are

12 │ incorporated by reference into this decision.  Petitioner did not

13 │ waive this claim of bias by not objecting at the hearing since there

14 │ is no evidence that he knew these facts at that time.

15 │     This Court believes that a remand to the Board would, given the

16 │ statistical background and evidence from the previously examined

17 │ cases, doubtless be futile.  Further, since the length of

18 │ Petitioner's sentence has become disproportionate to his crime as a

19 │ matter of law, a remand is inappropriate because Petitioner is

20 │ entitled to immediate relief based on this separate ground.

21 │

22 │

23 │                              **ORDER**

24 │     For the above reasons the petition for a writ of habeas corpus

25 │ is granted.  Since Respondent has not disputed Petitioner's assertion

26 │ that his custody credits exceed the matrix for his crime, the Board

27 │ is ordered to set a date for Petitioner's immediate release on parole

28 │

1   forthwith.   The Board shall comply with this order within fourteen

2   days of the date indicated below unless this order is stayed by a

3   higher court.

4

5

6

7   DATED: _Aug 6_ , 2003   _James C. Emerson_

8                           JAMES C. EMERSON
                            JUDGE OF THE SUPERIOR COURT

9

10  cc:   Public Defender (Barbara Fargo)
          Attorney General (Jessica Blonien)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA                    CASE # 79029
                          VS
IRVING SHEPPARD



PROOF OF SERVICE BY MAIL OF :  ORDER

AUG 0 6 2003

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of County of Santa Clara
BY _____ DEPUTY

CLERKS CERTIFICATE OF MAILING ;
I CERTIFY THAT I AM NOT A PARTY TO THIS CAUSE AND THAT A TRUE
COPY OF THIS DOCUMENT WAS MAILED FIRST CLASS POSTAGE PREPAID
IN A SEALED ENVELOPE ADDRESSED AS SHOWN BELOW AND THE
DOCUMENT WAS MAILED AT SAN JOSE, CALIFORNIA ON
    AUG 0 6 2003          .


DATED:   AUG 0 6 2003                              KIRI TORRE
                                                  COUNTY CLERK

                                     BY: _____
                                            Angela Mavrakakis

Public Defender's Office              Attorney General of California
120 W. Mission Street                 455 Golden Gate Ave
San Jose  Ca.,                        Suite 11000
Attn:  Barbara Fargo                  San Francisco, Ca., 94102-3664
(placed in inter-office box)          ATTN: Jessica Blonien


CJIC/ Hall of Justice                 Research Attorney's/Hall of Justice
190 W. Hedding Street                 190 W. Hedding Street
San Jose Ca., 95110                   San Jose, Ca., 95110
(placed in inter-office box)          (placed in inter-office box)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **In re IRVING SHEPPARD, #C-34952, On Habeas Corpus**

Santa Clara County Superior Court Case No.:        **79029**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On August 11, 2003, I served the attached

NOTICE OF APPEAL

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, San Francisco, California 94102-7004, addressed as follows:

Barbara Fargo
Office of the Public Defender, Santa Clara County
120 West Mission Street
San Jose, CA 95110
Attorney for Irving Sheppard C-34952

Irving Sheppard C-34952
Folsom State Prison
P O Box 715071
Represa, CA 95671-5071
In Pro Per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 11, 2003, at San Francisco, California.

| P. MILLARD | P. Millard |
|---|---|
| Declarant | Signature |



PAROLE DENIED __ YEARS PLACE

ON __3/2001__ __ HEARING CALENDAR.

BOARD OF PRISON TERMS                                STATE OF CALIFORNIA
# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ................................................. |  |  |  |
| Date Life Term Begins ........................................................... | + |  |  |
| At Large Time ...................................................................... | + |  |  |
| PAROLE DATE ...................................................................... | = |  |  |

## MISCELLANEOUS

PANEL RECOMMENDS AND REQUESTS
___ BECOME ___ REMAIN DISCIPLINARY FREE
___ WORK TOWARDS REDUCING HIS/HER CUSTODY LEVEL
___ UPGRADE ___ VOCATIONALLY ___ EDUCATIONALLY
___ PARTICIPATE IN ___ SELF-HELP (AND) ___ THERAPY
___ TRANSFER TO ___ CAT. X ___ CAT. T.

AA

*Denied Three years*
*1. Co—*
*2 Prior Social & Cri—*
*3. Lack of Self Program*

PENAL CODE SECTION 3042 NOTICES    [X] SENT    (Date) ___JANUARY 20, 1998___

COMMITMENT OFFENSE

| P187, P12022.5, P1203.06 | MURDER 1ST, USE OF FIREARM, PPT |
|---|---|
| (Code Section) | (Title) |
| SCL 79029 | 01 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 08-27-81 | 08-27-81 | 04/17/98 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| [X] INITIAL  [ ] SUBSEQUENT (Hearing No.) _____ |  |

Department Representative
TOM FELKER, CLASSIFICATION AND PAROLE REPRESENTATIVE

| Counsel for Prisoner   G. DIAMOND | Address PO BOX 371, ROCKLIN, CA 95677 |
|---|---|
| District Attorney Representative R. BRAUGHTON | County SANTA CLARA |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a __proposed__ decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | | Date 3/ |
|---|---|---|
| Concurring (Name) | | Date 12/ |
| Concurring (Name) | Arthur F. Van Court | Date 98 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SHEPPARD, IRVING | C34952 | HDSP | MARCH 1998 | 3/12/98 |

BPT 1001 (REV. 1/91)                              PERMANENT ADDENDA

39

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    PRESIDING COMMISSION KOENIG:  We've reconvened

4    the Panel hearing on Irving Sheppard.  All

5    participants are present who were present prior to the

6    recess.  The Panel unanimously finds the prisoner

7    unsuitable for parole.  We do feel he would pose an

8    unreasonable risk of danger to society if released at

9    this time for the following reasons.  Number one, the

10    violent crime the prisoner committed.  It's a crime

11    where the prisoner shot and killed the victim because

12    of a drug debt.  The victim was shot several times in

13    the head.  The prisoner then left the state to avoid

14    prosecution, flying to South Carolina.  It's noted

15    that the prisoner was fleeing a felony warrant -- a

16    felony warrant out of New York State for the sale of

17    cocaine when he came to California (inaudible).  The

18    second reason is the prior social factors and

19    criminality.  It's noted that the prisoner became

20    involved in drugs at an early age, which became -- and

21    he also began dealing drugs.  It's noted that the

22    prisoner was -- had a bad discharge, a bad conduct

23    discharge from the military because of being absent

24    without leave and robbery.  The prisoner began

25    criminality at an early age.  (Inaudible) several

26    other violations at the time up and to the instant

27    IRVING SHEPPARD   C-34952   DECISION PAGE 1    3/12/98

40

1    offense.  Stealing a bike, auto theft, also grand

2    larceny, stolen property, and a rape arrest with

3    (inaudible).  As an adult, he had theft and robbery

4    (inaudible) also had a bad -- and received a bad

5    conduct discharge from the army.  Was arrested for a

6    controlled substance and he served two prior prison

7    terms, one in New York and also one federal prison

8    term (inaudible).  The third reason is his lack of

9    programming in the institution.  It's noted we commend

10    the prisoner for his programming in the various areas

11    that he has programmed in, particularly in the self-

12    help group and his educational area.  Although he

13    states he's sufficient in the computer area, he does

14    not have a completion of a vocation (inaudible)

15    institution.  We note that he has received six 115s,

16    the latest (inaudible) 1995, May of '95.  A serious

17    one, a prior serious one was September 1990,

18    (inaudible).  Although the CC-I gave a positive

19    report, (inaudible) and also the psych report by

20    Criswell are generally positive, I think the report by

21    the Doctor and the question he asks.  In reviewing it,

22    and I don't know where he got it, but reviewing the

23    confidential file, it makes sense.  The Doctor says

24    that the prisoner rehabilitated -- is a prisoner

25    (inaudible) rehabilitated inmate (inaudible) self by

26    being in numerous programs to better himself and who

27    **IRVING SHEPPARD   C-34952   DECISION PAGE 2    3/12/98**

41

1    has maintained a good disciplinary record, or is he a

2    clever psychopath who has used the opportunity

3    afforded by participation in these various work and

4    education programs to further his success in dealing

5    drugs in the prison system. And that's a very strong

6    possibility. The Panel finds that when we consider

7    the violent crime the prisoner committed, when we

8    consider his prior -- his (inaudible) in New York

9    prior to that and he came to California to avoid

10   arrest and prosecution, when we consider his drug

11   involvement and dealing drugs, his prior criminality

12   which began at an early age, the fact that he was

13   convicted by two juries, 24 people, and society's

14   previous attempts to correct his criminality each

15   failed with two prior prison terms, when we consider

16   his need for additional programming in the

17   institution, there is absolutely no reason to believe

18   that the prisoner would behave differently if released

19   from prison. In a separate decision, the Panel finds

20   it is not reasonable to expect that the prisoner would

21   receive a parole date in the following three years.

22   It's a three year denial. The reasons are the crime

23   he committed, his prior social factors, his'

24   criminality and the lack of sufficient programming.

25   In the ensuing three years, we ask that the prisoner

26   remain disciplinary free, that he upgrade in the

27   IRVING SHEPPARD    C-34952    DECISION PAGE 3    3/12/98

42

1    vocational area, that he continue to participate in

2    self-help and therapy programming, particularly AA and

3    the 12 steps.  This concludes the hearing.  Good luck

4    to you.

5            **INMATE SHEPPARD:**  (Inaudible).

6            **PRESIDING COMMISSION KOENIG:**  Yes, you may.

7    And to answer your questions, there is other

8    confidential information in there which connects the

9    prisoner to drug dealing within the institution

10   besides the theft and besides that.  Thank you.  This

11   concludes the hearing.  If you're dealing drugs, you

12   better knock it off_or you'll never get out.  All

13   right.

14                        --o0o--

15

16

17

18

19

20

21

22

23                                          J

24

25   **PAROLE DENIED THREE YEARS**

26   **EFFECTIVE DATE OF THIS DECISION** MAY 1 2 1998

27   **IRVING SHEPPARD   C-34952   DECISION PAGE 4    3/12/98**

BOARD OF PRISON TERMS                                                                 STATE OF CALIFORNIA

## LIFE PRISONER: PAROLE CONSIDERATION
## PROPOSED DECISION  (BPT §2041)

I.  [✓] PAROLE DENIED  *Three years*

TENTATIVE SUBJECT TO BPT ACTION COMPUTATION

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]  PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense | |
|---|---|---|---|

B. Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|
| Case No. | Count No. | Offense | _____ mos. |
| Case No. | Count No. | Offense | _____ mos. |

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

E. Postconviction Credit From _____ To _____ − _____ Months
     (Date)              (Date)

F. Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

### PANEL HEARING CASE

| Name | | Date |
|---|---|---|
| Name | | Date |
| Name | | Date |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| SHEPPARD, IRVING | C34952 | HDSP | 3/12/98 |

Distribution: White—C. File
Canary—BPT
Pink—Prisoner

T 1005 (Rev. 8/1/81)



C

BOARD OF PRISON TERMS                                                STATE OF
CALIFORNIA

## PRISONER DECISION FACE SHEET

### PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

| | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement .................................................. | | | |
| Date Life Term Begins ............................................................. | + | | |
| At Large Time ......................................................................... | + | | |
| PAROLE DATE ........................................................................ | = | | |

### MISCELLANEOUS

Panel recommendations and requests:
_____ Become ☑ Remain disciplinary free.
_____ Work towards reducing his/her custody level.
☑ Upgrade ☑ vocationally _____ educationally.
☑ Participate in ☑ self-help (and) ☑ therapy
_____ Transfer to _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES    ☒    SENT    (Date)    **7-30-01**

### COMMITMENT OFFENSE

| PC 187   P12022.5 | | MURDER 1ST   USE OF FIREARM   PISTOL |
|---|---|---|
| (Code Section) | | (Title) |
| **SCL 79029** | | **01** |
| (Case Number) | | (Count Number) |

| Date Received by CDC<br>8-27-81 | Date Life Term Begins<br>8-27-81 | Controlling MEPD<br>**4-17-98** |
|---|---|---|
| Type of Hearing<br>☐ INITIAL   ☒ SUBSEQUENT (Hearing No.)    01 | | If Subsequent Hearing, Date of Last Hearing |
| Department Representative<br>D. TOBIN | | |
| Counsel for Prisoner    **WAIVED** | | Address    -- |
| District Attorney Representative<br>RON BROUGHTON | | County<br>**SANTA CLARA** |

### PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms.   The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | | Date 10-1-01 |
|---|---|---|
| Concurring (Name) | | Date |
| Concurring (Name) | | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| **SHEPPARD, IRVING** | **C-34952** | **FSP** | **3-2001** | **10-1-2001** |

BPT 1001  (REV. 1/91)                                        PERMENENT ADDENDA

47

| | |
|---|---|
| 1 | **CALIFORNIA BOARD OF PRISON TERMS** |
| 2 | **D E C I S I O N** |
| 3 | **COMMISSIONER DALY:** Okay we're back on |
| 4 | record. In the matter of Irving Sheppard the |
| 5 | Panel has reviewed all of the information received |
| 6 | from the public and relied on the following |
| 7 | circumstances in concluding the prisoner is not |
| 8 | suitable for parole and would pose an unreasonable |
| 9 | risk of danger to society or a threat to public |
| 10 | safety if released from prison. The offense was |
| 11 | carried out in an especially callous manner. The |
| 12 | offense was carried out in a manner which |
| 13 | demonstrates an exceptionally callous disregard |
| 14 | for human suffering. And the motive for the crime |
| 15 | was very trivial in relation to the offense in |
| 16 | that this was a drug death. The conclusions are |
| 17 | drawn from a Statement of Facts wherein the police |
| 18 | responded to an apartment and saw the victim lying |
| 19 | on the floor with four gunshot wounds to his head |
| 20 | and when the murder weapon was recovered the |
| 21 | fingerprints from Sheppard were found on the paper |
| 22 | bag and newspaper containing the firearm. The |
| 23 | victim and the prisoner had been engaged in a |
| 24 | narcotics business resulting in the victim owing |
| 25 | the prisoner a large sum of money. The prisoner |
| 26 | has an escalating pattern of criminal conduct and |
| 27 | **IRVING SHEPPARD C-34952   DECISION PAGE 1   10/01/01** |

48

1   has failed to profit from society's previous

2   attempts to correct his criminality and those

3   attempts included two prison terms, juvenile camp

4   and a county jail.  He has an unstable social

5   history and prior criminality which includes .

6   offenses from the age of 10 from bike theft, auto

7   theft, grand larceny, stolen property and

8   unauthorized use of a vehicle.  And as an adult,

9   theft and robbery, bad conduct discharge from the

10  Army, menacing, possession of a controlled

11  substance and drug paraphernalia and possession

12  and sale of cocaine which was dismissed and then

13  the incident offense.  The prisoner has, actually

14  you've programmed very well.  You've been doing a

15  lot of very, very good things and I really have to

16  commend you for continuing on with your education.

17  The -- Your parole plans are not in the county of

18  commitment and, you know, whether or not, you need

19  to look into this a little bit more if you go back

20  to the county of commitment.  It's something that

21  you might want to think about, doing dual parole

22  plans (inaudible) and you do not yet have

23  acceptable employment plans although we've noted

24  that you have sent out a number of resumes in an

25  attempt to obtain a job.  The Hearing Panel notes

26  that responses to 3042PC indicate an opposition

27  **IRVING SHEPPARD C-34952   DECISION PAGE 2   10/01/01**

49

1    for a finding of parole suitability and

2    specifically from the District Attorney in Santa

3    Clara County.  Other information bearing upon

4    suitability would be the attitude towards the

5    crime and the continuous denial for the

6    responsibility of the death of the victim with

7    regard to the actual shooting.  Although he does

8    acknowledge being involved in the sale of drugs

9    and in the element that could have perhaps created

10   this.  That the prisoner's gains are recent and he

11   must demonstrate an ability to maintain gains over

12   a period of -- a longer period of time.  When

13   we're looking at the positive things that you have

14   done, working on your two vocations in vocation

15   Computer Repair Programming and your Office

16   Service and Technology.  And the positive things

17   that you've been doing in the tutoring program,

18   you're taking your class in your Alternatives to

19   Violence and Training the Trainer.  Your Anger

20   Management, your Breaking Barriers, your Logo

21   Mentoring workshop and your participation in NA

22   and AA.  This is going to be a two-year denial at

23   this time.  The Panel finds that it is not

24   reasonable to expect that parole would be granted

25   at a hearing during the following two years.  And

26   specific reasons for this are:  The prisoner

27   **IRVING SHEPPARD C-34952   DECISION PAGE 3   10/01/01**

50

1    committed the offense in an especially cruel

2    manner in that a person he was dealing drugs with

3    was shot in the head four times and killed.  The

4    offense was carried out in a dispassionate manner

5    and the offense was carried out in a manner which

6    demonstrates an exceptionally callous disregard

7    for human suffering.  And the prisoner has an

8    extensive history of criminality or misconduct as

9    it was outlined earlier in this reading.  He has a

10   history of unstable or tumultuous relationships

11   (inaudible) goes back to his dealings on the

12   street and his use of drugs from a very early age.

13   Therefore a longer period of observation and

14   evaluation of the prisoner is required before the

15   Board should find the prisoner suitable for

16   parole.  Asking that he remain disciplinary free

17   -- This is going to be very important.  You've

18   been really good at that so I don't, since 1990,

19   so I don't anticipate there would be any problems

20   with that.  And if it's available, continue with

21   your upgrade vocationally and educationally and if

22   available, participate in the self-help and the

23   therapy programming.  We're also going to request

24   a new psychological report be done for the next

25   Board hearing.  And specifically we're going to

26   ask the psychologist to review the probation

27   **IRVING SHEPPARD C-34952  DECISION PAGE 4   10/01/01**

51

1    officers' reports, the concerns that were outlined

2    by the District Attorney here today and the

3    minimization.  Minimization of your drug use and

4    minimization of your involvement in this homicide

5    and your denial of committing the life crime to

6    try to give us a better understanding of that.

7    With that, any comments, Commissioner Smith?

8         **DEPUTY COMMISSIONER SMITH:**  Mr. Sheppard,

9    I'd just like to congratulate you on your efforts

10   up to this point.  This is only your second

11   hearing and in my view you're much further along

12   than many of the people that come and sit before

13   us.  And I want you to take some positive from

14   that and feel good about the accomplishments that

15   you've made and, excuse me, have the opportunity

16   in a couple of years to sit again.  I look forward

17   to seeing you even further in continued

18   accomplishments on your part and you'll be all the

19   closer.  I wish you well.

20        **INMATE SHEPPARD:**  I feel your denial of --

21   Well, what I'd like to know is that -- What is it

22   else that you asking for me to do to come back in

23   order to receive a date?  I mean what else that

24   you want me to do that I, you know, that you

25   saying that you asking me to do?

26        **PRESIDING COMMISSIONER DALY:**  Mr. Sheppard,

27   **IRVING SHEPPARD C-34952  DECISION PAGE 5  10/01/01**

52

1    you are committed 29 years to life for a homicide

2    case and, like I said here, we're not here to

3    retry the facts.  The facts have already been

4    proven in court.  It was an awful crime, your

5    minimization of the use of drugs and some of your

6    history and your denial in the participation in

7    the incident offense -- I don't have any way of

8    determining the facts on that.  They've already

9    been established by the courts.  What we're asking

10   for you to do is continue along the same lines

11   that you're doing with your vocation, with your

12   education and to try to firm up your parole plans.

13   Continue with your resume, sending that out and

14   see what you can do to firm up those plans.  Okay?

15         **INMATE SHEPPARD:**  Okay.

16         **PRESIDING COMMISSIONER DALY:**  All right.

17   Hearing is terminated at 18:02 hours.

18         **DEPUTY COMMISSIONER SMITH:**  Good luck, sir.

19   And might I say that I think you did an

20   exceptional job representing yourself.

21         **INMATE SHEPPARD:**  Thank you.

22         **DEPUTY COMMISSIONER SMITH:**  Counsel, thank

23   you.

24                     --oOo--

25   **PAROLE DENIED TWO YEARS**

26   **EFFECTIVE DATE OF THIS DECISION**  ___OCT 1 9 2001___

27   **IRVING SHEPPARD C-34952   DECISION PAGE 6   10/01/01**

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION (BPT §2041)

I. [ ] PAROLE DENIED

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II. [ ] PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|----------|-----------|---------|

B. Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

_____ mos.

| Case No. | Count No. | Offense |
|----------|-----------|---------|

_____ mos.

| Case No. | Count No. | Offense |
|----------|-----------|---------|

_____ mos.

| Case No. | Count No. | Offense |
|----------|-----------|---------|

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

E. Postconviction Credit From _____ To _____ – _____ Months
            (Date)              (Date)

F. Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

III. If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

| PANEL HEARING CASE | | |
|---|---|---|
| Name | | Date |
| Name | | Date |
| Name | | Date |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|------|-----------|-------------|--------------|
| SHEPPARD, IRVING | C-34952 | FOLSOM | 10-01-2001 |



SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )    CDC Number C-34952
Hearing of: )
 )
IRVING SHEPPARD )
_____ )

FOLSOM STATE PRISON

REPRESA, CALIFORNIA

OCTOBER 1, 2001

PANEL PRESENT:

CAROL DALY, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

IRVING SHEPPARD, Inmate
ROD BRAUGHTON, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
_____ Yes            See Errata Sheet

**Debra S. Bradfute**        **Capitol Electronic Reporting**

**INMATE COPY**

ii

INDEX

Page

Proceedings...................................... 1

Case Factors.....................................11

Pre-Commitment Factors...........................15

Post-Commitment Factors..........................22

Parole Plans.....................................29

Closing Statements...............................38

Recess...........................................46

Decision.........................................47

Adjournment......................................52

Transcriber Certification........................53

--oOo--

1

**P R O C E E D I N G S**

1

2      **PRESIDING COMMISSIONER DALY:** Okay. We're

3    on tape. Now do you have your paperwork and

4    everything all straightened out for you there?

5      **INMATE SHEPPARD:** Yes, Ma'am.

6      **PRESIDING COMMISSIONER DALY:** All right.

7    This is a Subsequent Parole Consideration Hearing

8    for Irving Sheppard, S-H-E-P-P-A-R-D, CDC number

9    C-34952. Date of the hearing is October 1st of

10   2001 at Folsom State Prison. Date received was

11   August 27th of 1981. Life term starts August 27th

12   of 1981 out of the County of Santa Clara. Murder

13   in the first with use of a firearm, case number

14   SCL79029, one count of 187PC and 12022.5PC.

15   Twenty-nine years to life with minimum eligible

16   parole date of 4/17 of 1998. This hearing is

17   going to be tape recorded so for the purposes of

18   voice identification we will go around the room to

19   my left. Each person will state their name and

20   spell the last name and then when it comes to you,

21   after you have spelled your last name, give your

22   CDC number following. Okay?

23     **INMATE SHEPPARD:** Yes.

24     **PRESIDING COMMISSIONER DALY:** Carol Daly,

25   D-A-L-Y, Commissioner.

26     **DEPUTY COMMISSIONER SMITH:** Dennis Smith,

27   S-M-I-T-H, Deputy Commissioner.

2

1          **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**  My name

2    is Rod Braughton, B-R-A-U-G-H-T-O-N, I'm a Deputy

3    District Attorney from Santa Clara County and I

4    represent the people at today's hearing.

5          **INMATE SHEPPARD:**  Irving Sheppard,

6    S-H-E-P-P-A-R-D, C-34952.

7          **PRESIDING COMMISSIONER DALY:**  952?

8          **INMATE SHEPPARD:**  Yes.

9          **PRESIDING COMMISSIONER DALY:**  Okay.  And let

10   the record reflect there is a correctional peace

11   officer in the room for security purposes only.  I

12   understand that you are here today representing

13   yourself, Mr. Sheppard.  And can you explain to me

14   why you've chosen to represent yourself today?

15         **INMATE SHEPPARD:**  Yes.  I've chosen to

16   represent myself because I feel that I'm capable

17   of representing myself.  I know my case better

18   than anyone (inaudible).  Furthermore I have

19   researched Title 15, Division 2 of the Board of

20   Prison Terms and other case law and I think I'm

21   ready to represent myself.

22         **PRESIDING COMMISSIONER DALY:**  Okay.  You

23   brought your Board packet with you.  Have you

24   reviewed the Board packet?

25         **INMATE SHEPPARD:**  Yes, I have.

26         **PRESIDING COMMISSIONER DALY:**  And you've

27   read your counselor's report?

3

1          **INMATE SHEPPARD:**  Yes, I have.

2          **PRESIDING COMMISSIONER DALY:**  What'd the

3     counselor have to say?

4          **INMATE SHEPPARD:**  The counselor said that I

5     have met all the Board stipulated goals and that

6     over the last three years that I've met the Board

7     stipulated -- Board goals and that I was -- That

8     he feels I should be a low risk to society.

9          **PRESIDING COMMISSIONER DALY:**  Okay, and

10    you've read the psychiatrist's report?

11         **INMATE SHEPPARD:**  Yes.

12         **PRESIDING COMMISSIONER DALY:**  Okay.  And

13    what is your education level?

14         **INMATE SHEPPARD:**  Well at this point I'm

15    (inaudible) BA degree in Business Administration.

16         **PRESIDING COMMISSIONER DALY:**  Okay.  And did

17    you have your Olson review?

18         **INMATE SHEPPARD:**  Yes, I did.

19         **PRESIDING COMMISSIONER DALY:**  Okay.  And you

20    have reviewed your C-File?

21         **INMATE SHEPPARD:**  Yes.

22         **PRESIDING COMMISSIONER DALY:**  Okay.  And you

23    know what all of your rights are?

24         **INMATE SHEPPARD:**  Yes, I do.

25         **PRESIDING COMMISSIONER DALY:**  And are you on

26    any psychotropic medication?

27         **INMATE SHEPPARD:**  No.

4

1      **PRESIDING COMMISSIONER DALY:**  Okay.  Are you

2   on any other kind of medication?

3      **INMATE SHEPPARD:**  No.

4      **PRESIDING COMMISSIONER DALY:**  Okay.

5   Commissioner, do you have any questions?

6      **DEPUTY COMMISSIONER SMITH:**  Yeah.

7   Mr. Sheppard, do you know the Board rules

8   regarding the number of years that the Board can

9   deny parole and what the basis of those denials

10   would be?

11      **INMATE SHEPPARD:**  Yes.

12      **DEPUTY COMMISSIONER SMITH:**  Okay.  Tell me.

13      **INMATE SHEPPARD:**  Well they can deny you

14   from one to five years and after, you all state in

15   writing why and what the reason would be for.

16      **DEPUTY COMMISSIONER SMITH:**  Yeah.

17      **INMATE SHEPPARD:**  And then the part with the

18   metrics, it would be on the metric system, you all

19   would set a date according to the metric after you

20   all discuss the case.

21      **DEPUTY COMMISSIONER SMITH:**  If we were to

22   deny a person five years, when would their next

23   case -- When would their case be reviewed next?

24      **INMATE SHEPPARD:**  It would be five days from

25   -- five years from the time it was reviewed, which

26   would be 90 days from the time that it was, it was

27   -- Five -- It would be five years from the time

5

1    that it was confirmed, which would be -- Confirmed

2    would be 30 -- Or 60 days after the Board hearing.

3         **DEPUTY COMMISSIONER SMITH:** You see, that's

4    not exactly accurate but it's fairly close.  And

5    the reason I'm asking you the -- you know, these

6    questions is that if you're represented by

7    counsel, counsel's going to understand the ins and

8    outs of the laws and regulations.  And I want to

9    make sure that if both my partner and I, you know,

10   confirm you as being capable of representing

11   yourself, that we're doing so in your best

12   interest.  Okay?

13        **INMATE SHEPPARD:** See I'm a little nervous

14   right now.

15        **DEPUTY COMMISSIONER SMITH:** Okay.  No,

16   you're doing -- doing fine and I say that to you

17   so that you understand why we're asking these

18   questions.  I don't want you to feel that we're

19   being adversarial with you.  We just want to make

20   sure that, you know, your right to counsel and

21   your right to waive counsel is being appropriately

22   explored.  Okay?

23        **INMATE SHEPPARD:** Yes.

24        **DEPUTY COMMISSIONER SMITH:** Okay.  No other

25   questions.

26        **PRESIDING COMMISSIONER DALY:** Do you have

27   any objections to us proceeding?

6

1      **DEPUTY COMMISSIONER SMITH:**  No.

2      **PRESIDING COMMISSIONER DALY:**  Okay. I have

3  no objections to you representing yourself.  We

4  will proceed.  The purpose of today's hearing is

5  to once again consider your suitability for

6  parole.  So in doing that we're going to look at

7  your crime, your prior criminal and your social

8  history and your programming and your behavior

9  since your commitment.  We have reviewed your

10  Central File and the prior transcripts and you

11  will have an opportunity to correct or to clarify

12  the record.  You do understand that this is a

13  Subsequent Parole Consideration Hearing.  We will

14  only be considering that information in your file

15  which is relevant from the period of March 1998

16  until now.  We don't go back to the very beginning

17  of your prison history.  Do you understand that?

18      **INMATE SHEPPARD:**  Yes.

19      **PRESIDING COMMISSIONER DALY:**  Okay.  We will

20  consider your progress since your last hearing and

21  any psychiatric reports and any other information

22  that may have a bearing on your suitability for

23  parole.  Any change in parole plans needs to be

24  brought to our attention.  Before we recess for

25  deliberation, the District Attorney and you will

26  be given the opportunity to make a statement

27  regarding your parole suitability and your length

7

1    of confinement.  After this is done we will

2    recess, clear the room and deliberate.  And then

3    when we have completed our deliberations, we will

4    resume the hearing and announce our decision.  The

5    Board of Prison Terms' rules and the laws state

6    that a parole date shall be denied if your release

7    would pose an unreasonable risk of danger to

8    others.  Now you have certain rights.  Do you feel

9    that your rights have been met up to this point?

10        INMATE SHEPPARD:  Yes, I do.

11        PRESIDING COMMISSIONER DALY:  And you have

12   the right to be heard by an impartial Panel and

13   you have the Panel seated before you today.  Do

14   you have any objections to any member of this

15   Panel?

16        INMATE SHEPPARD:  No, I don't.

17        PRESIDING COMMISSIONER DALY:  Okay.  You

18   signed a Board of Prison Form -- BPT Form 1073 on

19   January 19th of '01.  That was a form asking you if

20   you had a disability as would be defined under the

21   American with Disabilities Act and you indicated

22   that you did not have.  So I just need to ask you,

23   is there anything that would prevent you from

24   participating in today's hearing or anything that

25   you would need assistance with?

26        INMATE SHEPPARD:  No.

27        PRESIDING COMMISSIONER DALY:  Okay.  You

8

1   will receive a copy of our written tentative

2   decision today and the decision becomes effective

3   90 days after review.  At that time you will

4   receive a copy of the transcript and the decision

5   and then you will have 90 days within which to

6   file an appeal.  You are not required to discuss

7   your offense nor are you required to admit to your

8   offense.  However this Panel does accept as true

9   the findings of the court.  Do you understand what

10  that means?

11        INMATE SHEPPARD:  Yes, I do.

12        PRESIDING COMMISSIONER DALY:  Will any

13  confidential material be used today?

14        DEPUTY COMMISSIONER SMITH:  No.

15        PRESIDING COMMISSIONER DALY:  Okay.  I've

16  passed the hearing checklist to you.  If you will

17  take a look at it and tell me whether or not you

18  have received all of those documents that we'll be

19  working from.

20        INMATE SHEPPARD:  Yes, I have.

21        PRESIDING COMMISSIONER DALY:  Okay.  And,

22  District Attorney, if you would look at the list

23  --

24        DEPUTY DISTRICT ATTORNEY BRAUGHTON:  Yes.

25        PRESIDING COMMISSIONER DALY:  -- and make

26  sure we're all working off of the same set of

27  documents.

9

1        **DEPUTY DISTRICT ATTORNEY BRAUGHTON:** I don't

2    have any of the supporting letters but I have an

3    ample amount of material to proceed with.

4        **DEPUTY COMMISSIONER SMITH:** Thank you.

5        **PRESIDING COMMISSIONER DALY:** (Inaudible.)

6        **DEPUTY COMMISSIONER SMITH:** Okay.

7        **PRESIDING COMMISSIONER DALY:** The -- Okay,

8    so we have all -- And I was going to ask you if

9    any additional documents needed to be submitted

10   but I believe that you just did that --

11       **INMATE SHEPPARD:** Yes --

12       **PRESIDING COMMISSIONER DALY:** -- before we

13   came in?

14       **INMATE SHEPPARD:** -- And I also have some

15   more documents that I'd like to submit and would

16   like included into this packet.

17       **PRESIDING COMMISSIONER DALY:** And what are

18   you talking about? What kind of --

19       **INMATE SHEPPARD:** Talking about --

20       **PRESIDING COMMISSIONER DALY:** -- documents?

21       **INMATE SHEPPARD:** -- my work chronos,

22   certificates, (inaudible).

23       **PRESIDING COMMISSIONER DALY:** They may not

24   be in that package. Were they in the C-File when

25   you did the Olson review?

26       **INMATE SHEPPARD:** No.

27       **PRESIDING COMMISSIONER DALY:** Are they

10

1    current ones, new ones, or what?

2         **INMATE SHEPPARD:**  Since, yes.

3         **PRESIDING COMMISSIONER DALY:**  All right.  If

4    you will take out what it is that you are talking

5    about, have Commissioner Smith look at them and

6    he'll decide whether or not he has copies of them.

7    Okay.  Now is that it for the additional documents

8    that you wanted submitted for us to take a look at

9    -- To make sure that we have?

10        **INMATE SHEPPARD:**  And also my updated

11   resume.  I don't think this resume that was in

12   this package is updated.

13        **PRESIDING COMMISSIONER DALY:**  Okay.

14   (Inaudible), have Commissioner Smith look at it.

15   Anything else?

16        **INMATE SHEPPARD:**  No.

17        **PRESIDING COMMISSIONER DALY:**  Okay.  Do you

18   have any preliminary objections before we start?

19        **INMATE SHEPPARD:**  No, I don't.

20        **PRESIDING COMMISSIONER DALY:**  Are you going

21   to be talking with us today?

22        **INMATE SHEPPARD:**  Yes, I am.

23        **PRESIDING COMMISSIONER DALY:**  Raise your

24   right hand so I can swear you in.  Do you solemnly

25   swear or affirm that the testimony you give at the

26   hearing today will be the truth and nothing but

27   the truth?

11

1        **INMATE SHEPPARD:**  Yes.

2        **PRESIDING COMMISSIONER DALY:**  Okay.  Now

3    just to make sure you understand that there are no

4    objections, I would like to incorporate by

5    reference the facts as they were spelled out in

6    your March 12th of 1998 hearing.  Do you understand

7    what I mean by that?

8        **INMATE SHEPPARD:**  Yes.

9        **PRESIDING COMMISSIONER DALY:**  Okay.  So the

10   facts were all spelled out and the case was

11   discussed in that hearing.  So instead of going

12   through them verbatim, I'm just going to

13   incorporate by reference those facts as they were

14   in the Board report of March 12th of 1998.  This

15   case involved a situation that had occurred on

16   December 21st of 1980 when the Sunnyvale police

17   responded to Hollenbeck Avenue and found the

18   victim lying in the kitchen with four gunshot

19   wounds to the head.  And you had been identified

20   as the person who made threats against the victim

21   on the evening of his death and that you had left

22   the State the following day to go to South

23   Carolina and was there until you were arrested.  A

24   murder weapon was recovered and your fingerprints

25   were found on a paper bag and a newspaper

26   containing the firearm and you had been involved

27   in the sale of narcotics.  Given the facts as they

12

1    are just spelled out very briefly, was that the

2    circumstances of how this crime occurred?

3        **INMATE SHEPPARD:**  I take full responsibility

4    for my crime and my incarceration and that I was

5    the cause of everything that's happened.  Because

6    I was the one that supplied everybody with the

7    drugs.

8        **PRESIDING COMMISSIONER DALY:**  Okay.  You

9    were the one that supplied everybody with the

10   drugs.

11       **INMATE SHEPPARD:**  That's right, yes.  I was

12   -- I come out here in 1990, in 1980, November and

13   I was introduced to Lawrence, Mr. Lawrence

14   Williams from (inaudible) and he was taking care

15   of my nephew and he said I was his cousin.  And

16   then I started dealing drugs.  And he started

17   introducing me to other people (inaudible).  So I

18   was supplying everybody with narcotics to be

19   (inaudible) in California.

20       **PRESIDING COMMISSIONER DALY:**  What happened

21   on the evening of the crime?

22       **INMATE SHEPPARD:**  On the evening of the

23   crime I went down to Sunnyvale, I dropped off a

24   package to Mr. Williams.  I seen Jamal Sampson and

25   I picked up some money from him and I gave him

26   some other -- another package.  I went back to --

27   came up -- back up to Sacramento.  I got a call

13

1    from him.  He told me he got what I need then I

2    was on my way to go pick up a large quantity of

3    drugs from South Carolina.  I met him at the

4    airport and I got the gun from him.  I put it in

5    the paper, put it in the trunk (inaudible) when I

6    came back.  I never made it back before I got

7    arrested down in South Carolina.

8         PRESIDING COMMISSIONER DALY:  All right.  So

9    what you're saying is that you had had contact

10   with the victim earlier in the evening.  Did you

11   make any threats to kill him at that time?

12        INMATE SHEPPARD:  No, I didn't.

13        PRESIDING COMMISSIONER DALY:  And then you

14   go to pick up drugs and then you meet somebody

15   else at the airport and he gives you a gun wrapped

16   up in a newspaper?

17        INMATE SHEPPARD:  I wrapped it in the

18   newspaper that was in the car because I was on my

19   way to South Carolina.  After I picked up the

20   money, I had enough money to go to South Carolina

21   and pick it up.

22        PRESIDING COMMISSIONER DALY:  The gun that

23   you had, was that the gun that killed him?

24        INMATE SHEPPARD:  Yes, it was.

25        PRESIDING COMMISSIONER DALY:  And how did

26   you come into possession of it?

27        INMATE SHEPPARD:  I got -- I received that

14

1    from Jamal Sampson.

2         **PRESIDING COMMISSIONER DALY:**  When?

3         **INMATE SHEPPARD:**  When I went to the

4    airport.  That morning when I went to the airport.

5         **PRESIDING COMMISSIONER DALY:**  Okay.  You

6    were tried by two different juries?

7         **INMATE SHEPPARD:**  Yes.

8         **PRESIDING COMMISSIONER DALY:**  And they both

9    found you guilty --

10        **INMATE SHEPPARD:**  Yes.

11        **PRESIDING COMMISSIONER DALY:**  -- of the

12   crime as stated?

13        **INMATE SHEPPARD:**  Yes.

14        **PRESIDING COMMISSIONER DALY:**  And so you're

15   saying that you're an innocent man in prison?

16        **INMATE SHEPPARD:**  No, I'm not saying I'm an

17   innocent man.  I'm saying that it's my -- It's

18   because of me that all this happened.  My

19   lifestyle was drug related and all the people that

20   I was involved with it was drug related.

21        **PRESIDING COMMISSIONER DALY:**  Okay.  Is the

22   March 12th, the report, I know that they discussed

23   several things and looking at the offense, is

24   there anything else that you want to have put on

25   the record that you don't have on the record.

26   Because certainly I'm not here to answer, you

27   know, to argue whether you did or you did not

15

1   commit this crime since you've already been found

2   guilty of this.  You said that your drug dealing -

3   - you consequentially were probably responsible,

4   or could have been responsible.  So is that what

5   I'm hearing you saying?

6       **INMATE SHEPPARD:**  Yes, I am responsible for

7   it.  And I'm not providing drugs because I have

8   (inaudible).  I have people like want to kiss my

9   butt to be in with it and a lot of stuff going on

10  with people out here.  And the short period of

11  time that I was out here and I really wasn't

12  knowing anyone, (inaudible) except for

13  Mr. Williams and (inaudible) as his cousin.  So he

14  knew everyone, so I had no reason to want him, to

15  want him -- Anything to happen to him.

16      **PRESIDING COMMISSIONER DALY:**  Okay.  So you

17  were framed on the murder but you did sell drugs,

18  is that what you're saying?

19      **INMATE SHEPPARD:**  I was involved in the drug

20  life, yes I was.

21      **PRESIDING COMMISSIONER DALY:**  Okay.  Is

22  there anything else about the commitment offense

23  that you want to say and put on the record?

24      **INMATE SHEPPARD:**  Nope.

25      **PRESIDING COMMISSIONER DALY:**  And we may

26  have more questions a little bit later.  Looking

27  at your criminal history, you have a long criminal

16

1   history.  I mean you've been involved with the law

2   from the time that you were a juvenile.  Actually

3   from the time you were 10 years old, stealing a

4   bicycle; age 13, auto theft; age 13, petitioned,

5   you were sent to state training school; age 17,

6   grand larceny, stolen property and unauthorized

7   use of a vehicle and you received probation for

8   that.  Age 17 you had a rape complaint but that

9   was dismissed.  And then as an adult at the age of

10  18 you had theft; 19, robbery, you were sentenced

11  to Ft. Leavenworth, bad conduct discharge from the

12  Army.  Age 20, found guilty of menacing, you were

13  fined $50 dollars; age 21, possession of a

14  controlled substance, you were sentenced to the

15  Department of Corrections in New York.  So was

16  that a prison or a county jail?  Was that a state

17  prison -- in New York?

18          **INMATE SHEPPARD:**  Yes, state prison.

19          **PRESIDING COMMISSIONER DALY:**  State prison.

20  Age 22, possession of drug paraphernalia and

21  possession of a controlled substance; age 27,

22  possession and sale of cocaine but the charge was

23  dismissed.  And then at age 27 you have the

24  commitment offense that you're incarcerated for.

25  Is there anything you want to say about your

26  criminal history?

27          **INMATE SHEPPARD:**  Well I would say that my

17

1  criminal history is stemmed from a lack of not

2  having control.

3     **PRESIDING COMMISSIONER DALY:**  You want to

4  move up just a little bit to make sure that we get

5  a good clear recording of this for the tape.

6  Okay.  Stems from --

7     **INMATE SHEPPARD:**  A lack of unsupervised

8  (inaudible) when I was young.  I was wanting to

9  fit in with the older people that I was -- most of

10  my friends was always older than me.  I wanted to

11  fit in and (inaudible) some place, I'm the one

12  that got caught.  Be joyriding in the car, I got

13  caught -- I wanted to (inaudible), I wanted to

14  feel like I was in.  You know it was activity but

15  nevertheless it was no violence -- no history of

16  violence in any of my crimes as a youth.  Though I

17  did have a record of, you know, immaturity and

18  wanting to fit in, I don't have no history of

19  violent crimes as a youth.

20     **PRESIDING COMMISSIONER DALY:**  Okay.

21  Anything else that you want to say regarding some

22  of your past crimes?

23     **INMATE SHEPPARD:**  (Inaudible) if I had to do

24  it over again it wouldn't be the same thing.

25     **PRESIDING COMMISSIONER DALY:**  Okay.  Let's

26  talk a little bit about your social history.  When

27  you were saying that you didn't have any control

18

1    or anything, what was it like growing up?

2         **INMATE SHEPPARD:**  Well I was -- When I came

3    home from school my mother worked at night, so

4    that means when I came home I was with my sister

5    and I had older people around me that I

6    (inaudible) and they (inaudible) my neighbor's

7    house and (inaudible).  So I was just unsupervised

8    and running here.  And in the morning I'd go to

9    school, come home, my wife -- My mother's gone to

10   work so I really didn't have the supervision that

11   I would've had if I had stayed (inaudible).

12        **PRESIDING COMMISSIONER DALY:**  Okay.  You

13   finished school?

14        **INMATE SHEPPARD:**  I finished  --  I

15   graduated here (inaudible) --

16        **PRESIDING COMMISSIONER DALY:**  After you were

17   in prison?

18        **INMATE SHEPPARD:**  Yes.

19        **PRESIDING COMMISSIONER DALY:**  You finished

20   your schooling?

21        **INMATE SHEPPARD:**  Yes.

22        **PRESIDING COMMISSIONER DALY:**  When did you

23   start your drug use?

24        **INMATE SHEPPARD:**  I started recreation -- It

25   wasn't like drug use, I -- I was experimenting

26   with drugs, marijuana.  I started with drugs, I

27   think it was '76 when I was introduced to

19

1   (inaudible) selling.  Because my whole family was

2   (inaudible), financial part was getting into

3   selling.

4        **PRESIDING COMMISSIONER DALY:**  Okay, so what

5   all kind of drugs did you use?

6        **INMATE SHEPPARD:**  I had experimented with

7   marijuana and I experimented with cocaine.

8        **PRESIDING COMMISSIONER DALY:**  Okay and those

9   are the only two?

10        **INMATE SHEPPARD:**  And when I was like 13,

11   (inaudible) heroin.

12        **PRESIDING COMMISSIONER DALY:**  Okay, so

13   you've had marijuana, cocaine and heroin?

14        **INMATE SHEPPARD:**  Yes.

15        **PRESIDING COMMISSIONER DALY:**  And alcohol?

16        **INMATE SHEPPARD:**  I drank beer occasionally.

17        **PRESIDING COMMISSIONER DALY:**  Okay, any

18   other drugs?

19        **INMATE SHEPPARD:**  No.

20        **PRESIDING COMMISSIONER DALY:**  All right.

21   And you don't feel you were ever addicted to

22   drugs?

23        **INMATE SHEPPARD:**  No.

24        **PRESIDING COMMISSIONER DALY:**  Were you under

25   the influence at the night you were dealing with

26   the victim?

27        **INMATE SHEPPARD:**  No.

20

1      **PRESIDING COMMISSIONER DALY:**  So you were
2  sober?

3      **INMATE SHEPPARD:**  I think that was the --
4  Well the night that -- The night that the incident
5  happened I wasn't even there.  But I was in
6  contact after I left there with the package,
7  (inaudible) and then I was on my way back to
8  (inaudible) Sacramento.

9      **PRESIDING COMMISSIONER DALY:**  So whatever
10 happened to, is it Jamal?

11     **INMATE SHEPPARD:**  Yes.

12     **PRESIDING COMMISSIONER DALY:**  Whatever
13 happened to him?

14     **INMATE SHEPPARD:**  Jamal didn't show up for
15 the first trial.  He showed up for the second
16 trial from -- in custody.  The night of the
17 incident it needs to be noted that Jamal Sampson
18 did test positive for gun, gun -- gun residue on
19 his hand.

20     **PRESIDING COMMISSIONER DALY:**  Okay, anything
21 else about your social history.  You've been
22 married, what, twice?

23     **INMATE SHEPPARD:**  Yes.

24     **PRESIDING COMMISSIONER DALY:**  And divorced
25 once.

26     **INMATE SHEPPARD:**  Yes.

27     **PRESIDING COMMISSIONER DALY:**  And you're

21

1    still married to your second wife?

2        **INMATE SHEPPARD:**  Yes, 17 years.

3        **PRESIDING COMMISSIONER DALY:**  And you have

4    good contacts with her?

5        **INMATE SHEPPARD:**  Yes.

6        **PRESIDING COMMISSIONER DALY:**  And good

7    support and you have how many children?

8        **INMATE SHEPPARD:**  I have one from my wife

9    and one from my (inaudible) girlfriend.

10       **PRESIDING COMMISSIONER DALY:**  Okay.  So you

11   have the two children?

12       **INMATE SHEPPARD:**  Yes.

13       **PRESIDING COMMISSIONER DALY:**  And are you in

14   touch with them?

15       **INMATE SHEPPARD:**  Yes.

16       **PRESIDING COMMISSIONER DALY:**  And where are

17   they located?

18       **INMATE SHEPPARD:**  In New York City and my

19   daughter's in Oakland with my wife.

20       **PRESIDING COMMISSIONER DALY:**  Okay.  And how

21   are they doing?

22       **INMATE SHEPPARD:**  One -- My son is

23   incarcerated and my daughter's doing (inaudible)

24   good, she's in school in (inaudible).

25       **PRESIDING COMMISSIONER DALY:**  Okay and your

26   son's incarcerated for what?

27       **INMATE SHEPPARD:**  I think the same thing --

22

1    with drugs.  Something to do with drugs
2    (inaudible).
3         **PRESIDING COMMISSIONER DALY:**  Okay.  Did he
4    pick up this when he was around you, or --
5         **INMATE SHEPPARD:**  When I came to prison he
6    was only two years old so I know he didn't pick it
7    up from me.  He was raised in the same
8    neighborhood, same environment that I came from.
9         **PRESIDING COMMISSIONER DALY:**  Same
10   environment.
11        **INMATE SHEPPARD:**  Yes.
12        **PRESIDING COMMISSIONER DALY:**  Okay.  Is
13   there anything else about your social history that
14   we haven't talked about that you want to have on
15   the record?
16        **INMATE SHEPPARD:**  No.
17        **PRESIDING COMMISSIONER DALY:**  Okay.  Let's -
18   - Commissioner Smith will cover the post-
19   conviction factors.
20        **DEPUTY COMMISSIONER SMITH:**  Mr. Sheppard,
21   you were originally committed on August the 27th of
22   '81.  Most recently received here at Folsom Prison
23   on July the 21st of '98.  You had your Initial
24   Hearing on March of '98 and received a three-year
25   denial at that time.  You have a classification
26   score of zero, you've received five CDC 115s, the
27   last one being September of '90, so it's been

23

1    nearly 11 years since you've had a write-up.

2    Certainly you're to be complimented for that.  The

3    write-up in '90 was for use of stimulants and

4    sedatives.  Since your last hearing -- and let me

5    note to you that I reviewed both documents that

6    you've prepared and let me say they're both

7    excellent accumulations of various certificates

8    and write-ups that are all positive that you've

9    received since you've been incarcerated.  I'm

10   going to be focusing on what's been occurring

11   since your last hearing, so many of these items I

12   won't refer to.  Okay?

13            **INMATE SHEPPARD:**  Yes.

14            **DEPUTY COMMISSIONER SMITH:**  Since last

15   hearing you were assigned as a canteen clerk.  You

16   received above average reports.  Reassigned from

17   that to vocational office services.  Received

18   positive reports there and then assigned to the

19   vocation computer repair program and that's where

20   you're currently assigned.  Is that right?

21            **INMATE SHEPPARD:**  Yes, I'm in computer

22   (inaudible).

23            **DEPUTY COMMISSIONER SMITH:**  Okay.  Notes

24   that you received satisfactory grades throughout.

25   Completed 925 hours in that program or more.  One

26   of the documents you gave me showed a total of 925

27   hours.

24

1          **INMATE SHEPPARD:** (Inaudible) I've just

2     completed.

3          **DEPUTY COMMISSIONER SMITH:** Okay.

4          **INMATE SHEPPARD:** (Inaudible) OSS

5     (inaudible) Office Services and Related

6     Technologies.

7          **DEPUTY COMMISSIONER SMITH:** Okay. And

8     September of this year you received a vocational

9     educational certificate completion for certified

10    technician preparation. And there are numerous

11    other vocational certificates that you've received

12    from December of last year through this one. At

13    least a half a dozen that I counted all in the

14    area of vocational computer repair. Where are you

15    currently assigned?

16         **INMATE SHEPPARD:** Computer repair.

17         **DEPUTY COMMISSIONER SMITH:** Okay. You

18    volunteered as a tutor in the Lubak (phonetic)

19    Literacy program and you've gotten a number of

20    positive accolades with regard to your

21    participation in that program. And you're still

22    doing that?

23         **INMATE SHEPPARD:** Yes.

24         **DEPUTY COMMISSIONER SMITH:** Okay. You

25    completed the 21-hour basic and advanced

26    Alternatives to Violence workshops. Completed

27    Training for Trainers in the Alternatives to

25

1    Violence workshops.  Are you continuing to

2    participate as a training for trainer?

3         **INMATE SHEPPARD:**  As we speak there's no

4    programs here in DBF, I mean in Folsom.

5         **DEPUTY COMMISSIONER SMITH:**  Okay.  Is there

6    any anticipation that they may be coming back on

7    line?

8         **INMATE SHEPPARD:**  I have no idea.

9         **DEPUTY COMMISSIONER SMITH:**  Okay.  You

10   completed the Anger Management workshop.

11   Completed the Breaking Barriers workshop and

12   you're participating in the Logo Mentoring

13   workshop.

14        **INMATE SHEPPARD:**  Yes.

15        **DEPUTY COMMISSIONER SMITH:**  What is the --

16   What's logo stand for?

17        **INMATE SHEPPARD:**  Logo is a mentor -- A

18   mentor behavior modification program.

19   (Inaudible), right understanding, (inaudible) --

20        **DEPUTY COMMISSIONER SMITH:**  Is that a

21   positive program for you?

22        **INMATE SHEPPARD:**  Yes, it is.

23        **DEPUTY COMMISSIONER SMITH:**  You've also been

24   participating in Narcotics Anonymous and

25   Alcoholics Anonymous.

26        **INMATE SHEPPARD:**  Yes.

27        **DEPUTY COMMISSIONER SMITH:**  Is that an

26

1    ongoing program?

2         **INMATE SHEPPARD:**  Yes, it's ongoing.

3         **DEPUTY COMMISSIONER SMITH:**  Okay.  And I

4    noted that -- Or want to note that one of the

5    documents that you gave me indicated that -- and

6    it's in here somewhere -- Indicated that you had

7    contacted -- right, here it is -- That you had

8    contacted Narcotics Anonymous with regard to the

9    location of local Narcotics Anonymous programs in

10   the community that you're interested in paroling

11   to.  And I'll address that in a minute.  And that

12   they suggested that you, you know, you contact

13   them when you're paroled and they'd give you those

14   locations.  Clearly it shows a continued interest

15   on your part in continuing to participate in that

16   program.  Am I right in that --

17        **INMATE SHEPPARD:**  Yes.

18        **DEPUTY COMMISSIONER SMITH:**  -- in that

19   conclusion?  Okay.  In October of last year, in

20   one of the laudatory chronos that you received is

21   in the electronics program and that was prepared

22   by R. DeBoer, D-E capital B-O-E-R.  Looking at the

23   summary and evaluation that was prepared by

24   Correctional Counselor -- Correctional Counselor

25   Tobin, T-O-B-I-N, on the summary page the

26   counselor writes that:  Considering the commitment

27   offense your prior record and prison adjustment,

27

1    the counselor believes that you would pose a very

2    low degree of threat to the public at this time if

3    released.  And that your disciplinary record is

4    outstanding, your work reports range from well

5    above average to exceptional and that you continue

6    to achieve educational, vocational goals and

7    continue to -- And continue your self-improvement

8    through participation in self-help therapy.

9    That's clearly a reflection of your documents in

10   your file as well as the documents that you've

11   provided me.  The counselor also writes that prior

12   to release you could benefit from continuing to

13   remain disciplinary free, continuing to fine-tune

14   your vocational skills and continuing to

15   participate in self-help therapy.  Did you have an

16   opportunity to review this document with your

17   counselor?

18       **INMATE SHEPPARD:**  Yes.  Not with him but

19   (inaudible) too.

20       **DEPUTY COMMISSIONER SMITH:**  All right.

21   Would you agree with the conclusions in the

22   summary?

23       **INMATE SHEPPARD:**  Yes, I would.

24       **DEPUTY COMMISSIONER SMITH:**  I also reviewed

25   the psychological evaluation, there was a most

26   recent review done by Dr. Macomber,

27   M-A-C-O-M-B-E-R, dated July of this year.

28

1    Indicates that he interviewed you at length and as
2    a result of that interview the doctor is convinced
3    that you're free of any mental or emotional
4    problems.  And that in review of the previous
5    evaluations, he notes that your achievement while
6    in the institution, your level of performance and
7    your effort at self-improvement are outstanding.
8    That your progress is superior in comparison with
9    other prisoners who are serving life sentences and
10   that there are no psychological factors that would
11   interfere with your being granted parole at this
12   time.  He does refer back to the prior
13   psychological report that's dated February the 26th
14   of this year by Dr. Beermann, B-E-E-R-M-A-N-N,
15   who, under assessment of dangerousness, writes
16   that in the doctor's opinion you do not pose more
17   than a normal risk factor in a controlled
18   environment and that as long as you stay away from
19   drugs it's the doctor's estimation that the risk
20   factors when out of a controlled environment would
21   be less than average.  Under observations and
22   recommendations he writes:  It's recommended that
23   you continue Narcotics Anonymous if paroled and
24   you should be required to submit to drug testing
25   and those are the only recommendations.  Are there
26   any other items that I should address that I
27   haven't regarding your institutional adjustment

30

1   confirms that.  Again referring to the same

2   correctional counselor's report, counselor writes

3   that you plan to seek work in the computer repair

4   field and that you also plan to complete a

5   Bachelor of Arts -- your Bachelor of Arts in

6   Business Administration.  That you've completed

7   some 41 units.  Is that right?

8           **INMATE SHEPPARD:**  That's correct.

9           **DEPUTY COMMISSIONER SMITH:**  One of the

10  documents that you handed me is from the Oakland

11  Private Industry Council written by doctor -- or

12  by Program Coordinator Charles Turner,

13  T-U-R-N-E-R.  And Mr. Turner writes that,

14  regarding the Welfare to Work training program,

15  that you'd be capable of performing mechanical

16  repair work, that you have excellent communication

17  skills and that those skills are transferable.

18  And there are a number of various programs that

19  are offered and that -- and they would assist you

20  in placement in one of those programs.  Is that an

21  accurate summary of that report, sir?

22          **INMATE SHEPPARD:**  Yes.

23          **DEPUTY COMMISSIONER SMITH:**  Or that letter?

24  And have you written any specific letters to

25  anyone with regard to employment?

26          **INMATE SHEPPARD:**  Yes.

27          **DEPUTY COMMISSIONER SMITH:**  Other than the

31

1  Oakland Private Industry Council?

2      **INMATE SHEPPARD:**  Yes (inaudible).  All of

3  those -- All of those letters I (inaudible).

4      **DEPUTY COMMISSIONER SMITH:**  Okay.  One of

5  the letters is to the College of Alameda inquiring

6  about possible employment, California Staffing

7  Services, Wherehouse Music, Gavin Industries and

8  so forth.  Quite -- I would say there are probably

9  some dozen or so letters.

10     **INMATE SHEPPARD:**  Probably a dozen --

11 probably a dozen.

12     **DEPUTY COMMISSIONER SMITH:**  Have you

13 received, other than the response from the Private

14 Industry Council, have you received responses from

15 any of the people that you've written to?

16     **INMATE SHEPPARD:**  Yes.  But they were saying

17 that they, they don't --

18     **DEPUTY COMMISSIONER SMITH:**  So what are the

19 responses generally?

20     **INMATE SHEPPARD:**  The responses generally

21 was that they couldn't assist me and some of them

22 said that I was overqualified for their position.

23     **DEPUTY COMMISSIONER SMITH:**  Okay.  So that

24 you still have to continue to do some --

25     **INMATE SHEPPARD:**  I have to continue.

26     **DEPUTY COMMISSIONER SMITH:**  -- to do some

27 searching --

32

1          **INMATE SHEPPARD:**  Yes.

2          **DEPUTY COMMISSIONER SMITH:**  -- some

3    development to establish some employment waiting

4    for you.  Is that right?

5          **INMATE SHEPPARD:**  That's true.  And I was

6    hoping that the letter from the Private Council

7    saying that they would support me in any need that

8    I need in that letter once they qualify me because

9    I'm also (inaudible).

10         **DEPUTY COMMISSIONER SMITH:**  Okay.  So you

11   clearly have things in motion to assist you were

12   you paroled.  Is that right?

13         **INMATE SHEPPARD:**  Yes.

14         **DEPUTY COMMISSIONER SMITH:**  Okay.  We sent

15   out what's known as 3042 notices to the various

16   criminal justice agencies that were involved in

17   your commitment.  We didn't receive any letters

18   back.  However we do have a representative from

19   the District Attorney's office here who will be

20   speaking.  I also looked through at the letters

21   that we received in support of your parole and

22   there's quite a number.  There's a letter from

23   your sister, Madeline Wallace, who supports your

24   parole.  From your wife, Irene Sheppard, who not

25   only supports your parole but would provide --

26   offers you a place to live and will assist you in

27   getting employment and talks about her need to

33

1    have you home.  From a friend of yours, Anthony

2    Lee, who offers to provide you with residence and

3    financial services and support.  A letter from --

4    signed by the members of the Roberson family, who

5    offer you support and recommend your parole.  A

6    letter from your mother, Kermith --

7         **INMATE SHEPPARD:**  Yes.

8         **DEPUTY COMMISSIONER SMITH:**  -- am I

9    pronouncing that right?

10        **INMATE SHEPPARD:**  Yes, Kermith.

11        **DEPUTY COMMISSIONER SMITH:**  -- who's

12   offering you housing and financial support and she

13   has actually written some three or four separate

14   letters in your support.  So she's, you know,

15   clearly a big fan of yours.  Debra Wilson, who's

16   your sister, Kerma Smith, who's your nephew.

17        **INMATE SHEPPARD:**  Niece.

18        **DEPUTY COMMISSIONER SMITH:**  Niece.  And

19   Anita Peele, who's a friend.  Lavena Crain, who

20   was your Office Services instructor, is that

21   right?

22        **INMATE SHEPPARD:**  That's correct.

23        **DEPUTY COMMISSIONER SMITH:**  And she's

24   offering her assistance and her support.  There's

25   also a letter from your daughter.  What's your

26   daughter's first name?

27        **INMATE SHEPPARD:**  Ayesha.

34

1       **DEPUTY COMMISSIONER SMITH:**  Ayesha.  And a

2    letter from the night gym supervisor, a Mr. Bob

3    Welch.  And there's also another letter that you

4    handed me also written by your daughter, Ayesha,

5    dated September of this year asking that you be

6    given a parole date, that she'd like to have you

7    home.  Any other, you know, documents or items

8    with regard to your parole plans that I haven't

9    covered?

10      **INMATE SHEPPARD:**  No, there's not.

11      **DEPUTY COMMISSIONER SMITH:**  All right.

12   Thank you very much and I'll return you to the

13   Chair.

14      **PRESIDING COMMISSIONER DALY:**  Okay.  Now's

15   the opportunity for questions to be asked.  Any of

16   the support letters that you have, are any of

17   those for Santa Clara County or are they all in

18   Oakland?

19      **INMATE SHEPPARD:**  They're all in Oakland.

20      **PRESIDING COMMISSIONER DALY:**  Okay.  So you

21   don't have any support plans for Santa Clara

22   County?

23      **INMATE SHEPPARD:**  Nothing (inaudible).  I

24   never had a (inaudible) address in California.

25   The crime was committed in Santa Clara County.

26      **PRESIDING COMMISSIONER DALY:**  Right.  That's

27   the county of commitment.

35

1    **INMATE SHEPPARD:**  Yes.  I had written -- And
2    that is to Santa Clara County but I hadn't got any
3    response to that.

4    **PRESIDING COMMISSIONER DALY:**  In your
5    participation in NA and AA, because you said that
6    you didn't have a drug problem, that you sold
7    drugs and did you take -- Start participation in
8    that because of the recommendation from the Board
9    or did you do it on your own?

10   **INMATE SHEPPARD:**  I started back in '92 in
11   Tracy and then the Board recommended that I get in
12   it and stay in it and I started participating and
13   started getting insight into the program.  As of
14   right now I'm secretary of that program and it's
15   been beneficial to me.

16   **PRESIDING COMMISSIONER DALY:**  Okay.  So you
17   benefited from it even if you didn't have a severe
18   drug problem.  In working through the steps, what
19   step is the most important to you?

20   **INMATE SHEPPARD:**  I would say number 10, to
21   continue taking inventory of myself and
22   (inaudible) trying to better myself.

23   **PRESIDING COMMISSIONER DALY:**  Okay.  Do you
24   have any questions, Commissioner Smith?

25   **DEPUTY COMMISSIONER SMITH:**  Yeah.  Just
26   something that I'd like to note from the records.
27   Since the county of commitment is Santa Clara

36

1    County -- and I'll address that -- The response
2    letter that you received from the Parole Community
3    Services Division regarding your request to
4    transfer to Alameda County, which is clearly where
5    all of your support is based.  And you know that
6    letter basically lays out the elements that you
7    would have to meet for such a transfer and
8    suggests that that's something that you pursue
9    prior to entering parole.  And I just want to note
10   to make sure that you understand that should a
11   transfer not be granted, that you'd be required to
12   return to the county of commitment.  And so that
13   you may need to be thinking about some secondary
14   or alternative parole plans in that county of
15   commitment in the likelihood, or the possibility
16   rather than likelihood, that a transfer wouldn't
17   be approved.  And I just comment that, make that
18   comment as information to you.  Okay?
19          **INMATE SHEPPARD:**  Yeah.
20          **DEPUTY COMMISSIONER SMITH:**  Nothing further.
21          **PRESIDING COMMISSIONER DALY:**  All right.
22   District Attorney, you have any questions?
23          **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**
24   Several.
25          **PRESIDING COMMISSIONER DALY:**  Okay.
26          **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**  I note
27   that the inmate has fathered a child since he's

37

 1    been down on a life term.  I'm wondering if he has

 2    with regularity supported financially that child.

 3         INMATE SHEPPARD:  At the time I was working

 4    PIA and the DBI I was supporting my child and

 5    sending home money.  Because of that my wife has

 6    been supporting my daughter -- As well as her

 7    modeling, help support herself also.

 8         PRESIDING COMMISSIONER DALY:  Okay.  And are

 9    you -- do you have a pay number now?

10         INMATE SHEPPARD:  No, I'm in vocation,

11    vocation now (inaudible) --

12         PRESIDING COMMISSIONER DALY:  Okay.

13    Vocation, okay.

14         INMATE SHEPPARD:  -- and when I was working

15    I did help support.

16         PRESIDING COMMISSIONER DALY:  Okay --

17    (inaudible).

18         DEPUTY DISTRICT ATTORNEY BRAUGHTON:  Has the

19    child received public assistance?

20         INMATE SHEPPARD:  Not at this time, no.  The

21    first year, year and a half she was receiving

22    public assistance temporarily.  But my wife has

23    (inaudible) herself with my daughter.

24         DEPUTY DISTRICT ATTORNEY BRAUGHTON:  I note

25    that the last 115 was for getting a positive urine

26    analysis that was taken after a visit.  Who was

27    the inmate visiting when he came back with a

38

1    positive urine?

2        **INMATE SHEPPARD:**  I was visiting my wife and

3    a friend of hers.

4        **PRESIDING COMMISSIONER DALY:**  Okay.  You

5    want to explain the positive urine analysis?

6        **INMATE SHEPPARD:**  The positive urine

7    analysis came back from amphetamines of the

8    (inaudible) medication, I mean the pain medication

9    I was taking in Tracy before they started to

10   discontinue use of it.

11       **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**  I have

12   no other questions then.

13       **PRESIDING COMMISSIONER DALY:**  Okay.  Do you

14   have anything else you want to say before we go to

15   closing statements?

16       **INMATE SHEPPARD:**  No.

17       **PRESIDING COMMISSIONER DALY:**  Okay.  You

18   want to close?

19       **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**  Thank

20   you.  I'm particularly aggravated about this case

21   and I don't want the inmate to think that a

22   significant part of it is directed toward him

23   because he's done pretty well in prison.  He's

24   educated himself, he has at least recently,

25   behaved himself.  What I find very egregious are

26   the people that are professionally paid to prepare

27   reports who ignore things that are just plain

39

1    facts.  For instance, the psychosocial assessment
2    was prepared by somebody, a fellow by the name of
3    Macomber, M-A-C-O-M-B-E-R.  And on the first page
4    of that report under substance abuse history, that
5    report says:  In fact he's never had a problem
6    with illegal drug use or alcohol abuse.  Well,
7    that's not true.  He had an offense related to
8    drugs here in prison, CDC 115.  Notwithstanding
9    the fact that in the very next paragraph, this
10   Macomber says:  The previous report noted that
11   Mr. Sheppard has a very few minor CDC 115s and one
12   was drug related.  This is not the case.  He has
13   never had any CDC 115s that were drug related.  He
14   obviously is overlooking things.  One thing that
15   he's overlooking is the probation officer's report
16   that was prepared after the second conviction.  I
17   point out on page five of that second probation
18   officer's report, the second paragraph, probation
19   officer is questioning the inmate:  When
20   questioned about his use and experimentation with
21   dangerous drugs and narcotics, the defendant,
22   meaning the inmate, reported that he used
23   marijuana daily, principally for relaxation.  He
24   also used cocaine by inhalation on occasions,
25   which he estimated to occur every three weeks.  He
26   denied using any other forms of controlled
27   substances but an examination of both his inner

40

1    arms revealed evidence of scarring on his right

2    inner arm.  When questioned as to the scarring,

3    the defendant indicated it was a result of prior

4    medical testing.  I would note parenthetically

5    that it has been my experience that medical

6    testing does not leave scarring.  The reason you

7    get scarring from illicit drug use is because of

8    using the unsanitary kinds of needles to inject

9    yourself.  You could have blood testing every day,

10   I had a ton of it in an Army hospital where they

11   would poke holes in me every day and you don't get

12   scarring from that.  In response to questions

13   concerning his alcohol consumption, the defendant

14   reported he drank beer on a daily basis for

15   purposes of relaxation.  Now --

16        **DEPUTY COMMISSIONER SMITH:**  Counsel, if I

17   may I'm going to interrupt you so I can

18   (inaudible) the tape.

19        [Thereupon, the tape was turned over.]

20        **DEPUTY COMMISSIONER SMITH:**  Okay.

21        **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**  This

22   Macomber compounds the difficulty on the final

23   page of his report in that first paragraph, Roman

24   numeral 15:  "It is evident that he does not have

25   a drug or alcohol problem, therefore it is not

26   recommended that he be required to submit to drug

27   testing or urine analysis testing."  I mean he's

42

1    it's considered that in California, got sent to
2    military's version of a prison long enough to
3    qualify as a prison prior.  He does have two
4    prison priors, by the way.  The second one being
5    his commitment to New York for some kind of a drug
6    problem.  He has been convicted of willful,
7    deliberate and premeditated murder.  That's the
8    only kind of first degree murder it could've been.
9    Two juries have convicted him of that.  It
10   revolved around a life of crime.  Even by his own
11   admission he's wandering around with a gun having
12   been previously convicted of two felonies and
13   being a drug dealer.  All of these things I think
14   should've been addressed in the report that was
15   prepared for the Board.  How can you make a
16   decision on a person with the kind of history that
17   this inmate has with a willful, deliberate
18   premeditated murder and the evident drug use that
19   has been involved with the kind of reports that
20   were prepared for you.  I respectfully request
21   that you deny a date to the inmate today and that
22   you make it a multiple year denial to allow him to
23   come to terms with the crime that he committed and
24   he did, so that you can decide that he's safe to
25   be released.  And until he does that, he's not
26   safe. Please don't release him.  Thank you.
27              **PRESIDING COMMISSIONER DALY:**  Okay.  Time

43

1    for you to do your closing statement.

2         INMATE SHEPPARD: First of all I want to

3    reiterate (inaudible) that I'm (inaudible) and I
     *That I regret what happen to Mr. Williams*

4    take full responsibility for this incarceration.
                                  *my*

5    I understand the nature and the magnitude of my

6    offense as well. I also wanted to point out that

7    I cannot change my past. The only thing I can

8    change is who I am sitting before you right now.

9    A man that has to (inaudible) changed his life in
                        *Tremendously*

10   order to provide, to be a productive member of

11   society which my record reflects.

12        PRESIDING COMMISSIONER DALY: You need to be

13   addressing the court.

14        INMATE SHEPPARD: During the course of this

15   hearing there was no evidence to show my

16   unsuitability. However I have presented you with

17   evidence, in fact shown you that I met all the

18   requirements of Title 15, 2281(b), on suitability.

19   From day one, 1981 I started programming to change

20   my life and I made my first accomplishment when I

21   received my high school diploma in 1983. In 1990

22   I graduated and received my diploma in Small

23   Business. In April 2000 I was certified an office

24   technician when I completed Office Services and

25   Related Technology. I just graduated and

26   completed computer repair making me A-plus

27   certified. And at this time I need 41 units to

44

1    receive my BA degree in Business Administration.
2    Therefore this Panel would note that the change
3    and the gains of my life are real.  I do not have
4    a history of violent behavior neither within the
5    community or in prison.  All my psych reports
6    look, look -- All my counseling reports are
7    favorable which I'd like to read.  When he stated
8    that --

9            **PRESIDING COMMISSIONER DALY:**  You're not to
10   -- You're not to be argumentative when talking
11   about what the District Attorney said to you.
12   Leave your statement strictly to your parole
13   suitability.

14           **INMATE SHEPPARD:**  I have numerous self-help
15   programs that I have completed which I have shown
16   you in the documents that I've presented again in
17   this hearing.  I have numerous academic vocations
18   that I have accomplished over the years which is
19   outlined in the packet.  High school diploma,
20   business training, Office Service and Related
21   Technology, computer repair, to name a few.  All
22   the original 128s is in my C-File.  I lack any
23   history of violent crime showing that this crime I
24   am incarcerated will never occur again.  I have
25   quite numerous marketable skills in computer,
26   office service, warehouse, (inaudible), bakery, to
27   name a few.  And I have realistic plans for

45

1  parole.  I have been tutoring other inmates for
2  the last 11 years because I want to give back to
3  those, to help them too become productive members
4  of society.  I have extensive stable relationships
5  with others in the community, such as my wife,
6  children, family and friends that have supported
7  me over the years and will continue to support me
8  upon my release.  My institutional activities
9  indicate an enhanced ability to function within
10  the rules and regulations of the law upon my
11  release.  I do not have a record of assault other
12  than a juvenile or committed a crime with the
13  potential of causing harm to others.  What has to
14  be looked at here is that I have changed my life.
15  I have changed my life and that's something that
16  nobody can deny.  And it's (inaudible) also.  The
17  counselor have agreed with me.  It's an
18  outstanding report, it just makes everything clear
19  as to where everybody is at this time.  When you
20  look at the laudatory (inaudible) chrono, the
21  education, vocation, when you look especially at
22  the self-help, the lifers therapy program, the
23  Narcotics Anonymous.  Right around 1990, that's
24  when all this came into play and it continues up
25  to today.  And if you look at the packet I gave
26  you you will see that I've made a conscious
27  decision that I'm going to turn my life around.  I

46

1    would not want to get into anymore trouble and I'm
2    going to improve my life and myself and that's
3    exactly what you would ask somebody in my
4    position.  Then from 1990 on and I think to the
5    present, that I haven't had a 115 in 11 years.
6    The psych report's also interesting --
7    Mr. Macomber that my achievement while in the
8    institution, level of performance, self-help
9    improvements are outstanding and my progress is
10   superior in comparison to other inmates that are
11   serving life time.  There are not many times you
12   can say in a psych report these kind of things.  I
13   would like -- I would ask that you to think about
14   all the positives that I have done and take into
15   consideration that I have changed my life and I
16   regret what happened to Mr. Williams.  Thank you.
17           **PRESIDING COMMISSIONER DALY:**  Okay we're
18   going to recess for deliberations at 17:40 hours.
19           **DEPUTY COMMISSIONER SMITH:**  You can leave
20   those documents here if you'd like.
21                   **R E C E S S**
22                   --o0o--
23
24
25
26
27

47

1       **CALIFORNIA BOARD OF PRISON TERMS**

2                 **D E C I S I O N**

3       **COMMISSIONER DALY:**  Okay we're back on

4    record.  In the matter of Irving Sheppard the

5    Panel has reviewed all of the information received

6    from the public and relied on the following

7    circumstances in concluding the prisoner is not

8    suitable for parole and would pose an unreasonable

9    risk of danger to society or a threat to public

10   safety if released from prison.  The offense was

11   carried out in an especially callous manner.  The

12   offense was carried out in a manner which

13   demonstrates an exceptionally callous disregard

14   for human suffering.  And the motive for the crime

15   was very trivial in relation to the offense in

16   that this was a drug death.  The conclusions are

17   drawn from a Statement of Facts wherein the police

18   responded to an apartment and saw the victim lying

19   on the floor with four gunshot wounds to his head

20   and when the murder weapon was recovered the

21   fingerprints from Sheppard were found on the paper

22   bag and newspaper containing the firearm.  The

23   victim and the prisoner had been engaged in a

24   narcotics business resulting in the victim owing

25   the prisoner a large sum of money.  The prisoner

26   has an escalating pattern of criminal conduct and

27   **IRVING SHEPPARD C-34952  DECISION PAGE 1  10/01/01**

48

1   has failed to profit from society's previous

2   attempts to correct his criminality and those

3   attempts included two prison terms, juvenile camp

4   and a county jail. He has an unstable social            *Never in*
                                                            *County Jail*

5   history and prior criminality which includes

6   offenses from the age of 10 from bike theft, auto

7   theft, grand larceny, stolen property and

8   unauthorized use of a vehicle. And as an adult,

9   theft and robbery, bad conduct discharge from the

10  Army, menacing, possession of a controlled

11  substance and drug paraphernalia and possession

12  and sale of cocaine which was dismissed and then

13  the incident offense. The prisoner has, actually

14  you've programmed very well. You've been doing a

15  lot of very, very good things and I really have to

16  commend you for continuing on with your education.

17  The -- Your parole plans are not in the county of

18  commitment and, you know, whether or not, you need

19  to look into this a little bit more if you go back

20  to the county of commitment. It's something that

21  you might want to think about, doing dual parole

22  plans (inaudible) and you do not yet have

23  acceptable employment plans although we've noted

24  that you have sent out a number of resumes in an

25  attempt to obtain a job. The Hearing Panel notes

26  that responses to 3042PC indicate an opposition

27  **IRVING SHEPPARD C-34952   DECISION PAGE 2   10/01/01**

49

1    for a finding of parole suitability and

2    specifically from the District Attorney in Santa

3    Clara County.  Other information bearing upon

4    suitability would be the attitude towards the

5    crime and the continuous denial for the

6    responsibility of the death of the victim with

7    regard to the actual shooting.  Although he does

8    acknowledge being involved in the sale of drugs

9    and in the element that could have perhaps created

10   this.  That the prisoner's gains are recent and he

11   must demonstrate an ability to maintain gains over

12   a period of -- a longer period of time.  When

13   we're looking at the positive things that you have

14   done, working on your two vocations in vocation

15   Computer Repair Programming and your Office

16   Service and Technology.  And the positive things

17   that you've been doing in the tutoring program,

18   you're taking your class in your Alternatives to

19   Violence and Training the Trainer.  Your Anger

20   Management, your Breaking Barriers, your Logo

21   Mentoring workshop and your participation in NA

22   and AA.  This is going to be a two-year denial at

23   this time.  The Panel finds that it is not

24   reasonable to expect that parole would be granted

25   at a hearing during the following two years.  And

26   specific reasons for this are:  The prisoner

27   **IRVING SHEPPARD C-34952  DECISION PAGE 3  10/01/01**

50

1    committed the offense in an especially cruel

2    manner in that a person he was dealing drugs with

3    was shot in the head four times and killed. The

4    offense was carried out in a dispassionate manner

5    and the offense was carried out in a manner which

6    demonstrates an exceptionally callous disregard

7    for human suffering. And the prisoner has an

8    extensive history of criminality or misconduct as

9    it was outlined earlier in this reading. He has a

10   history of unstable or tumultuous relationships

11   (inaudible) goes back to his dealings on the

12   street and his use of drugs from a very early age.

13   Therefore a longer period of observation and

14   evaluation of the prisoner is required before the

15   Board should find the prisoner suitable for

16   parole. Asking that he remain disciplinary free

17   -- This is going to be very important. You've

18   been really good at that so I don't, since 1990,

19   so I don't anticipate there would be any problems

20   with that. And if it's available, continue with

21   your upgrade vocationally and educationally and if

22   available, participate in the self-help and the

23   therapy programming. We're also going to request

24   a new psychological report be done for the next

25   Board hearing. And specifically we're going to

26   ask the psychologist to review the probation

27   **IRVING SHEPPARD C-34952   DECISION PAGE 4   10/01/01**

51

1    officers' reports, the concerns that were outlined

2    by the District Attorney here today and the

3    minimization.  Minimization of your drug use and

4    minimization of your involvement in this homicide

5    and your denial of committing the life crime to

6    try to give us a better understanding of that.

7    With that, any comments, Commissioner Smith?

8        **DEPUTY COMMISSIONER SMITH:**  Mr. Sheppard,

9    I'd just like to congratulate you on your efforts

10   up to this point.  This is only your second

11   hearing and in my view you're much further along

12   than many of the people that come and sit before

13   us.  And I want you to take some positive from

14   that and feel good about the accomplishments that

15   you've made and, excuse me, have the opportunity

16   in a couple of years to sit again.  I look forward

17   to seeing you even further in continued

18   accomplishments on your part and you'll be all the

19   closer.  I wish you well.

20       **INMATE SHEPPARD:**  I feel your denial of --

21   Well, what I'd like to know is that -- What is it

22   else that you asking for me to do to come back in

23   order to receive a date?  I mean what else that

24   you want me to do that I, you know, that you

25   saying that you asking me to do?

26       **PRESIDING COMMISSIONER DALY:**  Mr. Sheppard,

27   **IRVING SHEPPARD C-34952  DECISION PAGE 5  10/01/01**

52

1    you are committed 29 years to life for a homicide

2    case and, like I said here, we're not here to

3    retry the facts.  The facts have already been

4    proven in court.  It was an awful crime, your

5    minimization of the use of drugs and some of your

6    history and your denial in the participation in

7    the incident offense -- I don't have any way of

8    determining the facts on that.  They've already

9    been established by the courts.  What we're asking

10   for you to do is continue along the same lines

11   that you're doing with your vocation, with your

12   education and to try to firm up your parole plans.

13   Continue with your resume, sending that out and

14   see what you can do to firm up those plans.  Okay?

15        **INMATE SHEPPARD:**  Okay.

16        **PRESIDING COMMISSIONER DALY:**  All right.

17   Hearing is terminated at 18:02 hours.

18        **DEPUTY COMMISSIONER SMITH:**  Good luck, sir.

19   And might I say that I think you did an

20   exceptional job representing yourself.

21        **INMATE SHEPPARD:**  Thank you.

22        **DEPUTY COMMISSIONER SMITH:**  Counsel, thank

23   you.

24                    --o0o--

25   **PAROLE DENIED TWO YEARS**

26   **EFFECTIVE DATE OF THIS DECISION __ OCT 1 9 2001 __**

27   **IRVING SHEPPARD C-34952  DECISION PAGE 6  10/01/01**

53

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, DEBRA S. BRADFUTE, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 52, and which recording was duly recorded at FOLSOM STATE PRISON, at REPRESA, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of IRVING SHEPPARD, CDC No. C-34952, on OCTOBER 1, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated October 15, 2001, at Sacramento County, California.

Debra S. Bradfute
Transcriber
**CAPITOL ELECTRONIC REPORTING**



# TOASTMASTERS INTERNATIONAL

**Greg Giesen**
Manager
Membership and
Club Extension

May 24, 1990


Irving Sheppard
P.O. Box 600
Tracy, CA  95376-0600

                              GC-19

Dear Mr. Sheppard:

It is our privilege to send you the enclosed Competent
Gavelier Certificate for your completion of the first section
of the Toastmasters Communication and Leadership Program.

We take this opportunity to extend congratulations on your
accomplishment and to offer our best wishes toward your
continued progress in your Gavel Club and member programs.

We suggest you arrange with your Educational Vice-President
for special presentation a club meeting.  This ceremony will
help to encourage your fellow members to continue in their
program.

Your next step is completion of the Advanced Communication and
Leadership Manuals, which are enclosed.  Upon completion, you
will have earned recognition as an Able Gavelier.

Best wishes for your continuing achievement in communication
and leadership development.

Sincerely,

Greg Giesen, ATM
Manager

GG:jj
Enclosure



1742

# GAVEL CLUBS

*an affiliate of Toastmasters International*

*honors*

## Irving Sheppard

*as a*

# Competent Gavelier

for successful completion of the Toastmasters
COMMUNICATION AND LEADERSHIP PROGRAM

CLUB PRESIDENT

EXECUTIVE DIRECTOR
TOASTMASTERS INTERNATIONAL



27



Certificate of Participation

The Road to Freedom

For his co...
*Good Me...*
Self-Help Gr...

*Jim McClary*
Group Sponsor

*Rev. Roland S. Ruffin*
Protestant Chaplain

This certificate is being awarded to:

# Irving Sheppard

Congratulations on a job well done!

This certificate is given in honor of successfully completing the

# LIFER GROUP

with an emphasis on

## STRESS MANAGEMENT, ANGER CONTROL and RELAXATION

May 9, 1995

M. J. Morris, Ph.D
**M. J. MORRIS, Ph.D.**
**Staff Psychologist**

G. Sainz, M.D.
**G. SAINZ, M.D.**
**Health Care Manager**



*This is to certify that*

Irving Sheppard     C34952

has successfully completed an Anger Management Program at Folsom State Prison.

December 28, 1999

Reverend Thomas Maguire
Chaplain & Instructor

Tipton C. Kindel
Community Resources Manager

# Certificate

## Sierra Foothills Alternative to Violence Project
### Workshop for Training in Non-Violence



RESPECT FOR SELF · CARING FOR OTHERS

*This is to Certify that*

## Irving Sheppard

*Has Satisfactorily Completed the Basic Course in Non-violent Conflict Resolution*

Bob Barry Kevin Roland Stephen Jacob

Mark R. Phipps

Trainers

August 19, 1999
_____
Date



# Certificate

## From a Handguilts Alternative to Violence Workshop for Training in Non-Violence

RESPECT FOR SELF — CARING FOR OTHERS

This is to Certify that

## IRVING SHEPPARD

Has Satisfactorily Completed the Advanced Course in Non-violent Conflict Resolution

32



*I. SHEPPARD*

has successfully completed

# LOGO-MENTORING WORKSHOP

**A 12-hour workshop synthesizing Viktor Frankl's
Logotherapy ("Man's Search for Meaning")**

*Self-Analysis • Pathways to Change • Decision Making and Thinking Skills • Goal Setting and
Self Improvement • Self-Esteem and Positive Motivation • Substance Abuse and Recovery
Life-long Learning • Responsibility and Accountability*

**This** *10th* **day of** *MARCH* **2000**

G. Hamilton, Peer-Instructor

Dr. H. E. Shrum, Program Coordinator



This is to certify that

# IRVING SHEPPARD

Has completed

Gordon Graham's
**A Framework for**

# BREAKING BARRIERS
A Cognitive Reality Model

On    OCTOBER 25,  2000

_____
Dr. H. E. Shrum
Re-Entry Coordinator

_____
Mark E. Phelps
Peer Facilitator

_____
R. Churchill
Supervisor of Academic Instruction



# Parenting Program

## Certificate of Completion

presented to

**Irivng Sheppard**

on March 23, 2001

Case Management Specialist
and
Program Facilitator

FRIENDS OUTSIDE
National Organization

Friends Outside since 1955

OFFICIAL CERTIFICATE ISSUED IN BLUE AND BLACK TONES. DUPLICATES WILL BE ISSUED BY FRIENDS OUTSIDE NATIONAL OFFICE ONLY.
VERIFICATION OF COMPLETION WILL BE CONFIRMED AND SIGNATURES PROVIDED: 3031 TISCH WAY, SUITE 507, SAN JOSE, CA 95128

33b



# Certificate of Achievement

Folsom State Prison, (FOL)

hereby grants Peer Educator status to

## Irving Sheppard

Certificate Number 01-FOL-075

in recognition of the successful completion of the
Basic Infectious Disease Requisite for the

Inmate Peer Education Program

May 2001

S. Hand, M.D.
Health Care Manager (A)

C. Elston, R.D.A.
Program Coordinator

R. Campbell
Warden

Shona Latimer
Regional Coordinator

33c

NAME and NUMBER    **SHEPPARD**    C–34952          E–241                    CDC-128-B (Rev. 4/74)

Inmate Sheppard, C–34952, has been a member of Gavel Club #19 since September 1987. His attendance and particpation have been excellent. Inmate Sheppard has completed five(5) of his ten(10) required speeches and has served as Topic Master, Toastmaster and in several other capacities.

Inmate Sheppard has made important strides in improving his communication skills and is to commended for his assistance to other members.

cc:C-File
     Counselor
     Inmate                              H.R. Bolce
     File                                Staff Sponsor

DATE   **October 11, 1988**          "LAUDATORY CHRONO"    D.V.I.          GENERAL CHRONO

---

NAME and NUMBER    SHEPPARD        C–34952      E–241      (B)              CDC-128-B (Rev. 4/74)

Having fulfilled the requirements prescribed by Gavel Club #19, an affiliate of Toastmaster's International, Inc., Inmate SHEPPARD, C–34952, has been awarded his Competent Gaveleer certif-icate. The Competent Gaveleer is a Communication and Leadership Skills Basic program; the equivalent of Competent Toastmaster certification in Toastmaster's International. In addition to the above accomplishment, Inmate SHEPPARD has been active in Gavel Club #19 since July 14, 1987.

ORIG:  Central File
   cc:  Counselor
        Inmate
                                         SHIRLEY MITCHELL
                                         Sponsor
                                         Gavel Club #19 – Education

DATE   August 9, 1990    [LAUDATORY]    DVI–Tracy, California          GENERAL CHRONO

34

Inmate Sheppard, C-34952 has participated in a study techniques of anger control through the "ROAD TO FREEDOM RECOVERY PROGRAM." This program was develope by a Christian Psychiatrist named Dr. Abraham low. The book, "Mental Health through Will Training" provides the resource material for weekly group discussion during which time impulses, symptoms and principles such as "temper," "emotional reactions,"imagination" and/or self-control are discussed and practiced through role-playing and constructive critique. An Instructor conducts the sessions on a weekly basis. Inmate Sheppard has completed 17-weeks of classroom study. The duration of each class is approximately 2-hours/ one day per week.

      Orig: CENTRAL FILE

CC: PROTESTANT CHAPLAIN
    INMATE
    COUNSELOR

Rev. Roland S. Ruffin
Protestant Chaplain / DVI

DATE    **APRIL 17, 1995**    **\*\*INFORMATIVE/COUNSELING\*\***    GENERAL CHRONO

---

NAME and NUMBER    SHEPPARD, IRVING    C-34952    C-242    CDC-128-B (Rev. 4.74)

This student has participated in a study of techniques of anger control through the "ROAD TO FREEDOM RECOVERY PROGRAM." These techniques have been developed by a Psychiatrist named Dr. Abraham Low. The book, "Mental Health through Will Training" provides the resource material for weekly group discussions during which time destructive impulses, "tempers," emotions, and negative reactions to environmental stimuli are discussed and practiced through role-playing and constructive critique. An Instructor conducts the sessions on a weekly basis. This student has participated in classroom study and completed <u>some</u> home work assignments.

      Orig: CENTRAL FILE

CC: PROTESTANT CHAPLAIN
    INMATE
    COUNSELOR

JIM McCLARRY
Road To Freedom Instructor

ATE    8-16-1995    GENERAL CHRONO

35

**NAME: SHEPPARD, IRVING**      CDC #: C-34952      **HOUSING: C-242**   **CDC 128-C**

Mr. Sheppard has actively participated in a 22 week therapy group for Lifers. The focus of the group has been on stress management, anger control and relaxation. He has learned much about himself. He is better able to recognize stressors in his life and how to effectively manage them. Furthermore, he is able to identify the emotional aspects of anger and appropriately express his anger. He has benefited from the group as well as benefiting the group.

MICHAEL J.MORRIS, Ph.D.
Staff Psychologist

DATE: 4/27/95              DVI  st          PSYCHIATRIC

Orig:   C-File
cc:    Medical Record
       CCI T. Sukhram
       Inmate
       File Copy


**NAME: SHEPPARD, IRVING**      CDC #: C-34952      **HOUSING: C-242**

Mr. SHEPPARD has actively participated in a 20 week therapy group for Lifers. The focus of the group has been on stress management, anger control and relaxation. He has learned much about himself. He is better able to recognize stressors in his life and how to effectively manage them. Furthermore, he is able to identify the emotional aspects of anger and appropriately express his anger. He has benefited from the group as well as benefiting the group.

Michael J.Morris, Ph.D.                    Signature
Staff Psychologist

Orig:   C-File
cc:    Medical Record
       CCI J. ALLEN
       File copy
       Inmate

DATE: 4/29/95          PSYCHIATRIC              DVI/st   CDC 128-C

NAME and CDC: Sheppard, I. C34952 5-AB2-40    Folsom State Prison    CDC-128B(Rev. 4/74)

Inmate Sheppard, I. has been attending Anger Management Class at Folsom State Prison. This program consists of 10 units of 1½ hour each. The material presented is based on the American Correctional Association Program 'Cage Your Rage.' This is augmented by materials looking at the causes of anger - life history - and techniques to focus & manage anger positively. This has been very enthusiastic about this program. He has been very active in class participation, and has a perfect attendance record. I want to commend inmate Sheppard, I. on his efforts to improve.

Orig: C-File
cc: Inmate
Chapel File

Reverend Thomas Maguire    /vp
Chaplain & Instructor

DATE: December 28, 1999    LAUDATORY CHRONO    C:\1AIRPORT.DOC

---

**I/M NAME:** SHEPPARD    **CDC#:** C-34952    **HOUSING:** 4-A1-12

I/M SHEPPARD, CDC# C-34952 has successfully completed a 21-hour *Basic Alternatives to Violence Project* workshop, held on August 16, 17, 18, 19, 1999 in the Education Annex. The goal of the Basic workshop is to help inmates learn new skills and attitudes that lead to fulfilling and crime-free lives. It is an intensive learning experience taking place over the course of three days. Inmates participating in the Basic workshop can attend it only once, but may participate more than once in the 'Advanced' and the 'Training-for-Trainers' workshops. The Basic workshop focused on primary conflict resolution skills, focusing on affirmation, communications, cooperation, and creative conflict resolution. [A 03.02.05, A 03.02.06, A 03.02.07]

**CDC 128-B  Date:** 08/19/99    cc: C-File    Signature  *HES/AEC*

Folsom State Prison    AVP Sponsor, x4527
Alternatives-To-Violence-Project Workshop

---

**I/M NAME:** SHEPPARD    **CDC#:** C-34952    **HOUSING:** 4-A1-12

I/M SHEPPARD, CDC# C-34952 has successfully completed a 21-hour *Advanced Alternatives to Violence Project* workshop, held on October 18, 19, 20, & 21, 1999 in the Education Annex. The goal of the Advanced workshop is to build on the skills and attitudes developed in the Basic workshop, skills and attitudes that lead to fulfilling and crime-free lives. It is an intensive learning experience taking place over the course of four days. The Advanced workshop allows a deeper look at aspects of violence such as sterotyping, fear and anger. Inmates participating in the Advanced workshop may participate more than once in the 'Advanced' and the 'Training-for-Trainers' workshops. The Advanced workshop builds on communications, cooperation and problem solving, and related topics such as AIDs, gender issues and forgiveness. [A 03.02.05, A 03.02.06, A 03.02.07]

**CDC 128-B  Date:** 10/21/99    cc: C-File    Signature
Folsom State Prison    AVP Sponsor, x4527
Alternatives-To-Violence-Project Workshop

37

**I/M NAME:**  SHEPPARD _____ **CDC#:** C34952 _____ **HOUSING:** B5ABT240L

I/M SHEPPARD, CDC# C34952 has successfully completed a 21-hour *Training for Trainers Alternatives to Violence Project* workshop, held on June 19, 20, 21, & 22, 2000 in the Education Annex. The goal of the Training for Trainers workshop is to train inmates as facilitators to assist in Basic and Advanced workshops. It is an intensive learning experience taking place over the course of three days. Inmates participating in the Training for Trainers workshop may attend it more than once. The Training for Trainers workshop focused on the techniques for teaching primary conflict resolution skills, focusing on affirmation, communications, cooperation, and creative conflict resolution. [A 03.02.05, A 03.02.06, A 03.02.07]

**CDC 128-B  Date:** 6/22/00            cc: C-File /Inmate/Education File       **Signature** _Dr. Harvey J. Shrum_
Folsom State Prison                                                              AVP Sponsor, x4527
                                                                                Alternatives-To-Violence-Project Workshop

---

**I/M NAME:**  SHEPPARD _____ **CDC#:** C-34952 _____ **HOUSING:** 5-AB-240

I/M SHEPPARD, CDC# C-34952 has successfully completed a 15-hour *Logo Mentoring workshop*, held on . Logo Mentoring is a synthesis of Viktor Frankl's Logotherapy (Man's Search for Meaning) and Cognitive Reality. The multiple objectives of the workshop are: (1) to increase one's awareness that one's life becomes meaningful through experiences & encounters with others, through creative works & deeds, & through one's attitude toward unavoidable events; (2) to increase one's awareness of one's direction in life through intensive journaling; (3) to change one's negative direction through use of the cognitive reality model; (4) to increase one's self-esteem in healthy ways; (5) to set & achieve goals for self-improvement; (6) to escape the addiction cycle; (7) to constructively deal with anger & stress; (8) to develop a positive attitude toward lifelong learning; and (9) to accept & be accountable for the responsibility that goes hand-in-hand with freedom. Change was measured with the "Purpose-in Life" screening tool.

**CDC 128-B  Date:** 03/10/00          cc: C-File                            **Signature** _Dr. W. Shrum_
Folsom State Prison                                                          Dr. Harvey E. Shrum
                                                                            Re-Entry Coordinator - Logotherapy Sponsor
                                                                            Education Annex  Ext.4527

**I/M NAME:** SHEPPARD          **CDC#:** C34952          **HOUSING:** B5ABT240

I/M SHEPPARD, CDC# C34952 volunteered to facilitate Breaking Barriers - A Cognitive Reality Model. He has been trained to leas the 21 hour workshop which was given in the Education Annex on October 23rd thru 25th 2000. This workshop is directed toward creating within its participants an awareness that change is possible and the providing tools to develop cognitive thinking skill so change can take place. The workshop addresses how habits, attitudes, beliefs, and expectations play a key role in how one's future unfolds. Breaking Barriers provides hands-on practice in using these concepts on daily basis.

**CDC 128-B  Date:** 10/25/00          cc: C-File          Signature _____
Folsom State Prison                                                  Breaking Barriers Sponsor
                                                                      Ms. A. Carter/ Dr. H. Shrum

CDC-128-B Rev. 4/74

**NAME and NUMBER**

Irving Sheppard, C-34952

Voluntarily participated in the FRIENDS OUTSIDE'S Parenting Education Program for incarcerated parents. This proram is designed to reduce the incidence of child abuse and neglect in high risk parents and helps set the stage for successful reunification of the family after release. It is first and foremost a parenting education program which meets the needs of those under court order for parenting as a condition of family reunification by including those topics that are mandated by the courts in the State of California. The program consists of 30 hours of interactive instruction. Providing information and encouraging understanding of developmental stages, in order to foster reaonable expectations. In addition parents are taught, how to interact appropriately with their children at different ages, attend to their physical, emotional, social and educational needs appropriately, and recognize and deal with developmental delays. Throughout, Student Sheppard was attentive and actively participated.

Clara L. Barajas, Program Facailiçator

March 23 2001

DATE                                                                **GENERAL CHRONO**

**NAME and NUMBER       Irving Sheppard          CDC-128-B**

This 128-B chrono is being issued to acknowledge that the above named inmate has successfully complete the training course in communicable disease risk reduction and prevention classes conducted by the HIV/STD Peer Education Program.

As a result of this training, the above named inmate is now qualified to conduct risk reduction and prevention classes to his peers in both formal and informal settings within the prison setting, as well as the public sector.

The Peer Education Program wishes to commend him for his hard work, studies, and dedication to the cause of reducing and eliminating the risk of infection from communicable diseases such as, HIV/AIDS, Sexually Transmitted Diseases, Tuberculosis and Hepatitis.

**DATE:  June 11, 2001**          C. Elston, EDA
                                  Cassandra Elston,
                                  Program Coordinator
                                            General Chrono

# Certificate of Appreciation

Awarded to

## Irving Sheppard

### From The Deuel Vocational Institution
### Peer Tutoring Program

This certificate is awarded for four years of faithful volunteer service.
From 1992 to 1996, Inmate Sheppard has given freely of his time to this program.
Without such a commitment the Peer Tutoring Program at DVI could not exist.
His willingness to assist and encourage others to learn is appreciated.

Awarded this date, September 20, 1996.

*Dave Davis*
Community Resou...

C-34952

# NARCOTICS ANONYMOUS RECOGNITION CERTIFICATE

Congratulations For Meeting Your Goal Towards Recovery
It Works When You Work It!

This certificate is to commend

## SHEPPARD

For living "One Day At A Time" in sobriety and your willingness to bring
this message to others.

Presented this 2nd day of May, 2001.

*Penny C. Vaughn*

Penny Vaughn
**Staff Sponsor**
Narcotics Anonymous Program
Folsom State Prison



# P.H.A.S.E.S.

## *Personal Health And Self Enhancement System*

### *This Certificate has been awarded to*

## **MR. IRVING SHEPPARD**

### *For Completion of the Basic Course in*
### *"P.H.A.S.E.S. Life Skills"*
### *This 12th Day of September in the year 2003*

*This Twelve Week Course is given on the prison yard during the inmate's recreational time, by an Inmate Peer Facilitator. The emphasis is on personal initiative as it been found that skills practiced on a daily basis become a part of an individual's life. The P.H.A.S.E.S. Course emphasizes the abatement of drug abuse and violence and prepares the inmates to become productive citizens. The subjects covered include but are not limited to Stress Mastery, Relationships & Communication, Work & Career, Self Care, Nutrition and Diet, Exercise & Fitness, Financial Health, Play & Creativity, Environmental Responsibility, Beliefs & Self-Esteem, Life Purpose & Service, and Spirituality.*

P.H.A.S.E.S. Facilitator
Folsom Prison

Ronald Lorimor, Yard – Lite ULC
Board of Directors, Sponsor Prison Outreach

28

# ♣*Yard – Lite ULC*♣

## *Prison P.H.A.S.E.S Program*
## *P.O. Box 12*
## *Timnath, CO  80547*

*10/6/2003*

*To:  All Concerned*

*Regarding:   Mr. Irving Sheppard*

*Subject: Completion of Twelve-Week Basic Course*

*This Letter is being awarded for Completion of the Twelve Week Basic Course for the Personal Health And Self-Enhancement System (P.H.A.S.E.S.)*

*This Intensive Twelve Week Course is given on the prison yard during the inmate's recreational time, by a Senior Inmate Peer Facilitator.  The emphasis is on personal initiative as it has been found that skills practiced on a daily basis become a part of an individual's life.*

*The P.H.A.S.E.S. Course emphasizes the abatement of drug abuse and violence and prepares the inmates to become productive citizens.*

*The subjects covered include but are not limited to Stress Mastery, Relationships & Communication, Work & Career, Self Care, Nutrition and Diet, Exercise & Fitness, Financial Health, Play & Creativity, Environmental Responsibility, Beliefs & Self-Esteem, Life Purpose & Service, and Spirituality.*

Johnny    Smith                                  Ronald Lorimor

*Inmate Facilitator*                                *Ronald Lorimor*
*Folsom Prison*                                      *Board of Directors,  Yard – Lite*
                                                    *Universal Life Church*
                                                    *Sponsor Prison Outreach*

29



GRENSTONE ADULT SCHOOL

This is to certify that

IRVING   SHEPPARD

HAS PARTICIPATED AS A

FACILITATOR

Gordon Graham's

A Framework for

BREAKING BARRIERS

A Cognitive Reality Model

From  October 2001 to October 2003

Dr. H. E.  Shrum
Re-Entry Coordinator

# BREAKING BARRIERS FACILITATOR

**NAME:**____ SHEPPARD_____ _____**CDC#:** C-34952 _____**HOUSING:** 5-AB2-40

Inmate <u>SHEPPARD,</u> CDC# <u>C-34952</u> has been volunteering in Breaking Barriers program as a Facilitator: A Cognitive Reality Model. He has been training individuals in a 21 hour workshop which are given in the Education Annex. This workshop is directed toward creating within its participants an awareness that change is possible and the providing tools to develop cognitive thinking skill so change can take place. The workshop addresses how habits, attitudes, beliefs, and expectations play a key role in how one's future unfolds. Breaking Barriers provides hands-on practice in using these concepts on daily basis. Inmate SHEPPARD has completed all necessary criteria for a facilitator, and should be commended for his efforts.

**CDC 128-B  Date:** <u>09/12/02</u>         cc: C-File; File         **Signature** _D.c.H.Shrum_
Folsom State Prison                    CCI; Inmate                   Breaking Barriers Sponsor
                                                                     Ms. A. Carter/ Dr. H. Shrum

**State of California**

# Memorandum  **FACILITATOR**

DATE: September 11, 2003

TO: **I/M SHEPPARD  C34952   Housing: 5AB2-40**

FROM: Dr. Shrum/Ms. Carter, Re-Entry Coordinators

SUBJECT: BREAKING BARRIERS - A Cognitive Reality Model

**Next Workshop: BREAKING BARRIERS/ANGER MANAGEMENT**

**Scheduled for: Sept. 16, 18, 19, 2003 (ANGER MANAGEMENT – Sept. 26th)**

The next Breaking Barriers - A Cognitve Reality Model is tentatively scheduled for the dates shown above, 0800 to 1400 daily. It will be limited in the number of participants. If you wish to attend the workshop *you must obtain your supervisor's initialed approval\* at the bottom of the form*. Please let us know as soon as possible so that we can develop a ducat list for those days. The workshop will be held in the Education Annex. Please remember that you *must* wear state issue clothing only to this class. Any questions by yourself or your supervisor may be directed to us at extension 4527.

<u>**Breaking Barriers: A Cognitive Reality Model**</u>

A no-cost workshop consisting of working with life's problems and identifying the points in one life that need to be addressed and resolved.

YES, I can make it: _Quincy Sheppard_ CDC# C-34952

**NO, I cannot make it:**

\*Note: Warden R. Campbell has approved the granting of "ETO" time for the Breaking Barriers workshop attendance per DR 3045.2 (e)(2)(G)(5) and recommends inmate attendance as a worthwhile activity.

**Supervisor's Approval: Yes (Initial)** _R_ **Date:** _9/15/03_

Please return to Ms. Carter or Dr. Shrum, Education Annex

_Dr. H. E. Shrum_
Dr. H. E. Shrum

32

**MEMORANDUM**
**State of California**

September 16, 2003

**TO:  SHEPPARD        C34952              B5ABT240**

**FROM:**   Dr. Shrum, Re-Entry Coordinator

**RE:**        **LIFE FORUM PRESENTATION SCHEDULE**



| **BREAKING BARRIERS** | | |
|---|---|---|
| TUE, THURS, FRI., SEPT.. 16TH, 18TH, & 19TH        8 AM | | |
| SHEPPARD        C34952              B5ABT240 | | |

The following dates and times have been selected for each of the Life Forum Members listed below.  Hopefully, these time slots will be agreeable.  However, if there is any conflict with your present schedule or you need a verification for your work supervisor please feel free to have your supervisor call Dr.  Shrum at Ext 4527. Thank you for your participation.

| HAMILTON | D-19499 | B5AAT102 | MON. | 9/29 | 8 AM |
|---|---|---|---|---|---|
| MENDOZA | B-56166 | B5AAT205 | THURS. | 10/2 | 8 AM |
| JONES | B-98000 | B5AAT127 | MON. | 9/22 | 8 AM |
| BRAR | C-04279 | B3SAT234 | THURS. | 9/18 | 8 AM |
| SIMMONS | C17460 | B5BAT101U | TUES. | 9/23 | 8 AM |

Dr.  Shrum, Re-Entry Coordinators
Education Annex,  Ext.  4527

33

# FACILITATOR

**State of California**

## Memorandum

**DATE:**   July 7, 2003

**TO: SHEPPARD**                    **C34952**              **5-AB240**

**FROM:**   Dr. Shrum/Ms. Carter, Re-Entry Coordinators

**SUBJECT:**   BREAKING BARRIERS:  Cognitive Reality Model

**Next Workshop:**                    **Breaking Barriers**

**Scheduled:** JULY 16, 17, & 18, 2003

The next Breaking Barriers - A Cognitive Reality Model and Anger Management
Workshop is tentatively scheduled for the dates shown above, 0730 to 1400 daily.  It will
be limited in the number of participants.  If you wish to attend the workshop *you must
obtain your supervisor's initialed approval\* at the bottom of the form*.  Please let us
know as soon as possible so that we can develop a ducat list for those days.  The
workshop will be held in the Education Annex.  Please remember that you *must* wear state
issue clothing only to this class.  Any questions by yourself or your supervisor may be
directed to us at extension 4527.

## Breaking Barriers: A Cognitive Reality Model

A no-cost workshop consisting of working with life's problems and identifying the
points in one life that need to be addressed and resolved.

**YES,** I can make it:   *Irving Sheppard* CDC# C - 34952

**NO,** I cannot make it:

*\*Note: Warden D. Butler has approved the granting of **ETO** time for the **Breaking
Barriers Workshop** attendance per DR 3045.2 (e)(2)(G)(5) and recommends inmate
attendance as a worthwhile activity.*

**Supervisor's Approval:** Yes (Initial) *JB*    Date: 7/14/03

Please return to Ms. Carter or Dr. Shrum,  Education Annex

_____    *Dr. H. E. Shrum*    _____
              Dr. H. E. Shrum

**'MEMORANDUM**
**State of California**

July 3, 2003

**TO:**    I/M SHEPPARD    C34952    B5ABT240

**FROM:**    Dr. Shrum, Re-Entry Coordinators

**RE:**    **LIFE FORUM PRESENTATION SCHEDULE**

**JULY RE-ENTRY CLASS**

The following dates and times have been selected for each of the Life Forum Members listed below.  Hopefully, these time slots will be agreeable.  However, if there is any conflict with your present schedule or you need verification for your work supervisor please feel free to have your supervisor call Ms.  Carter or Dr.  Shrum at Ext 4527. Thank you for your participation.

| | | | | | | |
|---|---|---|---|---|---|---|
| JAMES | C79960 | | | | | |
| SHEPPARD | C34952 | | Weds. | 7/16 | 8AM- 1:30 PM | |
| **BREAKING BARRIERS** | | | Thurs. | 7/17 | 8AM- 2:00 PM | |
| | | | Fri. | 7/18 | 8AM- 1:30 PM | |
| PHELPS | D-83007 | B5BBT131 | Thurs. | | 7/24 | 9 AM |
| BRAR | C-04279 | B3SAT234 | Thurs. | | 7/24 | 8 AM |
| JONES | B-98000 | B5AAT127 | Mon  . | | 7/21 | 8 AM |
| SIMMONS | C-17460 | B5BAT101 | Tues. | | 7/22 | 8 AM |
| MENDOZA | B-56166 | B5AAT205 | Mon. | | 7/28 | 8 AM |

*Q. Carter 4/*
_____
Dr.  Shrum, Re-Entry Coordinators
Education Annex, Ext.  4527

35

Corrected 01/02/03

**State of California**

# Memorandum　　　　　$\boxed{\textbf{FACILITATOR}}$

DATE:　　June 12, 2003

TO:　　**I/M SHEPPARD　　C34952　　　Housing: 5AB2-40**

FROM:　　Dr. Shrum/Ms. Carter, Re-Entry Coordinators

SUBJECT:　BREAKING BARRIERS - A Cognitive Reality Model

**Next Workshop:　　Breaking Barriers**

**Scheduled for:　　　JUNE 17, 19, & 20, 2003**

The next Breaking Barriers - A Cognitve Reality Model is tentatively scheduled for the dates shown above, 0800 to 1400 daily. It will be limited in the number of participants. If you wish to attend the workshop *you must obtain your supervisor's initialed approval* * *at the bottom of the form*. Please let us know as soon as possible so that we can develop a ducat list for those days. The workshop will be held in the Education Annex. Please remember that you *must* wear state issue clothing only to this class. Any questions by yourself or your supervisor may be directed to us at extension 4527.

### Breaking Barriers: A Cognitive Reality Model

A no-cost workshop consisting of working with life's problems and identifying the points in one life that need to be addressed and resolved.

(**YES**) I can make it: *Irving Sheppard*　　CDC# *C-34952*

**NO**, I cannot make it:

*Note: Warden R. Campbell has approved the granting of "ETO" time for the Breaking Barriers workshop attendance per DR 3045.2 (e)(2)(G)(5) and recommends inmate attendance as a worthwhile activity.

**Supervisor's Approval:** Yes (Initial) _____ . Date: _12/16/03_

Please return to Ms. Carter or Dr. Shrum, Education Annex

------

**AEC/HES**
Ms. A. E. Carter/Dr. H. E. Shrum

File:BRKBETO.DOC

**'MEMORANDUM**
**State of California**

June 12, 2003

**TO:**     I/M SHEPPARD          C34952          B5ABT240

**FROM:**     Ms. Carter and Dr. Shrum, Re-Entry Coordinators

**RE:**     **LIFE FORUM PRESENTATION SCHEDULE**



**MAY RE-ENTRY CLASS**

The following dates and times have been selected for each of the Life Forum Members listed below.  Hopefully, these time slots will be agreeable.  However, if there is any conflict with your present schedule or you need verification for your work supervisor please feel free to have your supervisor call Ms.  Carter or Dr.  Shrum at Ext 4527. Thank you for your participation.

| SHEPPARD | C34952 | | Tues | 6/17 | 8AM-2 PM |
|---|---|---|---|---|---|
| | | | Thurs. | 6/19 | 8AM-2 PM |
| **BREAKING BARRIERS** | | | Fri. | 6/20 | 8AM-2 PM |
| PHELPS | D-83007 | B5BBT131 | Tues. | 6/26 | 9 AM |
| BRAR | C-04279 | B3SAT234 | Thurs. | 6/26 | 8 AM |
| JONES | B-98000 | B5AAT127 | Mon . | 6/23 | 8 AM |
| SIMMONS | C-17460 | B5BAT101 | Tues. | 6/24 | 8 AM |
| MENDOZA | B-56166 | B5AAT205 | Mon. | 6/30 | 8 AM |
| HAMILTON | D19499 | B5AA102 | Mon. | 6/16 | 8 AM |

Dr.  Shrum, Re-Entry Coordinators
Education Annex,  Ext.  4527

Corrected 01/02/03

37

**MEMORANDUM**
**State of California**

February 14, 2003

**TO:**     I/M SHEPPARD     C-34952     B5ABT240

**FROM:**   Ms. Carter and Dr. Shrum, Re-Entry Coordinators

**RE:**     **LIFE FORUM PRESENTATION SCHEDULE / CLASS No. 03-043**


FEBRUARY RE-ENTRY CLASS

The following dates and times have been selected for each of the Life Forum Members listed below.  Hopefully, these time slots will be agreeable.  However, if there is any conflict with your present schedule or you need verification for your work supervisor please feel free to have your supervisor call Ms.  Carter or Dr.  Shrum at Ext 4527. Thank you for your participation.

| HAMILTON | D-19499 | B5AAT102 | Mon. | 3/3 | 8 AM |
|----------|---------|----------|------|-----|------|
| PHELPS | D-83007 | B5BBT131 | Mon. | 2/24 | 8 AM |
| SHEPPARD | C-34952 | B5ABT240 | Mon. . | 2/24 | 9-11AM |
| BRAR | C-04279 | B3SAT234 | Thurs. | 2/27 | 8 AM |
| JONES | B-98000 | B5AAT127 | Thurs. | 2/27 | 9 AM |
| SHEPPARD | C-34952 | B5ABT240 | Tues. | 2/25 | 8-2.PM |
| SHEPPARD | C-34952 | B5ABT240 | Wed. | 2/26 | 9-1:30PM |
| SIMMONS | C-17460 | B5BAT101 | Fri. | 2/21 | 8 AM |
| MENDOZA | B-56166 | B5AAT205 | Thurs. | 3/6 | 8 AM |

Dr.  Shrum/Ms.  Carter, Re-Entry Coordinators
Education Annex,  Ext.  4527

Corrected 01/02/03

**MEMORANDUM**
**State of California**

January 22, 2003

**TO:**    I/M SHEPPARD    C-34952    B5ABT240

**FROM:**    Ms. Carter and Dr. Shrum, Re-Entry Coordinators

**RE:**    LIFE FORUM PRESENTATION SCHEDULE / CLASS No. 03-023


JANUARY RE-ENTRY CLASS #2

The following dates and times have been selected for each of the Life Forum Members listed below.  Hopefully, these time slots will be agreeable.  However, if there is any conflict with your present schedule or you need verification for your work supervisor please feel free to have your supervisor call Ms.  Carter or Dr.  Shrum at Ext 4527. Thank you for your participation.

| BLAKE | D-59655 | B5AAT102 | Thurs. | 1/23 | 11 AM |
| HAMILTON | D-19499 | B5AAT102 | Tues. | 1/28 | 8 AM |
| PHELPS | D-83007 | B5BBT131 | Mon. | 2/03 | 8 AM |
| SHEPPARD | C-34952 | B5ABT240 | Mon. . | 2/03 | 9-11AM |
| BRAR | C-04279 | B3SAT234 | Thurs. | 1/30 | 8 AM |
| JONES | B-98000 | B5AAT127 | Thurs. | 1/30 | 9 AM |
| SHEPPARD | C-34952 | B5ABT240 | Tues. | 2/04 | 8-2.PM |
| SHEPPARD | C-34952 | B5ABT240 | Wed. | 2/05 | 9-1:30PM |
| SIMMONS | C-17460 | B5BAT101 | Fri. | 2/07 | 8 AM |
| MENDOZA | B-56166 | B5AAT205 | Tues. | 2/11 | 8 AM |
| BLAKE | D-59655 | B5AAT102 | Tues. | 2/11 | 10 AM |

Dr.  Shrum/Ms.  Carter, Re-Entry Coordinators
Education Annex,  Ext.  4527

Corrected 01/02/03

**MEMORANDUM**
**State of California**

January 02, 2003

**TO:** I/M SHEPPARD          C-34952      B5ABT240

**FROM:**    Ms. Carter and Dr. Shrum, Re-Entry Coordinators

**RE:**       **LIFE FORUM PRESENTATION SCHEDULE / CLASS No. 03-002**



JANUARY RE-ENTRY CLASS

The following dates and times have been selected for each of the Life Forum Members listed below.  Hopefully, these time slots will be agreeable.  However, if there is any conflict with your present schedule or you need verification for your work supervisor please feel free to have your supervisor call Ms.  Carter or Dr.  Shrum at Ext 4527. Thank you for your participation.

| BLAKE | D-59655 | B5AAT102 | Thurs. | 1/02 | 11 AM |
|---|---|---|---|---|---|
| HAMILTON | D-19499 | B5AAT102 | Thurs,. | 1/09 | 8 AM |
| PHELPS | D-83007 | B5BBT131 | Mon. | 1/13 | 8 AM |
| SHEPPARD | C-34952 | B5ABT240 | Mon. . | 1/13 | 9.AM |
| BRAR | C-04279 | B3SAT234 | Fri. | 1/10 | 8 AM |
| JONES | B-98000 | B5AAT127 | Thurs. | 1/16 | 8 AM |
| SHEPPARD | C-34952 | B5ABT240 | Tues. | 1/14 | 8-2.PM |
| SHEPPARD | C-34952 | B5ABT240 | Wed. | 1/15 | 9-2.PM |
| SIMMONS | C-17460 | B5BAT101 | Fri. | 1/17 | 8 AM |
| MENDOZA | B-56166 | B5AAT205 | Tues. | 1/21 | 8 AM |
| BLAKE | D-59655 | B5AAT102 | Tues. | 1/21 | 8 AM |

Dr.  Shrum/Ms.  Carter, Re-Entry Coordinators
Education Annex,  Ext.  4527

40            Corrected 01/02/03

MORANDUM
te of California

November 14, 20

**TO:**        I/M

**FROM:**    Ms. Carter and Dr. Shrum, Re-Entry Coordinators

**RE:**        LIFE FORUM PRESENTATION SCHEDULE / CLASS No. 02-318

**NOVEMBER RE-ENTRY CLASS**

The following dates and times have been selected for each of the Life Forum Member
listed below. Hopefully, these time slots will be agreeable. However, if there is an
conflict with your present schedule or you need verification for your work superviso
please feel free to have your supervisor call Ms. Carter or Dr. Shrum at Ext 4527
Thank you for your participation.

| HAMILTON | D-19499 | B5AAT102 | Tues. | 11/19 | 8 AM |
|----------|---------|----------|-------|-------|------|
| PHELPS | D-83007 | B5BBT131 | Fri. | 11/22 | 1 PM |
| SHEPPARD | C-34952 | B5ABT240 | Fri. | 11/22 | 10-2.PM |
| BRAR | C-04279 | B3SAT234 | Fri. | 11/22 | 8 AM |
| JONES | B-98000 | B5AAT127 | Thurs. | 11/21 | 8 AM |
| SHEPPARD | C-34952 | B5ABT240 | Tues. | 11/26 | 8-2.PM |
| SHEPPARD | C-34952 | B5ABT240 | Wed. | 11/27 | 10-2.PM |
| SIMMONS | C-17460 | B5BAT101 | Mon. | 12/02 | 8 AM |
| MENDOZA | B-56166 | B5AAT205 | Wed. | 12/04 | 8 AM |
| BLAKE | D-59655 | B5AAT102 | Thur. | 11/14 | 11 AM |
| BLAKE | D-59655 | B5AAT102 | Wed. | 12/04 | 10 AM |

Dr. Shrum/Ms. Carter, Re-Entry Coordinators
Education Annex, Ext. 4527

**MEMORANDUM**
**State of California**

October 22, 2002

**TO:**     I/M SHEPPARD          C-34952          B5ABT240

**FROM:**   Ms. Carter and Dr. Shrum, Re-Entry Coordinators

**RE:**     **LIFE FORUM PRESENTATION SCHEDULE / CLASS No. 02-296**



The following dates and times have been selected for each of the Life Forum Members listed below.  Hopefully, these time slots will be agreeable.  However, if there is any conflict with your present schedule or you need verification for your work supervisor please feel free to have your supervisor call Ms.  Carter or Dr.  Shrum at Ext 4527. Thank you for your participation.

| HAMILTON | D-19499 | B5AAT102 | Fri. | 10/28 | 8 AM |
| PHELPS | D-83007 | B5BBT131 | Thurs. | 10/31 | 8 AM |
| SHEPPARD | C-34952 | B5ABT240 | Thurs. | 10/31 | 8-2.PM |
| BRAR | C-04279 | B3SAT234 | Fri. | 11/1 | 8 AM |
| JONES | B-98000 | B5AAT127 | Thurs. | 10/31 | 8 AM |
| SHEPPARD | C-34952 | B5ABT240 | Tues. | 11/5 | 10-2.PM |
| SHEPPARD | C-34952 | B5ABT240 | Wed. | 11/6 | 9-1.PM |
| SIMMONS | C-17460 | B5BAT101 | Fri. | 11/8 | 8 AM |
| MENDOZA | B-56166 | B5AAT205 | Tues. | 11/12 | 11 AM |

Dr.  Shrum/Ms.  Carter, Re-Entry Coordinators
Education Annex,  Ext.  4527

**State of California**                                              <u>**FILE COPY**</u>

# Memorandum

DATE:     October 28, 2002

TO:       **I/M   SHEPPARD      C-34952        Housing:     B5ABT240**

FROM:     Dr. Shrum/Ms. Carter, Re-Entry Coordinators

SUBJECT:  BREAKING BARRIERS - A Cognitive Reality Model

**Next Workshop:        Breaking Barriers**

**Scheduled for:         October 31, 2002 and November 5 & 6, 2002**

The next Breaking Barriers - A Cognitive Reality Model is tentatively scheduled for the dates shown above, 0730 to 1400 daily.  <u>**Please circle the month you would like to attend**</u>.  It will be limited in the number of participants.  If you wish to attend the workshop *you must obtain your supervisor's initialed approval\* at the bottom of the form*.  Please let us know as soon as possible so that we can develop a ducat list for those days.  The workshop will be held in the Education Annex.  Please remember that you *must* wear state issue clothing only to this class.  Any questions by yourself or your supervisor may be directed to us at extension 4527.

<u>**Breaking Barriers: A Cognitive Reality Model**</u>

A no-cost workshop consisting of working with life's problems and identifying the points in one life that need to be addressed and resolved.

**YES**, I can make it:                              CDC#

**NO**, I cannot make it:

\*Note: Warden D. Butler has approved the granting of **ETO** time for the **Breaking Barriers Workshop** attendance per DR 3045.2 (e)(2)(G)(5) and recommends inmate attendance as a worthwhile activity.

**Supervisor's Approval:** Yes (Initial)_____ Date: _____

Please return to Ms. Carter or Dr. Shrum,  Education Annex

_____
**AEC/HES**
Ms. A. E. Carter/Dr. H. E. Shrum

File:BRKBLET.DOC

43

**MEMORANDUM**
**State of California**

September 30, 2002

**TO:**      I/M SHEPPARD        C-34952        5ABT240

**FROM:**    Ms. Carter and Dr. Shrum, Re-Entry Coordinators

**RE:**      **LIFE FORUM PRESENTATION SCHEDULE**



OCTOBER RE-ENTRY CLASS

The following dates and times have been selected for each of the Life Forum Members listed below.  Hopefully, these time slots will be agreeable.  However, if there is any conflict with your present schedule or you need verification for your work supervisor please feel free to have your supervisor call Ms.  Carter or Dr.  Shrum at Ext 4527. Thank you for your participation.

| HAMILTON | D-19499 | B5AAT102 | Mon. | 10/7 | 8 AM |
|----------|---------|----------|------|------|------|
| PHELPS | D-83007 | B5BBT131 | Thurs. | 10/10 | 8 AM |
| SHEPPARD | C-34952 | B5ABT240 | Thurs. | 10/10 | 8-2.PM |
| YELLEN | C-90518 | B5BAT236 | Thurs. | 10/10 | 8-2.PM |
| BRAR | C-04279 | B3SAT234 | Fri. | 10/11 | 8 AM |
| DRIVER | E-30443 | B5BBTI31 | Fri. | 10/11 | 9 AM |
| JONES | B-98000 | B5AAT127 | Tues. | 10/15 | 8 AM |
| SHEPPARD | C-34952 | B5ABT240 | Tues. | 10/15 | 8-2.PM |
| YELLEN | C-90518 | B5BAT236 | Tues. | 10/15 | 8-2.PM |
| SHEPPARD | C-34952 | B5ABT240 | Wed. | 10/16 | 8-2.PM |
| YELLEN | C-90518 | B5BAT236 | Wed. | 10/16 | 8-2.PM |
| SIMMONS | C-17460 | B5BAT101 | Thur. | 10/17 | 8 AM |
| MENDOZA | B-56166 | B5AAT205 | Mon. | 10/21 | 11 AM |

Dr.  Shrum/Ms.  Carter, Re-Entry Coordinators
Education Annex,  Ext.  4527

Case 2:16-cv-01655-WHA Document 1-2 Filed 08/25/2008 Page 32 of 40



# Men's Violence Prevention Program

be it known that

I. SHEPPARD

C3492

has successfully completed

**ATTESTED TO THIS**

August 25, 2005

_M. K. Brewer_
**Sponsor**

_Na'eem R. Washington_
**Facilitator**



# NARCOTICS ANONYMOUS

## CERTIFICATE OF RECOGNITION

### Congratulations For Meeting Your Goal Toward Recovery

### It Works When You Work It!

### This certificate is to commend

## SHEPPARD    C34952

in the Fellowship of Narcotics Anonymous, living "One Day At A Time," in sobriety, and his willingness to bring this message to others. For your participation throughout the calendar year of 2004.

J. A. Bishop
**Staff Sponsor**
**Narcotics Anonymous Program**
**Folsom State Prison**



# NARCOTICS ANONYMOUS

## CERTIFICATE OF RECOGNITION

Congratulations For Meeting Your Goal Toward Recovery

### It Works When You Work It!

This certificate is to commend

**SHEPPARD    C34952**

in the Fellowship of Narcotics Anonymous, living "One Day At A Time,"
in sobriety, and his willingness to bring this message to others.
For your participation throughout the calendar year of 2003.

**J. A. Bishop**
**Staff Sponsor**
**Narcotics Anonymous Program**
**Folsom State Prison**



F



State of California

*Vocational Education*

Completion of Program

for

**A+ Certified Technician Preparation**

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

**Issued to**

**Irving Sheppard**

**9/26/2001**
Date

**Robert de Boer**
Vocational Instructor

**Fred Ringer**
Supervisor Vocational Instruction

Log # 02-0500



State of California

*Vocational Education*

Completion of Program

for
VOL.02

OFFICE SERVICES & RELATED TECHNOLOGIES

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

Issued to

*IRVING SHEPPARD*

04/06/00
Date

L. CRANE
Vocational Instructor

F. RINGER
Supervisor Vocational Instruction

Log # 99-2209

# EDUCATION TRANSCRIPT OF

# *IRVING SHEPPARD*

**OFFICE SERVICES & RELATED TECHNOLOGIES**
**VOCATIONAL EDUCATION DEPARTMENT**
**GRAYSTONE ADULT SCHOOL**
**P.O. BOX 71**
**REPRESA, CA 95671**

During the period from 01/13/99 until 04/29/00 the following subjects were completed while enrolled in the Office Services & Related Technologies program as part of the Vocational Education Department at Graystone Adult School.

| DATE | UNIT # | TITLE | GRADE* |
|------|--------|-------|--------|
| 01/29/99 | V01.02.01 | ORIENTATION | COMP |
| 01/29/99 | V01.02.02 | SHOP & SITE SAFETY | COMP |
| 01/29/99 | V01.02.07 | ALPHABETICAL FILING/RECORDS MANAGEMENT | COMP |
| 03/02/99 | V01.02-I-C | PROOFREADING/PUNCTUATION | COMP |
| 03/08/99 | V01.02-III-M | ELECTRONIC CALCULATIONS | 97% |
| 03/08/99 | V01.02-II-G | BUSINESS ENGLISH | COMP |
| 03/29/99 | V01.02-I-A | BEGINNING TYPING | COMP |
| 04/30/99 | V01.03.07 | WORD PROCESSING - WORD 6.0 | 98% |
| 05/14/99 | V01.02-II-H | BUSINESS MATHEMATICS | 98% |
| 05/28/99 | V01.03.09 | SPREADSHEET SOFTWARE - EXCEL 5.0 | 97% |
| 06/21/99 | V01.02-III-Q | ACCOUNTING | 84% |
| 07/13/99 | V01.03.03 | INTRODUCTION TO COMPUTERS | 100% |
| 08/03/99 | V01.02-II-I | GENERAL BUSINESS | 88% |
| 09/02/99 | V01.03.05 | DATABASE - ACCESS 2.0 | 98% |
| 12/03/99 | V01.02-III-R | BUSINESS PRINCIPLES & MANAGEMENT | 93% |
| 12/03/99 | V01.03.11 | PRESENTATION SOFTWARE - POWERPOINT 4.0 | 93% |
| 01/31/00 | V01.02-II-F | INTERMEDIATE TYPING | COMP |
| 03/08/00 | V01.02-I-E | JOB PREPARATION | COMP |
| 03/24/00 | V01.02.17 | SMALL BUSINESS | 90% |
| 04/06/00 | V01.02-III-P | BUSINESS LAW | 91% |

* A listed grade denotes a subject that was completed with its corresponding grade, whereas a "COMP" denotes a subject that is not a graded subject within the curriculum or was credited as transfer units from another school.

LAVINA CRANE,    DATE   May 1, 2000
OFFICE SERVICES
INSTRUCTOR
W.A.S.C. ACCREDITED



St. John's University
31916 University Circle
Springfield, LA 70462
(504) 294-2129

November 8, 1995

Mr. Irving Sheppard
P.O. Box 600 / C-34952
Tracy, CA 95376-0600

Dear Mr. Sheppard:

Welcome to the undergraduate division of St. John's University. You have been formally admitted to the Department of Business Management as of November 3, 1995. Enclosed is the Graduation Notice that you will need to complete and mail three months prior to your January or July graduation.

After evaluating your file, you have been granted 82 semester hours of credit towards your Bachelor's degree. On the enclosed evaluation sheet, I have listed 27 semester hours of core curriculum, along with the current textbook prices. This leaves 14 elective hours for you to choose. Please select courses numbered below 500 in the department(s) of your choice to satisfy the 14 elective hours.

When sending your lessons to your Instructors, please be sure to also enclose a stamped self-addressed envelope with sufficient postage so your lessons and/or grades can be returned to you. Your lesson materials will be sent with each textbook that you order. You may order one or more textbooks when you remit your initial tuition payment, student activity fee, and Tuition Agreement Form. When you order textbooks be sure to add an additional $4.00 per book to cover mailing and insurance.

Enclosed you will find a Student Tuition Agreement Form. Please complete, sign and return within 30 days, along with your remittance of the $100.00 initial tuition payment and $17.50, 1/2 of the annual student activity fee of $35.00. You will need to call me if you plan on beginning your degree program more than 30 days of receiving this letter. Your tuition is listed on the back of the evaluation sheet. You may pay in full at this time or elect to pay monthly; a 10% carrying charge will be added if you pay monthly. The $150.00 graduation fee can be paid at this time or just prior to your graduation.

If you have any questions, please write or call the Office of Admissions. I can be reached weekdays between 9 a.m. and Noon and from 1 p.m. until 4:30 p.m. (CST). I will be happy to assist you.

Best wishes,

Ms. Sue Cooper
Office of Admissions

3

Office of Admissions
ST. JOHN'S UNIVERSITY

GR

Student's Name: Irving Sheppard          Soc. Sec. #: 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

Degree Pursued: Bachelor of Business Administration

Major: Business Management          Minor: Sociology

Colleges Attended:

St. John's Degree Program:

| Catalog # | Course Title | # Sem. Hrs. | Text Price |
|-----------|--------------|-------------|------------|
| BA   303 | Administrative Office Management | 5 | $ 39.00 |
| BA   408 | Managing Organizational Behavior | 5 | 25.00 |
| BA   423 | Business Law | 5 | 27.00 |
| Soc 101 | Introduction to Sociology | 3 | 17.50 |
| Soc 303 | Understanding Sociology | 4 | 20.00 |
| Psy 210 | Social Psychology | 5 | 20.00 |
| | Total Required Semester Hrs: | 27 | |
| Electives | Choose courses numbered below 500 in the department(s) or your choice | 14 | |
| | Total Semester Hours: | 41 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# St. John's University

31916 University Circle
Springfield, LA 70462 - 8234
(504) 294 - 2129
FAX (504) 294 - 2157
E-mail: stjohns@i-55.com
WWW: i-55.com/~stjohns

## Tuition Acknowledgement Form

Date: December 11, 1998

Dear _Irving Sheppard_,

\_\_\_\_ This is to confirm your St. John's University tuition payment for the month(s) of
_____ in the amount of $_____ has been received.
Your current tuition balance is $_____. Your next payment should be mailed
on the 25th of _____ so that it is received at the university on the
first of the following month.

_X_ We are in receipt of your 1998 student activity fee.

\_\_\_\_ Your $_____ late fee(s) for the month(s) of _____ has been received.

\_\_\_\_ We regret to inform you that your $10.00 late fee was not included with your
monthly tuition payment. In order to process your tuition payment, your $10.00 late
fee must be received at the university no later than _____.
Thank you for your prompt attention to this matter. We want to assist you in main-
taining your current active student status.

\_\_\_\_ We are in receipt of your graduation fee of $_____.

_X_ Comments: When you send your next monthly payment, please include your e-mail
address. To better serve our students, as of January of 1998, tuition acknowledgments
and other responses will be sent electronically to those who are on the internet.

Best wishes,

Beth Huszar
Office of Records

5



Business Training Institute

West Palm Beach, Florida

This Certifies That

IRVING SHEPPARD

Has Satisfactorily completed Small Business Operations prescribed for Graduation from this School and is therefore awarded this

Diploma

Given this thirtieth day of March nineteen hundred and ninety

Director

James L. Steinhauer

6

# Business Training Institute

**A Division of**
**Business Training International, Inc.**

301 U.S. 19 North
Suite 200
Clearwater, Florida 34625

## STUDENT TRANSCRIPT

Student Name: IRVING SHEPPARD                SS#_____

Address: _____DVI_____    City: TRACY    State: CA

Enrolled: 10-17-88    Graduated: 03-29-90    Dropped:_____    Term:_____

Program/Course:    SMALL BUSINESS OPERATION

| COURSE NO. | HOURS | DESCRIPTION | GRADE | GPA | COMMENT |
|---|---|---|---|---|---|
| MG-100 | 4 | STARTING A NEW ENTERPRISE | A | 4.0 | |
| EN-100 | 4 | ORAL COMMUNICATION | A | 4.0 | |
| BU-107 | 2.5 | GENERAL MATH | A | 4.0 | |
| CO-100 | 3 | INTRODUCTION TO COMPUTERS | A | 4.0 | |
| BU-100 | 4 | SMALL BUSINESS MANAGEMENT | A | 4.0 | |
| BU-207 | 4 | BUSINESS LAW | A | 4.0 | FINAL |
| BU-215 | 2.5 | BUSINESS MATH | A | 4.0 | TRANSCRIPT |
| EN-200 | 3 | WRITTEN COMMUNICATION | A | 4.0 | |
| BU-200 | 4 | BUSINESS ETHICS | A | 4.0 | |
| MG-200 | 4 | SUPERVISION | A | 4.0 | |
| AC-100 | 3 | ACCOUNTING I | A | 4.0 | |
| WP-100 | 2.5 | WORD PROCESSING | A | 4.0 | |
| SO-120 | 4 | ECONOMICS | B | 3.0 | |
| MG-150 | 4 | SELLING | B | 3.0 | GRADING |
| DP-100 | 2.5 | MICROS & SPREADSHEET I | A | 4.0 | |
| AC-105 | 3 | ACCOUNTING II | A | 4.0 | A=4.0 GPA |
| MG-120 | 4 | MARKETING | A | 4.0 | B=3.0 GPA |
| BU-300 | 4 | BUSINESS STRATEGIES | A | 4.0 | C=2.0 GPA |
| DP-105 | 2.5 | MICROS & SPREADSHEET II | A | 4.0 | D=1.0 GPA |
| BU-305 | 3 | BUSINESS CASE STUDIES | A | 4.0 | F<1.0 GPA |
| AC-215 | 4 | FINANCE | A | 4.0 | I=Incomplete |
| MG-250 | 4 | ADVERTISING | B | 3.0 | |
| CP-100 | 3 | CAREER PLANNING | A | 4.0 | |
| MG-299 | 2.5 | BUSINESS PLAN | A | 4.0 | |

OVERALL GPA    3.83

SEAL

DIRECTOR

# Business Training International

**100 SOUTH DIXIE HIGHWAY • WEST PALM BEACH, FL 33401**

WEST PALM BEACH SCHOOL
(407) 833-7391

## D E A N ' S   L I S T

*IRVING SHEPPARD*

*3.75*

has achieved a cumulative

grade point average of

3.75 or higher for the

Winter quarter, 1988

The entire BTI staff wishes to congratulate you

on achieving this distinction.  These grades are

reached only through diligence and hard work.

_____
BTI Director

_____
*3-27-89*
Date

INDIVIDUALIZED LEARNING OF OFFICE SKILLS

8

# Folsom Cordova Unified School District

## Folsom, California

### This Certifies That

*Irving Sheppard*

has completed a High School Course of Studies in accordance with the requirements of the State Board of Education for Graduation from the Twelfth Grade and is therefore awarded this

## Diploma

Given this 11th day of June  Nineteen hundred and 83

_President, Board of Education_

_Clerk, Board of Education_

_Superintendent_

_Principal_

Mr. Sheppard has been assigned to the Office Services Program (OSS) since January 1999. He has just completed the OSS Program with a grade of 4.0 and will receive his Certificate of Completion. During his assignment, he has always shown to be attentive to his studies and the rules and regulations of the program. He shows up for class on time and always has school work at the end of the day to turn in for review and testing. I believe he has made a concerted effort to learn and grasp all subject matters.

cc: C-file
cc: Ed Ofc.
cc: CC1
cc: Teacher
cc: Inmate ✓

Academic Grade: A    Lesson Grade: A    Conduc Grade: A    Total Grade Point: 4.0

L. Crane

L. Crane, Voc

Laudatory

**DATE: 4/3/2000          FSP**          **GENERAL CHRONO**

| BEHAVIOR/ASSESSMENT | CERTIFICATION UNITS IN COURSE | TOTAL | COMPLETED PRIOR TO THIS QUARTER |
|---|---|---|---|
| Adaptability       S | Vocational Title: Office Services and Related | 17 | 3 |
| Conduct            S | Academic Title: | | |
| Cooperation        S | Adult High School Title: | | |
| Dependability      S | General Education Development | | |
| Initiative         S | | | |

LIST SPECIFIC CERTIFICATION UNITS COMPLETED THIS QUARTER BY NAME:
Orientation VO1.02.01, Safety VO1.02.02, Calculator VO1.02-III-M, English VO1.02-II-G, Beginning Typing VO1.02-I-A, Math VO1.02-II-H, Intro to Computers VO1.03.01, Alpha Filing VO1.02-I-B, Word Processing VO1.03.07, Proofreading VO1.02-I-C, Spreadsheet VO1.03.09. DataBase VO1.03.05. General Business VO1.02-II-L Business Principals VO1.02-III-G. PowerPoint

| DATE INMATE ENROLLED | DATE INMATE TERMINATED | TERMINATION CODE | REASON FOR TERMINATION |
|---|---|---|---|
| 1/13/1999 | | | |

COMMENTS SPECIFIC TO COURSE:
Mr. Sheppard accomplished the goals set for this quarter, he has been in attendance 30.5 days of a possible 31. He has completed all lessons for the Office Services Program and will receive his Certificate Of Completion.
Academic Grade: A   Lessons Grade: A   Conduct Grade: A   Total Grade Point: 4.0
ABE Score: Exempt-HS/GED

| **VOCATIONAL EVALUATION OF EMPLOYABILITY** | | | | | |
|---|---|---|---|---|---|
| X | OCCUPATIONAL JOB TITLE | DOT CODE NUMBER | X | OCCUPATIONAL JOB TITLE | DOT CODE NUMBER |
| | | | | | |
| | | | | | |
| | | | | | |

| DATE OF REPORT | QUARTER GRADE | INSTRUCTOR/TEACHER (PRINT NAME AND SIGN) | | SUPERVISORY REVIEW |
|---|---|---|---|---|
| 3/31/2000 | A | L. Crane    L. Crane | | INITIALS |
| NAME (LAST, FIRST) | | | CDC NUMBER | INSTITUTION |
| Sheppard, I | | | C34952 | FSP |

DISTRIBUTION: White-Central File: Canary-Education File; Pink-Originator; Goldenrod-Inmate

**Quarter Chrono**



*State of California*

# Vocational Education

## Completion of Certification Unit

### for

*V03.01.30 - Purchasing a PC or Building Your Own*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

**Issued to**

*Irving Sheppard*

*August 6, 2002*
Date

Robert de Oliver
Vocational Instructor

Fred Ringel
Supervisor Vocational Instruction

Log # 03-1759



State of California

*Vocational Education*

Completion of Certification Unit

for

*V03.01.29 - Supporting Windows 2000 Professional*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

**Issued to**

*Irving Sheppard*

August 2, 2002
Date

Robert De Boer
Vocational Instructor

Fred Riege
Supervisor Vocational Instruction

Log # 03-1758

12



State of California

# Vocational Education

## Completion of Certification Unit

for

*V03.01.28 - Understanding and Supporting Windows NT Workstation*

**Issued to**

*Irving Sheppard*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

May 26, 2002
Date

Robert LeBoer
Vocational Instructor

Fred Ringel
Supervisor Vocational Instruction

Log # 03-1757

ACCREDITED
WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES

13



State of California

# Vocational Education

Completion of Certification Unit

for

*V03.01.27 – Supporting Windows 9x*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

**Issued to**

*Irving Sheppard*

July 18, 2002
Date

Fred Ringer
Supervisory Vocational Instruction

Robert de Boer
Vocational Instructor

Log # 03-1756

14



State of California

# Vocational Education

## Completion of Certification Unit

for

V03.01.26 - Electricity and Power Supplies

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

**Issued to**

Irving Sheppard

May 10, 2002
Date

Robert de Boer
Vocational Instructor

Fred Ritger
Supervisor Vocational Instruction

Log # 03-1755

State of California

# Vocational Education

## Completion of Certification Unit

for

*VO1.03.25 - Multimedia Technology*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

**Issued to**

*Irving Sheppard*

June 21, 2002
Date

Robert de Boer
Vocational Instructor

Fred Birney
Supervisor Vocational Instruction

WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES
ACCREDITED

Log # 03-1754

*State of California*

# Vocational Education

## Completion of Certification Unit

### for

*V01.03.24 - Supporting I/O Devices*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

**Issued to**

*Irving Sheppard*



*Robert de Boer*
Vocational Instructor

*May 7, 2002*
Date


Fred Ranger
Supervisor Vocational Instruction



Log #  03-1753

*State of California*

# Vocational Education

## Completion of Certification Unit

### for

*V01.03.23 - Troubleshooting Fundamentals*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

**Issued to**

*Irving Sheppard*

May 31, 2002
Date



Robert de Boer
Vocational Instructor


ACCREDITED
WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES



Fred Berger
Supervisor Vocational Instruction

Log # 03-1752

State of California

# Vocational Education

## Completion of Certification Unit

### for

*V01.03.22 - Hard Drive Installation and Support*

It is with great pleasure that we sign and present this completion certificate to you. Congratulations for achieving this commendable goal.

**Issued to**

*Irving Sheppard*

May 28, 2002
_____
Date






Robert de Boer
_____
Vocational Instructor

Fred Rieger
_____
Supervisor Vocational Instruction

Log # 03-1751



State of California

Vocational Education

Completion of Certification Unit
for

V01.03.21 - Introduction to Hard Drives

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal

Issued to

Irving Sheppard

May 21, 2002
Date

Fred Ringer
Supervisor Vocational Instruction

Robert G. Doer
Vocational Instructor

Log # 03-1750

20

*State of California*

# Vocational Education

## Completion of Certification Unit

for

*V01.03.20 - Floppy Drives*

Issued to

*Irving Sheppard*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

*May 9, 2002*
Date

*Fred Klingy*
Supervisor Vocational Instruction

*Robert de Boer*
Vocational Instructor

ACCREDITED
WESTERN ASSOCIATION OF COLLEGES AND SCHOOLS

Log # 03-1749

21



State of California

# Vocational Education

Completion of Certification Unit

for

*V01.03.19 - Understanding and Managing Memory*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

Issued to

*Irving Sheppard*

May 6, 2002
_____
Date

*Robert de Boer*
_____
Vocational Instructor

*Fred Ringer*
_____
Supervisor Vocational Instruction

Log # 03-1748



State of California

# Vocational Education

Completion of Certification Unit

for

V03.01.18 – The System Board

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

**Issued to**

*Irving Sheppard*

April 16, 2002

Date

Robert de Boer

Vocational Instructor

Fred Briger

Supervisor Vocational Instruction

ACCREDITED
WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES
Accrediting Commission Community Schools

Log # 03-1747



State of California

*Vocational Education*

Completion of Certification Unit

for

*V03.01.17 - How Software and Hardware Work Together*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this certificate to good.

Issued to

*Irving Sheppard*

April 11, 2002

Date

Fred Rings

Supervisor Vocational Instruction

Robert de Boer

Vocational Instructor

Log # 03-1746

24



State of California

*Vocational Education*

Completion of Certification Unit

for

*V03.01.16 - How Computers Work*

It is with great pleasure that we sign and present this completion certificate to you.
Congratulations for achieving this commendable goal.

Issued to

*Irving Sheppard*

April 8, 2002
_____
Date

Fred Ringer
_____
Supervisory Vocational Instruction

Robert de Boer
_____
Vocational Instructor

Log # 03-1745

25

| BEHAVIOR/ASSESSMENT | | CERTIFICATION UNITS IN COURSE | TOTAL | COMPLETED PRIOR TO THIS QUARTER |
|---|---|---|---|---|
| Adaptability | S | Vocational Title: ELECTRONIC FUNDAMENTALS | 38 | 15 |
| Conduct | S | Academic Title: | | |
| Cooperation | S | Adult High School Title: | | |
| Dependability | S | General Education Development | | |
| Initiative | S | | | |

LIST SPECIFIC CERTIFICATION UNITS COMPLETED THIS QUARTER BY NAME: *HOW COMPUTER WORK, HOW SOFTWARE AND HARDWARE WORK TOGETHER, THE SYSTEM BOARD, UNDERSTANDING AND MANAGING MEMORY, FLOPPY DRIVES, INTRO TO HARD DRIVES, HARD DRIVE INSTALLATION AND SUPPORT TROUBLESHOOTING FUND., SUPPORT I/O DEVICES, MULTIMEDIA TECH. ELECTR. & POWER SUPPLIES, SUPPORT WIN 9X, SUPPORT WIN NT, SUPPORT WIN 2000, PURCHASING A PC OR BUILDING OWN.*

| DATE INMATE ENROLLED | DATE INMATE TERMINATED | TERMINATION CODE | REASON FOR TERMINATION | |
|---|---|---|---|---|
| 04/29/2000 | 08/29/2002 | 3S TRANSFER | DMS# 02-240 | (SEE BELOW) |

COMMENTS SPECIFIC TO COURSE: INMATE SHEPPARD WAS TERMINATED THROUGH NO FAULT OF HIS OWN FROM VOCATIONAL ELECTRONICS DUE TO CLASS CLOSURE.

## VOCATIONAL EVALUATION OF EMPLOYABILITY

| (X) | OCCUPATIONAL JOB TITLE | DOT CODE NUMBER | (X) | OCCUPATIONAL JOB TITLE | DOT CODE NUMBER |
|---|---|---|---|---|---|
| x | VOC COMPUTER REPAIR | 028.281.014 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| DATE OF REPORT | QUARTER GRADE | INSTRUCTOR/TEACHER (PRINT NAME AND SIGN) | SUPERVISORY REVIEW |
|---|---|---|---|
| 01/13/2003 | | ROBERT deBOER | INITIALS |
| | INMATE NAME (LAST, FIRST, MI) | CDC NUMBER | INSTITUTION |
| SHEPPARD | IRVING | C34952 | FSP |

DISTRIBUTION: White-Central File; Canary-Education File; Pink-Originator; Goldenrod-Inmate

STATE OF CALIFORNIA
NAME and NUMBER          Sheppard          C34952

DEPARTMENT OF CORRECTIONS
CDC 128 B (Rev. 4/74)

### Laudatory Chrono

I/M Sheppard has been assigned to the voc. electronics program since 4/29/00. During this time i/m Sheppard has been diligent in his studies and classroom work. He has completed the required competencies and tests to receive a certificate of completion for A+ Certification preparation, an industry recognized program of testing and certifying computer repair technicians. He is now working on the certified electronics technician portion of this vocational program. I/M Sheppard has a good attitude in the classroom, excellent attendance, and a good understanding of the material covered. He is able to expand his learned knowledge to hands on work and demonstrates that he is competent and should be able to find employment in the computer repair field.

R. de Boer _____
Voc. Instr.

DATE          10/2/0$\emptyset$          GENERAL CHRONO

26



# LAUBACH LITERACY ACTION

## VOLUNTEER TUTOR WORKSHOP
### CERTIFICATE OF COMPLETION

This is to recognize that _Irving Sheppard_
has satisfactorily completed a _12_ hour workshop with emphasis on tutoring
_literacy_ sponsored by a Laubach Literacy Action member program,
(Literacy Skill)
and/or conducted by an LLA certified trainer.

_A.P.I.S.E. Literacy Project_
Program

_Maribeth O. Stone, Jean Reinish_
Trainer

_Gene R. Watts_
Executive Director, Laubach Literacy Action

_Bob Caswell_
President/CEO, Laubach Literacy International

_February 1 & 2, 1996_
Date



**LAUBACH
LITERACY
ACTION**

U.S. PROGRAM OF
LAUBACH LITERACY INTERNATIONAL

LLA6

# CERTIFICATE OF ACHIEVEMENT

Awarded to

## Irving Sheppard

*Successfully Completed The*
*Discover Intensive Phonics Course*

*Presented by*

## The A.R.I.S.E Literacy Program

**March 10, 1996**

_Nan Renish_
**Nan Renish**

_O. Stone_
**Rocky Stone**

_Sunni R. Brown_
**Sunni Brown**



# GREYSTONE ADULT SCHOOL
## LITERACY CERTIFICATE

### THIS IS TO CERTIFY THAT

# SHEPPARD, I.

Has performed superbly as a tutor in the Laubach Literacy Program

For the 2nd, quarter of 1999

J. A. Valdez

J. A. VALDEZ, LITERACY, COORDINATOR

06/22/99



GREYSTONE ADULT SCHOOL

LITERACY CERTIFICATE

THIS IS TO CERTIFY THAT

SHEPPARD, I.

Has performed superbly as a Tutor in the Laubach Literacy Program

for the 1st, quarter of 1999

J. A. VALDEZ, LITERACY COORDINATOR

03/24/99



# GREYSTONE ADULT SCHOOL

## LITERACY CERTIFICATE

THIS IS TO CERTIFY THAT

# SHEPPARD, I

Has performed superbly as a Tutor in the Laubach Literacy Program

for the 4th, quarter of 1998

J. A. VALDEZ, LITERACY, COORDINATOR

12/12/98

# GREYSTONE ADULT SCHOOL

## LITERACY CERTIFICATE

THIS IS TO CERTIFY THAT

# SHEPPARD, I

Has performed superbly as a Tutor in the Laubach Literacy Program for the 8rd, quarter of 1998

Jennifer Valdez
J. VALDEZ  S.A.I.

10 / 06 / 08
DATE

L. NIELSEN LITERACY COORDINATOR



# GREYSTONE ADULT SCHOOL

## LITERACY CERTIFICATE

*THIS IS TO CERTIFY THAT*

### IRVING SHEPPARD

*Has performed superbly as a tutor in the Laubach Literacy Program*

*For the 2nd, quarter of 2000*

06/22/2000

L. HANSON, LITERACY COORDINATOR

45a



# GREYSTONE ADULT SCHOOL
## LITERACY CERTIFICATE

*THIS IS TO CERTIFY THAT*

# IRVING SHEPPARD

*Has performed superbly as a tutor in the Laubach Literacy Program*

*For the 3rd quarter of 2000*

10/04/2000

L. Hanson

L. HANSON, LITERACY PROGRAM SUPERVISOR

454

Case 3:08-cv-03983-WHA    Document 1-5    Filed 08/20/2008    Page 10 of 43

NAME and NUMBER    SHEPPARD        C34952        C-109    CDC-128-B (Rev. 4/74)

Under my direction the above named Inmate has been a volunteer tutor since the inception of the Tutoring Department in February 1991. As we begin our third year I would like to apprise the D.V.I. Staff of the dedication and faithful attendance with which this Inmate has served his fellow peers. Teaching them to read, write, study for G.E.D. tests, and where applicable, help in their studies for their daily classes. He also assists in keeping all materials, workbooks, textbooks, and records pertaining to tutoring in order so that a new student may be helped immediately according to his ability and grade level. No small task. This Inmate has attended each workshop, given by me on a quarterly basis, to insure by suggestions, tutoring film reviews, and going through all materials on hand that our books and records are current. Without the assistance of tutors of his caliber this program could not exist. In gratitude I submit this laudatory chrono.....small payment for his hours of teaching, and the dedication shown therein.

ORIG.:  CENTRAL FILE
    cc:  Counselor Sukhram
         Education File
         Inmate Sheppard

DATE    February 10, 1993

M. Taylor Frank, Instructor
LAUDATORY    XXXXXXXX    CHRONO

---

NAME and NUMBER    SHEPPARD    C-34952        C-242        CDC-128-B (Rev. 4/74)

As head of the D.V.I. Tutoring Department under the auspices of the Community Resources Division, and as we approach our third year anniversary, I take this opportunity to again commend the inmates whoes tutoring skills have made this volunteer effort possible. I wish to thank the above named inmate for his continued steadfast attendance, loyalty, preparation, and patience in helping those inmates less fortunate than he to better themselves.
We cover a broad spectrum. Reading, writing, G.E.D. test preparation, math (as required in the vocational programs), assisting those to whom English is a second language, and students who need assistance in their school studies. Without their able assistance this program could not exist. The tutors dedication to this program is the key to its success.

    Original:  Central File
        cc:  Counselor
             Education
             Inmate

DATE  October 27, 1993

Sincerely,

Mildred Taylor Frank,
Tutoring Dept. Head
LAUDATORY    GENERAL CHRONO

---

NAME and NUMBER    SHEPPARD, C-34952    C-242    D.V.L.    CDC-128-B    (Rev 4/74)

of February 1995, the above named inmate will have given three years of his free time voluntarily, to help other inmates less fortunate than he, to read and write. He also assists them in preparation for their G.E.D. tests, and with any math problems they may be having to qualify for the Air Frame, and Air Engine classes. He is one of several former college students who assist me in tutoring inmates who are illiterate, or to whom English is a second language. Without help of these inmates, the Tutoring Department at D.V.I. could not exist. They are to be commended for their faithful attendance, and for their dedication. This inmate has shown me complete courteousness, and respect during the three year association. Since this chrono is the only record of recognition these inmate tutors ever receive for the many hours of voluntary work, and effort to help their peers, I feel this chrono should be given special consideration on behalf of this inmate at any hearings reviewed by the Board regarding said inmate.

    Sincerely,

ginal: Central File
    cc: Counselor, Mr. Sukhram
        Education
        Inmate Sheppard

Copy Corrected
Bay M. Frank

M. Frank
Tutor Dept. Head

TE:  January 16, 1995

46

**NAME and NUMBER:**    SHEPPARD, I    C-34952    4-A1-12    CDC-128-B

VOLUNTEER LITERACY GROUP

The inmate above has voluntarily participated as a tutor in the Inmate Literacy Program at Folsom State Prison for the period shown. He is to be commended for his presonal commitment in assisting his peers to self-improvement. OCT. 01, 1998 through DEC. 31, 1998.

Orig:    Central File
cc:      Inmate

_JENNIFER, A. VALDEZ, Literacy Coordinator_

**DATE: 12/12/98**                                    **GENERAL CHRONO**

---

**NAME and NUMBER:**    **SHEPPARD, I.**    **C-34952**    **4-A1-12**    CDC-128-B

VOLUNTEER LITERACY GROUP

The inmate above has voluntarily participated as a tutor in the Inmate Literacy Program at Folsom State Prison for the period shown. He is to be commended for his personal commitment in assisting his peers toward  self-improvement.
SEPT.16,1998 through MAR.31,1999.

Orig:    Central File
cc:      Inmate

_JENNIFER, A. VALDEZ, Literacy Coordinator_

**DATE: 03/24/99**                                    **GENERAL CHRONO**

---

**NAME and NUMBER:**    **SHEPPARD, I.**    **C-34952**    **4-A1-12**    CDC-128-B

VOLUNTEER LITERACY GROUP

The inmate above has voluntarily participated as a tutor in the Inmate Literacy Program at Folsom State Prison for the period shown below.   He is to be commended for his personal commitment in assisting his peers toward  self-improvement in basic literacy.
SEPT.16,1998 through JUNE 30,1999.

Orig:    Central File
cc:      Inmate

JENNIFER, A. VALDEZ, Literacy Coordinator

**DATE: 06/26/99**                                    **GENERAL CHRONO**

NAME and NUMBER :    ˜EPPARD, I.        C-34952        5-AB2-40        CDC-128-B

VOLUNTEER LITERACY GROUP

Inmate SHEPPARD, I. has voluntarily participated as a tutor in the Inmate Literacy Program at Folsom State Prison for the period shown below.  He is to be commended for his personal commitment and dedication for tutoring his peers in basic literacy.  SEPT 16, 1998 through  March 31, 2000.

Orig:    Central File
  cc:    Inmate

DATE:03/31/2000

L. HANSON,  Literacy Coordinator

GENERAL CHRONO

NAME and NUMBER :SHEPPARD, I.        C-34952        5-AB2-40        CDC-128-B

VOLUNTEER LITERACY GROUP

Inmate SHEPPARD, I. has voluntarily participated as a tutor in the Inmate Literacy Program at Folsom State Prison for the period shown below.   He is to be commended for his personal commitment and dedication in tutoring his peers in basic literacy.   Sept. 16, 1998  through  Sept. 30, 2000.

Orig:    Central File
  cc:    Inmate

      10/05/2000

Larry Hanson, Literacy Program Supervisor

GENERAL CHRONO

48

NAME and NUMBER          HEPPARD        C-34952          \B2-40          CDC-12Rev.4/74)

Inmate, SHEPPARD, C-34952, has been an active member of the Narcotics Anonymous program at Folsom State Prison for the quarter ending December 1999. He has shown the ability to relate with the group and to improve himself. His participation in this program has demonstrated a willingness to cooperate in the Narcotics Anonymous Program.

Original: C-File
     Inmate ←
     File

L. VanderBrake
**Employee Staff Sponsor**
**Folsom State Prison**

### (Informational Chrono)

DATE    December 1999                                    **GENERAL CHRONO**

---

NAME and NUMBER          SHEPPARD        C-34952        5-AB2-40          CDC-128-B (Rev.4/74)

Inmate, SHEPPARD, C-34952, has been an active member of Narcotics Anonymous, Group B, at Folsom State Prison for the quarter ending March 31, 2000. He has shown the ability to relate with the group and to improve himself. His participation in this program has demonstrated a willingness to cooperate in the Narcotics Anonymous Program.

Original: C-File
     Inmate ←
     File

Linda Vande Brake
**Employee Staff Sponsor**
**Folsom State Prison**

### (Informational Chrono)

DATE    March 31, 2000                                    **GENERAL CHRONO**

---

NAME and NUMBER          **SHEPPARD**        **C-34952**        **5-AB2-40**          CDC-128-B (Rev.4/74)

Inmate, **SHEPPARD, C-34952,** has been an active member of **Narcotics Anonymous, Group B,** at Folsom State Prison for the quarter ending June 30, 2000. He has shown the ability to relate with the group and to improve himself. His participation in this program has demonstrated a willingness to cooperate in the Narcotics Anonymous Program.

Original: **C-File**
     **Inmate**
     **File**

***PENNY VAUGHN***
***Staff Sponsor***
***Folsom State Prison***

### (Informational Chrono)

DATE    June 27, 2000                                    **GENERAL CHRONO**

NAME and NUMBER          SHEPPARD          C34952          5-AB2-40          CDC-128-B (Rev.4/74)

Inmate, **SHEPPARD, C34952,** has been an active member of **Narcotics Anonymous, Group B,** at Folsom State Prison for the quarter ending December 31, 2000. He has shown the ability to relate with the group and to improve himself. His participation in this program has demonstrated a willingness to cooperate in the Narcotics Anonymous Program.

Original:  C-File
         Inmate ⇦
         File

*PENNY VAUGHN*
*Staff Sponsor*
*Folsom State Prison*

### (Informational Chrono)

DATE   December 29, 2000                              **GENERAL CHRONO**

NAME and NUMBER          SHEPPARD          C34952          5-AB2-40          CDC-128-B (Rev.4/74)

Inmate, **SHEPPARD, C34952,** has been an active member of **Narcotics Anonymous, Group B,** at Folsom State Prison for the quarter ending September 30, 2000. He has shown the ability to relate with the group and to improve himself. His participation in this program has demonstrated a willingness to cooperate in the Narcotics Anonymous Program.

Original:  C-File
         Inmate ↙
         File

*PENNY VAUGHN*
*Staff Sponsor*
*Folsom State Prison*

### (Informational Chrono)

DATE   September 27, 2000                              **GENERAL CHRONO**

NAME and NUMBER          SHEPPARD          C-34952          5-AB2-40          CDC-128-B (Rev.4/74)

... SHEPPARD, C-34952, has been an active member of the **Narcotics Anonymous, Group B** program at Folsom State Prison for the quarter ending March 31, 2001. He has shown the ability to relate with the group and to improve himself. His participation in this program has demonstrated a willingness to cooperate in the Narcotics Anonymous Program. In addition Inmate **SHEPPARD** has served as **Secretary** of Narcotics Anonymous, Group B.

Original:       C-File
         Inmate ⇐
         File

*PENNY VAUGHN*
**Staff Sponsor**
**Folsom State Prison**

### (Informational Chrono)

DATE        4/2/01                                        GENERAL CHRONO

49A

| NAME and NUMBER | SHEPPARD | C34952 | 5-AB2-40 | CDC-128-B (Rev.4/74) |

Inmate, **SHEPPARD, C34952,** has been an active member of **Narcotics Anonymous, Group B,** at Folsom State Prison for the quarter ending March 31, 2001. He has shown the ability to relate with the group and to improve himself. His participation in this program has demonstrated a willingness to cooperate in the Narcotics Anonymous Program.

Original:  C-File
          Inmate ⇐
          File

*Penny Vaughn*
*Staff Sponsor*
*Folsom State Prison*

### (Informational Chrono)

DATE    April 2, 2001                                              **GENERAL CHRONO**

NAME and NUMBER          SHEPPARD        C34952        5-AB2-40        CDC-128-B (Rev.4/74)

Inmate, **SHEPPARD, C34952,** has been an active member of **Narcotics Anonymous, Group B,** at Folsom State Prison for the quarter ending June 30, 2001. He has shown the ability to relate with the group and to improve himself. His participation in this program has demonstrated a willingness to cooperate in the Narcotics Anonymous Program.

Original:  C-File
          Inmate ⇐
          File

**PENNY VAUGHN**
*Staff Sponsor*
*Folsom State Prison*

### (Informational Chrono)

DATE    June 25, 2001                                              **GENERAL CHRONO**

NAME and NUMBER          SHEPPARD        C-34952        5-AB2-40        CDC-128-B (Rev.4/74)

...ate **SHEPPARD, C-34952,** has been an active member of the **Narcotics Anonymous, Group B** program at Folsom State Prison for the quarter ending June 30, 2001. He has shown the ability to relate with the group and to improve himself. His participation in this program has demonstrated a willingness to cooperate in the Narcotics Anonymous Program. In addition Inmate **SHEPPARD** has served as **Secretary** of Narcotics Anonymous, Group B.

Original:     C-File
             Inmate ⬅
             File

**PENNY VAUGHN**
**Staff Sponsor**
**Folsom State Prison**

### (Informational Chrono)

DATE     **June 25, 2001**                                         GENERAL CHRONO



H

### *FOLSOM STATE PRISON*
**BOARD OF PRISON TERMS**
**LIFE-TERM MENTAL HEALTH EVALUATION (Revised 1998)**

FOR THE CALENDAR MONTH OF FEBRUARY 2001

## PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Inmate Irving SHEPPARD is a 47 year old (DOB 05/11/53)), married, African American who has a Buddhist religious affiliation. He has no unusual physical characteristics or aliases. He does not have any nick names.

**SOURCES OF INFORMATION:** The following evaluation was based on my review of the CDC Central File, Unit Health Record and a clinical assessment interview conducted on February 26, 2001.

**DEVELOPMENTAL HISTORY:** Mr. Sheppard had no prenatal defects nor perinatal concerns. He had no birth defects. He does not have a history of abnormalities of developmental milestones, speech, language, or motor development. This inmate has no history of cruelty to animals, enuresis or arson. He had no significant childhood medical history. Neither did he have a history of physical or sexual abuse as a perpetrator or as a victim.

**EDUCATION:** This inmate claims to have completed the 11 grade. However, he did receive his high school diploma in 1983. He states that at the current time he is 41 units short of a Bachelors of Arts Degree in Business Administration. His measured grade level is 11.9. He has no history of special education. He has had no academic or behavior problems while in school. He has no current involvement in education. However, he does have an interest in educational activities this consists of desiring to complete college when he can afford this activity.

**FAMILY HISTORY:** His parents are his biological parents. He does not have any brothers but he does have one sister. He does not have any step-brothers or step-sisters. His mother is 67 years old and his father is deceased. When he was growing up his parents did not have any mental or medical problems. They did not have any substance abuse problems. He is not sure of much of the background for his father in that his father left when he was very young. As far as an educational level he believes that his mother completed high school but he is not sure about his father. His mother was a factory worker and once again he was not sure of what his father did. As far as he knows neither of his parents had any legal or criminal problems when he was growing up. His relationship with his father was nonexistent and it is still nonexistent today.. His relationship with his mother was good in the past, and currently he still has a good relationship with his mother.

Copy to Inmate:
5-8-01 per c c/
request

**SHEPPARD, IRVING   C-34952      FSP           02/26/01    LLB:dlb**
**BOARD OF PRISON TERMS EVALUATION**
Page 1

**PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:** This inmate is heterosexual and has had sexual relationships with a few women over the years. He has no history of high risk behavior or sexual aggression.

**MARITAL HISTORY:** He has been married two times; the first time was in 1971 and he was divorced in 1978. The second time he was married in 1984 and is still married. He has never had a common law type relationship. He has two children one is a boy who is twenty-two by his previous wife. His other child is a girl who is eleven years old by his current wife. His relationship with his current spouse was good in the past and currently this relationship is still very good as she is very supportive. His relationship with his children was good in the past and currently the relationship is still very good in that he writes them and they visit him here at Folsom.

**MILITARY HISTORY:** This inmate was in the Army from 1971 to 1973. He did not have any combat experience. While in the service he received disciplinary action for robbery and the nature of this action was a Bad Conduct discharge. He never received any meritorious awards. As previously stated his discharge from the Army was in the Bad Conduct category.

**EMPLOYMENT/INCOME HISTORY:** This inmates employment history consists of having one job in a period of seven years. He was self employed and he ran a children's arcade. The reason for termination was incarceration. He has developed some work skills while he has been in prison which include computer work, in addition he does have management skills. He has never been in any government programs. He has not had any union affiliations. He has not received any public assistance. His money management skills are good in that he did have some savings but does not anymore due to incarceration. The inmates current job interests are mainly in the area of computer work. He has received training in several areas (see list above).

**SUBSTANCE ABUSE HISTORY:** Mr. Sheppard acknowledges limited illegal drug and alcohol problems. He has been in a treatment program that is narcotics anonymous. His current problems are in remission.

**PSYCHIATRIC AND MEDICAL HISTORY:** Mr. Sheppard has never been diagnosed with any serious physical or mental illness. He has never had a serious accident or head injury. He has no history of suicide attempts, no history of homicidal assaultive behavior other than the instant offense which he still denies. The inmate states that he has not had disabilities, significant impairments or illnesses. He does not have a history of medications.

**PLANS IF GRANTED RELEASE:** He has a planned living arrangement and support system. His plans are to live with his wife and his daughter. His financial situation is limited due to incarceration. He plans to work in the computer field and complete college. In my opinion his plans are well thought out and reasonable. His prognosis for adjustment to community living is good in that he has a place to live and work skills.

## CLINICAL ASSESSMENT

**CURRENT MENTAL HEALTH STATUS TREATMENT NEEDS:** Mr. Sheppard's mental health status is as follows,

**DIAGNOSTIC IMPRESSIONS:**

| | |
|---|---|
| Axis I: | No symptoms noted |
| Axis II: | No symptoms noted |
| Axis III | No evidence |
| Axis IV | Incarceration |
| Axis V | GAF = 85 |

Currently he is not receiving any mental health treatment nor has he in the past. He made good eye contact and was very cooperative during the interview. He appears very stable and his affect was normal. There was no evidence that he had suicidal or homicidal ideation. His judgment and insight appear normal. No mental health treatment is indicated at this time. He is not taking any psychotropic medications and his prognosis for continuing a stable life is excellent. It should be noted that while he has been in prison these many years he has matured a great deal.

**REVIEW OF LIFE OF CRIME:** According to the inmate, as a juvenile he did have some crime such as joy ridding , petty theft, and also robbery. As an adult most of his crimes were involved with illegal drugs. This included drug trafficking and possession of a controlled substance. He has had a few minor 115's, however one was drug related. He has not had a 115 in the last eleven years. There is no evidence of any mental abnormalities related these crimes.

**ASSESSMENT OF DANGEROUSNESS:** In my opinion Mr. Sheppard does not pose more than normal risk factor in a controlled environment. As long as he stays away from drugs it is my estimation that his risk factors when out of a controlled environment would be less than average. No risk factors are apparent. This inmate was very articulate and cooperate and in my opinion would be a reasonable candidate for parole.

**CLINICIAN OBSERVATION /COMMENTS AND /RECOMMENDATIONS:** It is recommended that he continue narcotics anonymous if paroled. In addition he should be required to submit to drug testing. There are no further recommendations at this time.

Louis L. Beermann, Ph.D.
Licensed Psychologist
Folsom State Prison

**SHEPPARD, IRVING  C-34952     FSP            02/26/01     LLB:dlb**
**BOARD OF PRISON TERMS EVALUATION**
Page 3

*I*

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**ADDENDUM LIFER HEARING**
**FEBRUARY 2001 CALENDAR**
**FOLSOM STATE PRISON**

**SHEPPARD, IRVING (C-34952)**

**PSYCHOSOCIAL ASSESSMENT**

Mr. Sheppard noted several errors in the previous psychological evaluation completed by Louis Beermann, Ph.D. at Folsom State Prison.  As Dr. Beermann is no longer at this facility the following corrections are being made by this evaluator:

III. **Education:**  The previous evaluation noted that there was no current involvement in education.  This is not true.  Mr. Sheppard has numerous chronos in his possession documenting the fact that he is a voluntary tutor in the Laubach Literary Program at Folsom State Prison.  He continues to work in that capacity as a volunteer.  He is very interested in educational activities.

VI. **Marital History:**  Mr. Sheppard noted that he has two children.  One of his children is a 22 year old son whose mother was Mr. Sheppard's girlfriend.  The other child is an 11 year old daughter from his relationship with his current wife.  His current marriage is intact and his wife is very supportive.

VIII. **Employment/Income History:**  Mr. Sheppard possesses documentation verifying that he has completed office services and technology training, effective April 1999 with a grade point average of 4.0, which is outstanding.  He is currently enrolled in vocational computer repair and is making excellent progress in that trade.  It is evident that he has highly developed skills that will enable him to support himself in the community while on parole.

IX. **Substance Abuse History:**  Mr. Sheppard pointed out that the previous evaluation was not accurate in that he did not acknowledge limited illegal drug and alcohol problems.  In fact, he has never had a problem with illegal drug use or alcohol abuse.  He is currently attending Narcotics Anonymous because the Board of Prison Terms asked him to.  His commitment offense was drug related as he was involved in sales of narcotics, but he was not a narcotic addict or narcotic user.

XIII. **Review of Life Crime:**  The previous report noted that Mr. Sheppard has had a few minor CDC-115s and one was drug related.  This is not the case.  He has never had any CDC-115s that were drug related.  It is true that he has been disciplinary-free throughout the last 11 years.

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**ADDENDUM LIFER HEARING**
**FEBRUARY 2001 CALENDAR**
**FOLSOM STATE PRISON**

**SHEPPARD, IRVING (C-34952)**

**XV. Clinician    Observations/Comments/Recommendations:**    After interviewing Mr. Sheppard at length, I am convinced that he is free of any mental or emotional problems. He should not be required to attend a parole outpatient clinic. In addition, it is evident that he does not have a drug or alcohol problem. Therefore, it is not recommended that he be required to submit to drug testing or urinalysis testing.

The previous evaluation does not do Mr. Sheppard justice. His achievement while in the institution, level of performance, and effort at self-improvement are outstanding. His progress is superior in comparison to other prisoners who are serving life sentences. This was not noted or highlighted in the previous evaluation and I would like to highlight this fact at this point in time. I agree with the previous evaluation that Mr. Sheppard is free from any mental or emotional problems and does not have a mental disorder that can be diagnosed. There are no psychological factors that would interfere with his being granted parole at this point in time.

*Melvin Macomber, phD*

MELVIN MACOMBER, PH.D.
Clinical Psychologist

**PSYCHIATRIC REPORT TO THE BOARD OF PRISON TERMS**
**DECEMBER 3, 1997**
**HIGH DESERT STATE PRISON**

IDENTIFYING INFORMATION:  This is the fifth report to the Board of Prison Terms on Irving Sheppard, age 44.  He is a married, black male serving a sentence of 29 years-to-life on a conviction of First Degree Murder with Enhancements.  He was received by the Department of Corrections on 8-27-81.  He was received at High Desert State Prison on 3-24-97.  His MEPD is 4-17-98.

PSYCHIATRIC HISTORY:  He has no history of any psychiatric disorder or of any psychiatric treatment.

MENTAL STATUS EXAMINATION:  The mental status examination revealed a middle aged appearing black male of average height and build.  He has a shaved head and a graying full beard.  He was alert and oriented in all spheres.  He appeared to be serious and moderately tense, and affect appropriate to mood and thought content.  He was polite during the examination and responded to all questions asked of him.  He did not manifest any signs or symptoms of any psychiatric disorder consistent with his previous four examinations.  Cognitive functioning is within the normal range.  Intelligence is average to slightly above average.  Impulse control is good as manifested by his disciplinary record and his classification score of zero.

PAST AND FAMILY HISTORY:  His past and family history have been covered in detail in previous reports.  To summarize briefly, he was born and reared in Queens, NY in a fatherless family consisting of a mother, the inmate and his sister.  He became involved in criminal activities as a juvenile and his criminal behavior escalated in seriousness with increasing age.  After joining the Army to escape prosecution on previous offenses he committed armed robbery on an Army post.  He was subsequently convicted, served a prison sentence and received a bad conduct discharge.  In California he was involved in small time drug trafficking with cocaine.  This activity culminated in an apparent rip-off by his partner of the profits of a drug deal.  The inmate was convicted of his partner's murder.  He maintained during his trial, and has continued to maintain up to the present examination, that he is innocent of murder and his former partner was the victim of another party.

His mother is still living and still resides in Queens in New York City.  He has regular contact with her frequently by phone and by letter.  He was married after being incarcerated.  The marriage took place in 1984.  The union has produced one child, a girl now age 7.

2

DRUG AND ALCOHOL ABUSE HISTORY:  Prior to incarceration the inmate was a regular user of alcohol and marijuana, although this does not seem to have been to the extent to be dependent on either substance.  He was a heroin addict at age 17 but eventually get off of heroin. Early in his incarceration he had 115's for attempting to smuggle in Valium to a prison and he had a UA + (positive) for marijuana in 1990.

INSTITUTIONAL ADJUSTMENT:  The inmate, overall, has a good institutional record.  His last official 115 was in 1990.  He seems to have taken advantage of nearly every program for self-improvement that has been available to him over the years.  He has an excellent work record.  He obtained a GED and later a high school diploma.  He has completed approximately 19 hours of college credit and business management.  He was a voluntary tutor for several years for other inmates.  He says he was a warehouse manager for seven years at DVI.  He has attended NA and numerous other self-help groups and organizations.

When asked what his plans would be if released the inmate says he would live in Oakland where his wife and child currently live and seek a job where he could use the skills he has learned as an inmate; he would like to be in management and would like to continue his college courses and eventually graduate.

DIAGNOSTIC IMPRESSION (PER DSM IV):

| Axis I: | V71.09 | No Diagnosis on Axis I |
|---|---|---|
| Axis II: | 301.7 | Antisocial Personality Disorder |
| Axis III: | | None |
| Axis IV: | | Psychosocial Stressors:  Moderate, incarceration |
| Axis V: | GAF: | 80 |

SUMMARY AND RECOMMENDATIONS:  The case of Mr. Sheppard poses a difficult question.  Is he a rehabilitated inmate who has proven himself by being successful in numerous programs to better himself and who has maintained a good disciplinary record, or is he a clever psychopath who has used the opportunities afforded by participation in these various work and educational programs to further his success in dealing drugs in prison.  I do not possess sufficient information to answer this question.  On the positive side, however, is his record.  I note that his disciplinary record is essentially void of any violent behavior.  The record he has maintained is also evidence of his good impulse control.  With his record of non-violence and good impulse control since 1981, combined with his current age, he is unlikely, in the future, to commit any

**SHEPPARD, IRVING**          **C34952**          **HDSP**          **12-3-97**

3

violent crimes. I would rate his current potential for violence as below average. He does have the potential to be a productive, self-supporting citizen.

_____ , M.D.

F. M. Criswell, M.D.
Staff Psychiatrist

ls
dd:    12-3-97
dt:    12-4-97

**SHEPPARD, IRVING**          **C34952**          **HDSP**          **12-3-97**



INITIAL PAROLE CONSIDERATION HEARING

SHEPPARD, IRVING                                                    CDC # C34952

I.    COMMITMENT FACTORS:

    A.    Life Crime:

        On 8-21-81, Sheppard, C34952, was found guilty of Murder in the First Degree, PC
        187, in Santa Clara County, California, Case #79029. Sheppard was sentenced to 25
        years to Life.

        1.    Offense Summary:

        On 12-21-80, at approximately midnight, Sunnyvale police responded to 1674
        Hollenbeck Avenue, Apt. 21 for a reported dead body. Police found the victim lying
        in the kitchen area with four (4) .38 caliber gunshot wounds to the head. Sheppard
        was named as the person who made threats against the victim on the evening of his
        death. Sheppard flew to South Carolina the next day, and remained there until his
        arrest. The murder weapon was recovered and fingerprints from Sheppard were found
        on the paper bag and newspaper containing the weapon. The victim and defendant
        had been engaged in drug dealings together, resulting in the victim owing the
        defendant a large sum of money.

        2.    Prisoner's Version:

        Victim and I were dealing narcotics together after my arrival in California. Victim did
        not owe defendant any money. Defendant believes victim was robbed by possible
        suspect Jamal Sampson. "I only went to South Carolina to obtain more narcotics to
        bring back to California for our business. Had I not given the victim the narcotics,
        there would not have been the incentive for someone to kill him."

    B.    Aggravating Circumstances:

        Defendant has a long history of contact with the Criminal Justice System, starting at
        age 10. Each encounter resulted in increased severity.

    C.    Mitigating Circumstances:

        There are no mitigating factors noted in this case.

II.    PRECONVICTION FACTORS:

    A.    Juvenile Record:

        Inmate Sheppards' juvenile record is as follows:

        | 1963    | age 10 | Stealing a bike |
        |---------|--------|-----------------|
        | 1966    | age 13 | Auto Theft |
        | 4/66    | age 13 | 4 S.D. Petitions, sent to State Training School |
        | 6/13/70 | age 17 | Grand Larceny, Stolen Property, Unauthorized use of a Vehicle, Probation. |
        | 8/2/70  | age 17 | Rape, Dismissed |



B.   Adult Convictions:

| | | |
|---|---|---|
| 11/7/71 | age 18 | Theft |
| 6/29/72 | age 19 | Robbery, sentenced Fort Levenworth, Bad Conduct Discharge Army. |
| 12/27/73 | age 20 | Menacing, Fined $50.00. |
| 1/5/74 | age 21 | Possession Controlled Substance. Sentenced Dept. Corrections New York. |
| 6/3/75 | age 22 | Possession Drug Paraphernalia. |
| 12/4/75 | age 22 | Possession Controlled Substance. |
| 5/7/80 | age 27 | Possession/Sale Cocaine. Dismissed Charge |
| 12/20/80 | age 27 | Murder. Sentenced 25 to Life. Currently Incarcerated. |

C.   Personal Factors:

Born in NYC and raised there. Mother is alive and living in NYC. Father past away when Sheppard was 24 years old. I/M was raised by mother with father absent from household. He has one sister and one stepbrother raised with him. Married 1971, divorced in 1978. Son who is 18, daughter with current wife.

III.   POSTCONVICTION FACTORS:

Institutional History:

| | | |
|---|---|---|
| 8/27/81 | Received NRC-CMF | Close B |
| 9/17/81 | Received Folsom | Close B |
| 4/21/87 | Received DVI | MED A |
| 11/7/96 | Received Corcoran | MAX A |
| 8/24/97 | Received HDSP | MED A |

A.   Disciplinary History:

During I/M Sheppards' seventeen years of incarceration, he has received the following CDC 115's.

1.   CDC 115's

| | | |
|---|---|---|
| 3/4/83 | Serious | Had Contraband Brought in on Visit. Disposition: Found Guilty, Assessed 125 days Loss of Credit, 10 days CTQ, 90 days screened visit. |
| 8/15/84 | Serious | Altering Inmate Activity Card Disposition: Counseled and Reprimanded. 20 hours extra duty. |
| 9/21/84 | Serious | Failure to Perform Extra Duty. Disposition: Counseled and Reprimanded. 10 days CTQ. |
| 3/26/85 | Serious | Violation of Institutional Mail Procedures. Disposition: Found Guilty. 30 days Loss of Credit. |
| 9/27/90 | Serious | Stimulants and Sedatives (Positive Urinalysis) Disposition: Found Guilty. 121 days Loss of Credit. No contact visits for 6 months. |

CDC# C34952   SHEPPARD, IRVING                          1-21-98          HDSP

2.   CDC 128's

5/3/95      Sleeping at Job Assignment.

B.   Work Record

I/M Sheppard started working upon his incarceration as an Academic Clerk where he tutored, corrected papers and did filing. He was commended for his efforts, excellent work, outstanding job, initiative, diligence, cooperation, conscientiousness, reliability, attention to detail as reflected on his CDC 101 performance reports. I/m Sheppard worked for various supervisors, never receiving less than above average work reports. I/M Sheppard received only one unsatisfactory work performance report. That being 4/22/92, which resulted in a job change. Most of I/M Sheppards work supervisors have gone out of their usual routine to write about his exemplary work performance.

Laudatory Work Chronos

I/M Sheppard has received the following laudatory chronos from his work supervisors:

| | | |
|---|---|---|
| 1/22/88 | D.A. Clayton | Warehouse Manager |
| 7/17/89 | G. Kirkpatrick | Warehouse |
| 7/29/94 | M. Hagemeister | Material & Stores Supervisor |
| 7/29/94 | J. Fiskum | Warehouse Manager |
| 8/30/95 | M. Land | PIA Industries Supervisor |
| 10/12/95 | R. Langslet | PIA Mattress & Bedding Supervisor |
| 10/17/95 | J. Rosa | PIA Administrator |
| 10/17/95 | J. Fiskum | Warehouse Manager |
| 1/13/98 | J. Zazueta | Supervising Cook |

IV.   EDUCATION:

I/M Sheppard has completed the following courses:

| | | |
|---|---|---|
| 10/28/81 | Speed Reading Course, | Grade - Excellent |
| 1/29/82 | Consumer Economics | Grade - B+ |
| | English | Grade - C- |
| 6/8/82 | English | Grade - Incomplete |
| 6/11/82 | Math | Grade - B+ |
| 8/13/82 | History | Grade - C- |
| | English | Grade - C |
| 1/28/83 | English | Grade - C |
| | Typing   44 WPM | Grade - B |
| 2/1/83 | American Political Science | Grade - C+ |
| | Government | Grade - B+ |
| | Speech | Grade - B+ |
| 6/10/83 | California History | Grade - B+ |
| | English | Grade - B |
| 1/12/84 | Earned High School Diploma | |
| 1/30/84 | Computer Science | Grade - A |
| 5/16/86 | College Sociology | Grade - A |
| 2/13/92 | College Business | Grade - B |
| 1/14/93 | College Real Estate Finance | Grade - B |
| 2/25/93 | Legal Research Training | Passed |
| 3/17/94 | College Fundamental Concepts | Grade - B+ |

3/17/94     College Intro to Algebra          Grade - D

In addition to the above courses, I/M Sheppard has almost completed a Bachelor of Science Degree from St. Johns University while incarcerated. He is currently working towards that goal.

I/M Sheppard has received the following laudatory chronos from his Education Supervisors:

| | | |
|---|---|---|
| 1/12/84 | Gary Sutherland | Principal Represa Adult School |
| 1/20/84 | Terry Crouson | Academic Instructor |
| 9/28/84 | Barry Smith | Academic Instructor |
| 3/10/86 | Don Wakefield | Academic Instructor |
| 6/14/91 | Richard Batten | Academic Instructor |
| 1/31/92 | M. Frank | Instructor Tutoring Dept. |
| 2/10/93 | M. Frank | Instructor Tutoring Dept. |
| 10/27/93 | M. Frank | Instructor Tutoring Dept |
| 1/16/95 | M. Frank | Instructor Tutoring Dept |
| 12/1/95 | M. Frank | Instructor Tutoring Dept |

V.     SELF HELP:

| | |
|---|---|
| 10/11/88 | Gavel Club #19, a public speaking group where I/M Sheppard served as Toastmaster and Topic Master. |
| 6/30/90 | Gavel Club #19, improving communication skills. |
| 8/9/90 | Gavel Club #19, received "Competent Toastmaster" award. |
| 10/11/90 | Gavel Club #19, above average grades. |
| 4/17/95 | Road to Freedom Recover Program, dealing with anger control, self control. |
| 4/27/95 | Therapy Group for Lifers, a 22 week course teaching how to deal with stress, anger control and relaxation. |
| 5/11/95 | Parolee Recidivism Prevention Program, an 8 week course designed to reduce recidivism through education. |
| 6/13/95 | Narcotics Anonymous |
| 2/25/96 | Peace Versus Power in the Family, teaches control of temper, harmful behavior, how to live in society, controlling emotions. |
| 2/25/96 | As Man Thinketh, Attitude and Behavior Modification. |

In addition to the above self-help programs, I/M Sheppard has also spent over four (4) years of his spare time tutoring other inmates in subjects from Basic Math and Reading to Airframe and Vocational subjects. I/M Sheppard appears to take great pride in his accomplishments as a tutor and those of his pupils.

VI.     FUTURE PLANS:

Complete his studies at St. Johns University and receive his Bachelors Degree in Business Administration.

A.     Residence:

Will live with wife and 8 year old daughter in Oakland, California, in their apartment.

B.    Employment:

I/M Sheppard has received numerous job offers relating to computer work.   In addition, I/M Sheppard has numerous business skills (typing, clerical, computer, filing, supervising).   I/M Sheppard also has carpentry skills which he feels he could find employment pending a job in a field appropriate to his education.

VII.    SUMMARY:

I/M Sheppard appears to have been making good use of his time since his incarceration.   There appears to have been very little idle time during his 17 years, which may account for his minimal amount of disciplinaries.   He has received laudatory chronos from almost every supervisor during his confinement.   I/M Sheppard has received laudatory chronos from all his education instructors.   He has participated in tutoring other inmates from Basics of Reading and Writing to Airframe and Vocational material and has received laudatory chronos for his years of tutoring. I/M Sheppard has attended multiple Self Help programs for Anger Control, Stress, and Behavior Modification.   In all, I/M Sheppard has been preparing for the day he will be released from prison.   His consistency in these programs all appear to be for his benefit and not just for the Parole Boards' approval.   After talking with I/M Sheppard on multiple occasions over the past year, a review of his file, I believe his potential to recidivit is very low.   I believe the Parole Board should consider the possibility of parole.

Prepared by:

_____
A. CAIN, CC-I

_____1 - 2 2 - 9 8_____
Date

Reviewed by:

_____
T. DESCHLER, CC-II

_____
TOM FELKER, C & PR

CDC# C34952    SHEPPARD, IRVING                          1-21-98          HDSP

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

DOCUMENTATION HEARING
[x] PAROLE CONSIDERATION HEARING
[ ] PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED. i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §2290, 2292,2210 AND 2439.

| YEAR | POSTCONVICTION CREDIT BPT | PBR | REASON |
|------|------|-----|--------|
|  |  |  | Sheppard was transferred to HDSP on 3-24-97 and released to GPIII. I/M Sheppard has a current classification score of 0. |
| 5/18/96 to 5/17/97 |  |  | **PLACEMENT:** DVI - General Population/CSP-Corcoran/HDSP III. **CUSTODY:** MED A. **VOCATIONAL TRAINING:** No vocational programs available at this time. **ACADEMICS:** I/M was attempting to continue and complete correspondence courses from St. Johns University. HDSP inadvertently returned all of I/M's academic supplies. I/M is currently working on return of supplies and books. **WORK RECORD:** Assigned as Clerk, Clerk Porter, Bakery. Perfect work attendance. Above average to exceptional work evaluations. I/M Sheppard is currently working in the Main Kitchen Bakery where he is considered a Critical Worker. And has worked during the emergency lockdown, ensuring the safe and orderly operation of HDSP. **GROUP ACTIVITIES:** Inmate Sheppard received his Tutors Certificate in July 1996 from Laubach Literacy Group - for tutor training. **PRISON BEHAVIOR:** Has remained totally disciplinary free during this reporting period. |
| 5/18/97 to 1/16/98 (present |  |  | **PLACEMENT:** HDSP III G.P.. **CUSTODY:** MED A. **VOCATIONAL TRAINING:** Currently assigned to A Facility Bakery, receiving above average to excellent ratings. Is Assistant Leadman. Is considered a Critical Worker. I/M Sheppard has worked extra hours as well as RDO's during recent lockdowns to ensure the operation of HDSP Culinary Unit. **ACADEMICS:** |

| Correctional Counselor Signature | Date |
|---|---|

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|------|------------|-------------|----------|--------------|
| Sheppard, Irving | C34952 | HDSP | MARCH 1998 | |

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFER PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASON |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | None available at HDSP in his educational range of college programs. **WORK RECORD:** Currently in A Facility Bakery where he has a perfect attendance record and is receiving above average to excellent work reports. **GROUP ACTIVITIES:** No programs available at this time that I/M has participated in the past. **PRISON BEHAVIOR:** Continues to be disciplinary free during this reporting period. |

A. CAIN, CCI                     1-22-98
                                 DATE

T. DESCHLER, CCII

TOM FELKER, C & PR

**ORDER:**
- [ ] **BPT date advanced by** _____ **months.**
- [ ] **PBR date advanced by** _____ **months.**
- [ ] **BPT date affirmed without change.**
- [ ] **PBR date affirmed without change.**

**SPECIAL CONDITIONS OF PAROLE:**
- [ ] **Previously imposed conditions affirmed.**
- [ ] **Add or modify**

- [ ] Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| Sheppard, Irving | C34952 | HDSP | MARCH 1998 | |



LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 2001 CALENDAR

**SHEPPARD**                                                    **C-34952**

I.    **COMMITMENT FACTORS:**

A.    Life Crime:

Sheppard was committed to the California Department of
Corrections on 8/2/81 subsequent to a conviction for Murder First
Degree with Use of a Firearm, Santa Clara County Case Number
79029. Sheppard was sentenced to 25 Years to Life. MEPD: 4-
17-98.

*Offense Summary:*

On 12/21/80, at approximately midnight, Sunnyvale Police
responded to 1674 Hollenbeck Avenue, Apt. 21, subsequent to a
report of a dead body. Police found the victim lying in the kitchen
area with four gunshot wounds to the head. Sheppard was
identified as the person who made threats against the victim on the
evening of his death. The next day Sheppard left the state and
flew to South Carolina and remained there until his arrest and
extradition to California. The murder weapon was recovered and
fingerprints from Sheppard were found on the paper bag and
newspaper containing the firearm. The victim and the defendant
had been engaged in a narcotics business, resulting in the victim
owing the defendant a large sum of money.

B.    Prisoner's Version:

On January 30, 2001 inmate was interviewed and given an Olson
review. Prisoner admits that the victim and he were engaged in a
narcotics business in California. Prisoner claims that the victim did
not owe him money. The defendant believes that the victim was
robbed by a possible suspect named Jamal Sampson. Sheppard
claims that he only returned to South Carolina to obtain more
narcotics for the narcotics business. Sheppard believes that if he
had not given the victim the narcotics, there would not have been
an incentive for someone to kill him.



C.   Aggravating Circumstances:

Defendant has a long history of contact with the criminal justice system, starting at age 10.  Each encounter resulted in increased severity.

D.   Mitigating Circumstances:

There are no mitigating factors noted in this case.

## II.   PRECONVICTION FACTORS:

Documents from the previous hearings have been considered and that information remains valid.

## III.   POSTCONVICTION FACTORS:

Prisoner's last appearance before the BPT was on 3/12/98 for his Initial Parole Consideration Hearing.  A three-year denial was stipulated.  The BPT recommended that subject remain disciplinary free, upgrade vocationally, and participate in self-help and therapy programs.  Subject appeared for Post Board Review on 4/14/98.  During this review period subject was initially housed at HDSP-III, subject transferred on 7/21/98 to FSP-II for Level II placement and remains at FSP-II.  During this three-year evaluated period the subject has consistently met and exceeded all BPT stipulated goals.   Subject's completion of work assignments, vocational programs, and his participation in self-help and therapy programs is in the well above average to exceptional range.  Subject has remained disciplinary free since 9/27/90.  Subject has participated as a voluntary tutor in the LAUBACH Literacy Program.  On 4/3/00 Subject completed the Office Services and Related Technology Vocational Program at FSP-II with a note-worthy 4.0 GPL!  Subject is currently participating in the Vocational Computer Repair Program at FSP-II.  Sheppard has matured considerably since his reception into CDC.  For further details on Post Conviction Progress refer to attached Progress Report.

## IV.   FUTURE PLANS:

If granted parole prisoner plans to reside with his wife, Irene Sheppard, at 210 Athol Avenue, No. 19, Oakland, California, 94606.  Phone Number: (510) 839-5969.  There are eight letters of support, received by this

counselor, located in the Miscellaneous Section of the C-File.  Subject plans to seek work in the computer repair field.  Subject plans to complete his Bachelor of Arts in Business Administration.  It is noted that subject requires 41 units.

**V.    SUMMARY:**

A. Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would pose a very low degree of threat to the public at this time, if released from prison to parole.  Sheppard has matured considerably since his reception into the CDC on the commitment offense.  His disciplinary record is outstanding, his work reports range from well-above average to exceptional, he continues to achieve educational and vocational goals, and he continues self-improvement through participation in self-help therapy.

B. Prior to release, the prisoner could benefit from continuing to maintain his disciplinary free record, continuing to fine tune his vocational skills, and continuing to participate in self-help therapy.

C. This Board Report is based incidental contact in the Unit, inmate interviews, and an inmate Olson Review of the Central File that occurred on 1/30/01.

**D. H. TOBIN**
**Correctional Counselor I**

Reviewed by:

**P. D. BUSH**
**Correctional Counselor II**
**Supervising Counselor**

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROCESS REPORT

- ☐ DOCUMENTATION HEARING
- ☐ PAROLE CONSIDERATION HEARING
- ☐ PROGRESS HEARING

**INSTRUCTIONS**

TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS
                ORIGINALLY ESTABLISHED. i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT 2290 - 2292, 2410 AND
                2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 1/23/98<br><br>To<br><br>1/22/99 | | | Sheppard was committed to the California Department of Corrections on 8/21/81 from Santa Clara County subsequent to a conviction for Murder First Degree. Subject was sentenced to 25 Years to Life. For information prior to this report, refer to post conviction progress report dated 1/22/98.<br><br>**PLACEMENT:** HDSP-III. On 7/21/98 Subject was transferred to FSP-II.<br>**CUSTODY:** Initially MED A, upon arrival to FSP-II and per operational procedures Subject's custody was increased to CLO B, on 10/2/98 FSP-II ICC granted MED A Custody with Gate Pass Clearance.<br>**VOCATIONAL TRAINING:** On 1/13/99 Subject was assigned to Vocational Office Services and related technology.  No education progress reports for this period.<br>**ACADEMICS:** While the Subject was not assigned to an academic program during this reporting year, the Subject did participate as a voluntary tutor in the LAUBACH Literary Program at FSP-II.  A CDC-128B dated 12/12/98 notes the Subject's participation as a volunteer.<br>**WORK RECORD:** Initially at HDSP-III the subject was assigned to the Bakery. A Laudatory CDC-128B dated 1/13/98 is noted for his work performance. A CDC 101 (Work Supervisor's Report) dated 6/2/98 notes Above Average work performance and the Subject is a very good worker and learns quickly.  Upon arrival to FSP-II, Subject was assigned as a Canteen Clerk, a CDC 101 (Work Supervisor's Report) dated 10/22/98 notes Above Average work performance.<br>**GROUP ACTIVITIES:** No documented participation during this reporting year.<br>**PSYCHIATRIC TREATMENT:** NONE<br>**PRISON BEHAVIOR:** Subject remained disciplinary free for this reporting year.<br>**OTHER:** NONE |

| CORRECTIONAL COUNSELOR SIGNATURE | | | DATE |
|---|---|---|---|
| D. H. TOBIN, CCI | | | 5-8-01 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SHEPPARD | C-34952 | FOLSOM | MARCH/2001 | |

BOARD OF PRISON TERMS                                                      STATE OF CALIFORNIA
**CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| 1/23/99<br><br><br><br>TO<br><br><br><br><br>1/22/00 | | | **PLACEMENT:** FSP-II.<br>**CUSTODY:** MED A with GPC.<br>**VOCATIONAL TRAINING:** Subject is assigned to Office Services and Related Technology. A CDC 128E (Education Progress Report) dated 7/1/99 notes overall grade of A and the Subject assists other students. A CDC-128E, dated 10/1/99, notes overall grade of A, very good study habits and assists other students. A CDC-128E, dated 12/31/99, notes overall grade of A.<br>**ACADEMICS:** Subject continues to act as a voluntary tutor in the LAUBACH Literacy Program at FSP-II. CDC-128B's dated 3/24/99, 6/26/99 and 1/11/00 notes the Subject's continued effort in this program.<br>**WORK RECORD:** No work assignments for this reporting year.<br>**GROUP ACTIVITIES:** On 8/19/99, Subject completed the 21-Hour Basic Alternatives to Violence Workshop. On 10/21/99, Subject completed the 21-Hour Advanced Alternatives to Violence Workshop. On 12/28/99, the Subject completed an Anger Management Workshop. A CDC-128B dated 12/99 is noted for NA/AA participation in the September-December 1999 period.<br>**PSYCHIATRIC TREATMENT:** NONE<br>**PRISON BEHAVIOR:** Subject remains disciplinary free.<br>**OTHER:** NONE. |
| YEAR | BPT | PBR | REASONS |

**ORDER:**

- [ ] BPT date advanced by _____ months.
- [ ] PBR date advanced by _____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify _____
     _____

- [ ] Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SHEPPARD | C-34952 | FOLSOM | MARCH/2001 | |

BPT 1004 (Rev 7/86)                        PAGE 2 OF 3                        PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA
CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| 1/23/00 | | | **PLACEMENT:** FSP-II |

**PLACEMENT:** FSP-II
**CUSTODY:** MED A with GPC
**VOCATIONAL TRAINING:** Subject is assigned to Office Services and Related Technology Vocational Program. A CDC-128E (Educational Progress Report) dated 3/31/00, notes overall grade of A, and Subject has achieved all goals for this quarter. A CDC-128B dated 4/30/00 notes that Subject has completed the OSS-V program at FSP-II with an overall GPL of 4.0. On 4/29/00 Subject was reassigned to the Vocational Computer Repair Program.
**ACADEMICS:** Subject continues to serve as a voluntary tutor in the LAUBACH Literacy Program. CDC-128B's dated 3/31/00 and 10/5/00 note the Subject's continued contribution to this program.
**WORK REPORTS:** There are no work reports on file for this assignment period. Review of CDC-191 (Inmate Time Cards) note a perfect attendance record.

**TO**

**GROUP ACTIVITIES:** A CDC-128B dated 3/10/00 notes the Subject's participation in the LOGO Mentoring Workshop. A CDC-128B dated 3/31/00 notes continued participation in the NA/AA Program for the June-March 2000 period. On 6/22/00, Subject completed a 21-Hour Training for Trainers Alternatives to Violence Program. A CDC-128B dated 6/27/00 is noted for NA/AA participation in the April-June 2000 period. A CDC-128B dated 9/27/00 is noted for NA/AA participation in the July-September 2000 period. On 10/25/00 Subject participated in the Breaking Barriers Workshop.
**PSYCHIATRIC TREATMENT:** NONE.
**PRISON BEHAVIOR:** Subject's prison behavior is considered to be outstanding. Subject's last CDC-115 is dated 9/27/90.
**OTHER:** Subject was provided with a review of his Central File on 1/30/01 to prepare for this BPT Hearing.

**PRESENT**

**ORDER:**
☐ BPT date advanced by _____ months.    ☐ BPT date affirmed without change.
☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
☐ Previously imposed conditions affirmed.
☐ Add or modify _____
_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME<br>SHEPPARD | CDC NUMBER<br>C-34952 | INSTITUTION<br>FOLSOM | CALENDAR<br>MARCH/2001 | HEARING DATE |
|---|---|---|---|---|

**Reviewed by:** _____    **Approved by:** _____ 5/10/01 **Date:** x 4/40Y
P. Bush, Correctional Counselor II                Classification & Parole Representative

BPT 1004 (Rev 7/86)                              PAGE 3 OF 3                    PERMANENT ADDENDA



"M"

(b) Matrix of Base Terms for First Degree on or after November 8, 1978.

### CIRCUMSTANCES

| FIRST DEGREE MURDER Penal Code § 189 In years and does not include post conviction credit as provided in § 2290 | A. Indirect Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | D. Torture Victim was subjected to the prolonged infliction of physical pain through the use of nondeadly force prior to act resulting in death. |
|---|---|---|---|---|
| I. Participating Victim Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 25—26—27 | 26—27—28 | 27—28—29 | 28—29—30 |
| II. Prior Relationship Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 26—27—28 | 27—28—29 | 28—29—30 | 29—30—31 |
| III. No Prior Relationship Victim had little or no personal relationship with prisoner, or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape, or other felony. | 27—28—29 | 28—29—30 | 29—30—31 | 30—31—32 |
| IV. Threat to Public Order or Murder for Hire The act resulting in the victim's death constituted a threat to the public order include the murder of a police officer, prison guard, public official, fellow patient or prisoner, any killing within an institution, or any killing where the prisoner hired and/or paid another person to commit the offense. | 28—29—30 | 29—30—31 | 30—31—32 | 31—32—33 |

### SUGGESTED BASE TERM

(c) Matrix of Base Terms for Second Degree Murder on or after November 8, 1978.

### CIRCUMSTANCES

| SECOND DEGREE MURDER Penal Code § 189 In years and does not include post conviction credit as provided in § 2290 | A. Indirect Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. |
|---|---|---|---|
| I. Participating Victim Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 15—16—17 | 16—17—18 | 17—18—19 |
| II. Prior Relationship Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 16—17—18 | 17—18—19 | 18—19—20 |
| III. No Prior Relationship Victim had little or no personal relationship with prisoner, or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape, or other felony. | 17—18—19 | 18—19—20 | 19—20—21 |

### SUGGESTED BASE TERM

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

#### HISTORY

1. Editorial correction filed 10–8–81; effective thirtieth day thereafter (Register 81, No. 41).

2. Amendment of subsection (a) filed 1–20–88; operative 2–19–88 (Register 88, No. 5).

### § 2404. Circumstances in Aggravation of the Base Term.

(a) General. The panel may impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances. Circumstances in aggravation of the base term include:

(1) The crime involved some factors described in the appropriate matrix in a category higher on either axis than the categories chosen as most closely related to the crime;

(2) The victim was particularly vulnerable;

(3) The prisoner had a special relationship of confidence and trust with the victim, such as that of employee-employer;

(4) The murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation;

(5) The victim was intentionally killed because of his race, color, religion, nationality or country or origin;

(6) During the commission of the crime the prisoner had a clear opportunity to cease but instead continued;

(b) Matrix of Base Terms for First Degree on or after November 8, 1978.

### CIRCUMSTANCES

| FIRST DEGREE MURDER Penal Code § 189 in years and does not include post conviction credit as provided in § 2290) | A. Indirect Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force, e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | D. Torture Victim was subjected to the prolonged infliction of physical pain through the use of nondeadly force prior to act resulting in death. |
|---|---|---|---|---|
| **I. Participating Victim** Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 25–26–27 | 26–27–28 | 27–28–29 | 28–29–30 |
| **II. Prior Relationship** Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 26–27–28 | 27–28–29 | 28–29–30 | 29–30–31 |
| **III. No Prior Relationship** Victim had little or no personal relationship with prisoner, or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape, or other felony. | 27–28–29 | 28–29–30 | 29–30–31 | 30–31–32 |
| **IV. Threat to Public Order or Murder for Hire** The act resulting in the victim's death constituted a threat to the public order include the murder of a police officer, prison guard, public official, fellow patient or prisoner, any killing within an institution, or any killing where the prisoner hired and/or paid another person to commit the offense. | 28–29–30 | 29–30–31 | 30–31–32 | 31–32–33 |

**SUGGESTED BASE TERM**

(c) Matrix of Base Terms for Second Degree Murder on or after November 8, 1978.

### CIRCUMSTANCES

| SECOND DEGREE MURDER Penal Code § 189 in years and does not include post conviction credit as provided in § 2290) | A. Indirect Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. |
|---|---|---|---|
| **I. Participating Victim** Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 15–16–17 | 16–17–18 | 17–18–19 |
| **II. Prior Relationship** Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 16–17–18 | 17–18–19 | 18–19–20 |
| **III. No Prior Relationship** Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape or other felony. | 17–18–19 | 18–19–20 | 19–20–21 |

**SUGGESTED BASE TERM**

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

#### HISTORY

1. Editorial correction filed 10–8–81; effective thirtieth day thereafter (Register 81, No. 41).

2. Amendment of subsection (a) filed 1–20–88; operative 2–19–88 (Register 88, No. 5).

### § 2404. Circumstances in Aggravation of the Base Term.

(a) General. The panel may impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances. Circumstances in aggravation of the base term include:

(1) The crime involved some factors described in the appropriate matrix in a category higher on either axis than the categories chosen as most closely related to the crime;

(2) The victim was particularly vulnerable;

(3) The prisoner had a special relationship of confidence and trust with the victim, such as that of employee-employer;

(4) The murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation;

(5) The victim was intentionally killed because of his race, color, religion, nationality or country or origin;

(6) During the commission of the crime the prisoner had a clear opportunity to cease but instead continued;



EXHIBIT – "N"

# Compendium of Life Inmates' Demographics

**Life With The Possibility of Parole**
(7 Years to Life)
California Department of Corrections
Compiled February 22, 1997

Statistics for 1945-1996
and a
Partial Cross Reference of Lifer Cases

## Table of Contents

Pag

COMPENDIUM HISTORY ...........................................................
TABLE -- Time Served In Prison and Term Set...............................
CHART -- 1st Degree Murder -- Paroles and Time Served -- by Year ............
Life Terms / 1st Degree Murder (7 Years to Life)...........................
Life and Commuted Death Sentence Inmates..................................
C.C.R. §2282(b), Matrix of Base Terms for First Degree Murder, before 1/1/79........
　　KEMP, Darrell............................................................
　　HINES, Clay.............................................................
　　MEEKS, James ...........................................................1
　　NYE, Robert.............................................................1
　　TURVILLE, Charles.......................................................1
　　COOLEY, Spade ..........................................................
　　GOODRIDGE, Jerry Lee....................................................
　　STANWORTH, Dennis.......................................................
　　ANDERSON, Robert .......................................................
　　MABRY, Terry............................................................
　　FINCH, Bernard .........................................................
　　LOKEY, Galen............................................................
　　FAIN, William Archie ...................................................
　　SUBIA, Ted.............................................................
　　BREEDING, (Unknown).....................................................
　　McCLELLAN, William .....................................................
　　MASSIE, Robert .........................................................
　　ZAGARS, Raymond.........................................................
　　SPAIN, Johnny Larry.....................................................
　　McGAUTHA, Dennis Councle ...............................................
　　SLOAN, Michael Lee .....................................................
　　JOLLY, Charles .........................................................
　　RUIZ, Ralph............................................................
　　FEASBY, Jerry ..........................................................
　　ROBLES, Mario..........................................................
　　KUHNS, Robert LaFoy ....................................................
　　SALING, Warren O'Dell...................................................
　　COLE, James Adolphus ...................................................
　　HILL, Robert Douglas ...................................................
　　WILLIAMS, Buddy.........................................................
　　COOPER, Larry...........................................................
　　LUCAS, Herman ..........................................................
　　EARL, Milton (AKA Abu Qadir Al-Amin)....................................
　　LU, (Unknown) ..........................................................
　　TAFFOLA, Santiago Cornado, Jr...........................................
　　SCOTT, Oscar...........................................................

## Table of Contents
## (Continued)

| | Page |
|---|---|
| MAGRIS, David | 48 |
| GROGGIN, Steven | 49 |
| UNKNOWN ISL INMATE | 51 |
| CHARLTON, Randy | 52 |
| MORALES, Jose Ramon | 53 |
| FONG, Joe | 54 |
| WILLIAMS, David | 55 |
| WADDELL, Harold | 56 |
| ROMO, Danny | 57 |
| STEWART, Wilbur | 58 |
| BAGLEY, James | 59 |
| FAHSHOLTZ, David | 60 |
| GRIFFITH, Robert | 61 |
| AUTREY, David | 62 |
| PROCHANAU, Buddy | 63 |
| SEABOCK, Robert | 64 |
| ANDREWS, Leyland | 65 |
| HUSKEY, (Unknown) | 66 |
| FERGUSON, Thomas | 67 |
| DUNN, Billy Ray | 68 |
| FRANK, David | 69 |
| ALVAREZ, Nicholas | 70 |
| LADD, Wayne | 7 |
| COYNE, Ray | 7 |
| BURRUSS, Richard | 7 |
| HARRIS, James | 7 |
| CONOVER, Robert | 7 |
| WALLACE, Michael | 7 |
| CAMPOS, Elias | 8 |
| PRICE, Oscar | 8 |
| CORDIER, Clifford | 8 |
| SHAW, Otis | 8 |
| SOTELLO, (Unknown) | 8 |
| HERNANDEZ, (Unknown) | 8 |
| DAY, David | 8 |
| STEVENS, Richard | 8 |
| BARNETT, Larry | 8 |
| GUTIERREZ, (Unknown) | 8 |
| COLLINS, Robert | 8 |
| BOZZO, Vincent | 8 |
| MILLER, Jeffry | 8 |

## Table of Contents
## (Continued)

| | Page |
|---|---|
| PEREZ, Miguel | 93 |
| McILVAINE, Billy Joe | 94 |
| CURTIS, John | 96 |
| SMITH, Joseph | 98 |
| SAGIN, Ronald | 99 |
| REDD, (Unknown) | 100 |
| Index of All Cases | 101 |
| Index of Special Interest Cases | 104 |

## Table of Contents
## (Continued)

### Special Interest Cases

| Name | Term | Page |
|------|------|------|
| **COURT ORDERED RELEASES** | | |
| STANWORTH, Dennis | 17 Years | 15 |
| FAIN, William Archie | 15 Years / 8 Months | 22 |
| SPAIN, Johnny Larry | 21 Years | 29 |
| | | |
| **MULTIPLE DEATH PENALTY CASES** | | |
| STANWORTH, Dennis | 17 Years | 15 |
| | | |
| **SINGLE DEATH PENALTY CASES** | | |
| KEMP, Darrell | 19 Years | 8 |
| HINES, Clay | 14 Years | 9 |
| MEEKS, James | 13 Years | 10 |
| NYE, Robert | 13 Years | 11 |
| TURVILLE, Charles | 12 Years | 12 |
| GOODRIDGE, Jerry Lee | 13 Years | 14 |
| ANDERSON, Robert | 10 Years | 17 |
| MABRY, Terry | 14 Years | 19 |
| McCLELLAN, William | 21 Years | 25 |
| MASSIE, Robert | 13 Years | 26 |
| McGAUTHA, Dennis Councle | 15 Years | 3 |
| SLOAN, Michael Lee | 13 Years | 3 |
| HILL, Robert Douglas | 13 Years | 4 |
| WILLIAMS, Buddy | 12 Years | 4 |
| EARL, Milton (AKA Abu Qadir Al-Amin) | 9 Years | 4 |
| MAGRIS, David | 16 Years | 4 |
| HUSKEY, (Unknown) | 14 Years | 6 |
| CONOVER, Robert | 13 Years | 7 |
| | | |
| **MULTIPLE CONSECUTIVE LIFE TERM CASES** | | |
| FAIN, William Archie | 15 Years / 8 Months | 2 |
| LUCAS, Herman | 13 Years / 9 Months | 4 |
| WILLIAMS, David | 13 Years | 5 |
| LADD, Wayne | 13 Years | 7 |
| DAY, David | 14 Years | 8 |
| McILVAINE, Billy Joe | 15 Years / 6 Months | 9 |

# Table of Contents
## (Continued)

### Special Interest Cases

| Name | Term | Page |
|------|------|------|

**MULTIPLE MURDER CASES**

| STANWORTH, Dennis | 17 Years | 15 |
| LUCAS, Herman | 13 Years / 9 Months | 43 |
| LU, (Unknown) | 13 Years | 45 |
| FONG, Joe | 9 Years | 54 |
| WILLIAMS, David | 13 Years | 55 |
| STEWART, Wilbur | 10 Years | 58 |
| GRIFFITH, Robert | 11 Years | 61 |
| LADD, Wayne | 13 Years | 71 |

**SINGLE MURDER WITH ADDITIONAL MULTIPLE OFFENSES CASES**

| LOKEY, Galen | 9 Years | 21 |
| BREEDING, (Unknown) | 8 Years | 24 |
| SPAIN, Johnny Larry | 21 Years | 29 |
| ROBLES, Mario | 10 Years / 4 Months | 36 |
| COLE, James Adolphus | 14 Years / 3 Months | 39 |
| COOPER, Larry | 13 Years / 6 Months | 4. |
| TAFFOLA, Santiago Cornado, Jr. | 12 Years / 9 Months | 46 |
| UNKNOWN ISL INMATE | 17 Years | 5 |
| CHARLTON, Randy | 12 Years / 6 Months | 5. |
| BAGLEY, James | 12 Years / 6 Months | 5. |
| AUTREY, David | 9 Years | 6. |
| PROCHANAU, Buddy | 13 Years | 6 |
| SEABOCK, Robert | 15 Years | 6 |
| ANDREWS, Leyland | 16 Years | 6 |
| FERGUSON, Thomas | 14 Years / 6 Months | 6 |
| DUNN, Billy Ray | 12 Years / 6 Months | 6 |
| ALVAREZ, Nicholas | 12 Years | 7 |
| WALLACE, Michael | 13 Years / 6 Months | 7 |
| CAMPOS, Elias | 11 Years / 6 Months | 8 |
| PRICE, Oscar | 10 Years / 6 Months | 8 |
| CORDIER, Clifford | 10 Years / 6 Months | 8 |
| STEVENS, Richard | 12 Years / 6 Months | 8 |
| BOZZO, Vincent | 14 Years | 9 |
| McILVAINE, Billy Joe | 15 Years / 6 Months | 9 |

## Table of Contents
## (Continued)

### Special Interest Cases

| Name | Term | Page |
|------|------|------|

**SINGLE MURDER ONLY CASES**

| Name | Term | Page |
|------|------|------|
| COOLEY, Spade | 8 Years | 13 |
| FINCH, Bernard | 9 Years | 20 |
| SUBIA, Ted | 8 Years | 23 |
| ZAGARS, Raymond | 24 Years | 27 |
| JOLLY, Charles | 11 Years | 33 |
| RUIZ, Ralph | 10 Years | 34 |
| FEASBY, Jerry | 13 Years | 35 |
| KUHNS, Robert LaFoy | 15 Years | 37 |
| SALING, Warren O'Dell | 10 Years / 8 Months | 38 |
| SCOTT, Cecarl | 8 Years | 47 |
| GROGGIN, Steven | 16 Years / 9 Months | 49 |
| MORALES, Jose Ramon | 9 Years / 11 Months | 53 |
| WADDELL, Harold | 10 Years | 56 |
| ROMO, Danny | 7 Years | 57 |
| FAHSHOLTZ, David | 10 Years / 8 Months | 60 |
| FRANK, David | 13 Years | 69 |
| COYNE, Ray | 12 Years / 9 Months | 73 |
| BURRUSS, Richard | 12 Years / 7 Months | 75 |
| HARRIS, James | 13 Years | 76 |
| SHAW, Otis | 12 Years | 83 |
| SOTELLO, (Unknown) | 13 Years | 84 |
| HERNANDEZ, (Unknown) | 13 Years | 85 |
| BARNETT, Larry | 12 Years / 6 Months | 86 |
| GUTIERREZ, (Unknown) | 12 Years | 86 |
| COLLINS, Robert | 11 Years / 7 Months | 90 |
| MILLER, Jeffrey | 11 Years | 92 |
| PEREZ, Miguel | 11 Years | 92 |
| CURTIS, John | 14 Years | 93 |
| SMITH, Joseph | 10 Years | 93 |
| SAGIN, Ronald | 11 Years | 93 |
| REDD, (Unknown) | 12 Years | 10 |

# COMPENDIUM HISTORY

The California Department of Corrections compiled most of this documentation's statistical data on California State Life inmates for the years 1945-1996. This data reveals the number of life inmates that the relevant authority found suitable for parole and then released from custody for the past fifty (50) years. This data only includes life term inmates that had been convicted of one or more first degree murders, no other life term sentences were included.

## Data Compiled From:

1) ABC (American Broadcasting Company) News Documentary Life After Death Row, aired on 9/9/88, transcript from Journal Graphics.
2) Parole Data published by the California Department of Corrections Administrative Services Division, Offender Information Services Branch, Estimates and Statistical Analysis Section, Data Analysis Unit. This covered Life Inmate Statistics from 1945-1981. Data for the years 1982-1996 compiled independently via review of state and federal judicial case files. Refer to the "California Department of Corrections -- Murder 1st, Time Served in Prison and Term Set" chart (covering 1945-1996) following.
3) Independent research on life inmates that were convicted of one or more first degree murders and then found suitable for parole and released. A partial cross reference of life inmates released between 1974-1992 has been documented in this report.

## Average Time Served:

The California Department of Corrections data indicate that between 1945-1971 the average time served by those paroled on first degree murder convictions was eleven (11) years, seven (7) months. Figures for the time period of 1970-1981 reveal that the average had fallen to eleven (11) years, two (2) months. Data for the following six (6) years, 1981-1987, demonstrate that the average time served decreased even further to ten (10) years, nine (9) months. Figures for the time period of 1988-1990 show an upward climb to average at fourteen (14) years, eight (8) months. By 1990-1991 the average climbed even further to fifteen (15) years, six (6) months.

It is interesting that in 1992 the data reveals that only one (1) life inmate was released and that the time served was fifteen (15) years, six (6) months. Figures for 1993-1994 depict that **NO** life inmates (convicted of first degree murder) were found suitable for parole and released. Additional figures for 1995 through 1/1/97 also depict that **NO** life inmates (convicted of first degree murder) were found suitable for parole and released.

**Average Number Released:**

Data for those life inmates (convicted of one or more first degree murders) sentenced prior to the new 1979 laws regarding life sentences depict that between 1974-1988 (a fourteen year period) approximately eight hundred and twenty-five (825) life inmates were found suitable for parole and released. This results in an average of fifty-eight (58) paroles per year. Figures for the period of 1989-1992 depict approximately fourteen (14) life inmates were found suitable for parole and released from custody. This was accomplished by releasing six (6) life inmates in 1989, four (4) in 1990, three (3) in 1991, and one (1) in 1992, a dramatic and rapid decrease. The data during that three year period shows that during 1992 only one (1) life inmate was allowed to parole. As stated above in **Average Time Served**, **NO** life inmates have been paroled from 1993 to date, an average of zero (0) per year.

These figures may be further analyzed for the periods for which reliable statistics are available. See the following "California Department of Corrections -- Murder 1st Time Served in Prison and Term Set" chart (covering 1945-1996).

**Murder 1st**
**Time Served In Prison and Term Set**
**Male Felons First Paroled**
**1945-1996**

Indeterminate Sentencing Law:

| Statutory citation | Statutory sentence | Minimum parole date | As of |
|---|---|---|---|
| 190 | Life-Death | 84 months | 1/1/97 |
| 190 | 25-life | 230 months | |

| Year of Parole | Number Paroled | Time Served in Months | | Median term in years |
|---|---|---|---|---|
| | | Median Time | Range of mid 80% of cases | |
| 1945 | 26 | 168 | 120-228 | Life |
| 1946 | 41 | 168 | 120-228 | Life |
| 1947 | 33 | 160 | 120-228 | Life |
| 1948 | 27 | 165 | 120-228 | Life |
| 1949 | 42 | 162 | 120-228 | Life |
| 1950 | 27 | 150 | 120-203 | Life |
| 1951 | 44 | 160.5 | 120-204 | Life |
| 1952 | 40 | 144 | 97-220 | Life |
| 1953 | 33 | 144 | 96-180 | Life |
| 1954 | 39 | 138 | 96-180 | Life |
| 1955 | 31 | 138 | 102-151 | Life |
| 1956 | 32 | 121 | 96-192 | Life |
| 1957 | 26 | 120 | 93-222 | Life |
| 1958 | 21 | 144 | 100-159 | Life |
| 1959 | 32 | 136.5 | 101-193 | Life |
| 1960 | 16 | 139 | 97-300 | Life |
| 1961 | 22 | 141 | 122-150 | Life |
| 1962 | 17 | 130 | 126-237 | Life |
| 1963 | 14 | 145 | 115-173 | Life |
| 1964 | 20 | 136 | 109-174 | Life |
| 1965 | 34 | 132 | 102-210 | Life |
| 1966 | 27 | 141 | 119-352 | Life |
| 1967 | 23 | 126 | 102-180 | Life |
| 1968 | 24 | 145 | 114-240 | Life |
| 1969 | 31 | 144 | 91-256 | Life |

(Continued on Next Page)

**Life Inmate Demographics, February 22, 1997**                    Page

**Time Served In Prison and Term Set**
**Male Felons First Paroled**
**1945-1996**
(Continued)

| Year of Parole | Number Paroled | Time Served in Months | | Median term in years |
| | | Median Time | Range of mid 80% of cases | |
|---|---|---|---|---|
| 1970 | 46 | 139 | 99-234 | Life |
| 1971 | 90 | 143 | 103-223 | Life |
| 1972 | 63 | 130 | 91-262 | Life |
| 1973 | 18 | 167.5 | 91-259 | Life |
| 1974 | 18 | 122.5 | 94-239 | Life |
| 1975 | 122 | 133.5 | 109-237 | Life |
| 1976 | 90 | 129.9 | 94-169 | Life |
| 1977 | 77 | 125 | 95-220 | Life |
| 1978 | 106 | 137 | 94-194 | Life |
| 1979 | 53 | 134 | 95-163 | Life |
| 1980 | 50 | 131 | 89-155 | Life |
| 1981 | 39 | 134 | 88-205 | Life |
| 1982 | 42 | 134 | 88-205 | Life |
| 1983 | 41 | 132 | 89-195 | Life |
| 1984 | 40 | 132 | 89-195 | Life |
| 1985 | 39 | 135 | 95-205 | Life |
| 1986 | 38 | 138 | 95-205 | Life |
| 1987 | 36 | 137 | 94-198 | Life |
| 1988 | 34 | 140 | 95-199 | Life |
| 1989 | 6 | 172 | 100-205 | Life |
| 1990 | 4 | 174 | 105-205 | Life |
| 1991 | 3 | 180 | 107-205 | Life |
| 1992 | 1 | 180 | 180 | Life |
| 1993 | 0 | N/A | N/A | Life |
| 1994 | 0 | N/A | N/A | Life |
| 1995 | 0 | N/A | N/A | Life |
| 1996 | 0 | N/A | N/A | Life |

N/A = Not Applicable
Data for the years 1945-1981 supplied by California Department of Corrections, Administrative Services Division, Offender Information Services Branch, Estimates and Statistical Analysis Section, Data Analysis Unit. Data for the years 1982-1996 compiled independently via review of state and federal judicial case files.

Life Inmate Demographics, February 28, 1997

COPIED AT STATE EXPENSE - 4035689



1st Degree Murder -- Paroles and Time Served -- by year

**Life Terms / 1st Degree Murder (7 Years to Life)**
**Legislatively Defined Prior to 1/1/79:**

Penal Code Section 3046 mandates that an inmate serving a 'Life' sentence (7 Years to Life) for first degree murder that was sentenced prior to the new murder sentencing laws of 1979, must serve a minimum of seven (7) years prior to being released on parole.

In comparison, Penal Code Section 3041 (Disparity) requires that, with life inmates sentenced for conviction of first degree murder with offenses of similar gravity and magnitude, the Board is to establish criteria and set parole release dates in a manner that will provide "Uniform" terms of incarceration. The Board created its Matrix scale in the California Code of Regulations, Title 15, Section §2282(b), for first degree murders that were committed prior to 1/1/79, to accomplish this focus on uniformity (see C.C.R. §2282(b), "Matrix of Base Terms for First Degree Murder" attached next). However, the Board is no longer administering this criteria of equal protection to life inmates.

**Life and Commuted Death Sentence Inmates:**

All life inmates during the time period of 1944-1996 fell under the guidelines and authority of one of the following empowered panels: Adult Authority (AA), 1944-1975; Community Release Board (CRB), 1976-1979; and the Board of Prison Terms (BPT), 1980 to date.

For purposes concerning this demographic documentation, it should be noted that a small percentage of those life inmates listed, who did parole in the past twenty years, did, in fact, start out on California's Death Row. In 1972 a California State Supreme Court decision (People v. Anderson) overturned the state's death penalty statute on the grounds that it was cruel and unusual. The court then commuted all death row sentences (death warrants) to 'Life With the Possibility of Parole' (7 years to life). The Death Penalty was rapidly reinstated by the Legislature only to have it again overturned on the same grounds in 1976 (see Rockwell v. Superior Court, Ventura County, 1976, 18 CAL 3D 420).

The following inmates were chosen only as a partial cross reference of those who had been convicted of 1st Degree Murder and later released. All these inmates had been sentenced to either 'Life with the Possibility of Parole,' or a 'Death Penalty' and had their sentences commuted to 'Life with the Possibility of Parole' prior to 1/1/79.

## C.C.R. §2282(b). Matrix of [Ba]se Terms for First Degree Mu[rde]r before 1/1/79

**CIRCUMSTANCES**

| 2282(b) FIRST DEGREE MURDER Penal Code §189 (In years and does not include post conviction credit as provided in §2290) | A. Indirect Victim dies of causes related to the act of the prisoner but was not directly assaulted by prisoners with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include the victims acting in defense of self or death or actions calculated to induce terror in the victim. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate property. | D. Torture Victim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to act resulting in death. |
|---|---|---|---|---|
| I. Participating Victim Victim was an accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred; e.g. crime partner, drug dealer, etc. | 8-10-12 | 10-12-14 | 11-13-15 | 13-15-17 |
| II. Prior Relationship Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 10-12-14 | 12-14-16 | 13-15-17 | 15-17-19 |
| III. No Prior Relationship Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape, or other felony. | 11-13-15 | 13-15-17 | 14-16-18 | 16-18-20 |
| IV. Threat to Public Order or Murder for Hire The act resulting in the victim's death constituted a threat to the public order, include the murder of a police officer, prison guard, public official, fellow patient or prisoner, any killing within an institution, or any killing where the prisoner hired and/or paid another person to commit the offense. | 13-15-17 | 15-17-19 | 16-18-20 | 18-20-22 |

SUGGESTED BASE TERM

MATRIX

COPIED AT STATE EXPENSE - 4035689




Name **MEEKS, James**    CDC #    Age (at arrest) **25**

## Case #3

### Crimes

This case occurred in 1962. No other information is available. Case has been sealed by the court.

### Conviction

One (1) count 1st Degree Murder. As this was a capital case, he was also convicted of Special Circumstances.

### Sentence

Death (started term on death row)

### Prior Criminal History

No information available.

### Prison Adjustment

No information available.

      **Release Date:**   1975

      **Time Served:**   13 Years

**Information Source:**   ABC News Documentary "Life After Death Row"

### Notes

In 1972, a California Supreme Court decision overturned the state's Death Penalty Statute and commuted all death row prisoners' sentences to Life with the Possibility of Parole (7 Years to Life).

**Name** TURVILLE, Charles    **CDC #** Unknown A    **Age (at arrest)**

**Case #5**

## Crimes

Sometime around 1964, Turville was attempting to commit a robbery of businessman which culminated in a torture/murder.

## Conviction

One (1) count 1st Degree Murder ("torture killing")

## Sentence

Death (started term on death row)

## Prior Criminal History

No available information

## Prison Adjustment

Turville participated in rehabilitation programs that consisted of extensive grou therapy and group participation such as the 7-Step Program/Foundation, Gavalie (Toastmasters International), Squires (Juvenile Crime Deterrence Program), as well the completion of Vocational Machine Shop.

> **Release Date:** 1976 (approximately)
>
> **Time Served:** 12 Years
>
> **Information Source:** CDC Data Analysis Unit

## Notes

Turnville's sentence was first commuted to "Life Without the Possibility of Parc and then later again commuted from "Life Without" to "Life With the Possibility Parole."



Name **COOLEY, Spade**    CDC # **Unknown B** Age (at arrest) **2**

### Case #6

### Crimes

Sometime around 1966, Cooley tortured, mutilated, and murdered his wife. While she was alive both individuals were engaged in a life or death altercation regarding the husband's actions of sexually molesting their natural daughter with a "bumper jack handle" while she was taking a bath.

### Conviction

One (1) count 1st-Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

The only prison rehabilitative program that Cooley was involved with consisted of therapy. The psychiatric treatment analysis is unknown. The only other known activity that he was involved with was forming a Country & Western Band.

**Release Date:**    1974 (approximately)

**Time Served:**    8 Years

**Information Source:**    CDC Data Analysis Unit

Name **STANWORTH, Dennis**    Case #8 (Continued)

Stanworth was considered for parole and rejected by the Board in 1974, 1976, and 1977. Following the operative date of the Determinate Sentencing Law (SB42), he was reconsidered and again rejected in 1977 and 1978.   Finally, in 1979, the Community Release Board found Stanworth parole ready. In reaching their decision the Board stressed the following factors in Stanworth's personal history:  (1) Lack of prior serious criminal history or history of violent conduct; (2) Institutional behavior including cell study even while on death row, excellent work record, obtaining an Associate of Arts degree and a Certificate in Data Processing, six years of participation in therapy programs; (3) Stanworth's only disciplinary infraction occurred ten (10) years before, while on death row; (4) No psychiatric contradictions and (5) Realistic parole plans.

See:  In Re Stanworth (1982) 33 CAL 3d 176, 180.

Name  CDC #  Age (at arrest) 25

## Case #9

### Crimes

In 1966, Anderson entered a pawn shop to pawn a ring. While waiting on the store clerk, he got the feeling that, because he was black (his own words), he was being discriminated against. So, he picked out a rifle and loaded it. He then took aim on the store clerk. The clerk turned and started running for his life when Anderson sho him. Bystanders outside the pawn shop front window witnessed the murder and then watched as Anderson walked over to the weapons case, smashed the glass, and grabbed some pistols and ammunition. At this point Anderson recalls saying to himself, "If I can't go out, they're not going to come in!" Close to sixty-five (65) Sar Diego Police Officers surrounded the pawn shop and commenced a shoot-out with Anderson. A police sergeant made his way inside the shop and was able to shoo Anderson with multiple rounds from a 16 gauge shotgun. The shots almost rippe Anderson's arms off of his body and he was rushed to a nearby hospital where hi arms were saved.

### Conviction

One (1) count 1st Degree Murder, multiple counts of Armed Robbery, and severa counts of Attempted Murder on Police Officers. As this was a capital case, he wa also convicted of Special Circumstances.

### Sentence

Death (started term on death row)

### Prior Criminal History

No available information

### Prison Adjustment

Upon his release to the prison mainline, Anderson maintained a regular wo assignment until his release. No other rehabilitative and or therapy programmin information is available.

      Release Date:   1976

      **Time Served:**   10 Years

**Information Source:**   ABC News Documentary "Life After Death Row"

Name ANDERSON, Robert    Case #9 (Continued)

**Notes**

In 1972, a California Supreme Court decision overturned the state's Death Penalty Statute and commuted all death row prisoners' sentences to Life with the Possibility of Parole (7 Years to Life). This landmark decision was in Anderson's death penalty appeal (People v. Anderson).

Name **MABRY, Terry**       CDC # ▓Unknown &#▓   Age (at arrest) **49**

## Case #10

### Crimes

In 1966, Mabry committed multiple armed robberies for which he was not caught. He was under police surveillance and wanted for questioning. It was during this surveillance period that Mabry was inside a house that the police had staked out and were approaching in order to arrest him. Mabry, in hearing the police out front, exited out the back of the house. He crept up along the side of the house toward the front and opened fire with a handgun. He fired multiple shots at the approaching officers. One of the officers was fatally shot and died at the crime scene. Mabry was arrested and taken into custody after he had run out of ammunition.

### Conviction

One (1) count 1st Degree Murder (Police Officer in the line of duty). As this was a capital case, he was convicted of Special Circumstances.

### Sentence

Death (started term on death row)

### Prior Criminal History

Previous arrest records show that Mabry had convictions for three (3) Armed Robberies, one (1) Forgery, and one (1) Car Theft as an adult.

### Prison Adjustment

While Mabry was on death row, he received several serious CDC-115 rule violation reports. It wasn't until after he was removed from death row that his disciplinary record began to improve. In the last eight (8) years of his incarceration, Mabry received no disciplinary write-ups.

Release Date:   1980

Time Served:   14 Years

Information Source:   Independent Research

### Notes

In 1972, a California Supreme Court decision overturned the state's Death Penalty Statute and commuted all death row prisoners' sentences to Life with the Possibility of Parole (7 Years to Life).

Name **FINCH, Bernard**    CDC # **Unknown B#**    Age (at arrest) **?**

Case #11

## Crimes

In approximately 1967, Finch, who was a well known doctor, tortured and used acid to disfigure his wife. It was suspected that the doctor utilized the acid compound in an attempt to eliminate any trace of murdering his wife. Finch had a girlfriend (Carol Tregoff) who was his accomplice in this crime. She assisted in all phases of this heinous murder. This was a very notorious case.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

Virtually no rehabilitative programming.

**Release Date:**   1976 (approximately)

**Time Served:**   9 Years

**Information Source:**   CDC Data Analysis Unit

Name ZAGARS, Raymond    Case #18 (Continued)

## Prison Adjustment

During his incarceration period at San Quentin State Prison (1969-1978), Zagars received a multitude of very serious CDC-115's and CDC-128's. Some of the more serious rules violations are for Force & Violence (Fighting), Force & Violence (Stabbing), Possession of Heroin, Possession of Marijuana, Possession of Drug Paraphernalia, and Possession of Methamphetamine.

In 1978-1979 Zagars was housed at CMC-East (California Medical Facility-East Facility) to participate in a Community Release Board (CRB) ordered Category 'X' program (90 day psychiatric evaluation for release consideration). While at this facility he was involved in yet further disciplinary infractions, charged with Force & Violence (Assaulting Staff). At the conclusion of his Category 'X' program, the Chief Psychiatrist stated in his report to the CRB that Zagars was not parole ready and that he required further psychiatric review by medical staff.

In 1979-1991 Zagars was housed at CRC (California Rehabilitation Center) at Norco where he maintained a steady work program, completed a second Category 'X' program and was finally referred to the BPT (Board of Prison Terms) with a medical clearance for parole. Zagars appeared before the Board and was given a parole release date two (2) years away.

<blockquote>

**Release Date:**    1991

**Time Served:**    24 Years

**Information Source:**    Independent Research
</blockquote>

Name SPAIN, Johnny Larry    CDC # Unknown B    Age (at arrest) 17

Case #19

## Crimes

In 1967, Spain and two (2) crime associates attempted to rob a marijuana crop. The owner of the field, armed with a shotgun, caught them on his property and ordered them to leave. Spain and his associates enlisted the assistance of six (6) others and mapped out a concerted plan to overpower the owners and raid the crop. As part of the plan, several of the associates armed themselves with shotguns and Spain carried a .22 caliber semi-automatic rifle. They also brought a baseball bat, sticks, a knife, wire cutters, tools for harvesting, materials for masks, and tape & rope for restraining the owners. Once they arrived at the farm, the eight (8) individuals split into pairs and surrounded the field. After a shotgun was accidentally fired, four (4) of the robbers, including Spain, assembled together. When one of the owners approached the group through the bushes, carrying a shotgun, Spain shot the man nine (9) times. Immediately after the shots were fired, all parties ran away, leaving the man to die. At trial it was stated that Spain was a "youthful bravado, to uneasiness to fear for his life, to also include that he was panic stricken."

## Conviction

One (1) count 1st Degree Murder and one (1) count Attempted Armed Robbery

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

NO previous juvenile or adult arrest records.

## Prison Adjustment

Spain received numerous CDC-115's over his incarceration. An actual count of twenty-two (22) are listed in available documentation. These were accompanied by numerous CDC-128's for less severe rule violations. These rules violations resulted in Spain losing 70 months of good time reduction credits when his release date was set.

In the early 1970's, Spain was instrumental in a attempted prison break at San Quentin State Prison in which a small handgun was smuggled into the prison by private attorney visiting one of the prisoners involved in the breakout. Thus, Spain was coined, along with five (5) other defendants, as one of the "San Quentin Six." One (1) correctional officer was murdered during this attempted escape. Spain, along with other defendants, was taken to trial in Marin county on this murder case but was not convicted. Neither was the attorney who smuggled the gun into the prison.

Name SPAIN, Johnny Larry    Case #19 (Continued)

Spain had taken the BPT ten (10) years of psychiatric therapy, including the Category "X" and Category "T" programs. His job assignments had always been within his field of knowledge, as an electrician within the construction/maintenance departments. Spain had acquired skills in drafting/blueprint schematics and Light & Heavy Duty equipment operations. In 1984, his skills earned him a "Special Commendation" for electrical design improvements toward cost effectiveness at California Medical facility (CMF) at Vacaville. His CDC file had 90+ "positive" chronos from staff along with various community related supportive letters towards his parole.

Release Date:    1988 (by court order)

Time Served:    21 Years

Information Source:    CDC Data Analysis Unit & Independent Research

Notes

On 2/11/88, the Board of Prison Terms set a parole release date for Spain. They set his term at twenty-three (23) years. This date was set by the BPT in hopes of terminating the litigation that Spain had filed against them. The setting of this release date actually propelled the litigation even further with the claim that the proposed release date actually extended his deserved term.

see:    In Re Spain (1988)



Name **SLOAN, Michael Lee**    CDC # **B-10636**    Age (at arrest) **17**

**Case #21**

### Crimes

In 1967, Sloan was arrested for Murder, Kidnapping, Rape, and Armed Robbery. N
other information available.

### Conviction

One (1) count 1st Degree Murder, three (3) counts of Kidnapping, one (1) coun
Forcible Rape, one (1) count Armed Robbery. As this was a capital case, he wa
convicted of Special Circumstances.

### Sentence

Death (started term on death row)

### Prior Criminal History

Sloan was a juvenile when he committed these crimes. He was tried and convicted a
an adult. He had a prior juvenile arrest record full of arrests and convictions.

### Prison Adjustment

After Sloan was brought down off of death row, he could not remain disciplinary fre
for any length of time. From 1972 through 1978, he received a multitude of seriou
CDC-115 rule violation reports. Some of the charges include: Possession o
Weapons (Knives), Possession of Narcotics & Marijuana, Threatening Staff, an
Sexual Misconduct. Sloan also spent much of 1974 though 1978 in Administrativ
Segregation Units, described as a management problem by staff.

|  |  |
|---|---|
| **Release Date:** | 1980 |
| **Time Served:** | 13 Years |
| **Information Source:** | Independent Research |

### Notes

In 1972, a California Supreme Court decision overturned the state's Death Pena
Statute and commuted all death row prisoners' sentences to Life with the Possibili
of Parole (7 Years to Life).

In 1979, the Board of Prison Terms deemed Sloan suitable for a parole release dat
Some twelve (12) months later, Sloan was released.

Name **JOLLY, Charles**    CDC # **Unknown B#**    Age (at arrest) **?**

Case #22

## Crimes

Sometime around 1968, Jolly kidnapped and raped a woman then murdered her. Evidence at the scene of the crime depicted that Jolly had "slashed" the body beyond identification along with numerous/multiple stab wounds that killed the victim. Police Investigators in this case suspected that Jolly was actually attempting to dismember the victim's body to dispose of it in hope of avoiding detection.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

Jolly's rehabilitation programming consisted of a steady job assignment in the construction trade and involvement in group therapy.

**Release Date:**    1979 (approximately)

**Time Served:**    11 Years

**Information Source:**    CDC Data Analysis Unit

## Notes

Jolly escaped from San Quentin State Prison after he had served ten (10) years. Several Months after his escape, Jolly was recaptured. For unknown reasons, Jolly was "immediately" released on parole to the community soon after his recapture from his escape.

**Name** RUIZ, Ralph    **CDC #** Unknown B#    **Age (at arrest)** 2

Case #23

## Crimes

Sometime around 1968, during the commission of an armed robbery, Ruiz and his crime partner were intercepted by a police officer responding to a robbery in process call. Ruiz's crime partner returned gun fire, hitting and killing the officer.

## Conviction

One (1) count 1st Degree Murder (of a "Police Officer")

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

While incarcerated, Ruiz's rehabilitation programming consisted of doing art work and participating in group therapy.

|  |  |
|---|---|
| **Release Date:** | 1978 (approximately) |
| **Time Served:** | 10 Years |
| **Information Source:** | CDC Data Analysis Unit |

## Notes

After serving a little over nine (9) years of incarceration, Ruiz escaped from San Quentin State Prison. He was apprehended and returned to custody several months later. Soon after his apprehension, Ruiz was paroled.

**Name** FEASBY, Jerry    **CDC #** Unknown B#    **Age (at arrest)** 24

**Case #24**

## Crimes

Sometime around 1968, Feasby stabbed his girlfriend in a violent frenzy, as there were a multitude of fatal stab wounds on the victim's body. So many stab wounds were noted that the District Attorney made statements that Feasby had actually killed the victim 2 to 3 times (overkill).

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

Feasby engaged in NO prison programming whatsoever. He received numerous disciplinary infractions and serious incident and rules violation reports, including such acts as Possession of a Weapon, Work Stoppage/Agitation, and Refusal to Work (he was unassigned for over nine years). He served disciplinary terms in the Adjustment Centers of Folsom State Prison (Old Folsom), Soledad's Correctional Training Facility (CTF-C), and San Quentin State Prison.

**Release Date:**    1981 (approximately)

**Time Served:**    13 Years

**Information Source:**    CDC Data Analysis Unit



Name **ROBLES, Mario**    CDC # Unknown B#    Age (at arrest) 36

Case #25

## Crimes

On February 13, 1968, during the robbery of a liquor store in Fresno, a clerk gave Robles the money he demanded and then, when the clerk reached under the counter, Robles shot him to death.

## Conviction

One (1) count of 1st Degree Murder, one (1) count of Armed Robbery

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

Burglary, Armed Robbery, Assault with a Deadly Weapon.

## Prison Adjustment

Robles' behavior is marked with disciplinary citations for: Splattering a CDC guard with food, gambling, possession of liquor, and force & violence. Robles denied killing the liquor store clerk. By 1976 examiners found he had no psychological problems.

**Release Date:**    17 February 1982

**Time Served:**    10 Years / 4 Months

**Information Source:**    CDC Data Analysis Unit

## Notes

Robles was not captured/arrested for the murder of the liquor store clerk until 1972, some four (4) years after the crime.

COPIED AT STATE EXPENSE - 4035689

Name **KUHNS, Robert LaFoy**    CDC # **Unknown B#**    Age (at arrest) **36**

Case #26

## Crimes

On February 23, 1968, in the Santa Barbara area, Kuhns was burglarizing a home when the occupant awoke and shouted, chasing him from the house. Kuhns then turned and shot the home owner to death in the street in front of his house. The prosecutor called the killing deliberate while the defense maintained that Kuhns was trying to scare the man away and inadvertently shot him.

## Conviction

One (1) count of 1st Degree Murder (committed during the commission of a burglary)

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

Between the ages of 15-18 Kuhns was accused of eighteen (18) offenses, including Auto Theft, Burglary, Battery, and Strong Armed Robbery of a woman.

## Prison Adjustment

By 1977 a prison psychiatric examination found Kuhns' "...violence potential below average." Psychiatric examiners found him alert, cooperative, and repentant in 1978. During this same time a CDC guard suspected Kuhns was running a sophisticated prison loan-sharking operation.

> **Release Date:**    11 March 1981
>
> **Time Served:**    15 Years
>
> **Information Source:**    CDC Data Analysis Unit

COPIED AT STATE EXPENSE - 4035689

Name | **COLE, James Adolplhus** | CDC # | Unknown B# | Age (at arrest) | 34

Case #28

## Crimes

On November 16, 1968, Cole and an accomplice walked into a South Gate (L.A. County) barber shop and took the barber into a back room at gun-point. Cole's accomplice cleaned out the cash register. As they were leaving the shop, Cole turned and, without provocation, executed the thirty (30) year old barber by coldly shooting him in the back of the head, killing him instantly.

## Conviction

One (1) count 1st Degree Murder (execution style) and one (1) count Armed Robbery

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

Drug Use/Possession, Carrying a Weapon after his arrest for the commitment offense. Cole was further accused of brutal sexual assaults on other prisoners in County Jail.

## Prison Adjustment

Cole's behavior record is spotty, but his attitude was considered improved during the last few years of his incarceration. By 1978 his examiners felt he was no longer considered 'Sociopathic.'

**Release Date:**   14 January 1983

**Time Served:**   14 Years / 3 Months

**Information Source:**   CDC Data Analysis Unit

COPIED AT STATE EXPENSE · 4035689

| Name | HILL, Robert Douglas | CDC # | B-08608 | Age (at arrest) | 21 |

**Case #29**

### Crimes

In 1968, Hill entered a house he suspected was empty. Instead he was surprised to find a pregnant housewife still in the dwelling. Hill attacked, raped, and sodomized her before killing her, so that there would be no witnesses to identify him. There were witnesses that saw him leaving the house and the area of the murder. Shortly thereafter Hill was arrested and identified.

### Conviction

One (1) count 1st Degree Murder, one (1) count Forced Rape, and one (1) count Forced Sodomy. As this was a capital case, he was also convicted of Special Circumstances.

### Sentence

Death (started term on death row)

### Prior Criminal History

Incomplete information indicates that Hill had been previously convicted of Burglary and Grand Theft Auto.

### Prison Adjustment

Upon his release to the prison mainline, Hill maintained a regular work assignment until his release. No known serious CDC-115 disciplinaries while incarcerated. No other rehabilitative and or therapy programming information is available.

> **Release Date:**  1980
>
> **Time Served:**  13 Years
>
> **Information Source:**  ABC News Documentary "Life After Death Row"

### Notes

In 1972, a California Supreme Court decision overturned the state's Death Penalty Statute and commuted all death row prisoners' sentences to Life with the Possibility of Parole (7 Years to Life).

COPIED AT STATE EXPENSE - 4035689

| Name | **WILLIAMS, Buddy** | CDC # | Unknown B# | Age (at arrest) | 22 |

**Case #30**

## Crimes

In 1968, after Williams returned from his tour of duty in Vietnam, he was involved in an armed robbery that netted Williams $6.00 and ended in the shooting murder of a man. During his trial and/or sentencing hearing, Williams made the following statement on record before the judge, "I had supreme, power feeling after robberies where it was -- it was growing on me,' and I feel that I was rescued when I was finally caught."

## Conviction

One (1) count 1st Degree Murder and one (1) count Armed Robbery. As this was a capital case, he was also convicted of Special Circumstances.

## Sentence

Death (started term on death row)

## Prior Criminal History

During sentencing Williams stated that he had been involved in multiple armed robberies since his return from Vietnam.

## Prison Adjustment

No available information

**Release Date:**    1979

**Time Served:**    12 Years

**Information Source:**    ABC News Documentary "Life After Death Row"

## Notes

In 1972, a California Supreme Court decision overturned the state's Death Penalty Statute and commuted all death row prisoners' sentences to Life with the Possibility of Parole (7 Years to Life).

COPIED AT STATE EXPENSE - 4035639

| Name | COOPER, Larry | CDC # | Unknown B# | Age (at arrest) | 24 |

Case #31

## Crimes

In approximately 1968, Cooper murdered his victim in the course of a rape.

## Conviction

One (1) count 1st Degree Murder and one (1) count Rape

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

No available information

|  |  |
|---|---|
| **Release Date:** | 1982 |
| **Time Served:** | 13 Years / 6 Months |
| **Information Source:** | Independent Research |

## Notes

Cooper received his release date after serving approximately twelve (12) years and was released one and one-half (1-1/2) years later.

COPIED AT STATE EXPENSE · 4025689



Name | LUCAS, Herman |    CDC # | Unknown B# |    Age (at arrest) | 34

## Case #32

### Crimes

On May 4, 1969, in the L.A. County area, Lucas and three (3) accomplices went to the home of Violet Sullivan, an elderly eighty-four (84) year old woman, and her companion friend Mary Robinson, who was fifty-two (52) years old, for the sole purpose of robbing the women. One of the robbers threw a towel over Sullivan's head and when Robinson complained Lucas shot Mary Robinson in the back, killing her. Lucas then turned to Sullivan and shot her in the head. Lucas and his accomplices netted $10.00 (ten dollars) in the murder/robbery.

### Conviction

Two (2) counts 1st Degree Murder and one (1) count Armed Robbery

### Sentence

Two (2) consecutive Life With the Possibility of Parole terms (Double 7 Years to Life).

### Prior Criminal History

Multiple Robberies, extensive juvenile history/problems.

### Prison Adjustment

Lucas' prison behavior was 'spotty to good,' although he was accused of smoking 'pot' (marijuana) in his cell. Examiners found no psychological problems but he tended to rationalize the double murder. The L.A. County District Attorney's Office maintained Lucas had no remorse.

|  |  |
|---|---|
| **Release Date:** | 17 February 1983 |
| **Time Served:** | 13 Years / 9 Months |
| **Information Source:** | CDC Data Analysis Unit |

COPIED AT STATE EXPENSE · 4035689



| Name | LU, (Unknown) | CDC # | Unknown AF | Age (at arrest) | 22 |

**Case #34**

## Crimes

In 1964, Lu had, with forethought and contemplated planning, set out to murder two (2) other individuals that had crossed him in a business deal. Armed with a hatchet, he stalked both of his victims and attacked each one individually in a vicious, animal like manner. Because Lu used a hatchet, it was very difficult for the coroner to conclude just how many fatal blows were struck to each victim. The coroner concluded that Lu utilized such overkill as to murder each victim twice. This was a highly publicized case in the newspapers and local television news stations.

## Conviction

Two (2) counts 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

Lu engaged in NO rehabilitative programming whatsoever while incarcerated. He did receive many CDC-115 Rules Violation Reports and various CDC-128 counseling chronos regarding rules violations minor in nature.

**Release Date:** 1977

**Time Served:** 13 Years

**Information Source:** CDC Data Analysis Unit

COPIED AT STATE EXPENSE · 4035689

| Name |  TAFFOLA Santiago Cornado, Jr. | CDC #  Unknown B# | Age (at arrest) 31 |

**Case #35**

<u>Crimes</u>

On June 10, 1970, Taffola and three (3) juvenile accomplices burglarized the house of a seventy-four (74) year old Fresno woman. Once inside the house Taffola and his accomplices tied the elderly woman to her bed and when she shouted out for help, Taffola hit her in the head, killing the elderly woman instantly. Taffola and his accomplices then wrapped the victim's body up in a rug on the floor. Investigative officers found curtains (which defendants had pulled down from off of the windows) along with clothing items piled on top and over the rug containing the victim. Police suspected a plan was formulated to set the house on fire.

<u>Conviction</u>

One (1) count 1st Degree Murder, one (1) count Burglary/Robbery

<u>Sentence</u>

Life With the Possibility of Parole (7 Years to Life)

<u>Prior Criminal History</u>

Police Investigators say that at the time of the commitment offense Taffola and his accomplices were preying on elderly people in a series of home robberies by entering their homes and viciously beating them while having them tied up. Previously to this time period Taffola had been in trouble for Petty Theft, Assault, Car Theft, and Burglary.

<u>Prison Adjustment</u>

Taffola's rehabilitation was considered above average although he was occasionally cited with disciplinary violations of refusing to obey orders. Taffola continued to deny any role in the murder. He 'curtly' told the Parole Board members who found him suitable for release that he felt no need to convince them of repentance under current parole procedures.

> **Release Date:**    1 March 1983
>
> **Time Served:**    12 Years / 9 Months
>
> **Information Source:**    CDC Data Analysis Unit

COPIED AT STATE EXPENSE- 4035689

Name | SCOTT, Cecarl | CDC # | Unknown B# | Age (at arrest) | 22

## Case #36

### Crimes

During a drug deal in 1970, Scott ended up cutting the throat of his drug connection. This dispute was over a jar (container) of narcotics. After cutting his victim's throat, Scott chased him down and then commenced to inflict further great bodily injury by beating him with a tire iron until the victim died from a combination of bleeding and head injuries from the tire iron.

### Conviction

One (1) count 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

Scott participated in NO rehabilitative institutional programs whatsoever during his incarceration. It is noted that just previous to Scott's release in 1977, he attempted to murder another inmate over a narcotics deal.

**Release Date:**    1977

**Time Served:**    8 Years

**Information Source:**    CDC Data Analysis Unit

COPIED AT STATE EXPENSE - 4035689

| Name **MAGRIS, David** | CDC # **Unknown B#** | Age (at arrest) **21** |

**Case #37**

## Crimes

In 1970, Magris, along with his two (2) crime partners, went on a crime/shooting spree for financial gain. Magris, in the company of his associates, first approached a local gas station for the sole purpose of robbery. Once the robbery had been accomplished, the trio drove the 17 year old attendant out into the country and shot him five (5) times. The gas attendant had given them a total of $54.00. Next, needing more money, they drove to yet another gas station to repeat the same crime again. This victim (47 year old Mr. Tapp, attendant), who was not mortally shot but still seriously injured, stated, "When the person stepped around with the sawed-off carbine I knew it was a robbery. They told me to 'sit down.' I started to sit down. They said, 'Wait. Give me your wallet.' I gave them my wallet. I turned around and sat down in the chair." Concerning this robbery Magris stated, "I thought he was reaching for a gun, so I shot him." They shot Mr. Tapp several times in the back. One of the bullets struck him in the kidney, liver, and spinal cord. Another bullet ripped out his left shoulder. Mr. Tapp stated, "I gave them EVERYTHING. I - I gave them everything." The doctor's prognosis was that Mr. Tapp would never walk again.

## Conviction

One (1) count 1st Degree Murder, two (2) counts Armed Robbery, additional conviction of one (1) count Attempted 1st Degree Murder

## Sentence

Death (started term on death row)

## Prior Criminal History

Magris has no previous juvenile or adult criminal arrest record.

## Prison Adjustment

No serious disciplinaries or CDC-128's are noted.

> **Release Date:**   1985
>
> **Time Served:**   16 Years
>
> **Information Source:**   ABC News Documentary "'Life After Death Row'"

## Notes

In 1972, a California Supreme Court decision overturned the state's Death Penalty Statute and commuted all death row prisoners' sentences to Life with the Possibility of Parole (7 Years to Life).



| Name | **GROGGIN, Steven** | CDC # | **Unknown B#** | Age (at arrest) | **19** |

Case #38

## Crimes

In 1970, in and around the Los Angeles County area, Groggin, a known 'Manson Family' member, was directly involved with the "Shorty Shea" execution/mutilation contract murder that had been masterminded by Charles Manson. Groggin, along with Charles "Tex" Watson and under the directions of Manson, went to the ranch area where the victim lived and tricked him into going on a jeep ride which ended in his murder. Shea was brutally murdered by both parties (Groggin & Watson). Afterwards the body was dismembered and the separate body parts were buried in numerous places around the Shea Ranch. The L.A. Coroner's Office could not determine how the victim was murdered due to the mutilation of the body. Due to the notoriety of this case, it is still regularly in the news. A total of eight (8) individuals were arrested, convicted, and incarcerated for the Manson Family serial killings.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

Groggin's disciplinary record is unavailable. Groggin completed a Vocational Auto Body & Fender program, completed an "AA" degree at San Joaquin Delta College, retained multiple work assignments with good supervisory reports, was involved in the Hobby Arts Program with donating his funds to local police agencies, participated in psychotherapy groups including Category "X" and Category "T" programs (resulting in reports that were inconclusive as to parole readiness). Groggin also participated in many self-help groups, had an avid involvement with the Arts in Corrections program, and served as a Chairman for a Juvenile Crime Deterrence program (Project Last Chance) while housed at California Medical Facility, Vacaville.

      **Release Date:**  1987

      **Time Served:**  16 Years / 9 Months

  **Information Source:**  Independent Research

COPIED AT STATE EXPENSE - 4035689

Name **GROGGIN, Steven**    Case #38 (Continued)

<u>Notes</u>

Groggin was charged with being a co-conspirator in several of the other Manson Family murders. However, he was found not guilty of being a participant in any of these other homicides. Still, he received the same sentence as the other Manson Family members.

Groggin received a release date at a subsequent parole hearing in 1983. His term was set at twenty-one years, of which he had completed thirteen (13) by that time. With good time credits, his term was reduced to 16.8 years.

The Los Angeles District Attorney's office was represented at each of Groggin's Board hearings and vehemently opposed parole.

COPIED AT STATE EXPENSE · 4035689



Name **UNKNOWN ISL INMATE**    CDC # **A-74880**    Age (at arrest) **?**

**Case #39**

### Crimes

Previously sentenced to prison prior to this life sentence, this inmate was involved in a prison gang murder in 1970. He attempted to murder another inmate at the same time.

### Conviction

One (1) count 1st Degree Murder and one (1) count Attempted Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

This individual was sentenced to prison on prior felony convictions as an adult when he committed this crime. There is no information available on his criminal record prior to this incarceration.

### Prison Adjustment

This individual committed multiple murders while incarcerated. He also accumulated over seventy-one (71) serious disciplinary rule violation reports over the course of his incarceration.

> **Release Date:**    1987
>
> **Time Served:**    17 Years
>
> **Information Source:**   Independent Research

### Notes

This inmate requested that his name and age not be listed. He did give permission to utilize his CDC number and history.

This inmate committed another prison murder in 1978. He was convicted at trial of this additional homicide.

In spite of having committed serial murders and having the worst prison adjustment of any case listed herein, the Board found this inmate suitable for parole and set his base term at thirteen (13) years for this murder. The Board then aggravated the base term by an additional seven (7) years for the later homicide, for a total term of twenty (20) years. This inmate accumulated three (3) years of good time credit for an actual term of seventeen (17) years.

COPIED AT STATE EXPENSE - 4035689

Name **CHARLTON, Randy**    CDC # **Unknown B#**    Age (at arrest) **21**

## Case #40

### Crimes

In approximately 1971, Charlton committed a murder during an armed robbery.

### Conviction

One (1) count 1st Degree Murder and one (1) count Armed Robbery

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

No available information

| | |
|---|---|
| **Release Date:** | 1983 |
| **Time Served:** | 12 Years / 6 Months |
| **Information Source:** | Independent Research |

### Notes

Charlton received his release date after serving approximately twelve (12) years and was released six (6) months later.

COPIED AT STATE EXPENSE - 4035689

Name **MORALES, Jose Ramon**   CDC # **Unknown B#**   Age (at arrest) **28**

Case #41

## Crimes

In 1971 the body of Morales' girlfriend, Gina Wallace, was found in an abandoned medical building. She had been shot in the head, neck, and abdomen. Her right thumb had been amputated and her face slashed repeatedly. A bloody fingerprint near the victim's body matched Morales' fingerprint identification.

## Conviction

One (1) count 1st Degree Murder / Mutilation

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

There is a juvenile history of known criminal activities concerning Morales. This was his only known previous contact with law enforcement. If there was any prior 1971 criminal activity, it is unknown.

## Prison Adjustment

Morales did very little while he was incarcerated to assist in his becoming a good parole candidate. He did though marry a woman by the name of Ms. Louis Washabaugh in 1980.

**Release Date:**    11 April 1980 (to a halfway house)

**Time Served:**    9 Years / 11 Months

**Information Source:**    Independent Research

## Notes

Most of Morales' term in prison was spent at the California Training Facility (CTF) in Soledad, California.

COPIED AT STATE EXPENSE · 4035689



Name **FONG, Joe**    CDC # **Unknown B/F**    Age (at arrest) **25**

## Case #42

### Crimes

In 1971, Fong was the gang leader of the Chinatown "Joe Fong Gang." He was instrumental in the "Golden Dragon" restaurant massacre, where his gang members, some five (5) in total, entered the restaurant late in the afternoon and started "spraying" the inside with automatic gunfire. This was orchestrated by Fong in the hope of killing a rival gang leader that usually ate at this restaurant. The "hit" was unsuccessful and multiple innocent persons were killed. Fong was arrested soon thereafter.

### Conviction

Multiple counts 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

Fong had an extensive juvenile history. Listing his charges would fill multiple pages. Being the gang leader of a well known gang, Fong was under constant surveillance by the local police authorities.

### Prison Adjustment

During Fong's incarceration, he participated in a few self-help groups while at Deuel Vocational Institution (DVI). He also participated in one vocational trade program. His disciplinary record shows that he was mainly disciplinary free during his incarceration period. Only minor CDC-115 and CDC-128 infractions are noted.

> **Release Date:** 1980
>
> **Time Served:** 9 Years
>
> **Information Source:** Independent Research

### Notes

It was well known that Fong had a close relationship with the Director of Corrections (Mr. J. Enomoto) during his incarceration. Mr. Enomoto would personally visit with Fong at least once a month at DVI. It was Mr. Enomoto's strong political efforts and ties to the Board of Prison Terms that eventually allowed Fong to be given a release date in 1979 and paroled after only a relatively short incarceration.

COPIED AT STATE EXPENSE - 4035689

| Name | WILLIAMS, David | CDC # | Unknown B# | Age (at arrest) | 23 |

**Case #43**

## Crimes

In 1971, during a burglary\attempt, Williams was discovered by the occupants of the residence, an eight (8) year old girl and her guardian (an older man). Williams killed the little girl while she was cowering in her bed. Williams then killed the older man who was attempting to save the little girl's life as well as his own.

## Conviction

Two (2) counts 1st Degree Murder

## Sentence

Two consecutive "Life With the Possibility of Parole" terms (Double 7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

No available information

**Release Date:**  1984

**Time Served:**  13 Years

**Information Source:**  CDC Data Analysis Unit

COPIED AT STATE EXPENSE - 4035689

Name **WADDELL, Harold**    CDC # **Unknown B#**    Age (at arrest) **26**

## Case #44

### Crimes

In 1971, during a domestic dispute with his wife, Waddell grabbed a butcher knife from out of a kitchen drawer and commenced to stab her to death. The corner's autopsy report stated that Waddell had hacked his wife to death and that the count of stab/hack wounds could not be established as they overlapped, many of them entering the same wounds more than once. The corner estimated 30+ entrance wounds.

### Conviction

One (1) count 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

Waddell participated in some therapy during his incarceration period. No other documented rehabilitative programming. Waddell received minor CDC-115 infractions and many CDC-128 counseling chronos but nothing of a serious nature.

**Release Date:**    1982

**Time Served:**    10 Years

**Information Source:**    CDC Data Analysis Unit

COPIED AT STATE EXPENSE - 4035689

Name **ROMO, Danny**    CDC # Unknown B#    Age (at arrest) **24**

## Case #45

### Crimes

In 1971, Romo was in an argument with his uncle that turned into a very physical fist fight. Romo's uncle was knocked down to the ground when Romo jumped in his car and ran over the victim. Romo proceeded to reverse the car and back up over the victim when he noted that he was still alive. Romo continued this back and forth action of running over his uncle's body several times before stopping.

### Conviction

One (1) count 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

Romo served his entire term at San Quentin State Prison. During his incarceration. his personal rehabilitative efforts consisted of learning how to paint abstract art and attending some group therapy. Romo had no serious disciplinary infractions but did receive minor CDC-115 Rule Violation Reports and a few CDC-128 Counseling Chronos for various infractions of the rules.

**Release Date:**    1978

**Time Served:**    7 Years

**Information Source:**    CDC Data Analysis Unit

### Notes

Romo was given a parole release date at his very first board hearing in 1977 and was paroled soon after.

COPIED AT STATE EXPENSE - 4035689

Name STEWART, Wilbur    CDC # Unknown B#    Age (at arrest) 26

Case #46

## Crimes

In 1971, Steward committed multiple murders by shooting to death his wife, her mother, and her boyfriend. The coroner reported that each victim had been shot multiple times. Each victim had at least three (3) separate bullet entrance wounds in and around the head. Upon his arrest, Stewart engaged in a shoot out with local authorities until he ran out of ammunition.

## Conviction

Three (3) counts 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

Stewart had an extensive and lengthy previous adult and juvenile criminal record. Far too many charges to be included in this document.

## Prison Adjustment

Stewart served his entire term at San Quentin State Prison. While he was there, he worked for the prison psychiatrist and Chief Medical Officer. His rehabilitative programming consisted only of completing his high school education and partially completing a trade in the nursing field.

    **Release Date:**   1985 (approximately)

    **Time Served:**   10 Years

**Information Source:**   CDC Data Analysis Unit

COPIED AT STATE EXPENSE · 4035689

Name **BAGLEY, James**    CDC # Unknown B#    Age (at arrest) 20

Case #47

Crimes

In approximately 1971, Bagley committed a murder during an armed robbery.

Conviction

One (1) count 1st Degree Murder and one (1) count Armed Robbery

Sentence

Life With the Possibility of Parole (7 Years to Life)

Prior Criminal History

No available information

Prison Adjustment

No available information

**Release Date:**    1984

**Time Served:**    12 Years / 6 Months

**Information Source:**    Independent Research

Notes

Bagley received his release date after serving approximately twelve (12) years and was released six (6) months later.

COPIED AT STATE EXPENSE - 4035689

Name **FAHSHOLTZ, David**     CDC # **Unknown B#**     Age (at arrest) **32**

## Case #48

### Crimes

On June 4, 1972, in the Van Nuys area of L.A. County, Fahsholtz went to the home of his 'estranged' wife, climbed through the bedroom window and stabbed her lover to death.

### Conviction

One (1) count 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

One (1) count of Burglary, one (1) count Battery, and Drug Abuse.

### Prison Adjustment

Fahsholtz's behavior was considered 'generally good." By 1976 psychiatric examiners found that Fahsholtz had no severe mental problems although he felt abandoned by this family and friends. He further acknowledged guilt and full responsibility for the killing.

> **Release Date:**   6 February 1983
>
> **Time Served:**   10 Years / 8 Months
>
> **Information Source:**   CDC Data Analysis Unit

COPIED AT STATE EXPENSE - 4025689

Name **GRIFFITH, Robert**    CDC # **Unknown B#**    Age (at arrest) **37**

**Case #49**

## Crimes

In 1972, Griffith murdered his gay lover in a jealous rage.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

As a juvenile, Griffith was convicted of murdering his uncle and served approximately nine years in the Youth Authority, released in the early 1960's. Later, as an adult, Griffith was convicted of the first degree murder of his father. He served an approximate incarceration period of eleven (11) years and was released in 1974.

## Prison Adjustment

During his last incarceration period, Griffith was assigned in a maintenance position as an institutional inmate electrician for his entire term. He acquired no other skills or training during this incarceration. He did receive many disciplinary write-ups of a serious nature. Most were related to sexual assaults or sexual misconduct.

　　　**Release Date:**　1983

　　　**Time Served:**　11 Years

　　　**Information Source:**　Independent Research

## Notes

Griffith was convicted of three murders over his life. He was sentenced, served a term, and was released from each. He was 17 years old on his first conviction, 26 years old on his second conviction, and 37 years old on his last conviction. He has had a YA number, a CDC 'A' number, and a CDC 'B' number on his last incarceration. Griffith was given his last release date in 1982, after only serving ten (10) years.

COPIED AT STATE EXPENSE · 4035649

Name **AUTREY, David**    CDC # **Unknown B#**    Age (at arrest) **17**

Case #50

## Crimes

In approximately 1972, Autrey committed a murder during an armed robbery.

## Conviction

One (1) count 1st Degree Murder and one (1) count Armed Robbery

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

No available information

>            Release Date:  1981,
>
>            Time Served:  9 Years
>
>    Information Source:  Independent Research

## Notes

Autrey received his release date at his Initial Parole Consideration Hearing after serving approximately eight (8) years and was released one (1) year later.

COPIED AT STATE EXPENSE - 4025689

Name **PROCHANAU, Buddy**    CDC # **B-39644**    Age (at arrest) **?**

Case #51

## Crimes

Nothing is known about Prochanau's murder conviction, which occurred in approximately 1972.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

No available information

**Release Date:**    1985

**Time Served:**    13 Years

**Information Source:**    Independent Research

## Notes

Prochanau received his release date after serving approximately twelve (12) years and was released one (1) year later.

COPIED AT STATE EXPENSE - 4035689

| Name | SEABOCK, Robert | CDC # | Unknown PH | Age (at arrest) | 23 |

### Case #52

### Crimes

In approximately 1972 Seabock intercepted a Department of Corrections (CDC) transport vehicle in which two (2) prison guards were transporting a state prisoner to court. During the course of rescuing the state prisoner with a firearm (with force), one correctional officer was fatally shot. The other officer was beaten (assaulted) with the firearm until unconscious.

### Conviction

One (1) count 1st Degree Murder, one (1) count Assault with a Deadly Weapon, one (1) count Rescue of a Prisoner

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No previous arrest record.

### Prison Adjustment

No serious CDC-115s, received a Associate through Marin Community College and a BS degree though the University of California. Worked as an education clerk through most of his incarceration and consistently received excellent evaluations from his supervisor.

**Release Date:** 1978

**Time Served:** 15 Years

**Information Source:** Independent Research

COPIED AT STATE EXPENSE - 4035689

Name **ANDREWS, Leyland**    CDC # **Unknown B#**    Age (at arrest) **19**

## Case #53

### Crimes

In 1973, during the commission of an armed robbery, Andrews ended up shooting a District Attorney a multitude of times, killing him. The prosecution in this case blatantly said that Andrews killed the victim many times over due to the vast amount of fatal shots that were inflicted.

### Conviction

One (1) count 1st Degree Murder of a San Diego Public Official (Deputy District Attorney), one (1) count Armed Robbery

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

Very little is known of Andrews and his prior adult criminal history. He did have an extensive juvenile record.

### Prison Adjustment

While incarcerated, Andrews was involved with many self help, vocational, and therapy programs. He was successful in the outcome of all the programs.

    **Release Date:**   1989

    **Time Served:**   16 Years

  **Information Source:**   Independent Research

### Notes

After serving approximately ten (10) years, Andrews was given his parole release date in 1989.

COPIED AT STATE EXPENSE - 4035689

Name **HUSKEY, (Unknown)**     CDC # **B-42841**     Age (at arrest) **22**

Case #54

## Crimes

Huskey's murder was committed in 1973. There were aggravating circumstances that supported the death penalty.

## Conviction

One (1) count 1st Degree Murder. As this was a capital case, he was also convicted of Special Circumstances.

## Sentence

Death (started term on death row)

## Prior Criminal History

No available information

## Prison Adjustment

During Huskey's incarceration, particularly after he was brought down off of death row, he did accumulate multiple serious and administrative CDC-115 rule violation reports. His disciplinary record also reflects multiple CDC-128 counseling chronos for regulation infractions.

During Huskey's incarceration, he did not participate in any self-help groups, nor any psychiatric therapy evaluation groups. For close to fourteen (14) years, he did not even hold a work assignment. It wasn't until five (5) months prior to his last subsequent Board Hearing (in 1985) that Husky accepted a work assignment.

      **Release Date:**  1987

      **Time Served:**  14 Years

**Information Source:**  Independent Research

## Notes

In 1976, a California State Supreme Court decision (Rockwell v. Superior Court, Ventura County, 1976) overturned the state's Death Penalty Statute and commuted death row prisoners' sentences to Life With the Possibility of Parole (7 Years to Life).

At Huskey's Third (3rd) subsequent Board hearing he was found suitable for parole and given a maximum term of seventeen (17) years. Application of accrued good time credits reduced his term by three (3) years. He was released while still on psychotropic medication.

COPIED AT STATE EXPENSE - 4035689

| Name | FERGUSON, Thomas | CDC # | Unknown B# | Age (at arrest) | 22 |
|---|---|---|---|---|---|

**Case #55**

### Crimes

In approximately 1973, Ferguson committed a murder during an armed robbery.

### Conviction

One (1) count 1st Degree Murder and one (1) count Armed Robbery

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

No available information

| | |
|---|---|
| **Release Date:** | 1987. |
| **Time Served:** | 14 Years / 6 Months |
| **Information Source:** | Independent Research |

### Notes

Ferguson received his release date from the Board in approximately thirteen (13) years and was released one and one-half (1-1/2) years later.

Ferguson's co-defendant in this crime was Dunn (see Case #56).

COPIED AT STATE EXPENSE - 405689

Name DUNN, Billy Ray    CDC # Unknown B#    Age (at arrest) 20

## Case #56

### Crimes
In approximately 1973, Dunn committed a murder during an armed robbery.

### Conviction
One (1) count 1st Degree Murder and one (1) count Armed Robbery

### Sentence
Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History
No available information

### Prison Adjustment
No available information

> **Release Date:** 1985.
>
> **Time Served:** 12 Years / 6 Months
>
> **Information Source:** Independent Research

COPIED AT STATE EXPENSE - 4035689

### Notes
Dunn received his release date from the Board in approximately eleven (11) years and was released one and one-half (1-1/2) years later.

Dunn's co-defendant in this crime was Ferguson (see Case #55).

| Name | FRANK, David | CDC # | Unknown B# | Age (at arrest) | 21 |

**Case #57**

## Crimes

Nothing is known about Frank's murder conviction, which occurred in approximately 1973.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

No available information

| | |
|---|---|
| **Release Date:** | 1986 |
| **Time Served:** | 13 Years |
| **Information Source:** | Independent Research |

## Notes

Frank received his release date after serving approximately ten (10) years and was released three (3) years later.

COPIED AT STATE EXPENSE - 4035689

| Name | ALVAREZ, Nicholas | CDC # | Unknown B/f | Age (at arrest) | 19 |
|---|---|---|---|---|---|

**Case #58**

## Crimes

In approximately 1973, Alvarez committed a murder during an armed robbery of a known drug dealer.

## Conviction

One (1) count 1st Degree Murder and one (1) count Armed Robbery

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

No available information

> **Release Date:**   1985
>
> **Time Served:**   12 Years
>
> **Information Source:**   Independent Research

## Notes

Alvarez received his release date after serving approximately eleven (11) years and was released one (1) year later.

COPIED AT STATE EXPENSE - 4035689



| Name | LADD, Wayne | CDC # | A-37802 | Age (at arrest) | 35 |

**Case #59**

### Crimes

In 1974, Ladd was associated with his victims in that he had prior drug dealings with them. During the time period of this crime, Ladd was being forced at gun point to supply drugs for the victims. Ladd was released to get more drugs. He returned later with a hand gun and murdered the two occupants of the residence. Ladd then fled the area. The narcotics in question were heroin, being sold in bulk (kilo quantities).

### Conviction

Two (2) counts 1st Degree Murder, Habitual Criminal Act

### Sentence

25 years flat to the board on the Habitual Criminal Act. A consecutive 'Life With the Possibility of Parole' term (7 Years to Life) on the first murder. The life sentence to start after serving the first term.

### Prior Criminal History

Ladd has an extensive previous criminal arrest record starting at the age of 17. In 1950, as a juvenile, he was arrested for 1st Degree Murder, but at the trial/sentencing it was reduced to Voluntary Manslaughter. In 1956, Ladd was arrested for the first time as an adult. He was then charged with 1st Degree Murder but was found 'not guilty' at trial in Marin County. In 1963, he was arrested for 'Ex-Felon with a Firearm.' After being sentenced to prison and allowed to go to fire camp, he escaped and was later charged with 'False Imprisonment of a Correctional Officer' in the escape.

### Prison Adjustment

During his incarceration period, Ladd participated in a vocational program of Horticulture, continued with earning College credits at San Joaquin Delta College, retained multiple work assignments with excellent evaluations, involved himself with therapy for over 3-1/2 years (including a Category 'X' program). His disciplinary record shows that he only received five (5) CDC-115's during his entire incarceration. None of these disciplinary actions were classified as serious.

COPIED AT STATE EXPENSE - 4035689

Name **LADD, Wayne**          **Case #59 (Continued)**

When Ladd was before the Board of Prison Terms (BPT) and being assessed for a parole date, they considered the following factors: his juvenile record concerning the manslaughter, adult previous arrest/conviction record, materials contained in the confidential file CDC maintained on him, his affiliations with the prison gang "Ayran Brotherhood" (AB), and his previous affiliations with the "Blue Birds" (a previous prison gang before the AB was formed). The BPT brought up other confidential information involving Ladd in a drug smuggling ring inside the prison and pointing him out as the ring leader. Furthermore, the BPT brought up the Habitual Criminal Act commitment that was merged into the controlling sentence before giving him a release date at that hearing in 1986. He had served 12 years at that point.

> **Release Date:** 1987
>
> **Time Served:** 13 Years
>
> **Information Source:** Independent Research

**Notes**

In 1974, Senate Bill 42 (SB42) was enacted and the above two (2) convictions that were once consecutive, were merged into one (1) Life With the Possibility of Parole term (7 Years to Life). This enactment of SB42 did, in effect, drop the Habitual Criminal Act sentence from his sentence.

Ladd's Board Matrix term was set at 18 years but with good time credits was reduced to 12.6 years to serve. This almost put him out on parole immediately.

COPIED AT STATE EXPENSE · 4035689

| Name | **COYNE, Ray** | CDC # | **B-58634** | Age (at arrest) | **44** |

**Case #60**

### Crimes

In 1974, Coyne was involved with, and a member of, the "Hell's Angels" motorcycle gang. He was deeply associated with the drug sales and distribution end of this organized business. A police drug informant was detected and a 'contract' to have him murdered was put into motion by the club. Coyne was one of two people involved with this murder. The other was Richard Burruss, another well known Hell's Angels member. The victim in this case was brutally murdered by both these individuals. The victim's head was almost severed from the body. The entire body was disfigured in an attempt to reduce the likelihood of identification should the body be found. This murder was related to the sales and distribution of methamphetamines and the victim's actual activities as a police informant. Both murderers in this case were given the same sentences. During this time period, Coyne was under the investigation of multiple United States Government Offices/Agencies. The investigations were linked directly to Coyne's membership in the Hell's Angels and their suspected illegal affairs in the California Area.

### Conviction

One (1) count 1st Degree Murder (Execution of a Police Informant)

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

In 1950, while still a juvenile, Coyne was convicted of multiple Burglaries and sent to the Youth Authority. While incarcerated in YA, he escaped on numerous occasions.

In 1958, Coyne was arrested for Second Degree Burglary, convicted, and sentenced to Six (6) months to Fifteen (15) years in the Department of Corrections.

In 1961, Coyne was arrested for Armed Robbery, convicted, and sentenced to Five (5) years to Life.

### Prison Adjustment

During Coyne's incarceration period for this offense, he received numerous, serious CDC-115 rule violation reports. He completed a vocational trade in Optical Lens Grinding. He maintained steady work assignments. He participated in many self-help groups. He completed High School and obtained a diploma. He also involved himself in approximately three (3) years of group psychiatric therapy.

**Release Date:**   1986

**Time Served:**   12 Years / 9 Months

COPIED AT STATE EXPENSE - 4035689

Name **COYNE, Ray**                    **Case #60 (Continued)**

**Information Source:**    Independent Research

## Notes

This person is the crime partner of Richard Burruss.  Identical crime factors. (see Case #61).

During the Board hearing in which they set his release date, the BPT further relied upon the following information:  Juvenile (YA) record, including multiple escapes; adult prior arrest/conviction records; the commitment offense of 1st Degree Murder and its severity resulting in the execution of a police informant; letters opposing parole from the Sacramento District Attorney's Office, Judge Cole's Office (Sacramento), the Federal Drug Enforcement Agency (DEA), The Federal Alcohol, Tobacco and Firearms Agency (ATF), the State Attorney General's Office, and the Sacramento County Sheriff's Department.  These letters further implicated Coyne with the Hell's Angles, but more importantly, they implicated his local chapter/club with approximately twelve (12) to twenty-five (25) other assorted murders.  These agencies further implicated Coyne and his club members with about 80% of the methamphetamine production and distribution in California.

The BPT set Coyne's matrix scale at sixteen (16) years when he appeared before his "Initial" board hearing (at 6.8 years).  With time credits, this left him with six (6) years to serve.

COPIED AT STATE EXPENSE · 4035689

| Name | BURRUSS, Richard | CDC # | B-58684 | Age (at arrest) | 38 |

**Case #61**

## Crimes

This individual is the crime partner of Richard Coyne and was convicted of the same crime in 1974. See COYNE for details.

## Conviction

One (1) count 1st Degree Murder (Execution of a Police Informant)

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

Burruss' previous juvenile and adult criminal background is not readily available. According to his crime partner, Richard Coyne, Burruss was in and out of the Sacramento Count Jail numerous times prior to this murder case.

## Prison Adjustment

While Burruss was incarcerated, he had NO CDC-115's, but did have various CDC-128's on file for small infractions of the rules and regulations. He also participated and received certification for vocational Auto/Body & Smog checking. He continued his education with an AA degree from San Joaquin Delta College. He participated in NO psychiatric therapy during his years incarcerated.

  **Release Date:**  1986

  **Time Served:**  12 Years / 7 Months

  **Information Source:**  Independent Research

## Notes

This person is the crime partner of Richard Coyne. The majority of the information concerning this individual can be found in Coyne's documentation. Identical crime factors. (see Case #60)

During Burruss' first (Initial) board hearing (when he received his release date), he, like Coyne, was under investigation by a multitude of Federal and State Agencies and Departments due to his close ties to the Hell's Angels. The same agencies that wrote letters opposing Coyne's parole, submitted identical letters regarding Burruss' parole.

COPIED AT STATE EXPENSE / 4025689

| Name | HARRIS, James | CDC # | Unknown B# | Age (at arrest) | 25 |

**Case #62**

## Crimes

In 1974, Harris and an associate (Smith) were residing in Santa Clara County when this murder was conspired and carried out. The murder was a "Murder for Hire" contract killing. Both individuals were direct participants. The District Attorney in this case specifically stated and proved that this murder was for monetary gain only.

## Conviction

One (1) count 1st Degree Murder (Murder for Hire)

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

There is a record of Harris' receiving various serious CDC-115's and CDC-128's. No available information on vocations, self-help group participation, work assignments, or therapy programs is available.

      **Release Date:**   1987

      **Time Served:**   13 Years

  **Information Source:**   Independent Research

## Notes

Originally this was a death penalty case but the special circumstances were dropped during trial.

Harris had a crime partner in this matter named Smith. Other than that Smith was released prior to Harris, there is no further information available on him.

In 1984, at their third (3rd) Subsequent Board Hearing, the Parole Board set parole release dates for both individuals. Their terms were set to (16) sixteen years. Both individuals had served ten (10) years at this time. With the application of good time credits, both individuals were able to reduce their release dates by three (3) years.

The information used at their board hearings included letters opposing parole forwarded to the Board from the County Sheriff's Department. A Deputy District Attorney from the County of Santa Clara participated in the hearing, opposing parole.

COPIED AT STATE EXPENSE - 4035689





Name **CONOVER, Robert**   CDC # **Unknown B#**   Age (at arrest) **34**

Case #63

## Crimes

In 1974, Conover was residing in Sonoma County when he was approached by a second party to set up and carry out a paid "Contract Killing." Conover was the "Hit Man" and had two (2) accomplices. Conover was paid in advance, as was one of his accomplices. The murder victim was the wife of one accomplice (Harry Harding). After the homicide was carried out, all parties expected to profit further from the insurance money.

## Conviction

One (1) count 1st Degree Murder. As this was a capital case, he was also convicted of Special Circumstances.

## Sentence

Death (started term on death row)

## Prior Criminal History

No available information

## Prison Adjustment

During Conover's first two (2) years of incarceration he was on death row. Starting upon his release from death row in 1976, he participated in one (1) vocational trade and one (1) self-help group.

Conover did have multiple serious CDC-115 rule violation reports along with other administrative CDC-115's and multiple CDC-128 counseling chronos.

| | |
|---|---|
| **Release Date:** | 1987 |
| **Time Served:** | 13 Years |
| **Information Source:** | Independent Research |

## Notes

In 1976, a California State Supreme Court decision (Rockwell v. Superior Court, Ventura County, 1976) overturned the state's Death Penalty Statue and commuted death row prisoners' sentences to Life With the Possibility of Parole (7 Years to Life).

Conover had multiple crime partners associated with this murder. Very little is known concerning Harry Harding other than that he was also convicted of the same crime as Conover.

COPIED AT STATE EXPENSE - 4035689

Name **CONOVER, Robert**          **Case #63 (Continued)**

In 1984, at Conover's third (3rd) Subsequent Parole Hearing, he was granted a parole release date. His maximum term had been set at sixteen (16) years. With his accrued good time credits applied to this term, he was able to reduce his sentence to a thirteen (13) year term. Harding receive his release date within a year of Conover.

At the hearing that granted Conover his parole, the Board received letters opposing parole from the Sonoma County Sheriff's Department and the Sonoma County District Attorney's Office. The District Attorney also sent a representative to the hearing who pointed out that Conover had originally been found guilty of a death penalty offense.

COPIED AT STATE EXPENSE · 4035689

| Name | WALLACE, Michael | CDC # | Unknown B# | Age (at arrest) | 19 |

**Case #64**

<u>Crimes</u>

In approximately 1974, Wallace committed a murder during an armed robbery.

<u>Conviction</u>

One (1) count 1st Degree Murder and one (1) count Armed Robbery

<u>Sentence</u>

Life With the Possibility of Parole (7 Years to Life)

<u>Prior Criminal History</u>

No available information

<u>Prison Adjustment</u>

No available information

**Release Date:**   1988

**Time Served:**   13 Years / 6 Months

**Information Source:**   Independent Research

<u>Notes</u>

Wallace received his release date after serving approximately twelve (12) years and was released one and one-half (1-1/2) years later.

COPIED AT STATE EXPENSE - 4035689

| Name | CAMPOS, Elias | CDC # | Unknown B# | Age (at arrest) | 20 |

**Case #65**

Crimes

In approximately 1974, Campos murdered his young female cousin during a rape.

**Conviction**

One (1) count 1st Degree Murder and one (1) count Rape

**Sentence**

Life With the Possibility of Parole (7 Years to Life)

**Prior Criminal History**

No available information

**Prison Adjustment**

No available information

> **Release Date:**    1986
>
> **Time Served:**    11 Years / 6 Months
>
> **Information Source:**    Independent Research

**Notes**

Campos received his release date after serving approximately ten (10) years and was released one and one-half (1-1/2) years later.

COPIED AT STATE EXPENSE - 4035689

Name **PRICE, Oscar**    CDC # **Unknown B#**    Age (at arrest) 20

## Case #66

### Crimes
In approximately 1974, Price murdered his victim in the course of a rape.

### Conviction
One (1) count 1st Degree Murder and one (1) count Rape

### Sentence
Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History
No available information

### Prison Adjustment
No available information

|  |  |
|---|---|
| **Release Date:** | 1985 |
| **Time Served:** | 10 Years / 6 Months |
| **Information Source:** | Independent Research |

### Notes
Price received his release date after serving approximately nine (9) years and was released one and one-half (1-1/2) years later.

COPIED AT STATE EXPENSE - 4035689

| Name | CORDIER, Clifford | CDC # | Unknown B# | Age (at arrest) | 19 |

**Case #67**

## Crimes

In approximately 1974, Cordier committed a murder during an armed robbery of a known drug dealer.

## Conviction

One (1) count 1st Degree Murder and one (1) count Armed Robbery

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

No available information

      **Release Date:**   1984

      **Time Served:**   10 Years / 6 Months

  **Information Source:**   Independent Research

## Notes

Cordier received his release date after serving approximately nine (9) years and was released one and one-half (1-1/2) years later.

COPIED AT STATE EXPENSE - 4035689

| Name | SHAW, Otis | CDC # | B-61459A | Age (at arrest) | 17 |

**Case #68**

### Crimes
Nothing is known about Shaw's murder conviction, which occurred in approximately 1974.

### Conviction
One (1) count 1st Degree Murder

### Sentence
Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History
No available information

### Prison Adjustment
No available information

> **Release Date:** 1986
>
> **Time Served:** 12 Years
>
> **Information Source:** Independent Research

### Notes
Shaw received his release date after serving approximately nine (9) years and was released three (3) years later.

COPIED AT STATE EXPENSE - 4035689

Name **SOTELLO, (Unknown)**   CDC # **B-84930**   Age (at arrest) **?**

Case #69

## Crimes

Nothing is known about Sotello's murder conviction, which occurred in approximately 1974.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

No available information

|  |  |
|---|---|
| **Release Date:** | 1987 |
| **Time Served:** | 13 Years |
| **Information Source:** | Independent Research |

## Notes

Sotello received his release date after serving approximately ten (10) years and was released three (3) years later.

COPIED AT STATE EXPENSE · 403689

| Name | **HERNANDEZ,** **(Unknown)** | CDC # | **B-82107** | Age (at arrest) | **17** |



## Case #70

### Crimes

Nothing is known about Hernandez's murder conviction, which occurred in approximately 1974.

### Conviction

One (1) count 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

No available information

> **Release Date:** 1987
>
> **Time Served:** 13 Years
>
> **Information Source:** Independent Research

### Notes

Hernandez received his release date after serving approximately ten (10) years and was released three (3) years later.

COPIED AT STATE EXPENSE · 4035689

| Name | DAY, David | CDC # | B-78461 | Age (at arrest) | 20 |
|------|-----------|-------|---------|-----------------|-----|

**Case #71**

## Crimes

In 1975, during the commission of an armed robbery, Day ended up kidnapping the person he was robbing. Eventually Day realized that he needed to escape from the law without further detection so he killed his robbery/kidnap victim.

## Conviction

One (1) count 1st Degree Murder, one (1) count Kidnap, and one (1) count Robbery

## Sentence

Two (2) consecutive "Life With the Possibility of Parole" terms (Double 7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

Little is known of Day's incarceration period and/or any involvement in self-help, vocational, or therapy programs. It is known that he was paroled from CTF's (Soledad) Protective Custody Unit.

**Release Date:** 1989

**Time Served:** 14 Years

**Information Source:** Independent Research

## Notes

Day was given his release date in 1987, after serving approximately twelve (12) years of his multiple, consecutive life terms.

COPIED AT STATE EXPENSE - 4035689

| Name | STEVENS, Richard | CDC # | Unknown B# | Age (at arrest) | ? |

**Case #72**

<u>Crimes</u>

In approximately 1975, Stevens committed a murder during an armed robbery.

<u>Conviction</u>

One (1) count 1st Degree Murder and one (1) count Armed Robbery

<u>Sentence</u>

Life With the Possibility of Parole (7 Years to Life)

<u>Prior Criminal History</u>

No available information

<u>Prison Adjustment</u>

No available information

>       **Release Date:**    1988

>        **Time Served:**    12 Years / 6 Months

> **Information Source:**    Independent Research

COPIED AT STATE EXPENSE - 4035649

| Name | BARNETT, Larry | CDC # | Unknown B/ | Age (at arrest) | 23 |

## Case #73

### Crimes

In approximately 1975, Barnett tortured and murdered a female supervisor (co-worker). He stabbed her some fifty (50) times with a carving knife.

### Conviction

One (1) count 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

No available information

**Release Date:** 1988

**Time Served:** 12 Years / 6 Months

**Information Source:** Independent Research

### Notes

Barnett received his release date from the Board in approximately eleven (11) years and was released one and one-half (1-1/2) years later.

COPIED AT STATE EXPENSE - 4035689

Name  CDC # B-88555 Age (at arrest) 

**Case #74**

### Crimes

Nothing is known about Guitierrez's murder conviction, which occurred in approximately 1975.

### Conviction

One (1) count 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

No available information

|  |  |
|---|---|
| **Release Date:** | 1987 |
| **Time Served:** | 12 Years |
| **Information Source:** | Independent Research |

### Notes

Guitierrez received his release date after serving approximately eleven (11) years and was released one (1) year later.

COPIED AT STATE EXPENSE - 4035689

| Name | **COLLINS, Robert** | CDC # | **Unknown B#** | Age (at arrest) | 27 |

**Case #75**

## Crimes

In 1976, while residing in Contra Costa County, Collins was contacted by a second party to be a "Hit Man" for a contract murder. Collins did carry out the contract and received payment for this murder.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No previous juvenile or adult arrest records noted.

## Prison Adjustment

During his incarceration, Collins did accumulate many disciplinary rule violations, both serious and administrative CDC-115's and CDC-128's. Collins did participate in group psychiatric therapy for a short period of time. He also served as Editor for two (2) separate state prison newspapers. He participated in an unknown Vocational Trade.

|  |  |
|---|---|
| **Release Date:** | 1987 |
| **Time Served:** | 11 Years / 7 Months |
| **Information Source:** | Independent Research |

## Notes

Originally a death penalty case, special circumstances were dropped in a plea agreement.

After nine (9) years of incarceration, at his second subsequent Board parole hearing, he received a release date. His maximum term was set at fourteen (14) years but was reduced three (3) years due to application of good time credits.

Both the Contra Costa County District attorney and Sheriff's offices actively opposed parole at Collins' hearings.

COPIED AT STATE EXPENSE · 6035689

Name **BOZZO, Vincent**    CDC # **Unknown B#**    Age (at arrest) **19**

## Case #76

### Crimes

In approximately 1976, Bozzo committed a murder during an armed robbery.

### Conviction

One (1) count 1st Degree Murder and one (1) count Armed Robbery

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

No available information

| | |
|---|---|
| **Release Date:** | 1990 |
| **Time Served:** | 14 Years |
| **Information Source:** | Independent Research |

### Notes

Bozzo received his release date after serving approximately eleven (11) years and was released three (3) years later.

COPIED AT STATE EXPENSE · 4025689

Name | **MILLER, Jeffrey** | CDC # | **B-87912** | Age (at arrest) | **?**

**Case #77**

## Crimes

Nothing is known about Miller's murder conviction, which occurred in approximately 1976.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

No available information

## Prison Adjustment

No available information

**Release Date:** 1987

**Time Served:** 11 Years

**Information Source:** Independent Research

## Notes

Miller received his release date after serving approximately ten (10) years and was released one (1) year later.

COPIED AT STATE EXPENSE - 4035689

| Name | PEREZ, Miguel | CDC # | B-86066 | Age (at arrest) | 17 |

**Case #78**

### Crimes
Nothing is known about Perez's murder conviction, which occurred in approximately 1976.

### Conviction
One (1) count 1st Degree Murder

### Sentence
Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History
No available information

### Prison Adjustment
No available information

> **Release Date:**  1987
>
> **Time Served:**  11 Years
>
> **Information Source:**  Independent Research

### Notes
Perez received his release date after serving approximately ten (10) years and was released one (1) year later.

COPIED AT STATE EXPENSE - 4035689

Name **McILVAINE, Billy Joe**    CDC # **Unknown B#**    Age (at arrest) **27**

## Case #79

### Crimes

In 1977 McIlvaine was a San Gabriel police officer who stalked eighteen (18) year old David Dominguez for weeks before pretending to arrest him. He also staged an elaborate cover-up to persuade investigators that he had been kidnapped. Officer McIlvaine had kidnapped the victim and taken him to his own home. There he tied up Dominguez, tortured him, and then shot him in the head.

### Conviction

One (1) count 1st Degree Murder, one (1) count Kidnapping, a two (2) year gun enhancement

### Sentence

Two (2) consecutive Life With the Possibility of Parole terms (double 7 Years to Life)

### Prior Criminal History

None noted.

### Prison Adjustment

None noted.

|  |  |
|---|---|
| **Release Date:** | 1992 |
| **Time Served:** | 15 Years / 6 Months |
| **Information Source:** | San Jose Mercury Newspaper (Sacramento Bureau) 3/23/92 |

### Notes

McIlvaine's attorney stated that Governor Wilson and a major Republican Party contributor had sought to have McIlvaine released for many years. It was also Governor Wilson's own decision that McIlvaine be released. It was Governor Wilson who decided that McIlvaine had indeed "shown genuine remorse for the crime," and approved his release. McIlvaine's release had been further sought by Senator Robert Presley (D-Riverside) who sent a representative from his own office to make sure McIlvaine received a parole release date. The parole release date was apparently not a problem for Governor Wilson in this case.

COPIED AT STATE EXPENSE - 4035669

Name | McILVAINE, Billy Joe | Case #79 (Continued)

McIlvaine continues to claim that he was kidnapped by his victim and had to kill him to escape. The Parole Board's report sent to Governor Wilson noted that McIlvaine's version of the crime differs drastically from the evidence presented at trial. The sentencing judge accused the ex-policeman of lying and said that the evidence of his guilt of murder in this case was absolutely overwhelming. Governor Wilson did not mention these details to the Legislature on McIlvaine's parole release. Nor did the Governor mention other details of the case.

McIlvaine's release was objected to by the Los Angeles District Attorney's Office, which called McIlvaine "a heavy-handed, brutal policeman who more or less focused on young Hispanic fellows." The West Covina Police Chief said that McIlvaine was "a threat to society." McIlvaine credited Senator Presley with his release stating that Presley, an ex-policemen himself, sent an aide to his parole hearing "to make sure everything came out like it was supposed to."

COPIED AT STATE EXPENSE - 4035689

Name **CURTIS, John**    CDC # **B-87868**    Age (at arrest) 27

Case #80

## Crimes

In 1976 through mid 1977 the Riverside County Police Departments kept finding human remains (separated body parts) scattered throughout local desert areas. The amputated human remains were usually found inside tied up, dark colored plastic bags. The actual number of victims were unknown. The County Coroner's office determined that the bodies had been dismembered with a "chainsaw type device." Riverside County Sheriff's department arrested Curtis (and an accomplice David Bics) on the basis of a tip from an unknown informant. Curtis was bragging to others about the crimes, which undoubtedly lead to the informant. These crimes were called the most "bizarre & heinous" murders ever to have occurred in Riverside County. Curtis was only found guilty of one (1) of these murders but was suspected of many other homicides.

## Conviction

One (1) count 1st Degree Murder

## Sentence

Life With the Possibility of Parole (7 Years to Life)

## Prior Criminal History

Curtis was originally from New York State. He had no known previous "in state" arrest record.

## Prison Adjustment

During Curtis' incarceration, he participated in the following:  Vocational Optical Lens Grinding; various self-help groups; and psychiatric therapy programs, including a Category "X" evaluation in 1988 at California Men's Colony which was very negative and did not support parole consideration.

Curtis also received numerous serious and administrative CDC-115 rule violation reports and a variety of CDC-128's concerning less serious rule infractions.

> **Release Date:**    1991
>
> **Time Served:**    14 Years
>
> **Information Source:**    CDC Data Analysis Unit & Independent Research

COPIED AT STATE EXPENSE - 4035689

Name **CURTIS, John**          **Case #80 (Continued)**

## Notes

In 1990, the Board of Prison Terms brought Curtis before a subsequent hearing review panel and set his maximum term at eighteen (18) years. With good time credits Curtis was able to accrue, the maximum release date was lowered by five (5) years. With the good time credits, Curtis was eligible to parole within eighteen (18) months of his board hearing.

Bics was convicted of the same crime but has not yet received a release date.

COPIED AT STATE EXPENSE - 4035689

Name **SMITH, Joseph**    CDC # **Unknown B#**    Age (at arrest) **29**

**Case #81**

**Crimes**

In approximately 1977, Smith shot his estranged wife seven (7) times with a nine millimeter handgun.

**Conviction**

One (1) count 1st Degree Murder

**Sentence**

Life With the Possibility of Parole (7 Years to Life)

**Prior Criminal History**

No available information

**Prison Adjustment**

No available information

> **Release Date:** 1987
>
> **Time Served:** 10 Years
>
> **Information Source:** Independent Research

**Notes**

Smith received a release date from the Board at his Initial Parole Consideration hearing, after serving less than seven (7) years. He was released approximately three (3) years later.

COPIED AT STATE EXPENSE - 4035649

Name **REDD, (Unknown)**    CDC # **Unknown C#**    Age (at arrest) **28**

Case #83

## Crimes

In approximately 1982 Redd was a La Harbra Policeman who committed a felony murder. The specifics of this case have been sealed by what appears to be the Governor's Office (Pete Wilson). No circumstances of Redd's crime are available.

## Conviction

One (1) count 2nd Degree Murder

## Sentence

15 Years to Life (New Law)

## Prior Criminal History

No information available.

## Prison Adjustment

While in the custody of the Department of Corrections, Redd had an exemplary disciplinary record. They is no information available about any programming he participated in while incarcerated.

> **Release Date:**    1994
>
> **Time Served:**    12 Years
>
> **Information Source:**    Independent Research

## Notes

This is the only "new law" (post 1979) citing in this documentation. In 1993, under the approval of Governor Wilson, the Board of Prison Terms set Redd's parole release date. When this ex-police officer's release date came across Governor Wilson's desk for final review it was 'immediately approved." Redd paroled within the next year, serving the minimum amount of time for a second degree murderer.

COPIED AT STATE EXPENSE · 4035689

## Index of All Cases

| Name | Case | Page(s) |
|------|------|---------|
| ALVAREZ, Nicholas | 58 | 70 |
| ANDERSON, Robert | 9 | 17-18 |
| ANDREWS, Leyland | 53 | 65 |
| AUTREY, David | 50 | 62 |
| BAGLEY, James | 47 | 59 |
| BARNETT, Larry | 73 | 88 |
| BOZZO, Vincent | 76 | 91 |
| BREEDING, (Unknown) | 15 | 24 |
| BURRUSS, Richard | 61 | 75 |
| CAMPOS, Elias | 65 | 80 |
| CHARLTON, Randy | 40 | 52 |
| COLE, James Adolphus | 28 | 39 |
| COLLINS, Robert | 75 | 90 |
| CONOVER, Robert | 63 | 77-78 |
| COOLEY, Spade | 6 | 13 |
| COOPER, Larry | 31 | 42 |
| CORDIER, Clifford | 67 | 82 |
| COYNE, Ray | 60 | 73-74 |
| CURTIS, John | 80 | 96-97 |
| DAY, David | 71 | 86 |
| DUNN, Billy Ray | 56 | 68 |
| EARL, Milton (AKA Abu Qadir Al-Amin) | 33 | 44 |
| FAHSHOLTZ, David | 48 | 60 |
| FAIN, William Archie | 13 | 22 |
| FEASBY, Jerry | 24 | 35 |
| FERGUSON, Thomas | 55 | 67 |
| FINCH, Bernard | 11 | 20 |
| FONG, Joe | 42 | 54 |
| FRANK, David | 57 | 69 |
| GOODRIDGE, Jerry Lee | 7 | 14 |
| GRIFFITH, Robert | 49 | 61 |
| GROGGIN, Steven | 38 | 49-50 |
| GUTIERREZ, (Unknown) | 74 | 89 |
| HARRIS, James | 62 | 76 |
| HERNANDEZ, (Unknown) | 70 | 85 |
| HILL, Robert Douglas | 29 | 40 |
| HINES, Clay | 2 | 9 |
| HUSKEY, (Unknown) | 54 | 66 |
| JOLLY, Charles | 22 | 33 |
| KEMP, Darrell | 1 | 8 |
| KUHNS, Robert LaFoy | 26 | 37 |
| | 59 | 71-72 |

COPIED AT STATE EXPENSE - 4035689

## Index of All Cases
### (Continued)

| Name | Case | Page(s) |
|------|------|---------|
| LOKEY, Galen | 12 | 21 |
| LU, (Unknown) | 34 | 45 |
| LUCAS, Herman | 32 | 43 |
| MABRY, Terry | 10 | 19 |
| MAGRIS, David | 37 | 48 |
| MASSIE, Robert | 17 | 26 |
| McCLELLAN, William | 16 | 25 |
| McGAUTHA, Dennis Councle | 20 | 31 |
| McILVAINE, Billy Joe | 79 | 94-95 |
| MEEKS, James | 3 | 10 |
| MILLER, Jeffrey | 77 | 92 |
| MORALES, Jose Ramon | 41 | 53 |
| NYE, Robert | 4 | 11 |
| PEREZ, Miguel | 78 | 93 |
| PRICE, Oscar | 66 | 81 |
| PROCHANAU, Buddy | 51 | 63 |
| REDD, (Unknown) | 83 | 100 |
| ROBLES, Mario | 25 | 36 |
| ROMO, Danny | 45 | 57 |
| RUIZ, Ralph | 23 | 34 |
| SAGIN, Ronald | 82 | 99 |
| SALING, Warren O'Dell | 27 | 38 |
| SCOTT, Cecarl | 36 | 47 |
| SEABOCK, Robert | 52 | 64 |
| SHAW, Otis | 68 | 83 |
| SLOAN, Michael Lee | 21 | 32 |
| SMITH, Joseph | 81 | 98 |
| SOTELLO, (Unknown) | 69 | 84 |
| SPAIN, Johnny Larry | 19 | 29-30 |
| STANWORTH, Dennis | 8 | 15-16 |
| STEVENS, Richard | 72 | 87 |
| STEWART, Wilbur | 46 | 58 |
| SUBIA, Ted | 14 | 23 |
| TAFFOLA, Santiago Cornado, Jr. | 35 | 46 |
| TURVILLE, Charles | 5 | 12 |
| UNKNOWN ISL INMATE | 39 | 51 |
| WADDELL, Harold | 44 | 56 |
| WALLACE, Michael | 64 | 79 |
| WILLIAMS, Buddy | 90 | 41 |
| WILLIAMS, David | 43 | 55 |

COPIED AT STATE EXPENSE · 4035689

## Index of All Cases
### (Continued)

| Name | Case | Page(s) |
|------|------|---------|
| ZAGARS, Raymond | 18 | 27-28 |

COPIED AT STATE EXPENSE - 4035689

## Index of Special Interest Cases

| Name | Case | Page(s) |
|---|---|---|

**COURT ORDERED RELEASES**
FAIN, William Archie .................................................... 13 ................................ 22
SPAIN, Johnny Larry ...................................................... 19 ................................ 29-30
STANWORTH, Dennis ...................................................... 8 ................................ 15-16

**MULTIPLE DEATH PENALTY CASES**
STANWORTH, Dennis ...................................................... 8 ................................ 15-16

**SINGLE DEATH PENALTY CASES**
ANDERSON, Robert ........................................................ 9 ................................ 17-18
CONOVER, Robert .......................................................... 63 ................................ 77-78
EARL, Milton (AKA Abu Qadir Al-Amin) ................................ 33 ................................ 44
GOODRIDGE, Jerry Lee .................................................... 7 ................................ 14
HILL, Robert Douglas ..................................................... 29 ................................ 40
HINES, Clay .................................................................. 2 ................................ 9
HUSKEY, (Unknown) ....................................................... 54 ................................ 66
KEMP, Darrell ............................................................... 1 ................................ 8
MABRY, Terry ................................................................ 10 ................................ 19
MAGRIS, David .............................................................. 37 ................................ 48
MASSIE, Robert ............................................................. 17 ................................ 26
McCLELLAN, William ....................................................... 16 ................................ 25
McGAUTHA, Dennis Councle .............................................. 20 ................................ 31
MEEKS, James ............................................................... 3 ................................ 10
NYE, Robert .................................................................. 4 ................................ 11
SLOAN, Michael Lee ....................................................... 21 ................................ 32
TURVILLE, Charles .......................................................... 5 ................................ 12
WILLIAMS, Buddy ........................................................... 30 ................................ 41

**MULTIPLE CONSECUTIVE LIFE TERM CASES**
DAY, David ................................................................... 71 ................................ 86
FAIN, William Archie ....................................................... 13 ................................ 22
LADD, Wayne ................................................................ 59 ................................ 71-72
LUCAS, Herman ............................................................. 32 ................................ 43
McILVAINE, Billy Joe ....................................................... 79 ................................ 94-95
WILLIAMS, David ........................................................... 43 ................................ 55

COPIED AT STATE EXPENSE - 4035689

# Index of Special Interest Cases
## (Continued)

| Name | Case | Page(s) |
|------|------|---------|

**MULTIPLE MURDER CASES**

FONG, Joe.............................................42.............................54
GRIFFITH, Robert....................................49.............................61
LADD, Wayne..........................................59.........................71-72
LU, (Unknown)........................................34.............................45
LUCAS, Herman........................................32.............................43
STANWORTH, Dennis.....................................8.........................15-16
STEWART, Wilbur......................................46.............................58
WILLIAMS, David......................................43.............................55

**SINGLE MURDER WITH ADDITIONAL MULTIPLE OFFENSES CASES**

ALVAREZ, Nicholas....................................58.............................70
ANDREWS, Leyland.....................................53.............................65
AUTREY, David........................................50.............................62
BAGLEY, James........................................47.............................59
BOZZO, Vincent.......................................76.............................91
BREEDING, (Unknown)..................................15.............................24
CAMPOS, Elias........................................65.............................80
CHARLTON, Randy......................................40.............................52
COLE, James Adolphus.................................28.............................39
COOPER, Larry........................................31.............................42
CORDIER, Clifford....................................67.............................82
DUNN, Billy Ray......................................56.............................68
FERGUSON, Thomas.....................................55.............................67
LOKEY, Galen.........................................12.............................21
McILVAINE, Billy Joe.................................79.........................94-95
PRICE, Oscar.........................................66.............................81
PROCHANAU, Buddy.....................................51.............................63
ROBLES, Mario........................................25.............................36
SEABOCK, Robert......................................52.............................64
SPAIN, Johnny Larry..................................19.........................29-30
STEVENS, Richard.....................................72.............................87
TAFFOLA, Santiago Cornado, Jr.......................35.............................46
UNKNOWN ISL INMATE...................................39.............................51
WALLACE, Michael.....................................64.............................79

COPIED AT STATE EXPENSE - 403569

## Index of Special Interest Cases
### (Continued)

| Name | Case | Page(s) |
|------|------|---------|

**SINGLE MURDER ONLY CASES**

BARNETT, Larry ........................................................ 73 ........................... 88
BURRUSS, Richard ................................................... 61 ........................... 75
COLLINS, Robert ....................................................... 75 ........................... 90
COOLEY, Spade ........................................................ 6 ............................ 13
COYNE, Ray .............................................................. 60 ........................... 73-74
CURTIS, John ............................................................ 80 ........................... 96-97
FAHSHOLTZ, David ................................................. 48 ........................... 60
FEASBY, Jerry ........................................................... 24 ........................... 35
FINCH, Bernard ........................................................ 11 ........................... 20
FRANK, David ........................................................... 57 ........................... 69
GROGGIN, Steven ...................................................... 38 ........................... 49-50
GUTIERREZ, (Unknown) ......................................... 74 ........................... 89
HARRIS, James .......................................................... 62 ........................... 76
HERNANDEZ, (Unknown) ....................................... 70 ........................... 85
JOLLY, Charles .......................................................... 22 ........................... 33
KUHNS, Robert LaFoy .............................................. 26 ........................... 37
MILLER, Jeffrey ........................................................ 77 ........................... 92
MORALES, Jose Ramon ............................................ 41 ........................... 53
PEREZ, Miguel ......................................................... 78 ........................... 93
REDD, (Unknown) .................................................... 83 ........................... 100
ROMO, Danny ........................................................... 45 ........................... 57
RUIZ, Ralph .............................................................. 23 ........................... 34
SAGIN, Ronald .......................................................... 82 ........................... 99
SALING, Warren O'Dell ............................................ 27 ........................... 38
SCOTT, Cecarl ........................................................... 36 ........................... 47
SHAW, Otis ............................................................... 68 ........................... 83
SMITH, Joseph .......................................................... 81 ........................... 98
SOTELLO, (Unknown) .............................................. 69 ........................... 84
SUBIA, Ted ............................................................... 14 ........................... 23
WADDELL, Harold .................................................... 44 ........................... 56
ZAGARS, Raymond ................................................... 18 ........................... 27-28

COPIED AT STATE EXPENSE · 4035689



INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )     CDC Number C-34952
Hearing of: )
 )
IRVING SHEPPARD )
_____ )



HIGH DESERT STATE PRISON

SUSANVILLE, CALIFORNIA

MARCH 12, 1998

12:45 P.M.

PANEL PRESENT:

RON KOENIG, Presiding Commissioner
PAUL FOSTER, Deputy Commissioner
ARTHUR VAN COURT, Commissioner

OTHERS PRESENT:

IRVING SHEPPARD, Inmate
GARY DIAMOND, Attorney for Inmate
ROD BRAUGHTON, Deputy District Attorney
DENISE FARRAH, BPT Clerk

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ ✓   No
_____     Yes          See Errata Sheet

**Wendy Dippold, Transcriber**        **Capitol Electronic Reporting**

INMATE COPY

ii

INDEX

Page

Proceedings................................   1

Case Factors...............................   5

Pre-Commitment Factors.....................  12

Post-Commitment Factors....................  17

Parole Plans...............................  23

Closing Statements.........................  34

Recess.....................................  38

Decision...................................  39

Adjournment................................  42

Transcriber Certification..................  43

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER FOSTER:**  All right, we're

3     tape recording.

4          **PRESIDING COMMISSION KOENIG:**  This is an

5     Initial Parole Consideration Hearing for Irving

6     Sheppard, C-34952.  The prisoner was received

7     California Department of Corrections on August the

8     27th, 1981 from the County of Santa Clara for

9     violation of section 187/12022.5 and 12023.06.  That's

10    murder first with the use of a firearm prison term.

11    It's case number 79029.  The MEPD is April the 17th,

12    1998.  Today's date is March the 12th, 1998.  We're at

13    High Desert State Prison and the time is now 12:45

14    hours.  This is your Initial Hearing and we record the

15    hearing.  In order for the transcriber to know who is

16    speaking at a particular time, we must identify

17    ourselves.  We do that by stating our first name, last

18    name, spelling our last name.  When we come to you,

19    would you also give your CDC number.  We'll start with

20    Mr. Foster and go to the left.

21         **DEPUTY COMMISSIONER FOSTER:**  My name is Paul

22    Foster.  The last name is spelled F-O-S-T-E-R, Deputy

23    Commissioner.

24         **PRESIDING COMMISSION KOENIG:**  Ron Koenig,

25    K-O-E-N-I-G, Commissioner.

26         **COMMISSIONER VAN COURT:**  Arthur Van Court,

27    V-A-N capital C-O-U-R-T, Commissioner, Board of Prison

2

1    Terms.

2         **CLERK FARRAH:**  Denise Farrah, F-A-R-R-A-H,

3    Board of Prison Terms' clerk.

4         **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**  My name is

5    Rod Braughton, B-R-A-U-G-H-T-O-N.  I'm a Deputy

6    District Attorney for Santa Clara County (inaudible).

7         **ATTORNEY DIAMOND:**  Gary Diamond, D-I-A-M-O-N-D,

8    Attorney for Mr. Sheppard.

9         **INMATE SHEPPARD:**  Irving Sheppard, I-R-V-I-N-G,

10   S-H-E-P-P-A-R-D, C-34952.

11        **PRESIDING COMMISSION KOENIG:**  Thank you.  We

12   also have two correctional officers in the room for

13   security purposes only and we have three observers

14   (inaudible) employees and staff of the Department of

15   Corrections.  There are certain rights you're

16   afforded, Mr. Sheppard.  Were you notified you were

17   going to have a hearing today?

18        **INMATE SHEPPARD:**  Yes.

19        **PRESIDING COMMISSION KOENIG:**  Did you have an

20   opportunity to review your central file?

21        **INMATE SHEPPARD:**  Yes.

22        **PRESIDING COMMISSION KOENIG:**  You have the

23   right to appeal the decision within 90 days of

24   receiving it.  You also have a right to an impartial

25   Panel.  Do you have any problems with the three of us

26   who represents the Board of Prison Terms?

27        **INMATE SHEPPARD:**  No.

3

1    **PRESIDING COMMISSION KOENIG:**  Are you satisfied

2    the prisoner's rights have been met, counsel?

3    **ATTORNEY DIAMOND:**  Yes, I am.

4    **PRESIDING COMMISSION KOENIG:**  You'll receive a

5    tentative written decision today.  The decision will

6    be effective in approximately 90 days after the Board

7    of Prison Terms' review process has taken place.

8    You're not required to talk with the Panel if you do

9    not wish to.  You must keep in mind that we accept as

10   true the court findings.  Are you going to talk to the

11   Panel and answer questions?

12   **INMATE SHEPPARD:**  Yes, Sir.

13   **PRESIDING COMMISSION KOENIG:**  Would you raise

14   your right hand, please.  Do you solemnly swear or

15   affirm that the testimony you give will be the truth,

16   the whole truth and nothing but the truth?

17   **INMATE SHEPPARD:**  I do.

18   **PRESIDING COMMISSION KOENIG:**  Okay, thank you.

19   Any objections, counsel?

20   **ATTORNEY DIAMOND:**  None.

21   **PRESIDING COMMISSION KOENIG:**  Are we using any

22   confidential information, Mr. Foster?

23   **DEPUTY COMMISSIONER FOSTER:**  No.

24   **PRESIDING COMMISSION KOENIG:**  Documents to hand

25   in that we don't already have?

26   **ATTORNEY DIAMOND:**  I don't know if you have any

27   of these letters or not.  I think you do, so I'll go

4

1   through them when you (inaudible).

2        **PRESIDING COMMISSION KOENIG:**   Okay, all right.

3   (Inaudible).

4        **ATTORNEY DIAMOND:**   I'll hand them to you at

5   that time.

6        **PRESIDING COMMISSION KOENIG:**   There are three

7   areas of the hearing, Mr. Sheppard.   The first area is

8   the crime you committed and your prior criminal record

9   and social factors.   Then we'll go to the second part

10   of the hearing and Mr. Foster will handle that.

11   That's what you've done since you've come to prison.

12   And also your psych evaluations.   Then we'll go to the

13   third part of the hearing which are parole plans.

14   Mr. Van Court will handle the parole plans.   We'll

15   then go to questions by any one of the Panel members

16   regarding any part of the hearing, and then questions

17   by the Deputy District Attorney who represents The

18   People of Santa Clara County.   He will pose the

19   questions to the Panel and, when you answer, you'll

20   answer to the Panel.   Your attorney may have questions

21   he would like to ask (inaudible) talked about.   He may

22   ask questions at that time.   And then we'll go to

23   closing statements from the Deputy District Attorney

24   and then by your attorney.   And then you'll have an

25   opportunity to tell us why you think you should be

26   paroled back to society.   We will then recess.

27   Everyone will leave the room and we'll make a

5

1    decision, call you back in the room, and read into the
2    record the decision.  Do you have any questions?
3         **INMATE SHEPPARD:**  (No audible response.)
4         **PRESIDING COMMISSION KOENIG:**  Okay.  I'm going
5    to read the instant offense taken from the probation
6    officer's report.  It says, on page two, it says:
7              "On December 21st, 1980, at
8              approximately midnight, Sunnyvale
9              Department of Public Safety officers
10             were (inaudible) to 1674 Hollenbeck
11             Avenue, apartment 21 in Sunnyvale to
12             investigate a possible dead body.  Upon
13             arrival at the scene, officers found
14             victim Lawrence Ronald Williams, age 28,
15             lying on the kitchen floor in a large
16             pool of blood.  A check on the victim's
17             vital signs yielded that he had expired
18             apparently from several gunshot wounds
19             to the head.  The victim's true identity
20             was later found to be Ronald (inaudible)
21             Williams, age 38.  The coroner's report
22             filed on January 19th, 1981, indicated
23             the victim died of multiple gun wounds,
24             four to the head.  The alcohol analysis
25             was (inaudible) under the (inaudible)
26             blood alcohol (inaudible) at the time of
27             his death."

6

1    Did you kill this man?

2              INMATE SHEPPARD:  I didn't, no.

3              PRESIDING COMMISSION KOENIG:  You didn't.  Were

4    you there?

5              INMATE SHEPPARD:  No.

6              PRESIDING COMMISSION KOENIG:  And do you know

7    anything about it?

8              INMATE SHEPPARD:  No.

9              PRESIDING COMMISSION KOENIG:  Okay.  You had a

10   drug deal with this guy, did you not?

11             INMATE SHEPPARD:  Yes.

12             PRESIDING COMMISSION KOENIG:  He owed you

13   money?

14             INMATE SHEPPARD:  No.  (Inaudible) what it was

15   is that I came out to California in November of 1980.

16   This man was (inaudible) a day.  And he participated

17   in (inaudible) narcotics (inaudible).

18             PRESIDING COMMISSION KOENIG:  Did he owe you

19   money?

20             INMATE SHEPPARD:  Yes.

21             PRESIDING COMMISSION KOENIG:  How much?

22             INMATE SHEPPARD:  (Inaudible).  It was like 40

23   percent of the (inaudible) that I had gave him.

24             PRESIDING COMMISSION KOENIG:  How much?

25             INMATE SHEPPARD:  It was about 10,000.

26             PRESIDING COMMISSION KOENIG:  $10,000, all

27   right.  We have witnesses that made a statement, okay.

7

1    Investigating officers contacted your neighbor.  You

2    lived next door to the victim.  Around approximately

3    9:30 p.m., he had heard what had sounded like four

4    rapid gunshots coming from next door.  He informed

5    officers that the victim had been involved with a

6    person known as Faust; is that you?

7         **INMATE SHEPPARD:**  My name is not (inaudible).

8         **PRESIDING COMMISSION KOENIG:**  There identified

9    as the defendant in a cocaine transaction

10   approximately two weeks earlier.  During the

11   transaction, the victim had apparently cheated the

12   defendant in some fashion and owed him $5,600.  But it

13   was 10,000 you say, huh?

14        **INMATE SHEPPARD:**  (No audible response.)

15        **PRESIDING COMMISSION KOENIG:**  Sampson had also

16   informed officers that on several occasions the

17   defendant told him -- this is the witness -- defendant

18   told him that he was going to get even with the victim

19   and collect one way or another.  Did you tell him

20   that?

21        **INMATE SHEPPARD:**  No.

22        **PRESIDING COMMISSION KOENIG:**  Why would Sampson

23   say all these things?

24        **INMATE SHEPPARD:**  Well, Sampson is the

25   individual that Mr. (inaudible) wasn't involved in our

26   business.  (Inaudible) supplying us or (inaudible).

27        **PRESIDING COMMISSION KOENIG:**  Sampson reported

8

1    that on approximately nine p.m. on the evening in

2    question, the defendant came to the apartment stating

3    that the victim owed him money and claimed to be

4    accompanied by several (inaudible) guns with him.  Did

5    you do that?

6            **INMATE SHEPPARD:**  No.

7            **PRESIDING COMMISSION KOENIG:**  The intention,

8    according to the defendant, was to F (inaudible) over

9    while the defendant was at Sampson's apartment.  A

10   girlfriend observed the defendant to be in possession

11   of a long barreled handgun.  Did she see you there

12   with a gun?

13           **INMATE SHEPPARD:**  (Inaudible).

14           **PRESIDING COMMISSION KOENIG:**  Okay.  Defendant

15   left Sampson's apartment.  He was walking in the

16   direction of the victim's apartment.  Why would

17   Sampson do all this, say all this?

18           **INMATE SHEPPARD:**  Sampson (inaudible).  Sampson

19   was trying to be (inaudible) say no, he wasn't.

20           **PRESIDING COMMISSION KOENIG:**  Well, why would

21   Sampson say this about you?  He didn't have anything

22   against you, did he?

23           **INMATE SHEPPARD:**  Well, he was getting

24   something on the side so he doesn't know (inaudible)

25   was.

26           **PRESIDING COMMISSION KOENIG:**  Do you know Hazel

27   Walker?

9

1            **INMATE SHEPPARD:**  (Inaudible).

2            **PRESIDING COMMISSION KOENIG:**  Huh?

3            **INMATE SHEPPARD:**  That was Mr. (inaudible)

4     girlfriend.

5            **PRESIDING COMMISSION KOENIG:**  Yeah.  Age 28,

6     who was (inaudible) victim Williams.  She (inaudible),

7     she had (inaudible) the defendant approximately three

8     months earlier, then as a Lawrence Crock.  Was that

9     your alias?

10           **INMATE SHEPPARD:**  Yes.

11           **PRESIDING COMMISSION KOENIG:**  Born and lived in

12    Sacramento, sharing an apartment with the individual

13    known as Morris Williams.  She (inaudible) victim owed

14    the defendant a lot of money and (inaudible)

15    defendant.  Shortly before the victim was dead, she

16    indicated that (inaudible) several other acquaintances

17    and (inaudible) attempt to borrow money to pay your

18    debt.  Why would she say this?

19           **INMATE SHEPPARD:**  Well, (inaudible) probably

20    get money (inaudible) going to get a large sum of

21    narcotics to bring back to California (inaudible).

22    Business was going good.  And so therefore, what

23    they're saying is just accusations of two facts that

24    we was (inaudible).

25           **PRESIDING COMMISSION KOENIG:**  Now, do you know

26    Morris Williams?

27           **INMATE SHEPPARD:**  Yes (inaudible).

10

1      **PRESIDING COMMISSION KOENIG:**  That was your

2   roommate, huh?

3      **INMATE SHEPPARD:**  (Inaudible).

4      **PRESIDING COMMISSION KOENIG:**  He repeated the

5   information concerning the debt owed by the defendant

6   -- by the victim, owing to the defendant by the victim

7   and the threats to get even.  (Inaudible) reported on

8   the date of the offense, the defendant was driving

9   Williams' vehicle, traveled to Sunnyvale to meet with

10   the victim.  Did you do that?

11      **INMATE SHEPPARD:**  I went to Sunnyvale to drop

12   off some drugs.

13      **PRESIDING COMMISSION KOENIG:**  To meet with the

14   victim?

15      **INMATE SHEPPARD:**  Yes, I dropped off some

16   drugs.

17      **PRESIDING COMMISSION KOENIG:**  You did that?

18      **INMATE SHEPPARD:**  Yes, I did.

19      **PRESIDING COMMISSION KOENIG:**  You returned some

20   time during the night or the next morning.  Williams

21   overheard him making telephone reservations to fly to

22   South Carolina.  Did you do that?

23      **INMATE SHEPPARD:**  (Inaudible).

24      **PRESIDING COMMISSION KOENIG:**  How come you were

25   going to fly to South Carolina?

26      **INMATE SHEPPARD:**  I was going down there to get

27   more drugs.

11

1       **PRESIDING COMMISSION KOENIG:**  Okay.  They found

2    the -- your vehicle, actually registered to Williams,

3    but it was your vehicle at the airport.  And in a

4    hidden compartment in the trunk, the officers found a

5    .38 caliber pistol.  Was that yours?

6       **INMATE SHEPPARD:**  That's correct.

7       **PRESIDING COMMISSION KOENIG:**  Two boxes of

8    ammunition and a Sacramento Bee newspaper.  Later

9    analysis of the newspaper and paper bag contained a

10   pistol revealed -- containing the pistol revealed the

11   defendant's fingerprints.  On the pistol?

12      **INMATE SHEPPARD:**  (Inaudible).

13      **PRESIDING COMMISSION KOENIG:**  On the bag?

14      **INMATE SHEPPARD:**  Yes.

15      **PRESIDING COMMISSION KOENIG:**  Also, laboratory

16   analysis of the pistol revealed that it had fired the

17   shots that had killed the victim.  Huh?

18      **INMATE SHEPPARD:**  That's true.

19      **PRESIDING COMMISSION KOENIG:**  How did it get

20   there?

21      **INMATE SHEPPARD:**  I (inaudible) Jhamal.

22      **PRESIDING COMMISSION KOENIG:**  So you think

23   Jhamal did the killing, huh?

24      **INMATE SHEPPARD:**  No.  I think that he had

25   something (inaudible) because he knew what we were

26   doing.  He knew that (inaudible) some narcotics, and

27   he grew to get involved with us and (inaudible)

12

1   involved.  He knew a lot of things that (inaudible)

2   do.

3          **PRESIDING COMMISSION KOENIG:**  Well, I'll tell

4   you what (inaudible).  Did you have a jury trial?

5          **INMATE SHEPPARD:**  Yes, I had a jury.

6          **PRESIDING COMMISSION KOENIG:**  Huh?  They didn't

7   believe you either, did they?  Huh?  That's why they

8   convicted you of first degree murder.  Okay.  Anyway,

9   all right, we can't talk about the crime because you

10   don't know much about it because you weren't there.

11   In 1973, you started your juvenile record on

12   (inaudible) a bicycle, auto theft in '66, age 13.  Age

13   13 again (inaudible) San Diego petition to send to

14   State Training School.  This is wrong here.  Would

15   (inaudible).  Grand larceny, stolen property,

16   unauthorized use of vehicle.  You got probation.  On

17   8/2 -- wait.  Okay.  Rape.  What was the rape?

18          **INMATE SHEPPARD:**  I was seventeen years old and

19   the girl was seventeen.  It was statutory.  We was all

20   under-age and we found out it wasn't true.

21          **PRESIDING COMMISSION KOENIG:**  What wasn't true?

22          **INMATE SHEPPARD:**  (Inaudible).

23          **PRESIDING COMMISSION KOENIG:**  Did you have sex

24   with her?

25          **INMATE SHEPPARD:**  It was (inaudible) mother

26   said it was rape (inaudible) house.  (Inaudible).

27          **PRESIDING COMMISSION KOENIG:**  Did you have

13

1   intercourse with her?

2        **INMATE SHEPPARD:**  Yeah.

3        **PRESIDING COMMISSION KOENIG:**  You have a theft

4   in '71 at age 18, robbery age 19.  You were sent

5   (inaudible) for bad conduct, discharged from the army.

6   Is that right?

7        **INMATE SHEPPARD:**  Yes.

8        **PRESIDING COMMISSION KOENIG:**  And also robbery.

9        **INMATE SHEPPARD:**  Yes.

10       **PRESIDING COMMISSION KOENIG:**  Who did you rob?

11       **INMATE SHEPPARD:**  The (inaudible).

12       **PRESIDING COMMISSION KOENIG:**  With a gun?

13       **INMATE SHEPPARD:**  Yes.

14       **PRESIDING COMMISSION KOENIG:**  And how much did

15   you get?

16       **INMATE SHEPPARD:**  (Inaudible).

17       **PRESIDING COMMISSION KOENIG:**  Did you do it --

18       **INMATE SHEPPARD:**  We divided it with two other

19   people (inaudible).

20       **PRESIDING COMMISSION KOENIG:**  For drugs?

21       **INMATE SHEPPARD:**  (Inaudible).

22       **PRESIDING COMMISSION KOENIG:**  In 1973

23   (inaudible).  What was that?

24       **INMATE SHEPPARD:**  (Inaudible).

25       **PRESIDING COMMISSION KOENIG:**  In '74,

26   possession of a controlled substances, Department of

27   Corrections in New York.  Is that right?

14

1       **INMATE SHEPPARD:**  Yes.

2       **PRESIDING COMMISSION KOENIG:**  How long did you

3   spend there?

4       **INMATE SHEPPARD:**  (Inaudible).

5       **PRESIDING COMMISSION KOENIG:**  You just got out

6   and you got a possession of drug paraphernalia, huh?

7       **INMATE SHEPPARD:**  Yes.

8       **PRESIDING COMMISSION KOENIG:**  And then

9   (inaudible) possession of a controlled substance six

10  months later and possession and sale of cocaine,

11  dismissed the charge, and then the murder (inaudible)

12  Board of New York.  Were there (inaudible) in New

13  York?

14      **INMATE SHEPPARD:**  Yes.

15      **PRESIDING COMMISSION KOENIG:**  Okay.  Your

16  father passed away?

17      **INMATE SHEPPARD:**  Yes.

18      **PRESIDING COMMISSION KOENIG:**  Raised by your

19  mother.  Your (inaudible) one sister and one

20  stepbrother; is that right?

21      **INMATE SHEPPARD:**  Yes.

22      **PRESIDING COMMISSION KOENIG:**  Do you have

23  contact with any of them?

24      **INMATE SHEPPARD:**  I have contact with my

25  sister, yes.

26      **PRESIDING COMMISSION KOENIG:**  Okay.  So

27  (inaudible).  Married in 1971 and divorced in 1978.

15

1    You have a son and a daughter?

2            INMATE SHEPPARD:  Yes.

3            PRESIDING COMMISSION KOENIG:  You have a

4    daughter?

5            INMATE SHEPPARD:  (Inaudible).

6            PRESIDING COMMISSION KOENIG:  (Inaudible).

7            INMATE SHEPPARD:  Eight years old.

8            PRESIDING COMMISSION KOENIG:  Eight?

9            INMATE SHEPPARD:  Yes.

10            PRESIDING COMMISSION KOENIG:  It says 18 here.

11            INMATE SHEPPARD:  My son.

12            PRESIDING COMMISSION KOENIG:  Excuse me.  Son

13    18?

14            INMATE SHEPPARD:  Yes.

15            PRESIDING COMMISSION KOENIG:  Where is he?

16            INMATE SHEPPARD:  He's out (inaudible).

17            PRESIDING COMMISSION KOENIG:  How is he doing?

18            INMATE SHEPPARD:  (Inaudible).

19            PRESIDING COMMISSION KOENIG:  What, is he in

20    trouble?

21            INMATE SHEPPARD:  Yes.

22            PRESIDING COMMISSION KOENIG:  A lot like you?

23            INMATE SHEPPARD:  Yes.

24            PRESIDING COMMISSION KOENIG:  And your

25    daughter?

26            INMATE SHEPPARD:  She's (inaudible) wife

27    (inaudible).

16

1          **PRESIDING COMMISSION KOENIG:**  Not a good

2    record.  What do you think of all this?

3          **INMATE SHEPPARD:**  I think that I made a lot of

4    wrong decisions (inaudible).

5          **PRESIDING COMMISSION KOENIG:**  Did you get

6    discharged from the service?

7          **INMATE SHEPPARD:**  Yes, I did.

8          **PRESIDING COMMISSION KOENIG:**  Honorable?

9          **INMATE SHEPPARD:**  (Inaudible).

10          **PRESIDING COMMISSION KOENIG:**  What for?  Why?

11          **INMATE SHEPPARD:**  Because (inaudible).

12          **PRESIDING COMMISSION KOENIG:**  Because of the

13    robbery?

14          **INMATE SHEPPARD:**  Yes, Sir.

15          **PRESIDING COMMISSION KOENIG:**  What was -- How

16    long were you in?

17          **INMATE SHEPPARD:**  I was in (inaudible).

18          **PRESIDING COMMISSION KOENIG:**  When was your

19    job?

20          **INMATE SHEPPARD:**  (Inaudible).

21          **PRESIDING COMMISSION KOENIG:**  So you did pretty

22    good, huh?

23          **INMATE SHEPPARD:**  (Inaudible).

24          **PRESIDING COMMISSION KOENIG:**  Why the robbery?

25          **INMATE SHEPPARD:**  I was (inaudible) trying to

26    be (inaudible) said I wasn't (inaudible).

27          **PRESIDING COMMISSION KOENIG:**  Would you do

17

1   things different if you had to do your life over

2   again?

3        **INMATE SHEPPARD:**  Yes, I would.

4        **PRESIDING COMMISSION KOENIG:**  Like what?

5        **INMATE SHEPPARD:**  Like not following.  Make my

6   own decisions and be responsible for the things that I

7   do.

8        **PRESIDING COMMISSION KOENIG:**  And how about

9   drugs?

10       **INMATE SHEPPARD:**  I'd sustain from drugs

11   (inaudible).

12       **PRESIDING COMMISSION KOENIG:**  Would you start

13   drugs if you had it to do over again?

14       **INMATE SHEPPARD:**  No.

15       **PRESIDING COMMISSION KOENIG:**  We'll go to the

16   second part of the hearing which is programming.

17   Mr. Foster.

18       **DEPUTY COMMISSIONER FOSTER:**  Thank you.  I want

19   to note for the record that this, the counselor's

20   report, is an absolute excellent report.  I haven't

21   read any better in all my years with the Board.  Most

22   of this that's in this report I almost don't need to

23   repeat, but it appears that you're doing quite well in

24   prison.  Your work habits have gone anywhere from

25   satisfactory to excellent over the years.  You've

26   received numerous laudatory chronos from many

27   supervisors.  You've got good computer skills and

18

1    you've completed college courses, averaging from C to
2    A grades.  And apparently you're pretty close to
3    getting a Bachelor's degree, Bachelor of Science.
4            INMATE SHEPPARD:  Yes.
5            DEPUTY COMMISSIONER FOSTER:  From St. John's
6    University.  Where is that at?
7            INMATE SHEPPARD:  That's in (inaudible).
8            DEPUTY COMMISSIONER FOSTER:  Okay.  So you're
9    doing that through correspondence.
10           INMATE SHEPPARD:  Yes.
11           DEPUTY COMMISSIONER FOSTER:  And who is paying
12   for it?
13           INMATE SHEPPARD:  (Inaudible).
14           DEPUTY COMMISSIONER FOSTER:  Very good.  From
15   your --
16           INMATE SHEPPARD:  From my job (inaudible).
17           DEPUTY COMMISSIONER FOSTER:  You've done well
18   for yourself in prison, except you've had a, you know,
19   a few 115s.  I won't talk about those for a minute.
20   You participated in multiple self-help groups; Gavel
21   Club, Narcotics Anonymous and various Lifer Groups
22   which are well documented in your report.  Your
23   counselor was impressed with you and indicates
24   basically that -- felt that as far as recidivism goes
25   that, you know, your potential is very low for
26   recidivism.  And he believes you're ready for parole
27   and that's a good recommendation.  Now, on the

19

1   negative side, you do have some 115s.  Most of them

2   occurred in the '80s.  And one in 1990, you gave a

3   dirty test.  What drug did you use in 1990?

4           INMATE SHEPPARD:  I tested for marijuana.

5           DEPUTY COMMISSIONER FOSTER:  Marijuana, okay.

6   And then in '95, sleeping on the job assignment.  Was

7   that a serious or administrative?

8           INMATE SHEPPARD:  Administrative.

9           DEPUTY COMMISSIONER FOSTER:  Oh, that's a 128.

10  Excuse me.  That was a 128.  It was just a counseling

11  chrono.  So you haven't had any serious disciplinary

12  since 1990.  And the ones before that weren't involved

13  in violence or stabbings or things of that nature.

14  You've had several psychiatric evaluations.  I take it

15  they've documented most of those.  Your first one was

16  in '86 by G. Hollingsworth, H-O-L-L-I-N-G-S-W-O-R-T-H,

17  MD, staff psychiatrist.  The diagnosis, which has been

18  maintained throughout your whole history, is Anti-

19  Social Personality Disorder.  And in that report,

20  there was no recommendations made.  The next report

21  was in May of '89 by B.L. McGaughran, that's M small

22  C, capital G-A-U-G-H-R-A-N, Ph.D., staff psychologist,

23  same diagnosis, no recommendations made.  The third

24  one was in May of '92, Roger Kotila, K-O-T-I-L-A,

25  Ph.D., staff psychologist, same diagnosis; however, he

26  said you were improving from your Personality Disorder

27  and Polysubstance Abuse by history.  He thought at

20

1    that time in '92 that your violence potential was

2    average, I guess compared to other inmates, and that

3    you were starting to gain some insight and he

4    recommended Narcotics Anonymous.  The next one, which

5    is the fourth one, was in April of '95 by Brunla,

6    B-R-U-N-L-A, Van Cleve, V-A-N capital C-L-E-V-E,

7    Ph.D., staff psychologist.  Again, the same diagnosis

8    as previous reports.  At that time, he felt -- I don't

9    know if Brunla is a he or she.

10           **INMATE SHEPPARD:**  She.  It's a she.

11           **DEPUTY COMMISSIONER FOSTER:**  Okay.  Felt that

12    your violence potential is reduced, that you were

13    improving psychiatrically, and the recommendation was

14    to continue Narcotics Anonymous.  And she did indicate

15    under conclusions:

16           "Mr. Sheppard's denial of the committing

17           offense precludes exploration of various

18           issues of etiology, insight, etcetera.

19           Nevertheless, he's been a quite high

20           functioning individual for some five

21           years and shows every sign of continuing

22           his performance."

23    And then the last one was F.M. Criswell,

24    C-R-I-S-W-E-L-L, MD, staff psychiatrist, and that was

25    December of '97.  Just gave the Axis II diagnosis of

26    Anti-Social Personality.  And in this particular

27    report, and it's under summary and recommendations,

21

1   I'll just read this into the record.

2           "The case of Mr. Sheppard poses a

3           difficult question:  Is he a

4           rehabilitated inmate who has proven

5           himself by being successful in numerous

6           programs to better himself and who has

7           maintained a good disciplinary record,

8           or is he a clever psychopath who has

9           used the opportunity afforded by

10          participation in these various work and

11          educational programs to further his

12          success in dealing drugs in prison."

13  I don't understand that, that latter part.  I'm

14  reading it for the record.

15          "I do not possess sufficient information

16          to answer this question.  On the

17          positive side, however, is his record.

18          I note that his disciplinary records are

19          essentially void of any violent

20          behavior.  The record he has maintained

21          is also evidence of a good impulse

22          control, with his record of non-violence

23          and good impulse control since 1981

24          combined with his current age, he is

25          likely in the future to -- he is

26          unlikely in the future to commit any

27          violent crimes.  I would rate his

22

1          current potential for violence as below

2          average.  He does have the potential to

3          be a productive, self-supporting

4          citizen."

5    What does -- Is it a he or she?

6          **INMATE SHEPPARD:**  He.

7          **DEPUTY COMMISSIONER FOSTER:**  What does he mean

8    by -- You're not (inaudible) right?

9          **ATTORNEY DIAMOND:**  There's a reason he doesn't

10   have an answer to the question.

11         **DEPUTY COMMISSIONER FOSTER:**  I mean, so why did

12   that come up about this, about the thought that you

13   were dealing drugs in prison?  There's no evidence

14   you've been dealing drugs in prison, is there?

15         **INMATE SHEPPARD:**  No.

16         **DEPUTY COMMISSIONER FOSTER:**  Okay.  Did you

17   ever ask the Doc why he said that?

18         **INMATE SHEPPARD:**  I (inaudible).

19         **DEPUTY COMMISSIONER FOSTER:**  Did you try and

20   send a ducket and have a little interview and say,

21   hey, Doc, what's going on?

22         **INMATE SHEPPARD:**  We spoke for about ten

23   minutes.

24         **DEPUTY COMMISSIONER FOSTER:**  Okay, well, okay.

25   So that never came up in the interview?

26         **INMATE SHEPPARD:**  In the interview, we spoke

27   for ten minutes.

23

1      **DEPUTY COMMISSIONER FOSTER:**  Okay.  Well, as

2    far as I'm concerned, we'll ignore that.  Okay.  With

3    that, back to the Chair.

4      **PRESIDING COMMISSION KOENIG:**  Parole plans.

5      **DEPUTY COMMISSIONER FOSTER:**  I mean, I'd like

6    to know what he said.

7      **COMMISSIONER VAN COURT:**  Okay.  What are your

8    parole plans, Mr. Sheppard?

9      **INMATE SHEPPARD:**  My parole plans is, I'm going

10   to have to obtain a job.  I have received a job

11   (inaudible) innovation, computer analyst.

12     **COMMISSIONER VAN COURT:**  As a computer analyst?

13     **INMATE SHEPPARD:**  Yes, or operator.  I'll go to

14   work for them as well as live with my wife and

15   daughter in Oakland.

16     **COMMISSIONER VAN COURT:**  Okay.  And this is

17   your job offer?

18     **INMATE SHEPPARD:**  Yes, Sir.

19     **COMMISSIONER VAN COURT:**  Okay.  Where do you

20   plan on living?

21     **INMATE SHEPPARD:**  I'm going to live in Oakland.

22     **COMMISSIONER VAN COURT:**  In Oakland,

23   California?

24     **INMATE SHEPPARD:**  Yes.

25     **COMMISSIONER VAN COURT:**  And of course your

26   county of commitment is Santa Clara County.  That's

27   the next county south (inaudible).

24

1              **INMATE SHEPPARD:**  Yes.

2              **COMMISSIONER VAN COURT:**  So you should be

3     making plans to parole to, of course, Santa Clara

4     County.

5              **INMATE SHEPPARD:**  (Inaudible) residence in

6     California.  My wife and daughter are in Oakland.  My

7     wife and (inaudible) Oakland.

8              **COMMISSIONER VAN COURT:**  She's living in

9     Oakland now?

10             **INMATE SHEPPARD:**  She's living in Oakland right

11    now (inaudible) daughter.

12             **COMMISSIONER VAN COURT:**  And would she be

13    willing to move to Santa Clara County?

14             **INMATE SHEPPARD:**  I suppose she would.  I was

15    thinking about getting my parole transferred to the

16    county where my wife lives, has a residence there.

17             **COMMISSIONER VAN COURT:**  Okay.  What was your

18    last legal address before you were arrested?

19             **INMATE SHEPPARD:**  In California?

20             **COMMISSIONER VAN COURT:**  Yeah.  Well, anyplace.

21             **INMATE SHEPPARD:**  I didn't have no legal

22    address.

23             **ATTORNEY DIAMOND:**  Well, where were you

24    staying?

25             **INMATE SHEPPARD:**  I was staying at the

26    Sacramento (inaudible).  I had just moved out.

27             **COMMISSIONER VAN COURT:**  So you really didn't

25

1    have a legal address then.

2         **INMATE SHEPPARD:**  I really didn't have a legal

3    address in California.

4         **COMMISSIONER VAN COURT:**  Okay.  Anyway, you

5    should then, when making your plans to be paroled, to

6    Santa Clara County because that's the county of

7    commitment.  What do you plan to do then?  Where were

8    you planning on staying?

9         **INMATE SHEPPARD:**  With Irene Sheppard and

10   (inaudible) my daughter.

11        **COMMISSIONER VAN COURT:**  And they (inaudible).

12        **INMATE SHEPPARD:**  Yes.

13        **COMMISSIONER VAN COURT:**  How close is that

14   (inaudible) to the county of --

15        **INMATE SHEPPARD:**  To Santa Clara County?

16        **COMMISSIONER VAN COURT:**  Well, I'm not really

17   sure where that county line is.

18        **INMATE SHEPPARD:**  It's just up the road.  It's

19   (inaudible).

20        **COMMISSIONER VAN COURT:**  Well, that's up to the

21   parole officer.  He's going to have to make the

22   decision anyway.  Okay.  What type of work are you

23   planning on doing?

24        **INMATE SHEPPARD:**  I plan on doing computer

25   work.

26        **COMMISSIONER VAN COURT:**  Computer work?

27        **INMATE SHEPPARD:**  Yes.

26

1    **COMMISSIONER VAN COURT:**  And at this point,

2    this is a computer consulting firm.  And what would

3    you be doing for this firm?

4        **INMATE SHEPPARD:**  I think I'll start out with

5    data entry.

6        **COMMISSIONER VAN COURT:**  With data entry?

7        **INMATE SHEPPARD:**  Yes.

8        **COMMISSIONER VAN COURT:**  Then do you have other

9    skills, vocational skills that you're competent at?

10       **INMATE SHEPPARD:**  I also have (inaudible)

11   skills.

12       **COMMISSIONER VAN COURT:**  You're also

13   (inaudible).  So that would be another possibility of

14   getting a good job because (inaudible).

15       **INMATE SHEPPARD:**  (Inaudible).

16       **COMMISSIONER VAN COURT:**  And that would be

17   something you could fall back on if you can't get, you

18   know, your first choice (inaudible).  Do you have any

19   other letters of support from anyone?

20       **INMATE SHEPPARD:**  Yes.  (Inaudible).

21       **COMMISSIONER VAN COURT:**  Yeah, there are none

22   in this file.

23       **ATTORNEY DIAMOND:**  Here.  I mean, I got them.

24   They came from the Board of Prison Terms.

25       **INMATE SHEPPARD:**  (Inaudible).

26       **COMMISSIONER VAN COURT:**  Okay.  And this is

27   (inaudible) Irene Sheppard.  Is that your wife --

27

1        **INMATE SHEPPARD:**  Yes.

2        **COMMISSIONER VAN COURT:**  -- or your daughter?

3        **INMATE SHEPPARD:**  That's my wife.

4        **COMMISSIONER VAN COURT:**  That's your wife,

5   okay.  And she'll provide housing and financial

6   support.

7        **INMATE SHEPPARD:**  Yes.

8        **COMMISSIONER VAN COURT:**  And you have a seven

9   year old daughter in fifth grade.

10       **INMATE SHEPPARD:**  She's eight now.

11       **COMMISSIONER VAN COURT:**  And then Arlene

12  Sheppard -- Oh, this is from (inaudible) appeal.  And

13  it's a (inaudible) since you were born.  And is she a

14  relative?

15       **INMATE SHEPPARD:**  Yes (inaudible).

16       **COMMISSIONER VAN COURT:**  Friend of your

17  mother's?

18       **INMATE SHEPPARD:**  Yes.

19       **COMMISSIONER VAN COURT:**  She's not (inaudible).

20       **INMATE SHEPPARD:**  No.

21       **COMMISSIONER VAN COURT:**  And you have another

22  letter from (inaudible) Wilson.

23       **INMATE SHEPPARD:**  Yes.

24       **COMMISSIONER VAN COURT:**  And she (inaudible)?

25       **INMATE SHEPPARD:**  That's my sister.

26       **COMMISSIONER VAN COURT:**  And it's your sister,

27  okay.  And she is supportive and wants you paroled.

28

1   And this letter is 2/17/98 (inaudible) from

2   (inaudible) Sheppard, February 5th, '98.  And then

3   another letter here from (inaudible) Sheppard.

4        INMATE SHEPPARD:  That's my mother.

5        COMMISSIONER VAN COURT:  That's your mother?

6        INMATE SHEPPARD:  Uh-hmm.

7        COMMISSIONER VAN COURT:  And this is February

8   1998.  And she writes a supportive letter (inaudible)

9   that she'll provide housing and financial support.

10  (Inaudible).  And then this, of course, is a copy of

11  the same letter that the Board (inaudible).  Okay.

12  Who visits you while you're in prison?

13       INMATE SHEPPARD:  My wife and daughter.

14       COMMISSIONER VAN COURT:  When was the last time

15  you had a visitor?

16       INMATE SHEPPARD:  August of '97.

17       COMMISSIONER VAN COURT:  August of '97?

18       INMATE SHEPPARD:  Yes.

19       COMMISSIONER VAN COURT:  That's quite a while

20  back.

21       INMATE SHEPPARD:  (Inaudible) High Desert.

22       COMMISSIONER VAN COURT:  I see.  And the

23  distance (inaudible).

24       INMATE SHEPPARD:  Yes.

25       COMMISSIONER VAN COURT:  Okay.  Do you talk to

26  her on the telephone?

27       INMATE SHEPPARD:  All the time.

29

1    **COMMISSIONER VAN COURT:**  Okay.  And have you
2    been earning any money since you got here?
3    **INMATE SHEPPARD:**  I have, yes, Sir.
4    **COMMISSIONER VAN COURT:**  What kind of money?
5    **INMATE SHEPPARD:**  (Inaudible).
6    **COMMISSIONER VAN COURT:**  Have you saved any?
7    **INMATE SHEPPARD:**  Yes.
8    **COMMISSIONER VAN COURT:**  How much?
9    **INMATE SHEPPARD:**  (Inaudible).
10   **COMMISSIONER VAN COURT:**  Okay.  Then you
11   actually don't have (inaudible) parole plans at this
12   point simply because -- This is your Initial Hearing?
13   **INMATE SHEPPARD:**  Yes.
14   **COMMISSIONER VAN COURT:**  Okay.  Well, it's
15   something for you to be thinking about, and that's
16   plans for where you're going to live and who you're
17   going to live with and the kind of work you're going
18   to do and the possibility of getting assistance from
19   your family (inaudible) other job offers.  So in case
20   this job is not exactly what you want, you could
21   possibly get a new job.  So those are all things that
22   (inaudible).  These, of course, (inaudible).  Okay.
23   And with that, I'll return to the Chairman.
24   **PRESIDING COMMISSION KOENIG:**  Mr. Foster, do
25   you have questions?
26   **DEPUTY COMMISSIONER FOSTER:**  No, not at this
27   time, thank you.

30

1      **PRESIDING COMMISSION KOENIG:**  Mr. Van Court, do

2  you have questions?

3      **COMMISSIONER VAN COURT:**  No, I have no

4  questions.

5      **PRESIDING COMMISSION KOENIG:**  Deputy District

6  Attorney, questions?

7      **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**  Several.

8  What sort of employment history did the inmate have

9  before (inaudible).

10     **PRESIDING COMMISSION KOENIG:**  Where did you

11  work before you did the crime?

12     **INMATE SHEPPARD:**  What did I do first?

13     **PRESIDING COMMISSION KOENIG:**  Yeah, what kind

14  of employment history?

15     **INMATE SHEPPARD:**  I had no employment in

16  California.  Just dealing drugs.

17     **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**  And

18  secondly, what plans, if any, did he have for

19  supporting the child while he was in prison?

20     **INMATE SHEPPARD:**  (Inaudible).

21     **PRESIDING COMMISSION KOENIG:**  (Inaudible).

22     **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**

23  (Inaudible).

24     **PRESIDING COMMISSION KOENIG:**  (Inaudible).

25     **ATTORNEY DIAMOND:**  Are you responsible for this

26  crime in any way?

27     **INMATE SHEPPARD:**  Yes, I'm responsible.

31

1       **ATTORNEY DIAMOND:**  How are you responsible for

2    this crime?

3       **INMATE SHEPPARD:**  I'm responsible for the fact

4    that we (inaudible) drugs to Mr. (inaudible).

5       **ATTORNEY DIAMOND:**  When I look at your record

6    (inaudible) all the reports, it seems that you changed

7    for some reason around 1990.  It seems that that was

8    your last serious 115 and (inaudible) self-help and

9    everything else.  What happened in 1990 that changed

10   things?

11      **INMATE SHEPPARD:**  (Inaudible) I realized that I

12   had to be counted for myself because I was (inaudible)

13   inside of myself.  That (inaudible) I had a son and a

14   daughter that I (inaudible) for them.  Before I was

15   committed to myself, just (inaudible) realized that

16   everything I do, not only affects me, but it affects

17   my daughter, my wife, my mother, and everyone else

18   that (inaudible).

19      **ATTORNEY DIAMOND:**  Did you go to AA or

20   (inaudible)?

21      **INMATE SHEPPARD:**  Yes.

22      **ATTORNEY DIAMOND:**  How long have you been

23   going?

24      **INMATE SHEPPARD:**  (Inaudible) started up here

25   as to (inaudible).

26      **ATTORNEY DIAMOND:**  Did you take it seriously?

27      **INMATE SHEPPARD:**  Yes, I did.

32

1    **ATTORNEY DIAMOND:**  When you get out on the

2    street, are you going to continue with that AA or NA?

3    **INMATE SHEPPARD:**  Well, that will be part of my

4    (inaudible) I have to (inaudible).

5    **ATTORNEY DIAMOND:**  Well, but for you.

6    **INMATE SHEPPARD:**  Yes.

7    **ATTORNEY DIAMOND:**  I mean, do you have any

8    doubt that you're going to go?

9    **INMATE SHEPPARD:**  I don't have any doubt that I

10   will go.  But as of now, I have been made to decide

11   that drugs are no longer part of my life.  And that

12   (inaudible) really stays (inaudible) ability.  I don't

13   think I'll have any problems with (inaudible).

14   **ATTORNEY DIAMOND:**  How long were you in

15   California before this happened?

16   **INMATE SHEPPARD:**  I came to California in

17   November 7.

18   **ATTORNEY DIAMOND:**  (Inaudible) when this

19   happened?

20   **INMATE SHEPPARD:**  December 21st, I was arrested

21   for it.

22   **ATTORNEY DIAMOND:**  So they asked you if you

23   worked in California and honestly you hadn't worked in

24   California.  What did you do in New York?

25   **INMATE SHEPPARD:**  (Inaudible) had an arcade for

26   kids and I had (inaudible).

27   **ATTORNEY DIAMOND:**  Did you work?

33

1        **INMATE SHEPPARD:**  (Inaudible) store
2    (inaudible).
3        **ATTORNEY DIAMOND:**  For how long did you own a
4    store?
5        **INMATE SHEPPARD:**  I owned the store for
6    (inaudible) '77 until I left it.
7        **ATTORNEY DIAMOND:**  So about (inaudible) years.
8    So you had an employment history.
9        **INMATE SHEPPARD:**  (Inaudible).
10       **ATTORNEY DIAMOND:**  Did you ever work as a
11   carpenter?
12       **INMATE SHEPPARD:**  No.
13       **ATTORNEY DIAMOND:**  No, okay.  I have no further
14   questions.
15       **PRESIDING COMMISSION KOENIG:**  (Inaudible) come
16   to California?
17       **INMATE SHEPPARD:**  I came to California to try
18   and (inaudible) drugs, dealing with what I had in
19   California and New York.
20       **PRESIDING COMMISSION KOENIG:**  You got a warrant
21   here for your arrest.
22       **INMATE SHEPPARD:**  Yes.
23       **PRESIDING COMMISSION KOENIG:**  You had two
24   trials in this, (inaudible)?
25       **INMATE SHEPPARD:**  Yes.
26       **PRESIDING COMMISSION KOENIG:**  You had 24 people
27   that found you guilty.

34

1        **INMATE SHEPPARD:**  Yes.

2        **PRESIDING COMMISSION KOENIG:**  The gun, where

3    did you get the gun?

4        **INMATE SHEPPARD:**  I received the gun from

5    Jhamal's (inaudible).

6        **PRESIDING COMMISSION KOENIG:**  For what reason?

7        **INMATE SHEPPARD:**  (Inaudible) California, hung

8    out in the bars.  And I just (inaudible) protection.

9        **PRESIDING COMMISSION KOENIG:**  Why?

10        **INMATE SHEPPARD:**  (Inaudible).

11        **PRESIDING COMMISSION KOENIG:**  (Inaudible).

12        **DEPUTY DISTRICT ATTORNEY BRAUGHTON:**  I noted

13    that in one of your conversations with the inmate that

14    he mentioned to you that (inaudible), it's sort of a

15    conflict of the fact of a positive urinalysis and

16    (inaudible).  Mr. Foster questioned (inaudible)

17    summary and recommendations, but I would refer you to

18    the top part of that page, alcohol (inaudible).  The

19    psychiatrist says that he was a heroin addict at age

20    17 and (inaudible).  Early in his incarceration, he

21    had a CDC 115 for attempting to smuggle (inaudible) in

22    prison and a positive urinalysis for marijuana.  I

23    suppose that might have been (inaudible) psychiatrist.

24    But the inmate was still involved with drugs in prison

25    (inaudible).  But in any event, that's certainly not a

26    glowing recommendation (inaudible) psychiatric

27    recommendation and the psychiatrist doesn't

35

1    (inaudible).  However, I do note that the past

2    performance of the inmate on the outside, starting at

3    age 10, was just a succession of criminal violations,

4    one right after the other.  Handled as a juvenile and

5    it didn't do any good.  Somebody then (inaudible)

6    army.  It was certainly a dirty trick on the army

7    because he gets in there and winds up doing a robbery

8    and getting a bad conduct discharge (inaudible) two

9    years in the military prison.  He goes to prison in

10   New York and has a warrant outstanding for him.  He

11   would have probably gone again except he got in

12   trouble in California for murder.  He's had two trials

13   on that.  Both of the juries have convicted him of

14   (inaudible) premeditated murder.  That's exactly what

15   it was.  Any gains that he's made in prison, if they

16   are real, the psychiatrist questions whether they are

17   or not, are recent.  I would ask that you keep that in

18   mind and (inaudible) respectfully that he's not

19   suitable for parole.

20        **PRESIDING COMMISSION KOENIG:**  Counsel.

21        **ATTORNEY DIAMOND:**  I think the important thing

22   about the psychiatric report is that it's totally

23   invalid and the reason is because you can't spend ten

24   minutes and write those types of conclusions.  He's

25   (inaudible).  Dr. Criswell, again, (inaudible).  I

26   think there's no doubt whatsoever, he had a lengthy

27   criminal history.  There's no doubt whatsoever and by

36

1    his own admission he was involved in all kinds of

2    narcotics and drugs.  But I think what you have to

3    look at is that, again, for whatever reason, right

4    around 1990, which is again eight years ago, there was

5    a change in his life and that's something that nobody

6    can deny.  And it's interesting also -- First of all,

7    I do want (inaudible) right away.  I don't know if the

8    counselor has (inaudible).  I guess (inaudible)

9    report.  It is an outstanding report.  I wish all the

10   reports were done this way.  It just makes it very

11   clear as to where everybody is and the time-frame.

12   And that's my whole point.  Within this time-frame,

13   when you look at the laudatory work chronos, the

14   education, when you look especially at the self-help,

15   right around 1990, that's when most of this came in.

16   And again, it's too lengthy to even go over.  But if

17   you look at the Gavel Club Therapy Group, the Lifers,

18   the Parolee Recidivism Prevention Program, the

19   Narcotics Anonymous and the different programs, they

20   all happened in 1990 on.  So for whatever reason, at

21   that point Mr. Sheppard made a conscious decision that

22   he was not going to get into any more trouble and he

23   was going to try and improve himself and that's what

24   we ask somebody in his position to do.  Again, he's

25   not denying any of his drug use (inaudible) anything.

26   He's admitting to all that.  But again, looking from

27   1990 on, and I think it's impressive that he's been

37

1   eight years without a 115 and all these courses have

2   come in.  He's doing just an outstanding job.  He

3   really is.  In fact, if he didn't have those 115s, he

4   would look at these -- you would look at this report

5   and all the programs he has done and said that this

6   inmate is a model inmate.  So, I would ask that you

7   keep all that in mind, the declarations.  Again, I

8   think he's definitely on the right path.  There's no

9   doubt about it whatsoever and this is his Initial

10   Parole Hearing.  And I just want you to think about

11   all the positive information.  Thank you.

12        **PRESIDING COMMISSION KOENIG:**  Okay.  Also

13   (inaudible) here?

14        **ATTORNEY DIAMOND:**  Okay.  Well, what is that?

15   Can I ask you a question then?

16        **PRESIDING COMMISSION KOENIG:**  Yes.

17        **ATTORNEY DIAMOND:**  Depending on what it is,

18   (inaudible) and the court (inaudible).

19        **PRESIDING COMMISSION KOENIG:**  Okay.

20        **ATTORNEY DIAMOND:**  (Inaudible) court order and

21   it says that this information is not reliable and

22   cannot be used.

23        **PRESIDING COMMISSION KOENIG:**  Thank you.

24        **ATTORNEY DIAMOND:**  In fact, this should have

25   been removed from his file.

26        **PRESIDING COMMISSION KOENIG:**  Okay, thank you.

27   Okay.  Do you want to tell us why you're eligible for

38

1    -- or should be paroled?

2         **INMATE SHEPPARD:**  I think I should be paroled

3    for the simple fact that, since I've been

4    incarcerated, I have come to terms with myself and

5    realize where I've been and where I'm going.  I am no

6    longer the same person that I was back in 1981.  I've

7    matured over the years.  I've acquired new skills to

8    be consistent in the patterns of becoming of a manager

9    of business once I'm released.  And I have been

10   working towards that goal and understanding myself and

11   (inaudible) just myself.  And on the way, I've also

12   been giving back and tutoring other inmates

13   (inaudible) that's less fortunate than I was, on why

14   not to be (inaudible) make the same mistake that I

15   have made.  And I think if I (inaudible) get out, I

16   think that I will be an asset to some community

17   (inaudible).

18        **PRESIDING COMMISSION KOENIG:**  Okay, we're going

19   to recess.  The prisoner may leave.  We'll call you

20   back.

21                    R E C E S S

22                    --o0o--

23

24

25

26

27

39

1        **CALIFORNIA BOARD OF PRISON TERMS**

2            **D E C I S I O N**

3        **PRESIDING COMMISSION KOENIG:**  We've reconvened

4    the Panel hearing on Irving Sheppard.  All

5    participants are present who were present prior to the

6    recess.  The Panel unanimously finds the prisoner

7    unsuitable for parole.  We do feel he would pose an

8    unreasonable risk of danger to society if released at

9    this time for the following reasons.  Number one, the

10   violent crime the prisoner committed.  It's a crime

11   where the prisoner shot and killed the victim because

12   of a drug debt.  The victim was shot several times in

13   the head.  The prisoner then left the state to avoid

14   prosecution, flying to South Carolina.  It's noted

15   that the prisoner was fleeing a felony warrant -- a

16   felony warrant out of New York State for the sale of

17   cocaine when he came to California (inaudible).  **The**

18   **second** reason is the prior social factors and

19   criminality.  It's noted that the prisoner became

20   involved in drugs at an early age, which became -- and

21   he also began dealing drugs.  It's noted that the

22   prisoner was -- had a bad discharge, a bad conduct

23   discharge from the military because of being absent

24   without leave and robbery.  The prisoner began

25   criminality at an early age.  (Inaudible) several

26   other violations at the time up and to the instant

27   **IRVING SHEPPARD    C-34952    DECISION PAGE 1    3/12/98**

40

1    offense.  Stealing a bike, auto theft, also grand

2    larceny, stolen property, and a rape arrest with

3    (inaudible).  As an adult, he had theft and robbery

4    (inaudible) also had a bad -- and received a bad

5    conduct discharge from the army.  Was arrested for a

6    controlled substance and he served two prior prison

7    terms, one in New York and also one federal prison

8    term (inaudible).  The third reason is his lack of

9    programming in the institution.  It's noted we commend

10   the prisoner for his programming in the various areas

11   that he has programmed in, particularly in the self-

12   help group and his educational area.  Although he

13   states he's sufficient in the computer area, he does

14   not have a completion of a vocation (inaudible)

15   institution.  We note that he has received six 115s,

16   the latest (inaudible) 1995, May of '95.  A serious

17   one, a prior serious one was September 1990,

18   (inaudible).  Although the CC-I gave a positive

19   report, (inaudible) and also the psych report by

20   Criswell are generally positive, I think the report by

21   the Doctor and the question he asks.  In reviewing it,

22   and I don't know where he got it, but reviewing the

23   confidential file, it makes sense.  The Doctor says

24   that the prisoner rehabilitated -- is a prisoner

25   (inaudible) rehabilitated inmate (inaudible) self by

26   being in numerous programs to better himself and who

27   **IRVING SHEPPARD    C-34952    DECISION PAGE 2    3/12/98**

41

1    has maintained a good disciplinary record, or is he a

2    clever psychopath who has used the opportunity

3    afforded by participation in these various work and

4    education programs to further his success in dealing

5    drugs in the prison system.  And that's a very strong

6    possibility.  The Panel finds that when we consider

7    the violent crime the prisoner committed, when we

8    consider his prior -- his (inaudible) in New York

9    prior to that and he came to California to avoid

10   arrest and prosecution, when we consider his drug

11   involvement and dealing drugs, his prior criminality

12   which began at an early age, the fact that he was

13   convicted by two juries, 24 people, and society's

14   previous attempts to correct his criminality each

15   failed with two prior prison terms, when we consider

16   his need for additional programming in the

17   institution, there is absolutely no reason to believe

18   that the prisoner would behave differently if released

19   from prison.  In a separate decision, the Panel finds

20   it is not reasonable to expect that the prisoner would

21   receive a parole date in the following three years.

22   It's a three year denial.  The reasons are the crime

23   he committed, his prior social factors, his

24   criminality and the lack of sufficient programming.

25   In the ensuing three years, we ask that the prisoner

26   remain disciplinary free, that he upgrade in the

27   **IRVING SHEPPARD    C-34952    DECISION PAGE 3    3/12/98**

42

1    vocational area, that he continue to participate in

2    self-help and therapy programming, particularly AA and

3    the 12 steps.  This concludes the hearing.  Good luck

4    to you.

5            INMATE SHEPPARD:  (Inaudible).

6            PRESIDING COMMISSION KOENIG:  Yes, you may.

7    And to answer your questions, there is other

8    confidential information in there which connects the

9    prisoner to drug dealing within the institution

10   besides the theft and besides that.  Thank you.  This

11   concludes the hearing.  If you're dealing drugs, you

12   better knock it off or you'll never get out.  All

13   right.

14                        --o0o--

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED THREE YEARS

26   EFFECTIVE DATE OF THIS DECISION_____MAY 1 2 1998_____

27   IRVING SHEPPARD    C-34952    DECISION PAGE 4    3/12/98

43

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, WENDY J. DIPPOLD, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 42, and which recording was duly recorded at HIGH DESERT STATE PRISON at SUSANVILLE, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING OF IRVING SHEPPARD, CDC Number C-34952, on March 12, 1998, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated March 31, 1998, at Sacramento, California.

Wendy J. Dippold
Transcriber
**CAPITOL ELECTRONIC REPORTING**

IRVING SHEPARD C-34952
P. O. Box 4000 /23-A-64
VacaVille, CA. 95696-4000

LEGAL MAIL

CSP-SOLANO

RECEIVED
AUG 19 2008
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


INSPECTED BY
AUG 19 2008
U.S. MARSHALS SERVICE

INSPECTED BY
AUG 19 2008
CALIFORNIA STATE PRISON-SOLANO
U.S. MARSHALS SERVICE

TO: The Clerk of the Court
Northern District Court
450 Golden Gate Avenue
San Francisco, CA. 94102

CSP SOLANO
STATE PRISON


PRIORITY
MAIL
UNITED STATES POSTAL SERVICE ™
LABEL107R, OCT 1997     www.usps.gov